LAW OFFICES OF STEVEN L. WITTELS, P.C.
Steven L. Wittels
J. Burkett McInturff
18 HALF MILE ROAD
ARMONK, NEW YORK 10504
Telephone: (914) 319-9945
Facsimile: (914) 273-2563
slw@wittelslaw.com
jbm@wittelslaw.com

*Attorneys for Plaintiffs and the Class*

**CV 13      4427**

SUMMONS ISSUED

GARAUFIS, J.

LEVY, M.J.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MARGARITA DELGADO AND WILLIAM SHEPPARD,

Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

OCWEN LOAN SERVICING, LLC, OCWEN MORTGAGE SERVICING, INC., OCWEN FINANCIAL CORPORATION, RONALD M. FARIS, SCOTT W. ANDERSON, CROSS COUNTRY HOME SERVICES, INC., HOMESURE OF AMERICA, INC., HOMESURE SERVICES, INC., HOMESURE PROTECTION OF CALIFORNIA, INC., HOMESURE OF VIRGINIA, INC., JOSEPH INCANDELA, SANDRA FINN, and "JOHN DOES 1-10,"

Defendants.

---

*CLASS ACTION COMPLAINT*

*JURY TRIAL DEMANDED*

## TABLE OF CONTENTS

Pages

OVERVIEW OF DEFENDANTS' UNLAWFUL CHECK SOLICITATION
SCHEME AND RICO ENTERPRISE .................................................................................1

JURISDICTION AND VENUE ........................................................................................... 4

PARTIES ............................................................................................................................. 5

FACTUAL ALLEGATIONS .............................................................................................. 9

   I.     THE CHECK SOLICITATION ENTERPRISE.............................................................9

          A. The Loan Servicer/Debt Collector: Ocwen Defendants .................................9

          B. The Home Warranty/Maintenance Plan Actors: Cross Country Defendants ..............10

   II.    HOW DEFENDANTS' CHECK SOLICITATION ENTERPRISE WORKS .................10

          A. The Home Warranty/Service/Maintenance Plans .........................................10

          B. Overview of the Check Solicitation Scheme and Enterprise .........................11

          C. The Misleading Check Envelope ...................................................................13

          D. The Misleading Checks...................................................................................15

          E. The Solicitation Pitch.....................................................................................18

          F. The So-Called 30-Day Cancellation Period...................................................21

          G. The Enterprise's Billing Practice ..................................................................22

          H. Defendants Know that Consumers Don't Use the Plans, and Have
             Complained About Being Cheated ..................................................................23

  III.   HOW DEFENDANTS' CHECK SOLICITATION SCHEME
       MISLED THE DELGADO PLAINTIFFS ..................................................................25

          A. Defendants Send the Delgados a $2.50 Solicitation Check ...........................25

          B. Defendants' Misleading Billing to Plaintiffs ................................................26

          C. Defendants Give Plaintiffs the Run-Around and Refuse to
             Refund the Fees Collected For their "Plan"...................................................27

CLASS ACTION ALLEGATIONS ................................................................................... 28

COUNTS............................................................................................................................ 31

   COUNT I – NEW YORK GENERAL BUSINESS LAW § 349 ................................... 31

   COUNT II – RACKETEER INFLUENCED AND CORRUPT
   ORGANIZATIONS ACT 18 U.S.C. § 1962(c) ........................................................... 33

i

COUNT III – RACKETEER INFLUENECED AND CORRUPT
ORGANIZATIONS ACT, CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(d)................... 38

COUNT IV – UNJUST ENRICHMENT................................................................................ 39

COUNT V – BREACH OF FIDUCIARY DUTY ................................................................ 40

COUNT VI – FAIR DEBT COLLECTION PRACTICES ACT
15 U.S.C. § 1692 *ET SEQ.* ................................................................................................ 41

PRAYER FOR RELIEF ........................................................................................................ 42

Plaintiffs Margarita Delgado and William Sheppard ("Plaintiffs" or the "Delgados"), by their undersigned attorneys, Law Offices of Steven L. Wittels, P.C. and The Roth Law Firm, PLLC, sue in their individual and representative capacity on behalf of a class of persons defined below, against Defendant Ocwen Loan Servicing, LLC, Defendant Ocwen Mortgage Servicing, Inc., Defendant Ocwen Financial Corporation, Defendant Ronald M. Faris, and Defendant Scott A. Anderson (collectively "Ocwen" or "Ocwen Defendants"); Defendant Cross Country Home Services, Inc., Defendant HomeSure of America, Inc., Defendant HomeSure Services, Inc., Defendant HomeSure Protection of California, Inc., Defendant HomeSure of Virginia, Inc., Defendant Joseph Incandela, and Defendant Sandra Finn (collectively "Cross Country" or "Cross Country Defendants"); and Defendants "John Does 1-10," and hereby allege the following with knowledge as to their own acts, and upon information and belief as to all other acts:

## OVERVIEW OF DEFENDANTS' UNLAWFUL
## CHECK SOLICITATION SCHEME AND RICO ENTERPRISE

1.     Plaintiffs bring this class action to stop Defendants from charging unwarranted fees to Ocwen Loan Servicing's mortgage customers whom they deceptively enroll in annual home warranty and service plans. Using the playbook of a similar "check solicitation" scheme deemed fraudulent by attorneys general across the country, Ocwen, the nation's largest subprime loan servicer, has teamed up with Cross Country Home Services, Inc. to take advantage of Ocwen's unsuspecting mortgage customers.

2.     To deceive homeowners into enrolling in the home warranty and service plans,[1] Defendants mail Ocwen's customers checks for $2.50 (or comparable low sums) that a reasonable consumer thinks is a refund or rebate on their mortgage. The checks also come with solicitation pitches that invite mortgage customers to "cash or deposit" the checks so they "can

---

[1] While not at all apparent from Defendants' check solicitations, upon information and belief Defendants' home warranty and service plans purport to extend warranties on home appliances, and provide discounts for contractors servicing systems such as air conditioning and plumbing.

start saving money right away!" Defendants highlight the "savings" and so-called "benefits" in large print, but hide the "costs" and "exclusions" with small print and confusing descriptions, and omit other downsides entirely. Defendants' check solicitation scheme fails to make clear that by cashing the check customers will be enrolled in home warranty and service plan that substantially increase their monthly mortgage payments.

3. Through their check solicitation scheme, Defendants lock Ocwen's mortgage customers into home warranty and service plans costing upwards of $500 a year for services customers never use because they don't know they are buying them. Defendants also don't provide customers with an agreement or contract to review before "enrolling" them in a plan.

4. The architect of the scheme is Defendant Cross Country, which markets itself to consumer-oriented financial companies such as Ocwen that have large customer bases. Cross Country, a self-described "leading provider of home warranties, home service plans and home maintenance plans," approaches these companies with the promise of a new joint enterprise that can enhance the bottom line. Ocwen was a perfect candidate, as it has more than 600,000 customers in its high-risk loan portfolio worth more than $125 billion. Having found a willing partner, Cross Country engineered a Trojan Horse stratagem for Ocwen to mail out the solicitation checks to homeowners.

5. The envelopes that show up in homeowners' mailboxes prominently display Ocwen's logo, making a reasonable consumer think that the $2.50 is from their loan servicer. The truth is, however, that the Cross Country Defendants are the source of the checks and warranty plans. Once the consumer cashes the check, Cross Country again uses Ocwen for cover. Without identifying Cross Country to any of the newly-enrolled customers, Ocwen bills Cross Country's plan fees as an additional line-item on the homeowners' mortgage bills that Ocwen sends out and collects. This racketeering enterprise – comprised of Cross Country and its

willing partner Ocwen – culminates with the companies dividing up the money collected. (Hereafter the "Racketeering Enterprise")

6.      To compound the wrongdoing, Defendants don't charge the amount listed in their solicitations.  In the Delgado Plaintiffs' case, Defendants represented that Plaintiffs would be charged $44.98 a month for a "warranty" plan.  But in violation of this representation, Defendants billed Plaintiffs $48.72 a month, nearly $4 more.

7.      Further, after consumers are enrolled, Defendant Ocwen's loan notices and escrow statements disguise the charges for Cross Country's plans.  For example, after the Delgado Plaintiffs deposited the $2.50 check, Ocwen sent them a loan notice and escrow statement that included a $48.72 monthly charge for optional insurance.  The Ocwen and Cross Country Defendants know that the plan documents state that they are not insurance, but Defendants send out fictitious notices anyway in order to confuse consumers.

8.      Defendant Ocwen also uses billing statements with confusing terminology about the new charges.  Ocwen billed the Delgado Plaintiffs for something called "Systems MD Gold," thus helping ensure that Ocwen's customers don't realize what they're paying for.

9.      Despite the mortgage servicer's fiduciary duty to act fairly and honestly with its customers, Defendant Ocwen makes no disclosure to them about how it is sharing the new "plan" fees with an outside company.  Instead, Defendants bank on the fact that most of Ocwen's customers – comprised of homeowners who may already be teetering on the edge of financial disaster from their subprime loans – don't realize what's happening.  Defendants' scheme is misleading in multiple ways, including by failing to make adequate disclosures about the reason for the checks or the financial pitfall that lies ahead for consumers who endorse them.

10.     Defendants' scheme constitutes a classic fraud that the Racketeer Influenced and Corrupt Organizations Act ("RICO") is designed to prevent.  Defendants' conducts also

constitutes a consumer fraud in violation of New York's consumer fraud statute, General Business Law ("GBL") §349, and results in unjust enrichment to Defendants. As a mortgage servicer, the Ocwen Defendants violated their fiduciary duty to the Delgado Plaintiffs and all their mortgage clients. Further, as a "debt collector," Ocwen violated the Fair Debt Collection Practices Act ("FDCPA") by billing for and collecting fraudulent charges.

11.     Plaintiffs are typical of the hundreds of thousands of Ocwen customers targeted by Defendants' scheme. Like Ocwen's other customers, Plaintiffs have been misled into paying excessive home warranty and service "plan" charges. Plaintiffs seek to represent a Class of Ocwen customers in New York and throughout the country who enrolled in Cross Country's plans through Defendants' Check Solicitation Scheme.

12.     Only through a class action can Ocwen's customers remedy Defendants' wrongdoing. Because the plan charges are relatively small compared to the much higher cost a single customer would incur in trying to challenge Defendants' conduct, it makes no financial sense for an individual customer to bring legal action. With this class action, Ocwen's customers seek to level the playing field and make sure that companies like Cross Country and Ocwen engage in fair and upright business practices. Plaintiffs therefore seek court-ordered relief requiring that Defendants return to Plaintiffs and the Class all misappropriated plan charges, compensate Plaintiffs and the Class for the damages suffered, and enjoin Defendants from continuing their check solicitation practices.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000.00, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendants.

14.     This Court also has federal question jurisdiction over this matter under 28 U.S.C. §1331 because the action arises under RICO, 18 U.S.C. §1961 *et seq.*, and the FDCPA, 15 U.S.C §1692 *et seq.* In addition, this Court may exercise supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §1367 because all of the claims arise from a common nucleus of operative facts and are such that Plaintiffs ordinarily would expect to try them in one judicial proceeding.

15.     This Court has personal jurisdiction over Defendants under 18 U.S.C. §1965. The Court also has personal jurisdiction over Defendants because they have sufficient contacts in this jurisdiction, including the check solicitation scheme and enterprise described herein as well as the debt collection activities of the Ocwen Defendants.

16.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(1) & (2). Substantial acts in furtherance of the alleged improper conduct occurred within this District. Plaintiffs reside within this District and were solicited and subjected to Defendants' conduct within this District.

## PARTIES

17.     Plaintiffs **Margarita Delgado and William Sheppard** are married and reside together in Brooklyn, New York. Their home mortgage is serviced by the **Ocwen Defendants**.

18.     **Defendant Ocwen Loan Servicing, LLC** is a mortgage loan servicing company headquartered in West Palm Beach, Florida. It describes itself as a "debt collector" in its communications to its customers.

19.     **Defendant Ocwen Mortgage Servicing, Inc.** is upon information and belief the parent company of Defendant Ocwen Loan Servicing, LLC.

20.     **Defendant Ocwen Financial Corporation** is a publicly traded financial services holding company. Upon information and belief, both Defendant Ocwen Loan Servicing, LLC

and Defendant Ocwen Mortgage Servicing, Inc. are wholly-owned subsidiaries of **Defendant Ocwen Financial Corporation.** Headquartered in Atlanta, Georgia, Ocwen Financial Corporation is engaged in the servicing and origination of mortgage loans.

21.    **Defendant Ronald M. Faris** has been at all relevant times Ocwen's President, Chief Executive Officer, and a Director.

22.    **Defendant Scott W. Anderson** is Ocwen's Executive Vice President in charge of Residential Loan Servicing. According to the Ocwen website: "In 2009, Mr. Anderson assumed the responsibility for managing all of Ocwen's Residential Loan Servicing operations."

23.    Upon information and belief, **Defendants Ocwen Financial Corporation and/or Defendant Ocwen Mortgage Servicing, Inc., Ronald M. Faris** and **Scott W. Anderson** control and direct the business, operations, and strategies of **Defendant Ocwen Loan Servicing, LLC.** (In this complaint, all the corporate and individual **Ocwen Defendants** are collectively referred to as "**Ocwen**," unless otherwise specified).

24.    Defendant **Ocwen** bills itself as "the industry leader in servicing high-risk loans." According to its website, "Ocwen currently services more than $125 billion of customer-care intensive, high risk single-family residential loans, including securitized residential loan servicing (GSE, subprime, ALTA, and second liens), Special Servicing and Interim Servicing." Upon information and belief, Defendant Ocwen services more than 600,000 residential home loans.

25.    Defendant **Cross Country Home Services, Inc.** is headquartered in Fort Lauderdale, Florida, and touts itself as "a leading provider of home warranties, home service plans and home maintenance plans to homeowners across the United States."

26.    Through its "**HomeSure**" subsidiary and/or affiliate companies described below, upon information and belief, **Defendant Cross Country Home Services, Inc.**, "enrolls"

customers in its plans and programs.

27.     **Defendant Joseph Incandela** has at all relevant times been the Chief Executive Officer of Defendant Cross Country Home Services, Inc.

28.     **Defendant Sandra Finn** has at all relevant times been the President of Defendant Cross Country Home Services, Inc.

29.     **Defendant HomeSure of America, Inc.** is a subsidiary of Defendant Cross Country Home Services, Inc.

30.     Upon information and belief, **Defendant HomeSure of America, Inc.** handles "enrollment" for Ocwen's New York customers in Defendant Cross Country's various warranty and home service plans and programs.

31.     **Defendant HomeSure of America, Inc.** is the company that "enrolled" Plaintiffs in a program called the "Systems MD Gold Home Warranty" plan.

32.     **Defendant HomeSure Services, Inc.** is another subsidiary of Defendant Cross Country Home Services, Inc.

33.     **Defendant HomeSure Protection of California, Inc.** is another subsidiary of Defendant Cross Country Home Services, Inc.

34.     **Defendant HomeSure Protection of Virginia, Inc.** is another subsidiary of Defendant Cross Country Home Services, Inc.

35.     Upon information and belief, **Defendant HomeSure Services, Inc.** handles "enrollment" for Ocwen's customers throughout the United States, except in the following states where enrollment is handled by the following Cross Country subsidiaries: in Alabama, Arizona, Florida, Illinois, Iowa, Massachusetts, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oklahoma, South Carolina, Texas, Utah, Vermont, Washington, Wisconsin and Wyoming by **Defendant HomeSure of America, Inc.**; in California by **Defendant HomeSure**

Protection of California, Inc.; and in Virginia and Oregon by **Defendant HomeSure Protection of Virginia, Inc** (collectively the **"HomeSure Companies,"** unless otherwise specified).

36.    **Defendant Cross Country Home Services, Inc., Defendant Joseph Incandela** and **Defendant Sandra Finn** individually and in concert, control and direct the business, operations, and strategies of Cross Country's HomeSure subsidiary and affiliate companies. (In this Complaint, Defendant **Cross Country Home Services, Inc., Defendant CEO Joseph Incandela, Defendant President Sandra Finn**, and all of **Cross Country Home Services, Inc.'s** subsidiary and affiliate **HomeSure Defendant companies** are referred to collectively as "**Cross Country**" or the "**Cross Country Defendants**," unless otherwise specified).

37.    **Defendant Cross Country Home Services, Inc.'s** main "distribution channels" for finding new customers are its "business partners in the mortgage, retail banking, insurance, real estate and utilities industries."

38.    Upon information and belief, the **Cross Country Defendants** sought out the **Ocwen Defendants** as business "partners" for their check solicitation scheme.

39.    Upon information and belief, both **Defendant CEO Faris** and **Executive Vice President Anderson** are well familiar with the check solicitation scheme brought to them by the **Cross Country Defendants**. With these executive officers' approval and encouragement, Ocwen has become an integral partner with the Cross Country Defendants in the scheme and enterprise described herein.

40.    Upon information and belief, Defendants "John Does 1-10" are currently unknown participants, actors and/or co-conspirators in Defendants' check solicitation scheme and enterprise, who will be identified and added as additional Defendants after sufficient discovery is conducted.

## FACTUAL ALLEGATIONS

### I.      THE CHECK SOLICITATION ENTERPRISE

#### A.      The Loan Servicer/Debt Collector: Ocwen Defendants

41.      Defendant Ocwen Loan Servicing is the largest servicer of subprime mortgage loans in the country.  Servicers like Ocwen get paid by loan owners, typically banks or investors, to collect mortgage payments and handle delinquencies and foreclosures.  Ocwen sends out monthly invoices to mortgagors demanding payment for principal, interest, insurance and other sums owed by the homeowner.

42.      The Company has grown substantially during the past few years, buying up tens of billions of dollars of loan portfolios from other banks and institutions.  In 2011, Ocwen began servicing the Delgado Plaintiffs' mortgage when it purchased a loan portfolio valued at approximately $41 billion from Goldman Sachs that included the Delgado's mortgage. (Goldman had previously acquired the portfolio from Litton Loan Servicing in 2007).  A recent report from *Inside Mortgage Finance* states that Ocwen serviced $439.25 billion worth of loans in the first quarter of 2013, more than double the $193 billion it serviced in the fourth quarter of last year.

43.      Loan servicing companies have increasingly replaced traditional lending sources, such as banks and savings and loans, as the collection agents of mortgage loans.  No longer do homeowners take out a mortgage from these traditional sources and deal with just that one company over the life of the loan.  Rather the loans are typically combined with other loans and sold as securities, i.e. securitized, and increasingly managed by third-party servicers like Ocwen, which have no direct connection with homeowner-mortgagors.

**B.      The Home Warranty/Maintenance Plan Actors: Cross Country Defendants**

44.      Defendant Cross Country Home Services, Inc. is a Fort Lauderdale-based operation in the business of marketing and selling appliance warranty plans, homeowner repair/referral plans, and related maintenance plans.  The Company, which operates through a web of subsidiary and affiliate companies and "brands" which it controls, describes itself as "one of the largest home warranty and home services companies in the United States."

45.      Cross Country boasts that its revenues have more than doubled in the past five years.  One reason for the growth is undoubtedly its enterprising business plan.  The company significantly expands its pool of potential "customers" by teaming up with consumer finance companies like mortgage servicers and retail banks that have large homeowner customer bases.  Promising companies like Ocwen a surefire way to increase the bottom line, Cross Country uses the other companies' brands to market its wares to the new partners' customers.  Cross Country Home Services ("CCHS") tells potential partners that its "add-on products … increase revenue," and pledges that "CCHS home service plans … create long-term impact to your bottom line."

**II.      HOW DEFENDANTS' CHECK SOLICITATION ENTERPRISE WORKS**

**A.      The Home Warranty/Service/Maintenance Plans**

46.      The scheme starts with the Cross Country Defendants' potpourri of similar home plans and programs (hereafter the "plans").  Using confusing names for the plans that reveal little about what they entail, Defendants rely on the likes of Ocwen for the target list of customers to solicit.  Plaintiffs fell victim in late summer 2011 to the plan Cross Country called "Systems MD Gold Home Warranty."

47.      Like the warranty plan Defendants enrolled Plaintiffs into, all of the Cross Country plans have exclusions and restrictions that are not readily apparent from the check solicitations sent to potential customers.  Regardless of the plan, the scheme starts with a

confusing and misleading check arriving in the homeowner's mailbox. After Plaintiffs realized that they'd been misled and canceled the plan a year later, Defendants mailed Plaintiffs additional check solicitations. (Complete copies of the solicitations for Defendants' "Referral Assistant 24" plan and "Systems MD Gold Home Service Plan" are attached to this Complaint as an exhibit and incorporated herein by reference). Knowing that homeowners won't closely examine the solicitation and realize that by depositing the check they are indebting themselves to Ocwen and its hidden partner Cross Country, Defendants use the check solicitation tactics for all their plans.

**B.      Overview of the Check Solicitation Scheme and Enterprise**

48.      The checks Defendants sends Ocwen homeowners are typically for $2.50 and made out to the homeowner directly. Ocwen sends the checks with its name as the return addressee on the envelope. The outside of the envelope also announces in big, bold letters "**CHECK ENCLOSED**," and fails the make the disclosures necessary for a reasonable consumer to understand that it is not his/her mortgage company which is sending a rebate or refund check.

49.      Compounding the misleading nature of the check is an accompanying solicitation pitch for a home "plan" that highlights the purported savings customers will enjoy. Unfortunately for consumers, the pitch fails to clearly and conspicuously disclose material information about the plan's limitations.

50.      Defendants' entire check solicitation scheme from the check itself to the solicitation pitch accompanying the check is likely to mislead a consumer acting reasonably under the circumstances and is part of Defendants' ongoing racketeering enterprise designed to sign up Ocwen's customers for plans they don't understand and don't really need. The following

summarizes the deceptive acts that constitute Defendants' consumer fraud and Racketeering Enterprise:

i.    the check envelopes are deceptive – because they are sent with Ocwen's name as the sender on the envelope, and fail to make the disclosures necessary for the homeowner to understand that the check inside is not a refund or rebate related to a customer's mortgage payment;

ii.    the checks confound a reasonable consumer's expectations – consumers who cash checks expect to be getting money, not obligating themselves to pay someone else money;

iii.    the checks contain confusing language in small print;

iv.    the checks contain misleading and conflicting language – the front states that by endorsing the check the customer has "purchased" a warranty for $2.50, while the reverse of the check contains contradictory language in small print;

v.    the check is accompanied by a solicitation pitch that hypes the savings of the plan in large bold letters while burying the caveats in confusing language and small typeface;

vi.    Defendants fail to provide customers with a plan "agreement" containing all material terms *before* locking them in to the annual plan;

vii.    Defendants falsely assure customers they have a 30-day window within which to cancel the plans – but Defendants have an undisclosed policy of not providing customers any information about the plans at all, or if they do, delaying the information at least 7-10 days (or more) after the check is cashed – thus negating the promised 30-day review period;

viii.   Defendants' billing invoices are unclear and omit a clear and adequate description of what is being billed for;

ix.   Defendants have an undisclosed policy of not billing for the new plan until 1 or 2 mortgage payment cycles later – confusing customers with cryptic add-on charges in their mortgage statements that make no reference to the customer having been enrolled in a Cross Country plan, or the fact that one of the prime beneficiaries of the higher monthly mortgage payments is a third-party called Cross Country;

x.   Defendants charge more than the amounts listed as the cost of the plans; for example, the "MD Gold" plan should have cost Plaintiffs $44.95 month, but Defendants instead charged $48.72 per month;

xi.   Defendants fail to inform consumers that Ocwen and Cross Country are dividing the fees as part of their joint Enterprise;

xii.   Defendants' misrepresent the benefits of the plans – Defendants know that most Ocwen customers don't use the plans or understand that they've even been enrolled in one; and

xiii.   the entire check solicitation scheme is designed to increase customers' mortgage costs without the homeowner realizing it.

**C.   The Misleading Check Envelope**

51.     Defendants entice Ocwen customers into one of the plans by misleading customers as to the originator of the checks. On the outside of the envelopes "OCWEN" is written in large letters as the sender, together with the company's large logo, an oversized "O". By using the name OCWEN on the outside of the envelopes, Defendants conceal the source of

the checks and create a misleading impression to Ocwen's customers as to the reason for the check.

52.     The form envelope Defendant uses for its "Referral Assistant 24" plan is a prime example.  The mailer envelope containing the solicitation check for this plan is reproduced as follows:



53.     The sender listed on the envelope is OCWEN, including a Post Office box number and Fort Lauderdale return address.  The envelope states in large bold letters that there is a **"Check Enclosed"** which has been "issued" directly to the addressee.

54.     What the envelope fails to disclose is that the check is not actually from Ocwen.  Upon information and belief, the return Fort Lauderdale address belongs to Defendant Cross Country, and the true source of the check funds is also Cross Country, not Ocwen.  Defendants have deliberately conspired to create the misleading impression that the check is from OCWEN, and thus mortgage-related.  Upon information and belief, Defendants send the same or similar misleading envelopes with OCWEN listed as the sender in all their check solicitations to Ocwen's customers.

**D.    The Misleading Checks**

55.    The checks Defendants send with the solicitations also contain misleading fine print. The virtually identical fronts of the checks for the Delgado Plaintiffs' "Systems MD Gold Home Warranty" plan and "Referral Assistant 24" plan are reproduced as follows:





56.    **The Front of the Checks**: The maker's name on the left side of the check is "CCHS," above a Fort Lauderdale address. The "authorized signature" on the check is

indecipherable as to who the signatory is. With a Fort Lauderdale return address on both the envelope and the check and no clear indication that CCHS is a separate business, an Ocwen customer reasonably assumes that CCHS is simply another name for Ocwen, or a related entity. The checks thus are likely to mislead reasonable consumers into believing that they are receiving some kind of refund or rebate from their mortgage company.

57.     On the right side of the check, underneath the date, is the name Bank of America, and then below that in small font is written: "By cashing or depositing this check, you are purchasing the annual Systems MD Gold Home Warranty." Or purchasing the "Referral Assistant 24," or whichever of Defendants' other plans that are activated by cashing the check. With this one line, the checks also are likely to mislead a reasonable consumer into believing that that not only is he or she getting $2.50, but with the check the consumer is also getting a paid-up annual warranty or paid-up annual membership plan. There is no caveat in the language. Defendants omit any warning language, symbol or footnote on the check front to alert consumers that accepting the check will result in additional recurring monthly charges.

58.     The legal definition of a check is:

*A written order instructing a bank to pay upon its presentation to the person designated in it, or to the person possessing it, a certain sum of money from the account of the person who draws it.*

http://legal-dictionary.thefreedictionary.com/check.

59.     The average consumer, familiar with checks since first learning the rudiments of banking, expects a check to come in a standard form bereft of fine print. As dictionary definitions concur, a check is "*a written order, usually on a standard printed form, directing a bank to pay money.*" http://dictionary.reference.com/browse/check.

60.     By cashing or depositing the check, all that the ordinary and reasonable customer understands is that he/she will be paid a certain sum. As the Merriam-Webster dictionary

16

succinctly puts it:  a check is "a *written order directing a bank to pay money as instructed*." http://www.merriam-webster.com/dictionary/check.  Black's Law Dictionary is the same: "[a] draft signed by the maker or drawer, drawn on a bank, payable on demand, and unlimited in negotiability.  BLACK'S LAW DICTIONARY (9th ed. 2009).

61.     **The Back of the Checks**:  The only thing highlighted on the back of Defendants' solicitation checks is the signature line in bold print, next to big bold-faced "X" which states as follows:

**X** _____

**Signature of payee required for processing.**

62.     The legal definition of a "payee" is "[o]ne to whom money is paid or payable." BLACK'S LAW DICTIONARY (9th ed. 2009).  Thus, any reasonable Ocwen customer expects that by endorsing Defendants' check, they are the "[o]ne to whom money is paid," not Defendants.

63.     Designed with an entirely different purpose, however, the Defendants' checks contain fine print intended to obligate Ocwen's customers to a recurring monthly fee simply by virtue of cashing the check.  The back of the check Plaintiff Mr. Sheppard endorsed, which contains miniscule print describing a "$44.95 per month" automatic charge, is reproduced as follows:



64.     Defendants well know that Plaintiffs and Ocwen's customers do not expect the back of checks sent from their mortgage company to be out of the ordinary.  Yet in furtherance of their consumer fraud and Racketeering Enterprise, Defendants fail to clearly and conspicuously disclose that the check will not be a "savings" for customers as the solicitation pitch claims, but rather will be a high "cost."

**E.     The Solicitation Pitch**

65.     Defendants send the checks accompanied by misleading solicitation pitches promoting the savings and benefits customers will supposedly receive by cashing the checks. These pitches, virtually uniform in proclaiming that the checks' purpose is to "pay you" and create "savings" for customers, all omit to clearly and conspicuously disclose the hidden cost of accepting the check, or the way to avoid the hidden costs.

66.     For example, the annual "Systems MD Gold Home Service" solicitation Defendants sent Plaintiff Mr. Sheppard has a separate fold-out box right above the check, all but demanding in oversized bold typeface that Mr. Sheppard cash the check.  The check and box are reproduced on the following page:



67.    Defendants' solicitation pitch to Mr. Sheppard for the Systems MD Gold plan continued on other attached fold-out sheets with more exhortations to cash the check ASAP, as follows:

**The enclosed Check is made out <u>in your name</u>.**

It's yours to cash so please **do not throw it away.**  Bring it to your bank by May 31, 2013, sign the back and get your $2.50 instantly.

**Get the protection you need**

                                        ***

19

See how much money you can save with Systems MD Gold and start by cashing the attached Check by May 31, 2013!

Sincerely,
Sandi Finn
President
Systems MD Gold

68.     The Referral Assistant 24 check Defendants sent to Plaintiffs comes with a similar fold-out solicitation pitch in large font.  Like all of the Defendant Enterprise's pitches, this one emphasizes the need to cash the check quickly so Plaintiffs can start "saving," as follows:

## Everyday Savings and Security for Valued Mortgage Customers.

## Simply cash or deposit the attached check and we'll pay you to see for yourself the rewards and benefits of Referral Assistant 24.

69.     The solicitation pitch continues as follows in bold large type:

**Do not send us a dime to try the Referral Assistant 24 benefits for yourself**

**Just cash or deposit your check** to get $2.50 instantly and activate the benefits of Referral Assistant 24

**A $2.50 check…$40 cash back for gas…**
**Over $1,600 in instant discounts and money back…**

**Over $1,600 in savings – at your fingertips**

**Cash or deposit your check today** so you can see how quickly Referral Assistant 24 can pay for itself and save you time and money – over and over again.

\* \* \*

**The attached check and all of Referral Assistant 24's benefits are designed to help make your life easier and save you money.  So cash or deposit your check by 6/30/13 so you can start saving money right away!**

20

70.     Upon information and belief, all of Defendants' check solicitations are substantially similar.  The solicitation pitches typically include a chart or graphics which further paint a rosy but misleading picture of what customers can expect in the way of savings.  All solicitations have confusing and barely legible tiny footnotes which contain or refer to disclaimers and limitations that drastically reduce the supposed benefits of the plans.  For example, the $40 cash back the Referral Assistant solicitation highlights (above), is not real money, but comes in the form of certificates that can only be redeemed in $10 increments, with only one certificate redeemable per calendar quarter.  The solicitation gives no information about how to obtain a redemption.

71.     Other footnotes in some solicitations refer to "terms, conditions and limitations" of the plans, but these terms are not contained in the actual solicitation.  Customers need to wait for arrival of a separate "service agreement" or "membership materials" before they can review any such terms.  The Delgado Plaintiffs, however, never received any agreement or membership materials, and upon information and belief, neither do many other customers whom Defendants enroll in the plans.  Defendants' policy of not providing the plans' terms, conditions, and limitations to prospective customers before enrolling Ocwen's customers is likely to mislead reasonable consumers.

**F.      The So-Called 30-Day Cancellation Period**

72.     The back of the checks and solicitation pitches typically state that customers have 30 days to both try out their plans and cancel them from "the date the check is cashed or deposited."  But customers cannot review their so-called "savings and benefits" during this 30-day window because:

    i.      Defendants have an undisclosed policy of never providing customers with any further information about the plans or how to use them, or if they do send additional information, it doesn't come for at least 7-10 days, or longer;

ii.    Defendants fail to disclose how a customer is supposed to use any of the supposed "benefits" of the plan during the 30 days, as neither the check nor the solicitation pitch provide any information as to who the customer is supposed to contact; and

iii.    Defendants fail to clearly or conspicuously disclose that that during the first 30 days, the plans contain exclusions that limit the customers' ability to even try out the plans.

**G.**    **The Enterprise's Billing Practice**

73.    Integral to Defendants' Enterprise is the billing component, which contains erroneous and/or incomplete descriptions of the new plan charges. The billing on the mortgage statements and in related notices is deceptive and omits the following material information:

i.    customers are billed for more than the sum disclosed in the check solicitation;

ii.    the billing fails to inform customers that Defendant Ocwen is partnering with the Cross Country Defendants to split the "plan" monies received;

iii.    Defendants fail to disclose accurate information on the mortgage billing statements and related escrow statements as to the nature of the new charges; and

iv.    Ocwen's mortgage statements (with the new plan charges) arrive after customers' 30-day review window is over, thus locking in customers for the full year without their having been provided sufficient time to review the new plan.

74.    Because the charges for the new plan are, as the solicitation pitch goes, "conveniently collected with your Ocwen Loan Servicing mortgage payment," the bills are less likely to raise suspicion with customers that the charges are anything different from their regular mortgage costs. Ocwen bills the charges for the new plan as just another line item on its mortgage bills. There is no indication on its monthly mortgage statements that the charge is actually for a product offered by its partner the Cross Country Defendants. Ocwen masks the new charge under vague names, variously calling it "optional insurance" on a customer's Escrow Statement and on an interest change notice. On Plaintiffs' mortgage bill, Defendants abbreviated

the full plan name and billed the $48.72 as an "Optional" line item, describing it as a charge for "Systems MD Gold." By failing to provide a clear and conspicuous description of what "Systems MD Gold" is and not identifying the charge by its full name, Defendants are further able to keep the scheme shrouded in mystery.

75.     Defendants' billing practices are likely to mislead Ocwen's customers about what they are getting billed for, and by whom. If a bill suddenly showed up in an Ocwen customer's mailbox from the Cross Country Defendants – an unknown and unfamiliar company – an Ocwen customer would be much more likely to suspect something was awry and question the charge. But coming from Ocwen, a name already familiar in the consumer's household, the customer is far less likely to notice the new charge and/or question it.

76.     Defendants' billing practices also take advantage of the fact that many Ocwen customers make their mortgage payments by automatic deduction from their bank accounts. Thus, Defendants know these customers have even less incentive to suspect that a new charge has been added to their monthly mortgage bill. Defendants' billing practices has the additional capacity to mislead reasonable customers, who don't expect their mortgage statements to include fees for services or products that don't relate to their mortgages and that they didn't explicitly buy.

**H.      Defendants Know that Consumers Don't Use the
Plans, and Have Complained About Being Cheated**

77.     Defendants are well aware that once "enrolled" via the check solicitation, Ocwen customers:

    i.      don't use the plans because customers are either unaware they are enrolled, or find the plans almost useless due to their exclusions and hidden costs, and/or

    ii.     complain about having been tricked into the plans through the check solicitation scheme.

78. As set forth in the named Plaintiffs' Facts section that follows, the Delgado Plaintiffs were unaware for a year that they were enrolled in a Cross Country plan. Like Plaintiffs, other Ocwen customers have expressed similar outrage about the scheme, including the following thread from the website *Pissed Consumer*:

# Cross Country Home Services - ***!!!!!!!!!

by Anonymous  Jan 30  | Review #: 380352

| 1 of 2 Cross Country Home... Reviews | Next → |
| --- | --- |

Company ----- **Cross Country Home Services**

Location ---- Boise, Idaho

Category ----- Home Security

Views ---- 44

Run from this F'ing company.They are F'ing crooks.

They are violating the Consumer Protection Act and exposing themselves to huge class action. They automaticaly signed me up for $15/mo insurance when I never authorized (written or verbal). This amount was deducted from my account each month until I noticed. They are partners with Ocwen Mortgage (my mortgage servicer).

Ocwen claimed that I authorized this additonal insurance but I never did.

they said that if I failed to respond to the solicitation for service and indicatd that I did not want the service that it was automatically added to my account.This is illegal!!! 770278

 **Wade**
*Jul 19 from Kennesaw, Georgia*

Just happened to me. Ocwen added $54.95 for a home warranty service I never applied for or authorized. I never even heard of Cross Country Home Services.

Ocwen told me to call Cross Country Home Services to dispute it, let's see how that works...
Reply

 **Anonymous**
*Jul 15*

Same thing just happened to me. Ocwen billed me $14.95, but would not talk to me about it. They simply said they are just the ones billing me. They told me to call Cross Country Home Services directly to dispute it. They (CCHS) claimed I mailed them a $2.50 check (the kind made out to you, so, when you deposit it, it signs you up for the service). I never deposited any such check. I told them I wanted to see the check, and the lady told me it'd take 3-4 weeks to have a copy of the check mailed to me. They said they'd do it, but I'm sure that's a lie. (They are just looking to scam
Reply

79.    Upon information and belief, Defendants are on notice of many other similar complaints from customers.

### III.   HOW DEFENDANTS' CHECK SOLICITATION SCHEME MISLED THE DELGADO PLAINTIFFS

### A.    Defendants Send the Delgados a $2.50 Solicitation Check

80.    In or around August 2011, Defendants sent Plaintiffs a solicitation check in the mail for $2.50.  The front of the check contains Mr. Sheppard's name as the payee with his Brooklyn address and is dated August 22, 2011.  Upon information and belief, Defendants sent similar checks to all Ocwen customers for whom Ocwen acts as the loan servicer.

81.    Upon information and belief, the return name on the mailing envelope which contained the check was from Ocwen.  The front of the check bore only the name "CCHS," thus failing to adequately disclose that the check was not from Ocwen.

82.    Mr. Sheppard deposited the check.  Defendants' records show the deposit date as November 23, 2011.  The front of the check gives no indication that after being deposited, Mr. Sheppard would be billed $48 a month for some kind of plan.

83.     Plaintiffs deposited the check unaware that by endorsing the back of the check, Defendants would enroll them in a "Systems MD Gold Home Warranty" plan.

**B.      Defendants' Misleading Billing to Plaintiffs**

84.     After Plaintiffs deposited the check, the billing component of Defendants' enterprise kicked in.  First, Defendants sent Plaintiffs a "notice" on Ocwen letterhead in or about December 20, 2011 which listed new mortgage amounts that would be due as a result of an interest rate change on their loan.  The notice included a line item for "Optional Ins." (Insurance) of $48.72.  A charge labeled "Optional Ins." was not disclosed in Defendants' solicitation check, or upon information and belief, in the solicitation pitch accompanying the check.  (Defendants have refused to provide Plaintiffs with a copy of the solicitation pitch for the "Systems MD Gold Home Warranty," despite multiple requests).

85.     Next, Defendants began assessing $48.72 on the monthly mortgage bill statements sent in 2012 from Ocwen.  The $48.72 amount was similarly not disclosed anywhere on the solicitation check, or upon information and belief, in the solicitation pitch.  The amount listed on the back of the solicitation check as the cost of the Systems MD plan is $44.95, almost $4 less than the $48.72 amount Defendants later charged Plaintiffs.

86.     The monthly mortgage bills Ocwen sent to the Delgados in 2012 included the "$48.72" as an "Optional" line item for "Systems MD Gold."   As with the December notice for optional insurance, Ocwen's monthly mortgage bills continued to conceal the true nature of the charges.  Further, the bills came from Ocwen with no mention of the Cross Country Defendants.

87.     Ocwen's September 18, 2012 annual escrow "Disclosure Statement" sent to Plaintiffs continued Defendants' practice of non-disclosure.  It stated that "your first monthly mortgage payment for the coming escrow year, beginning with your payment due on 11/1/2012, will be ... for principal and interest ***and $48.72 will be for optional insurance*** and $[ ] will go

into your escrow account  We will deduct this amount per your Automatic Payment Withdrawal form on file with us." (Emphasis added).

88.    As with their billing of all Ocwen customers, upon information and belief Defendants devised billing statements that charged a different sum than the amount listed in the solicitation check and pitch.  Defendants also framed their bills to leave out a full and complete description of the actual "service" being charged for, the reason for the charge, and to whom the charge was actually owed.

89.    The Delgados continued to make their monthly loan payments (which included the $48.72 fraudulent charge) from approximately January 2012 through October 2012.  During this period, they paid the $48.72 because they were misled as to the reason for the charge, were under a mistake of fact, and because their debt collector Ocwen warned them that missed or late payments could result in late fees and/or damage to the Plaintiffs' credit standing.

### C.    Defendants Give Plaintiffs the Run-Around and Refuse to Refund the Fees Collected For their "Plan"

90.    After Defendants had automatically deducted approximately $500 from the Plaintiffs' bank account as part of their scheme, the Delgados began to suspect they were victims of a fraud.  In September 2012, Plaintiffs contacted Ocwen to try and ascertain what the $48.72 charge was for.

91.    After a frustrating run-around from their loan servicer which couldn't, or wouldn't, provide them any information as to what the charge was for, they were finally steered to an 800 number.  After calling, Plaintiffs learned that the 800 number belonged to Cross Country Home Services, a company they had never heard of.  After more customer "service" rebuffs, they realized that Defendants had tricked them into paying $48.72 per month for a so-called "warranty plan" they never realized they were signed up for, knew nothing about, and had never used.

92.     Despite multiple requests, Defendants refused to refund the approximately $500 in fees they wrongfully extracted from Plaintiffs.   And only after multiple requests would Defendants provide a copy of the solicitation check that Plaintiffs had supposedly endorsed. Defendants nonetheless still refused to provide Plaintiffs with a copy of the solicitation pitch accompanying the check, or the so-called "agreement" Cross Country claimed to have sent Plaintiffs – an "agreement" Plaintiffs never received.

93.     Plaintiffs even wrote to Defendant Sandra Finn, the President of Cross Country Home Services, asking her to refund the charges and provide a copy of the agreement.  Ms. Finn never responded.

## CLASS ACTION ALLEGATIONS

94.     Plaintiffs sue on their own behalf and on behalf of a Class for damages and injunctive relief under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

95.     The Class, preliminarily defined as four subclasses, is as follows:

a.  All OCWEN customers in New York whom Defendants enrolled in the MD Gold Warranty plan through their solicitation check scheme at any time from August 6, 2007 to the date of judgment (the "New York MD Gold Subclass");

b.  All OCWEN customers whom Defendants enrolled in the MD Gold Warranty plan through their solicitation check scheme at any time from August 6, 2007 to the date of judgment (the "Multistate MD Gold Subclass")

c.  All OCWEN customers in New York whom Defendants enrolled in any of their home warranty, service or maintenance plans through their solicitation check scheme at any time from to August 6, 2007 to the date of judgment (the "New York Cross Country Subclass").

d.  All OCWEN customers whom Defendants enrolled in any of their home warranty, service or maintenance plans through their solicitation check scheme at any time from to August 6, 2007 to the date of judgment (the "Multistate Cross Country Subclass").

28

96.     Excluded from the Class and Subclasses are officers and directors of Defendants, members of the immediate families of the officers and directors of Defendants, and their legal representatives, heirs, successors or assigns and any entity in which they have or have had a controlling interest.  Also excluded are all federal, state and local government entities; and any judge, justice or judicial officer presiding over this action and the members of their immediate families and judicial staff.

97.     Plaintiffs do not know the exact size of the Subclasses (hereafter collectively the "Class" unless otherwise specified), since such information is in the exclusive control of Defendants.  Plaintiffs believe, however, that based on the number of customers whose mortgage loans Ocwen services, the Class encompass hundreds of thousands of individuals whose identities can be readily ascertained from Defendants' records.  Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

98.     The Named Plaintiffs are adequate class representatives.  Their claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class.  Both Plaintiffs and the other members of the Class were subject to the same or similar check solicitation conduct engineered by Defendants.  Further, Plaintiffs and members of the Class sustained substantially the same injuries and damages arising out of Defendants' conduct.

99.     Plaintiffs will fairly and adequately protect the interests of all Class members.  Plaintiffs have retained competent and experienced class action attorneys to represent their interests and those of the Class.

100.    Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

      a.     Whether Defendants participated in and pursued the common Check Solicitation Scheme;

b.   Whether Defendants' scheme is likely to mislead Ocwen's customers;

c.   Whether Defendants used the mails and/or wires through interstate commerce in a Racketeering Enterprise to accomplish their Check Solicitation Scheme;

d.   Whether Defendants' conduct constitutes unfair, unlawful and/or fraudulent practices prohibited by New York's consumer fraud statute, General Business Law §349;

e.   Whether Defendant Ocwen breached its fiduciary duty to Plaintiffs and the Class;

f.   Whether Defendants were unjustly enriched as a result of their conduct;

g.   Whether Defendant Ocwen's conduct violates the Fair Debt Collection Practices Act;

h.   Whether, and to what extent, Defendants are liable to Plaintiffs and the Class for damages; and

i.   Whether, and to what extent, equitable relief should be imposed on Defendants to prevent such conduct in the future.

101.   A class action is superior to all other available methods for resolving this controversy because i) the prosecution of separate actions by Class members will create a risk of adjudications with respect to individual Class members that will, as a practical matter, be dispositive of the interests of the other Class members not parties to this action, or substantially impair or impede their ability to protect their interests; ii) the prosecution of separate actions by Class members will create a risk of inconsistent or varying adjudications with respect to individual Class members, which will establish incompatible standards for Defendants' conduct; iii) Defendants have acted or refused to act on grounds generally applicable to all Class members; and iv) questions of law and fact common to the Classes predominate over any questions affecting only individual Class members.

102.    Accordingly, this action satisfies the requirements set forth under Fed. R. Civ. P. 23(a) and 23(b).

## COUNT I

## NEW YORK GENERAL BUSINESS LAW § 349

## (ON BEHALF OF THE (1) NEW YORK MD GOLD SUBCLASS and (2) NEW YORK CROSS COUNTRY SUBCLASS AGAINST ALL DEFENDANTS)

103.    Plaintiffs Margarita Delgado and William Sheppard re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

104.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the New York MD Gold Subclass and New York Cross Country Subclass (the "New York Subclasses").

105.    New York's consumer fraud statute prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law §349.

106.    Defendants' Check Solicitation Scheme is consumer-oriented in that it is directed at members of the consuming public.

107.    By engineering and implementing the check solicitation scheme on Plaintiffs and the other members of the New York Subclasses, Defendants engaged in, and continue to engage in, deceptive acts and practices in violation of N.Y. Gen. Bus. Law §349.

108.    Defendants have violated N.Y. Gen. Bus. Law §349 statute by, *inter alia*:

i)      Engaging in a Check Solicitation Scheme that is likely to mislead a reasonable Ocwen consumer acting reasonably under the circumstances;

ii)     Using a Check Solicitation Scheme that increases customers' mortgage costs without customers' awareness or consent;

31

iii)    Omitting material information through use of small print and misleading checks and solicitation pitches to enroll Ocwen customers in the MD Gold Warranty plan and other warranty and home service plans;

iv)    Failing to provide customers with a plan "agreement" containing all material terms before locking them in to the annual plan;

v)    Charging customers enrolled in the plans more than the amounts specified on the solicitation checks and in the pitches, and using deceptive billing practices; and

vi)    Creating the net impression that the checks deposited or cashed by consumers were refunds or rebates due Ocwen's customers.

109.    The aforementioned acts are unfair, unconscionable and deceptive and are contrary to the public policy of New York which aims to protect consumers.

110.    As a direct and proximate result of Defendants' unlawful and deceptive Check Solicitation Scheme, Plaintiffs and the New York Subclasses have suffered injury and monetary damages in an amount to be determined at the trial of this action and upon information and belief, believed to exceed $100 million.

111.    Plaintiffs and the other members of the New York Subclasses further seek equitable relief against Defendant.  Pursuant to N.Y. Gen. Bus. Law §349, this Court has the power to award such relief, including but not limited to, an order declaring Defendants' practices to be unlawful, an order enjoining Defendants from engaging in any further unlawful conduct, and an order directing Defendants to refund to Plaintiffs and the New York Subclasses all monthly fees wrongfully assessed and/or collected on its MD Gold Warranty and other warranty and home service plans.

## COUNT II

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) –

## 18 U.S.C. § 1962(c)

### (ON BEHALF OF ALL SUBCLASSES AGAINST ALL DEFENDANTS)

112.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

113.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the four Subclasses defined above (the "Class").

### (i) The Enterprise

114.    Defendants Ocwen Loan Servicing, LLC, Ocwen Mortgage Servicing, Inc., Ocwen Financial Corporation, Ronald M. Faris, Scott A. Anderson, Cross Country Home Services, Inc., HomeSure of America, Inc., HomeSure Services, Inc., HomeSure Protection of California, Inc., HomeSure of Virginia, Inc., Joseph Incandela, and Sandra Finn, are each persons within the meaning of the Racketeer Influenced and Corrupt Organizations Act, Title 18 United States Code §1961(3).

115.    At all relevant times, in violation of 18 U.SC. §1962(c), the Cross Country Defendants and the Ocwen Defendants, as well as their officer Defendants Ronald M. Faris, Scott A. Anderson, Joseph Incandela, and Sandra Finn, and their companies' other officers, directors, employees and agents, conducted the affairs of an association-in-fact enterprise, as that terms is defined in 18 U.SC. §1961(4) (the "Ocwen Enterprise" or "Enterprise"). The affairs of the Enterprise affected interstate commerce through a pattern of racketeering activity.

116.    The Ocwen Enterprise is an ongoing, continuing group or unit of persons and entities, associated together for the common purpose of limiting costs and maximizing profits by engaging in the fraudulent check solicitation scheme

117.    While the members of the Ocwen Enterprise participate in and are part the Enterprise, they also have an existence separate and distinct from the Enterprise.  The Ocwen Enterprise has a systemic linkage because there are contractual relationships, agreements, financial ties, and coordination of activities among Defendants to further the Check Solicitation Scheme.

118.    Operating the Enterprise according to the practices engineered and implemented by the Defendant companies' executives including the Defendant officers Ronald M. Faris and Scott A. Anderson of Ocwen, and Joseph Incandela and Sandra Finn of Cross Country, Defendant Cross Country Services, Inc. and Defendant Ocwen Mortgage Servicing, Inc. and/or Defendant Ocwen Financial Corporation control and direct the affairs of the Ocwen Enterprise and use the other members of the Enterprise as instrumentalities to carry out the fraudulent Check Solicitation Scheme.  These practices include (i) formulating and devising checks with attached solicitation pitches that have material omissions, and are misleading, unclear and ambiguous, (ii) using small print and misleading checks and marketing pitches to enroll Ocwen customers in the MD Gold Warranty plan and other similar warranty and home service plans; (iii) charging customers enrolled in the plans more than the amounts Defendants represented were the actual amounts owed for the plans, and using deceptive billing practices to lull customers into making payment on the plans, (iv) creating the net impression that the checks deposited or cashed by consumers were refunds or rebates due Ocwen's customers, and (v) increasing customers' monthly mortgage payments without customers' consent and awareness.

**(ii)  The Predicate Acts**

119.    Defendants' systematic scheme to enroll Ocwen customers in one of the home warranty or service plans through the Check Solicitation Scheme, as described above, was facilitated by the use of the United States Mail and wire.  Defendants' scheme constitutes

"racketeering activity" within the meaning of 18 U.S.C §1961(1), as acts of mail and wire fraud under 18 U.S.C §§1341 and 1343.

120.    Defendants used mail and wire in violation of 18 U.S.C §§1341 and 1343 in furtherance of their scheme to defraud Ocwen's loan customers by using the Check Solicitation Scheme to obtain money from customers using false and/or fraudulent and misleading pretenses.

121.    Through the mail and wire, the Ocwen Enterprise omitted to disclose material information about the check solicitations and plans, and sent misleading checks, deceptive marketing and solicitation pitches, false and misleading loan notices, escrow statements and mortgage statements, and other documents designed to lure customers into endorsing the solicitation checks and thereafter remain unaware as to the consequences of having deposited or cashed the checks.

122.    Defendants' checks concealed the true nature of their purpose and used ambiguous language, formatting, and print size to fraudulently induce Ocwen customers to cash or deposit the checks.

123.    Defendants accompanied the checks with similarly deceptive solicitation pitches that hyped the "savings and benefits" of the plans in large fonts but omitted material information about the checks and plans. Defendants also downplayed the high costs and problems customers would sustain if they endorsed the checks, and failed to conspicuously and clearly disclose that by endorsing the checks customers would be increasing their monthly mortgage payments. Defendants also misled customers concerning the plans' cancellation policies. Defendants further failed to provide customers with so-called "service agreements" applicable to the plans, or provided agreements written in confusing legalese after already "enrolling" customers in the plans.

124.   Defendants solidified the fraud by using misleading and deceptive billing practices to confuse customers as to what they were being billing for, and omitted a clear and conspicuous itemization of what they were billing for.

125.   Defendants' loan notices, escrow statements, mortgage statements and upon information and belief other statements and documents sent to customers mislabeled and concealed the actual fraudulent nature of the plan charges Defendants were billing for and collecting. Defendant Ocwen did not inform customers on its loan billing statements that it was billing its loan customers on behalf of another entity. Defendants also sent Plaintiffs bills and invoices for higher amounts than the amounts actually owed for the plans, thus further misleading customers as to their having been enrolled in a plan and owing money to Defendants.

126.   Defendants' omissions and misrepresentations were material to Plaintiffs and the members of the Class. Had Defendants made full, accurate and honest disclosures about the check solicitations, Plaintiffs would have been aware of the deceit involved in obtaining their signatures for the useless plans and would have challenged Defendants' unlawful assessments and billing practices, or would not have paid the monthly charges tacked on to their mortgage statements.

127.   Each of these omissions and/or misrepresentations constituted an act of mail and/or wire fraud for purposes of 18 U.S.C §1341.

128.   Additionally, by using the internet, telephone and facsimile transmissions to communicate false and misleading information about the Check Solicitation Scheme to customers in order to pursue and achieve their fraudulent scheme, Defendants engaged in repeated acts of wire fraud in violation of 18 U.S.C §1343.

129.    In pursuing their Check Solicitation Scheme, Defendants knowingly and fraudulently concealed and/or omitted material information from Plaintiffs and members of the Class.

130.    The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C §§1961(5) and 1962(c).

131.    All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the Ocwen Racketeering Enterprise. The racketeering acts committed by the Ocwen Enterprise employed a similar method, were related, had a similar purpose, involved similar participants, and resulted in a similar impact on members of the Class. Because this case is brought on behalf of a class of similarly situated Ocwen customers whom Defendants enrolled in one of the plans using the Check Solicitation Scheme, it would be impracticable for Plaintiffs to plead all the details of the scheme with particularity. Plaintiffs cannot plead the precise dates of all of Defendants' uses of the mail and wire because this information cannot be alleged without access to Defendants' records.

132.    Defendants' Check Solicitation Scheme centered around Defendants' mailing of similar checks and solicitations to Ocwen's customer is an ongoing wrongful scheme that has been repeated hundreds of thousands of time a year for many years. The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

133.    As a direct and proximate result of these violations of 18 U.S.C § 1962(c) and (d), Plaintiffs and members of the Class have suffered substantial damages. Defendants are liable to Plaintiffs and members of the Class for treble damages, together with all costs of this action, plus reasonable attorneys' fees and costs under 18 U.S.C §§ 1964(c).

## COUNT III

## RACKETEER INFLUENECED AND CORRUPT ORGANIZATIONS ACT – CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(d)

### (ON BEHALF OF ALL SUBCLASSES AGAINST ALL DEFENDANTS)

134.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

135.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the four Subclasses defined above (the "Class").

136.    As set forth above, in violation of 18 U.S.C. §1962(d) Defendants Ocwen Loan Servicing, LLC, Ocwen Mortgage Servicing, Inc., Ocwen Financial Corporation, Ronald M. Faris, Scott A. Anderson, Cross Country Home Services, Inc., HomeSure of America, Inc., HomeSure Services, Inc., HomeSure Protection of California, Inc., HomeSure of Virginia, Inc., Joseph Incandela, and Sandra Finn conspired to violate the provisions of 18 U.S.C. §1962(c).

137.    As set forth above, Defendants Ocwen Mortgage Servicing, Inc. Ocwen Financial Corporation, Ronald M. Faris, Scott A. Anderson, Cross Country Home Services, Inc., Joseph Incandela, and Sandra Finn, having directed and controlled the affairs of the Ocwen Enterprise, were aware of the nature and scope of the Enterprise's unlawful scheme, and all agreed to participate in it.

138.    As a direct and proximate result of these violations of 18 U.S.C § 1962(c) and (d), Plaintiffs and members of the Class have suffered substantial damages and been inured in their business or property by the predicate acts which make up Defendants' pattern of racketeering activity that comprise the Check Solicitation Scheme.

139.     Defendants are liable to Plaintiffs and members of the Class for treble damages, together with all costs of this action, plus reasonable attorneys' fees and costs under 18 U.S.C §§ 1964(c) and (d).

<div align="center">

**COUNT IV**

**<u>UNJUST ENRICHMENT</u>**

**(ON BEHALF OF ALL SUBCLASSES AGAINST ALL DEFENDANTS)**

</div>

140.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

141.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the four Subclasses defined above (the "Class").

142.     As a result of Defendants' deceptive, unlawful, and unfair conduct, Defendants have been enriched at the expense of Plaintiffs and the Class through the collection of fees associated with their home warranty and similar home service and maintenance plans. Defendants have been enriched by increasing Ocwen customers' monthly mortgage bills without the consent of the mortgagors.

143.     Defendants billed Plaintiffs $48.72 for a warranty plan the Delgado Plaintiffs had no idea they were enrolled in. This sum was nearly $4 more per month than the $44.95 cost that Defendants represented was the actual monthly cost of the plan. Upon information and belief, Defendants have similarly billed hundreds of thousands of other Ocwen customers for amounts higher than the actual cost of the plans.

144.     By collecting improper fees for home warranty and similar home service plans as a result of their Check Solicitation Scheme, Defendants have benefited from receipt of these illicit charges, and under principles of equity and good conscience, Defendants should not be permitted to keep this money.

<div align="center">

39

</div>

145.   As a result of Defendants' collection of charges stemming from their Check Solicitation Scheme, it would be unjust and/or inequitable for Defendants to retain the benefits of the scheme without restitution to Plaintiffs and the Class of the monies paid to Defendants for the so-called "plans" into which they were "enrolled" by Defendants.  Accordingly, Defendants must account to Plaintiffs and class members for their unjust enrichment.

## COUNT V

## BREACH OF FIDUCIARY DUTY

### (ON BEHALF OF ALL SUBCLASSES AGAINST THE OCWEN DEFENDANTS)

146.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

147.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the four Subclasses defined above (the "Class").

148.   While acting as a loan servicer, the Ocwen Defendants owed Plaintiffs and the Class all of the duties of fiduciaries.

149.   The Ocwen Defendants violated their fiduciary duty to Plaintiffs and the Class when they enacted, administered and profited from the Check Solicitation Scheme.

150.   The Ocwen Defendants breached their fiduciary duty to Plaintiffs and the Class by, *inter alia*, (1) not acting in their best interest when the Ocwen Defendants enacted, administered and profited from the Check Solicitation Scheme, (2) not disclosing the Check Solicitation Scheme to Plaintiffs and the members of Class, and (3) increasing their customers' monthly mortgage bills without their mortgagors' consent.

151.   These actions were undertaken by the Ocwen Defendants in bad faith for their own benefit and were not intended to benefit Plaintiffs and the Class.

152.     As a direct result the Ocwen Defendants' actions, and their subversion of their customers' interest to the Ocwen Defendants' own interests in reaping exorbitant fees, Plaintiffs and the Class have suffered injury in the form of unnecessary and excessive charges.

153.     Plaintiffs and the Class are entitled to damages for the Ocwen Defendants' breach of their fiduciary obligations.   In addition, Plaintiffs and the Class are entitled to punitive damages because the Ocwen Defendants acted in bad faith in deliberate or reckless disregard of their fiduciary obligations.

<div align="center">

**COUNT VI**

**FAIR DEBT COLLECTION PRACTICES ACT –**

**15 U.S.C. § 1692 ET SEQ.**

**(ON BEHALF OF ALL SUBCLASSES AGAINST THE OCWEN DEFENDANTS)**

</div>

154.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

155.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the four Subclasses defined above (the "Class").

156.     The Ocwen Defendants are "debt collectors" as defined by Section 1692a(6) of the Fair Debt Collection Practices Act (the "FDCPA").

157.     Plaintiffs and the Class are "consumers" as defined by section 1692a(3) of the FDCPA.

158.     Collection letters, such as those the Ocwen Defendants sent to Plaintiffs and the Class are to be evaluated by the objective standard of the hypothetical "least sophisticated consumer."

159.    The Ocwen Defendants violated 15 U.S.C. §§ 1692e, 1692e(2)(A), 1692e(2)(B), 1692e(5), 1692e(10), 1692f, 1692f(1), and 1692g(a)(1) of the FDCPA as evidenced by the following conduct:

i)      Illegally adding fees to the amount of the alleged debt;

ii)     Attempting to collect a fee that is not permitted by law, or authorized by an agreement;

iii)    Falsely representing the amount, character or legal status of the alleged debt;

iv)     Falsely representing services rendered and compensation which may be lawfully received for the collection of the alleged debt; and

v)      Otherwise using false, deceptive, misleading and unfair or unconscionable means to collect or attempt to collect a debt from Plaintiffs and the Class.

160.    The Ocwen Defendants' acts as described above were done with intentional and negligent disregard the legal rights of Plaintiffs and the Class and with the purpose of coercing them to pay monies not truly owed.

161.    As a result of the above violations of the FDCPA, The Ocwen Defendants' are liable to Plaintiffs Class in the sum of their statutory damages, actual damages and attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Margarita Delgado and William Sheppard respectfully request that the Court:

(a)     Issue an order certifying the Classes defined above, appointing the Plaintiffs as Class representatives, and designating the undersigned firms as Class Counsel;

(b)     Find that Defendants have committed the violations of law alleged herein;

(c)     Enter an order granting monetary relief pursuant G.B.L. §349 on behalf of the New York Subclasses;

(d)   Enter an order granting monetary relief and treble damages on behalf of the Class under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(c) and (d) *et seq.*;

(e)   Determine that all Defendants have been unjustly enriched as a result of their wrongful conduct, and enter an appropriate order awarding restitution and monetary damages to the Class;

(f)   Enter an order granting monetary relief and statutory damages up to $1000 per violation against the Ocwen Defendants on behalf of the Class under the Fair Debt Collections Practices Act 15 U.S.C. § 1692 *et seq.*

(g)   Determine that the Ocwen Defendants have violated their fiduciary duty to the Class and enter an appropriate order awarding monetary and injunctive relief;

(h)   Render an award of compensatory damages, the amount of which is to be determined at trial, but is believed to be in excess of $100,000,000;

(i)   Render an award of punitive damages;

(j)   Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(k)   Grant all such other relief as the Court deems appropriate.

Dated:  August 6, 2013
        Armonk, New York

LAW OFFICES OF STEVEN L. WITTELS, P.C.

By:  _____
     Steven L. Wittels (SW-8110)
     J. Burkett McInturff (JM-4564)
     18 HALF MILE ROAD
     ARMONK, NEW YORK 10504
     Telephone: (914) 319-9945
     Facsimile:  (914) 273-2563
     slw@wittelslaw.com
     jbm@wittelslaw.com

*Lead Counsel for Plaintiffs and the Class*

**THE ROTH LAW FIRM, PLLC**
Richard Roth (RR- 5538)
295 MADISON AVENUE, 22ND FLOOR
NEW YORK, NEW YORK 10017
Telephone: (212) 542-8882
Facsimile:   (212) 542-8883
rich@rrothlaw.com

*Co-Counsel for Plaintiffs and the Class*

# EXHIBIT



WITH THIS SIDE UP, SLIDE FINGER BETWEEN FRONT AND MIDDLE PANEL, SLIDE FINGER UP TO OPEN

OCWEN

PRESORTED
STANDARD
US POSTAGE
PAID
DMG

P.O. Box 550247
Fort Lauderdale, FL 33355-0247

# Check Enclosed

**Issued to:**

**William Sheppard**
[redacted]
**Brooklyn, NY 11225-**[redacted]

*Referral Assistant 24® is a dispatch and referral service only. Services are provided by independent tradespeople/contractors. Referral Assistant 24® is a service mark of Cross Country Home Services, Inc., Fort Lauderdale, FL 33355. Subject to certain terms and conditions.

¹The $40 cash back is in the form of four $10 certificates. Only one certificate may be redeemed per calendar quarter. You must be an active Referral Assistant 24 member at the time of redemption to be eligible for cash back.

²Based on finance experts annual repair/maintenance cost estimate of 1% of a home's market value. Assumes a $200,000 market value. Source: http://blog.hsh.com/index.php/2009/05/never-under-estimate-maintenance-costs/

³Benefits for homeowners deductible reimbursement not available during first thirty days of membership. Evidence of coverage under the policy issued by Voyager Indemnity Insurance Company, an Assurant Specialty Property company, will be available to you upon enrollment, showing a summary of all benefit terms, conditions and limits of your coverage. Homeowners Deductible Reimbursement coverage is provided on a monthly basis and will automatically continue each month as long as the required monthly membership is paid.

⁴Up to $50 cash back, twice a year, for locksmith services.

⁵Your membership materials will include a Cash Back Savings booklet containing cash back certificates worth more than $250 in total. Individual cash back certificates are for $15 each for specified services costing $100 or more, or 15% on services costing less than $100. Must be an active Referral Assistant 24 member to redeem cash back savings.

© 2013, Cross Country Home Services, Inc. All Rights Reserved.

SEE REVERSE SIDE FOR OPENING INSTRUCTIONS

DETACH ALONG PERFORATION

79705-00-V001/0009796

THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND

CCHS
PO Box 550607
Ft. Lauderdale, FL 33355

CHECK NO. 8852056902
March 18, 2013

5-13
110

Bank of America
**By cashing or depositing this check, you are purchasing a Referral Assistant 24 annual membership plan.**

Pay to the order of bearer or:

William Sheppard
[redacted]
Brooklyn, NY 11225-[redacted]

Two Dollars and 50/100

Void if amount over $2.50

Check Amount
$2.50

AUTHORIZED SIGNATURE

Valid through: 6/30/13

⑈8852056902⑈ ⑆011000138⑆ 4627185032⑈

By cashing or depositing this check, I understand that I am purchasing an annual Referral Assistant 24 Membership and understand that $14.95 per month will automatically be charged to my Ocwen loan servicing mortgage payment unless I cancel my membership by calling toll-free 1.888.754.5921 within 30 days from the date this check is cashed or deposited. I understand that this is an annually renewable membership and the monthly cost of $14.95 will continue to be collected with my monthly mortgage payment until I cancel the membership.

X _____

Signature of payee required for processing.

## Everyday Savings and Security for Valued Mortgage Customers

## Simply cash or deposit the attached check and we'll pay you to see for yourself the rewards and benefits of Referral Assistant 24®

**Do not send us a dime to try the Referral Assistant 24 benefits for yourself.**

**Just cash or deposit your check** to get $2.50 instantly and activate all the benefits of Referral Assistant 24.

We know how hidden repair and maintenance costs can take you by surprise and ruin your budget. To stop this from happening to you, Referral Assistant 24 — the National Home Repair and Maintenance Discount Network — was created to ensure that you save money on the repair and maintenance expenses homeowners frequently face.

**Over $1,600 in savings – at your fingertips.**

It starts with **$40 cash back for gas**[1] and continues with the instant discounts and money back you get on so many of the items and services you need for your home. (See below.)

**A $2.50 check… $40 cash back for gas…**
**Over $1,600 in instant discounts and money back…**

It's all part of Referral Assistant 24 that gives you full access to:

- A 24/7 personal hotline that puts you in touch with the service professionals you need — in your area.
- Pre-qualified service professionals who guarantee workmanship and a 15% instant discount on labor.
- Up to $1,000 cash back for covered homeowners insurance claim deductibles.[3]
- An Appliance Buyline® discount buying service, you'll get deep discounts off the suggested retail price of top, brand name appliances.

Plus so much more, including 24/7 peace of mind.

Cashing or depositing the attached check will result in a charge of $14.95 per month, conveniently collected with your Ocwen Loan Servicing mortgage payment, for a Referral Assistant 24 membership unless you cancel within 30 days of cashing or depositing the attached check by calling toll-free 1.888.754.5921. Referral Assistant 24 will not have to ask for your mortgage loan number or further consent from you in order to charge you. Referral Assistant 24 is not affiliated with your mortgage company. At the end of each year of benefits, Referral Assistant 24 will continue to collect the $14.95 fee per month unless you call to cancel.

**Cash or deposit your check today** so you can see how quickly Referral Assistant 24 can pay for itself and save you time and money — over and over again.



Referral Assistant 24

PLEASE KEEP THIS LETTER FOR YOUR RECORDS. YOU SHOULD EXPECT TO RECEIVE YOUR HOME SERVICE AGREEMENT WITHIN 7-10 DAYS OF CASHING YOUR CHECK.

### Along with $40 cash back for gas, you also get…

REIMBURSEMENT FOR HOME INSURANCE DEDUCTIBLES[3]

**15% SAVINGS** ON HOME REPAIRS AND MAINTENANCE[2]

**MONEY BACK** FOR LOCKSMITH SERVICES[4]

GET **CASH BACK** FOR HOME IMPROVEMENT[5]

**$300**   **$1000**   **$100**   **$250**

**PLUS… get deep discounts off brand name appliances!**

The attached check and all of Referral Assistant 24's benefits are designed to help make your life easier and save you money. So cash or deposit your check by 6/30/13 so you can start saving money right away!

3/13 OCW-CHK/RA24-CTL-250

WITH THIS SIDE UP, SLIDE FINGER BENEATH FRONT AND MIDDLE PANEL SLDE FINGER UP TO OPEN



PRESORTED
STANDARD
US POSTAGE
PAID
DMG

O C W E N
P.O. Box 550247
Fort Lauderdale, FL 33355-0247

REMOVE THESE EDGES
FOLD, CREASE, AND TEAR ALONG PERFORATION

**CHECK ENCLOSED**

William Sheppard
Brooklyn, NY 11225-

© 2013, Cross Country Home Services, Inc. All Rights Reserved.

SEE REVERSE SIDE FOR OPENING INSTRUCTIONS

## William Sheppard:
## Sign and Deposit the Enclosed Check

▼ DETACH ALONG PERFORATION ▼

CCHS
PO Box 550607
Ft. Lauderdale, FL 33355

THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND

CHECK NO. 8863816216
DATE: February 25, 2013

Bank of America
By cashing or depositing this check, you are purchasing
the annual Systems MD® Gold Home Service Plan

Pay to the order
or bearer of:

William Sheppard

Brooklyn, NY 11225-

Two Dollars and 50/100 * * * * * * * * * * * * * *     $2.50

Void if amount over $2.50

AUTHORIZED SIGNATURE

Valid through: 5/31/13

"8863816216" ":011000138: 462718503 2"

By cashing or depositing the check, I understand that I am purchasing an annual Systems MD Gold Home Service Plan and understand that $44.95 per month will automatically be charged to my Ocwen Loan Servicing, mortgage payment unless I cancel my Plan by calling toll-free 1.800.474.4047 within 30 days from the date this check is cashed or deposited. I understand that this is an annually renewable Plan and the monthly cost of $44.95 will continue to be collected with my monthly mortgage payment until I cancel the Plan.

X _____

Signature of payee required for processing.



## Protect Yourself Against the High Cost of Repairing or Replacing These Systems and Other Items:

Heating System    Water Heater

A/C System    Garbage Disposal

Plumbing System    Garage Door Opener

Electrical System    Accessible Ductwork

Ceiling Fan    Toilets

## Plus, enhanced protection that other home warranties don't offer!

- Pre-existing conditions
- Plumbing stoppages
- Rust and corrosion
- Faucets

## The enclosed Check is made out in your name.

It's yours to cash so please do not throw it away. Bring it to your bank by May 31, 2013, sign the back and get your $2.50 instantly.

## Get the protection you need

By cashing your check, you'll also see how $2.50 can lead to thousands of dollars in savings because your thirty-day review of Systems MD® Gold will also begin. This risk-free, no-obligation review gives you plenty of time to see how this one-of-a-kind home service plan protects you every single day against the high cost of repairs (and replacement) for your most important home systems and other items.

## You can't be sure WHEN your systems will break down... but they WILL.

And that's when you'll need protection for your budget. Whether your covered system or appliance needs to be repaired or replaced, Systems MD Gold will cover you with an annual maximum claims amount of up to $50,000 and benefits that include:

- **A 24/7 personal hotline** with access to pre-qualified service pros in your area.
- **Protection against the high cost** of covered system and appliance repairs and replacement. Plus additional coverage most other plans don't cover, like plumbing stoppages and rust and corrosion.
- **Unknown pre-existing condition protection** of covered items in good working order on your Service Agreement effective date.[1]

## Plus, you also get:

- **3 preventive maintenance checks** of your covered systems.[2] We'll make them run more efficiently so they'll last longer and save you money on your monthly energy bills!
- **Exclusive savings** on top, brand name appliances – special discounts not available to the general public.

## Why not take 30 days to see all the possible savings for yourself?

That's right! Take 30 days to review Systems MD Gold's savings and benefits so you can be sure it's right for you.

Cashing or depositing the attached check will result in a charge of $44.95 per month, conveniently collected with your Ocwen Loan Servicing mortgage payment, for a Systems MD Gold Home Service Plan unless you cancel within 30 days from the date this check is cashed or deposited by calling toll-free 1.800.474.4047. Systems MD Gold will not have to ask for your mortgage loan number or further consent from you in order to charge you. Systems MD Gold is not affiliated with your mortgage company or any of its subsidiaries or affiliates. At the end of each year of Plan benefits, Systems MD Gold will continue to collect the $44.95 fee per month until you call to cancel.

Remember, take your time... you have 30 days to decide. See how much money you can save with Systems MD Gold and start by cashing the attached Check by May 31, 2013!

Sincerely,

Sandi Finn
President
Systems MD Gold

## SYSTEMS MD
### GOLD HOME WARRANTY

**PLEASE KEEP THIS LETTER FOR YOUR RECORDS. YOU SHOULD EXPECT TO RECEIVE YOUR HOME SERVICE AGREEMENT WITHIN 7-10 DAYS OF CASHING YOUR CHECK.**

2/13 OCW-O9VSMD9-H55