UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

MARGARITA DELGADO, WILLIAM
SHEPPARD, NAIHUAI XU, and GERALDINE
MAHOOD, individually and on behalf of all
others similarly situated,

**MEMORANDUM & ORDER**

**13-CV-4427 (NGG) (RML)**

Plaintiffs,

-against-

OCWEN LOAN SERVICING, LLC, CROSS
COUNTRY HOME SERVICES, INC., SANDRA
FINN, and JOHN DOES 1-10,

Defendants.
------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiffs Margarita Delgado, William Sheppard, Naihuai Xu, and Geraldine Mahood

(collectively, "Plaintiffs") bring this putative class action against Defendants Ocwen Loan

Servicing, LLC ("Ocwen"), Cross Country Home Services, Inc. ("Cross Country"), its President

Sandra Finn ("Finn"), and John Does 1-10 (collectively, "Defendants"). Plaintiffs claim that

Defendants engaged in a deceptive check solicitation scheme that led Plaintiffs and other

consumers to unknowingly enroll in and pay monthly fees for Cross Country's home warranty

plans. Plaintiffs allege multiple causes of action, including violations of the Racketeer

Influenced and Corrupt Organizations Act ("RICO") and consumer protection laws of New York

and California. Defendants move to dismiss the First Amended Complaint ("FAC") pursuant to

Federal Rule of Civil Procedure 12(b)(6) and also argue that the FAC fails to satisfy the pleading

standards of Rules 8(a) and 9(b). (Ocwen Mot. to Dismiss ("Ocwen Mot.") (Dkt. 33); Cross

Country Mot. to Dismiss ("CC Mot.") (Dkt. 34).) After the parties completed briefing on the

1

motions to dismiss, Plaintiffs requested leave to supplement the FAC under Federal Rule of Civil Procedure 15. (Mot. to Suppl. Compl. (Dkt. 40).) For the reasons set forth below, Plaintiffs' request for leave to supplement the FAC is DENIED and Defendants' motions to dismiss are GRANTED IN PART and DENIED IN PART.

## I.     FACTUAL BACKGROUND

Except where indicated below, the following factual allegations are drawn from Plaintiffs' First Amended Complaint and the exhibit thereto. (FAC (Dkt. 25).)

### A.     The Parties

Ocwen is a loan servicing company that services more than 600,000 residential home loans across the country. (FAC ¶ 21.) Ocwen's customers included Margarita Delgado and William Sheppard (the "Delgados" or "Delgado Plaintiffs"), a married couple residing in New York (id. ¶ 18), and Naihuai Xu ("Xu") and Geraldine Mahood ("Mahood"), two California residents (id. ¶¶ 19-20).

Cross Country is a corporation that sells home warranty programs and other home appliance service and maintenance plans to homeowners. (Id. ¶¶ 22, 36.) Cross Country and its President, Finn, market and sell these plans through various subsidiaries and affiliate companies they control that operate in several states, including New York and California. (Id. ¶¶ 24-28, 36.) To seek out new customers, Cross Country partners with businesses that have large homeowner customer bases, to which Cross Country markets its plans. (Id. ¶¶ 29, 37.) On its website, Cross Country claims that its plans and other "add-on products" can "increase revenue" for its potential partners. (Id. ¶¶ 37, 149.) Ocwen was one such partner. (Id. ¶ 30.)

## B. The Alleged Check Solicitation Scheme

Plaintiffs allege that as early as 2007, Cross Country and Finn sent mailings to Ocwen's customers in New York, California, and other states (the "solicitation(s)"), soliciting their enrollment in Cross Country's home warranty plans, appliance maintenance plans, and similar membership programs, collectively referred to in this Order as "home warranty plans." (Id. ¶¶ 27, 38-39.) The solicitations were in the form of a foldout check mailer bearing the words "CHECK ENCLOSED" in large print on the front of the envelope.[1] (Id. ¶ 40 & Ex. (Dkt. 25-1) at 2, 4.)[2] Situated under Ocwen's logo in the upper left corner, the return address lists "Ocwen" and a post office box address in Fort Lauderdale, Florida. (Id.) The envelope is addressed to the Ocwen customer by name. (Id., Ex. at 2, 4.) Enclosed is a valid, negotiable check made out to the Ocwen customer for a small amount such as $2.50. (Id.) The payor of the check is listed as "CCHS" accompanied by a post office box address in Fort Lauderdale, Florida.[3] (Id. ¶¶ 40, 48 & Ex. at 2, 4.) The last three digits of the post office box number on the check differ from those in the envelope's return address, but the addresses are otherwise the same. (Id.) Although it is difficult to read, Finn's signature appears at the bottom of the check above the words "authorized signature." (Id. ¶ 48 & Ex. at 2, 4.) Neither the envelope nor the check is labeled as a solicitation.

---

[1] Plaintiffs allege that Defendants use similar check solicitations for all the Cross Country home warranty plans (FAC ¶¶ 39, 63, 90, 97) and attach to the FAC as examples two solicitations that were sent to the Delgado Plaintiffs (id., Ex.) As a result, the court infers that the solicitations received by all Plaintiffs and putative class members were substantially similar to those contained in the exhibit.

[2] The exhibit annexed to the FAC does not have an exhibit number; it is referred to herein as "Ex." and cited according to ECF page numbers.

[3] The only place in the solicitation that Cross Country's name appears unabbreviated is in a series of small print footnotes located on the back of the envelope in reference to the company's copyright and trademarks. (See FAC, Ex. at 2 ("Referral Assistant 24 is a service mark of Cross Country Homes Services, Inc. . . . © 2013, Cross Country Homes Services, Inc. All Rights Reserved"); 4 ("Systems MD Gold and Appliance Buyline are service marks of Cross Country Homes Services, Inc. . . . © 2013, Cross Country Homes Services, Inc. All Rights Reserved").)

Accompanying the check is a sales pitch for Cross Country's home warranty plan. (Id., Ex. at 3, 5.) The language varies according to the specific plan being marketed, but the pitch commonly exhorts the recipient to cash the check and highlights the savings that will result. (Id. ¶ 41, Ex. at 3 ("**Simply cash or deposit the attached check and we'll pay you to see for yourself the rewards and benefits of Referral Assistant 24.**"), 5 ("**The enclosed Check is made out in your name.** It's yours to cash so please **do not throw it away.** Bring it to your bank by May 31, 2013, sign the back and get your $2.50 instantly.") (emphasis in original).)[4]

Certain disclosures are included in the solicitation materials. Above the check's dollar amount in typeface smaller than the surrounding text—i.e., the check number, date, and amount—is the warning "[b]y cashing or depositing this check, you are purchasing the annual [home warranty plan]." (Id., Ex. at 2, 4.) Nothing on the front of the check discloses that by cashing or depositing the check the customer will be subject to a monthly fee. (Id.) The back of the check contains a more detailed disclosure, which in one example states in fine print:

> By cashing or depositing this check, I understand that I am purchasing an annual Systems MD Gold Home Service Plan and understand that $44.95 per month will automatically be charged to my Ocwen Loan Servicing mortgage payment unless I cancel my Plan by calling toll-free 1.800.474.4047 within 30 days from the date this check is cashed or deposited. I understand that this is an annually renewable Plan and the monthly cost of $44.95 will continue to be collected with my monthly mortgage payment until I cancel the Plan.[5]

(Id., Ex. at 5.) This entire message is located in the small area above the endorsement line. (Id.) The insert includes a paragraph containing a very similar disclosure near the end of the sales

---

[4] One sales pitch also states, "**Do not send us a dime to try the Referral Assistant 24 benefits for yourself. Just cash or deposit your check** to get $2.50 instantly and activate all the benefits of Referral Assistant 24. . . . **A $2.50 check . . . $40 cash back for gas . . . Over $1,600 in instant discounts and money back . . .**" (Id., Ex. at 3 (emphasis and last three ellipses in original).)

[5] From the two examples provided to the court as attachments to the First Amended Complaint, it appears that this message varies slightly according to the type of home warranty plan. (Id., Ex. at 3, 5.)

4

pitch. (Id. at 3, 5.) In addition, the enclosure states that customers should expect to receive an agreement concerning the home warranty plan within seven to ten days of cashing the check. (Id.)

Upon cashing or depositing the check, the customer is enrolled in the home warranty plan for a 30-day trial period during which the plan can be cancelled without incurring any charges. (Id. ¶ 65.) Although the sales pitch claims that the customer will receive a service agreement within seven to ten days of cashing the check, Plaintiffs allege that Cross Country does not always send information about the plan during the trial period.[6] (Id.) Further, the customer cannot actually try out the benefits of the home warranty plan during this time because the solicitation does not contain information about how to contact Cross Country or redeem the benefits, and there are many limitations and exemptions that apply during the trial period. (Id.) After the trial period, the customer is enrolled in an annual membership for which Cross Country assesses a monthly fee. (Id. ¶ 66.) Ocwen bills these charges as a line item on the customer's mortgage statements and refers to the fees in escrow statements and other notices issued by Ocwen. (Id. ¶ 67.) These bills and notices list the fees as "optional insurance," "home warranty," "Systems MS Gold," or other names that do not clearly indicate that the charges are associated not with Ocwen, but with Cross Country. (Id. ¶¶ 67-69.)

Plaintiffs allege that customers were misled by the solicitations, either believing they were rebates or refunds from their loan servicer Ocwen, or recognizing that the solicitations were for home warranty plans but believing the benefits of the plans were much greater than their actual value. (Id. ¶¶ 39-42, 48, 50, 74, 79, 94, 99.) The FAC also incorporates postings from the

---

[6] Plaintiffs' allegations on this point are somewhat muddled. Plaintiffs claim Cross Country has an "undisclosed policy" of never providing the agreements to customers or at least not providing them for at least seven to ten days after the check is deposited or cashed. (Id. ¶¶ 42(vii)-(viii), 65(i).) The latter, however, would be somewhat in accordance with the sales pitch. (See id., Ex. at 3, 5.)

website "Pissed Consumer," in which other purported Ocwen customers complain about being similarly deceived by the solicitations. (Id. ¶ 74.) Plaintiffs claim Ocwen's billing tactics further misled customers by not clearly identifying the source of the additional monthly charges. (Id. ¶¶ 70-72.)

Plaintiffs allege that Defendants worked together to intentionally deceive Ocwen customers into enrolling in Cross Country's home warranty plans. (Id. ¶¶ 4-5, 39, 42, 73, 147.) Plaintiffs claim that Defendants knew customers did not realize they were enrolling and subsequently did not use the limited benefits of the plans. (Id.) Defendants then shared the fees collected from enrolled customers. (Id. ¶ 66(ii).)

### C. The Plaintiffs' Experiences with Defendants' Check Solicitations

#### 1. Delgado Plaintiffs

Ocwen began servicing the Delgado Plaintiffs' home mortgage loan in 2011 after purchasing a loan portfolio that included their loan. (Id. ¶ 34.) In or around August 2011, Cross Country and Finn sent the Delgados a check solicitation for the "Systems MD Gold Home Warranty Plan." (Id. ¶¶ 76, 79.) As with Cross Country's other solicitations, the envelope listed only Ocwen in the return address field. (Id. ¶ 77.) Enclosed was a check for $2.50 made out to William Sheppard that listed "CCHS" as the payor. (Id. ¶ 77.) Believing the check to be a rebate or refund from Ocwen, the Delgados deposited it on November 23, 2011, unaware that by doing so they were enrolling in Cross Country's home warranty plan. (Id. ¶¶ 48, 79.) They never received a service agreement detailing the terms of the plan. (Id. ¶ 88.)

On or about December 20, 2011, Ocwen sent the Delgados a notice concerning an interest rate change on their loan and resulting mortgage payment adjustment. (Id. ¶ 80.) This notice also contained a line item of $48.72 for "Options Ins." (Id.) Beginning in 2012, Ocwen

6

began adding $48.72 to the Delgados' monthly mortgage statement as a charge labeled "Systems MD Gold." (Id. ¶ 82.) This amount was nearly $4 more than the $44.95 monthly charge disclosed on the back of the solicitation check. (Id. at ¶¶ 81, 84.) The Delgados paid their monthly mortgage bill, including the additional fee, from January 2012 through October 2012 because they misunderstood the nature of the charge and were concerned that missed or late payments would result in late fees or damage to their credit. (Id. ¶ 30.) During this time, the Delgados did not know they had enrolled in a home warranty plan. (Id. ¶ 86.)

The Delgados contacted Ocwen in September 2012 to determine the reason for the fee. (Id.) The customer service representative did not provide any information about the charge, instead referring them to a phone number for Cross Country, a company that the Delgados had never heard of. (Id. ¶ 87.) Ocwen and Cross Country refused to refund the Delgados' money despite multiple requests. (Id.)

### 2. Plaintiffs Xu and Mahood

Ocwen began servicing Xu's and Mahood's home mortgage loans in 2013 after obtaining the right to collect payments on a portfolio of loans previously serviced by GMAC. (Id. ¶ 34.)

In or around June 2013, Cross Country and Finn sent Xu a check solicitation for the "Residential MD Gold Home Service Plan." (Id. ¶¶ 90-91.) The envelope and check were similar to those received by the Delgados. (Id. ¶ 91.) As with Cross Country's other solicitations, the front of the check offered no indication that it was not from Ocwen or that cashing it would obligate Xu to make monthly payments. (Id. ¶¶ 92-93.) Believing the check to be a rebate or refund from Ocwen, Xu deposited it, unaware that by doing so he was enrolling in Cross Country's home warranty plan. (Id. ¶¶ 48, 93-94.) Beginning in August 2013, Ocwen began adding $54.95 to Xu's monthly mortgage bill as a charge labeled "Home Warranty." (Id.

¶ 95.) Xu paid his monthly mortgage bill, including the additional fee, through automatic withdrawal for two months before noticing the extra charge. (Id. ¶ 96.)

In or around August 2013, Cross Country and Finn sent Mahood a check solicitation for a Cross Country home warranty plan. (Id. ¶¶ 97-98.) The envelope and check were similar to those received by the Delgados and Xu. (Id. ¶ 97.) Believing the check to be a rebate or refund from Ocwen, Mahood deposited it, unaware that by doing so she was enrolling in the home warranty plan. (Id. ¶¶ 48, 98-99.) Subsequently, Ocwen began adding $54.95 to Mahood's monthly mortgage bill as a charge labeled "Home Warranty." (Id. ¶ 100.) Mahood paid her monthly mortgage bill, including the additional fee, for three months before noticing the extra charge. (Id. ¶ 96.) She paid the fee during this time because she misunderstood the nature of the charge and was concerned that missed or late payments would result in late fees or damage to her credit. (Id. ¶ 102.)

## II.    PROCEDURAL HISTORY

On August 6, 2013, Plaintiffs filed the original Complaint seeking individual and class-based relief. (Compl. (Dkt. 1).) On November 15, 2013, Plaintiffs filed the First Amended Complaint, which withdrew a claim under the Fair Debt Collection Practices Act, withdrew all claims against certain defendants, added Plaintiffs Xu and Mahood from California to this action, and added claims under California's consumer protection laws. (See FAC.) The FAC alleges that the remaining Defendants (Ocwen, Cross Country, and Finn) violated the New York General Business Law § 349 (id. ¶¶ 113-121), the California Consumers Legal Remedies Act ("CLRA") (id. ¶¶ 122-128), and the California Unfair Competition Law ("UCL") (id. ¶¶ 129-139); committed RICO violations (id. ¶¶ 140-164); conspired to violate the RICO statute (id. ¶¶ 165-170); and were unjustly enriched by their actions (id. ¶¶ 171-180). The FAC also claims that

Ocwen breached its fiduciary duty to Plaintiffs. (Id. ¶¶ 181-187.) Plaintiffs brought these claims on their own behalf and on behalf of seven subclasses of Ocwen customers who were enrolled in various Cross Country home warranty plans (collectively, the "Class"). (Id. ¶¶ 103-104.)

The court granted Defendants leave to bring motions to dismiss, which were filed as fully briefed on February 25, 2014. (Ocwen Mot.; CC Mot.) As part of the briefing, Plaintiffs filed two response briefs, one concerning their state law claims (Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss State Law Counts ("Pl. State Opp'n") (Dkt. 33-3) and the other concerning their RICO claims (Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss Fed. Law Counts ("Pl. RICO Opp'n") (Dkt. 33-4)). Plaintiffs subsequently requested leave to supplement the FAC under Federal Rule of Civil Procedure 15(d). (Mot. for Pre-Mot. Conf. (Dkt. 40).) The court heard argument on that request at a pre-motion conference and reserved decision on the issue at that time. (Aug. 1, 2014, Min. Entry.)

## III.     MOTION TO SUPPLEMENT THE COMPLAINT

"An application for leave to file a supplemental pleading is addressed to the discretion of the court." Bornholdt v. Brady, 869 F.2d 57, 68 (2d Cir. 1989). Leave should be granted if "supplementation will promote the economic and speedy disposition of the controversy between the parties, will not cause undue delay or trial inconvenience, and will not prejudice the rights of any other party." Id. Adding facts in support of Plaintiffs' claims after briefing has concluded on the motion to dismiss would either prejudice Defendants or delay consideration of the motion in order to permit Defendants to respond. The proffered supplemental facts concern instances of consumers allegedly being misled by Defendants' check solicitations; they are additional examples of occurrences already described in the FAC. The facts would not alter the nature of Plaintiffs' claims or add other named plaintiffs to the action. Thus the survival of Plaintiffs'

claims as a matter of law rests minimally on these facts. Therefore Plaintiffs' motion to supplement the FAC is DENIED.

## IV.  MOTIONS TO DISMISS

Defendants separately move to dismiss the FAC pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6).

### A.  Standard

The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of a plaintiff's claims for relief. Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007). In reviewing the complaint, the court accepts as true all allegations of fact, and draws all reasonable inferences from these allegations in favor of the plaintiff. See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). A complaint survives a motion to dismiss if it contains "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Plausibility "is not akin to a probability requirement," but requires "more than a sheer possibility that a defendant has acted unlawfully." Id. at 664 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "[M]ere 'labels and conclusions' or 'formulaic recitation[s] of the elements of a cause of action will not do'; rather, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 555).

Allegations of fraud, however, are subject to the heightened pleading standard of Rule 9(b), which requires that such claims "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "The 'complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.'" Lundy v. Catholic Health Sys. of Long Island Inc., 711 F.3d 106, 119 (2d Cir. 2013) (quoting Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989)). "To survive a motion to dismiss, a complaint alleging fraud must [also] 'allege facts that give rise to a strong inference of fraudulent intent.'" Space Hunters, Inc. v. United States, 500 F. App'x 76, 78-79 (2d Cir. 2012) (summary order) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)).

On a motion to dismiss, the court's review "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007) (citing Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002)). Where the complaint's characterization of the annexed documents conflicts with the actual documents, the court will rely on the documents themselves. See S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d 629, 637 (2d Cir. 1996) ("We begin by reiterating that the majority of [plaintiff's] allegations are belied by the exhibits attached to their complaint.").

## A.    Preliminary Matters

### 1.    Standing

Cross Country argues that Plaintiffs lack standing to bring claims on behalf of class members who were enrolled in a different home warranty plan. (CC Mot. at 24-25.) "For each

claim asserted in a class action, there must be at least one class representative . . . with standing to assert that claim." Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co., 862 F. Supp. 2d 322, 331 (S.D.N.Y. 2012). The fact that a case is a class action does not alter the elements of standing. See Lewis v. Casey, 518 U.S. 343, 357 (1996) ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured.") (ellipsis in original; internal quotation marks omitted); Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 64 (2d Cir. 2012) ("A federal rule cannot alter a constitutional requirement."). That the named plaintiffs must demonstrate a personal injury "does not mean that [they] must literally suffer the same actual injury that each class member suffered. . . . Rather, the named plaintiff[s] must 'show that [they are] within the class of persons who [were] concretely affected' by 'injurious conduct' by the defendant[s] such that that plaintiff has the 'necessary stake in litigating' the case." Fort Worth Emps.', 862 F. Supp. 2d at 332 (quoting Blum v. Yaretsky, 457 U.S. 991, 999 (1982)). Once the named plaintiffs have "satisfied th[is] Article III standing inquiry, their ability to represent putative class members who purchased products plaintiffs have not themselves purchased is a question for a class certification motion." In re Frito-Lay N. Am., Inc. All Natural Litig., No. 12-MD-2413 (RRM), 2013 WL 4647512, at *12 (E.D.N.Y. Aug. 29, 2013) (citing NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 160 (2d Cir. 2012)).

Plaintiffs sufficiently plead the elements of Article III standing for their claims—they each personally suffered an injury, caused by Defendants' conduct, that is redressible by the court. Defendant's standing argument raises a question of typicality, that is whether Plaintiffs'

claims and defenses are sufficiently similar to those of the class to satisfy the requirement under Rule 23(a)(3). This is an issue for class certification and is not considered in this Order.[7]

2.  Group Pleading

Throughout their motions, Defendants argue for dismissal of Plaintiffs' claims under Federal Rule of Civil Procedure 8(a), insisting that the FAC contains improper group pleading that does not distinguish the individual conduct of each Defendant. (CC Mot. at 5-6 & n.2; Ocwen Mot. at 12-13, 17.) This argument is meritless. While some paragraphs in the FAC refer to Defendants collectively, there is more than enough detail of each Defendant's individual conduct, particularly in the fact section, to give each "fair notice of what [each] . . . claim is and the grounds upon which it rests." Twombly, 550 U.S. at 545 (ellipsis in original). (See, e.g., FAC ¶¶ 4-9, 42(vii)-(xii), 65-72, 76, 80-88, 90, 95, 97, 100-101, 145-148, 154-157.) These allegations are incorporated by reference into each count section and are sufficient to satisfy the requirements of Rule 8. Cf. Amiron Dev. Corp. v. Sytner, No. 12-CV-3036 (JS), 2013 WL 1332725, at *6 (E.D.N.Y. Mar. 29, 2013) (finding group pleading did not satisfy the requirements of Rule 8 where defendants were not individually mentioned in the facts section of the complaint or in any exhibits).

---

[7] Courts recognize that some "tension" exists between the "entire concept of class actions" and "requirement of standing." Fort Worth Emps.', 862 F. Supp. 2d at 332. Named plaintiffs inevitably litigate transactions and occurrences that happened to other individuals:

> The cancer-stricken lead plaintiff in an asbestos case brings claims based on other people's cancers; a lead plaintiff, paralyzed from the waist down due to a car brake malfunction, can bring product liability claims on behalf of other people who were paralyzed from the neck down due to the same faulty break design.

Id. (emphasis in original) (quoting In re Bear Stearns Mortg. Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 778 (S.D.N.Y. 2012)). While Article III requirements have been used to deny class claims in cases where the named plaintiff's injury was materially different or different in kind from the injuries suffered by the class, see Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 769 (1st Cir. 2011) (noting examples of Supreme Court decisions), in the context of this case, the difference in home warranty plans is not material to Plaintiffs' theory of injury.

## B.    N.Y. General Business Law § 349

In Count One, the Delgado Plaintiffs claim that all Defendants violated section 349 of the New York General Business Law.[8]  (FAC ¶¶ 113-121.)  Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."  N.Y. Gen. Bus. Law § 349(a).  A claim under section 349 requires that (1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result.  Spagnola v. Chubb Corp., 574 F.3d 64, 74 (2d Cir. 2009) (citing Maurizio v. Goldsmith, 230 F.3d 518, 521 (2d Cir. 2000) (per curiam)).  Section 349 claims are not subject to Rule 9(b)'s heightened pleading standard.  Ackerman v. Coca-Cola Co., No. 09-CV-0395 (JG), 2010 WL 2925955, at *22 (E.D.N.Y. July 21, 2010) (citing Pelman ex rel. Pelman v. McDonald's Corp., 396 F.3d 508, 511 (2d Cir. 2005)).  Defendants challenge all three elements of Plaintiffs' claim.  (See CC Mot. at 13-17; Ocwen Mot. at 6-8 & n.5.)

### 1.    Consumer-Oriented Practices

A practice is "consumer-oriented" if it "ha[s] a broader impact on consumers at large," Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 647 N.E.2d 741, 744 (N.Y. 1995), or "potentially affect[s] similarly situated consumers," Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 64 (2d Cir. 2010) (alteration in original and internal quotations marks omitted).  "Single shot transactions" or "[p]rivate contract disputes, unique to the parties" are not governed by section 349.  Oswego, 647 N.E.2d at 744; see also MaGee v. Paul Revere Life Ins. Co., 954 F. Supp. 582, 586 (E.D.N.Y. 1997) ("[T]he injury must be to the public generally as distinguished from the plaintiff alone.").

---

[8] However, this claim is brought on behalf of the putative New York Systems Gold Subclass and New York Cross Country Subclass.  (FAC ¶ 114.)

Defendants argue that the Delgados' claim "represents a contract dispute" and "fails to allege that Defendants' conduct was directed at, and caused harm to, the general public in New York." (CC Mot. at 14.) The court finds this argument unpersuasive. The FAC states that the Delgados received check solicitations similar to the hundreds of thousands mailed to other Ocwen customers. (FAC ¶ 57.) Plaintiffs allege recurring solicitations, directed broadly at Ocwen's customer base, rather than a transaction that was unique to the Delgados, facts sufficient to show Defendants' conduct was consumer-oriented. See Oswego, 647 N.E.2d at 745 (finding conduct to be consumer-oriented when plaintiffs dealt with defendant Bank "as any customer entering the bank to open a savings account" and were "furnish[ed] . . . with standard documents presented to customers upon the opening of accounts"). Therefore the court finds this element to be adequately pled.

### 2. Materially Misleading

A practice is misleading or deceptive if "a reasonable consumer would have been misled by the defendant's conduct," an objective standard. Ackerman, 2010 WL 2925955, at *22 (citing Marcus v. AT&T, 138 F.3d 46, 64 (2d Cir. 1998); Oswego, 647 N.E.2d at 745 (adopting an "objective definition of deceptive acts and practices . . . limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances")). To make this determination, courts "view[]each allegedly misleading statement in light of its context" on the product label or advertisement "as a whole." Ackerman, 2010 WL 2925955, at *15; see also Avola v. Louisiana-Pac. Corp., 991 F. Supp. 2d 381, 393 (E.D.N.Y. 2013) (noting that courts "consider the advertisement in its entirety . . . . The entire mosaic should be viewed rather than each tile separately."). This issue may be a question of law or of fact "as individual cases require." Oswego, 647 N.E.2d at 745.

Where a defendant fully discloses the terms and conditions of a transaction, New York courts have found that the defendant's conduct is not materially misleading. See Derbaremdiker v. Applebee's Int'l, Inc., No. 12-CV-01058 (KAM), 2012 WL 4482057, at *4 (E.D.N.Y. Sept. 26, 2012) (collecting cases), aff'd, 519 F. App'x 77 (2d Cir. 2013). However, "[a] solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures." F.T.C. v. Cyberspace.com LLC, 453 F.3d 1196, 1200 (9th Cir. 2006) (applying the definition of "deceptive practices" under the Federal Trade Commission Act); Genesco Entm't, a Div. of Lymutt Indus., Inc. v. Koch, 593 F. Supp. 743, 752 (S.D.N.Y. 1984) ("[I]n interpreting the phrase 'deceptive practices' [in section 349,] the New York courts have in large measure relied on the Federal Trade Commission Act's definition of such practices."). Courts have also found that the mere presence of an accurate disclaimer does not necessarily cure other potentially misleading statements or representations on a product or advertisement. See Ackerman, 2010 WL 2925955, at *15 ("[T]he presence of a nutritional panel, though relevant, does not as a matter of law extinguish the possibility that reasonable consumers could be misled by [defendant]'s labeling and marketing."); Goldemberg v. Johnson & Johnson Consumer Cos., Inc., No. 13-CV-3073 (NSR), 2014 WL 1285137, at *5 (S.D.N.Y. Mar. 27, 2014) (holding that where defendant's trademark and "advertising exclusively tout[ed]" the natural ingredients in its "Active Naturals" personal care products, the disclosure of synthetic ingredients on the back label did not as a matter of law prevent a reasonable consumer from being misled). Furthermore, factors such as the font size, placement, or emphasis of a disclaimer can be relevant to whether the terms and conditions were in fact fully disclosed. See Lonner v. Simon Prop. Grp., Inc., 866 N.Y.S.2d 239, 247 (App. Div. 2008) (finding plaintiff stated a section 349 claim based on "the inadequate font size in which the [gift card's] dormancy fee

provision was printed"); Derbaremdiker, 2012 WL 4482057 (finding terms were "fully disclosed" where receipt contained language in same size font as surrounding text directing reader to website for sweepstake rules, which were then accessible via an all capitalized and underlined hyperlink).

The FAC alleges that multiple aspects of the solicitation materials and billing invoices were likely to mislead a reasonable consumer, including the following:

- Ocwen's name as sender on the envelope;

- The similarity between the return address on the envelope and the address on the check (implying that Ocwen is also the payor of the check);

- The solicitation's form as a negotiable instrument;

- The small print and confusing language of the disclosures;

- The inconspicuous disclosure on the front of the check stating "By cashing or depositing this check, you are purchasing the [home warranty plan]";

- The omission of language on the front of the check stating that depositing or cashing the check will result in monthly charges;

- Emphasis in bold lettering on the savings that will result from cashing a small dollar amount check; and

- Unclear mortgage statements that do not plainly identify the source of additional charges or mention Cross Country.

(FAC ¶¶ 40-42, 49-50, 53.) The "net impression" of these and other characteristics of Defendants' materials, according to Plaintiffs, is that the checks are refunds or rebates from Ocwen. (Id. ¶ 118.) Plaintiffs maintain that reasonable consumers would not realize that by depositing the check, they would be enrolled in a home warranty plan.[9] Defendants contend that no reasonable consumer would have been misled given the presence of disclosures on the check

---

[9] Plaintiffs also argue that, at best, a consumer could believe he had "purchased" a home warranty plan but would not realize that he was obligated to pay monthly fees or that the benefits of the plans were very limited. (See Pl. State Opp'n at 16 n.6; FAC ¶¶ 39, 41, 42(v), (xiii), 50, 63-65.)

and sales pitch insert, the promotional nature of the solicitation, and the omission of any statement that the checks were refunds. (CC Mot. at 15-16; Ocwen Mot. at 6-8.)

The court cannot find as a matter of law that no reasonable consumer would be misled by Defendants' solicitation materials. The FAC, and more importantly, the appended examples of Cross Country's solicitation, shows the potential for it to mislead a consumer. A consumer who receives a negotiable check in an envelope from his mortgage servicer could reasonably believe it to be a small refund, perhaps due to an interest rate adjustment. The disclosures advising otherwise are not conspicuous or prominent enough to necessarily cure that misperception. Nor do the mortgage statements Ocwen sent to Plaintiffs fully clarify the source of the charges. See Goldemberg, 2014 WL 1285137, at *5; Ackerman, 2010 WL 2925955, at *15. This is not a case where there is no ambiguity that the consumer was entering a contract, leaving only the question of whether the terms of that transaction were disclosed. (Pl. State Opp'n at 17 & nn.11-12.) See Hines v. Overstock.com, Inc., No. 09-CV-991 (SJ), 2013 WL 4495667, at *9-10 (E.D.N.Y. Aug. 19, 2013) (challenge regarding return policy on vendor's online shopping website); Serrano v. Cablevision Sys. Corp., 863 F. Supp. 2d 157, 161 (E.D.N.Y. 2012) (suit concerning bandwidth limitations in internet service contract); Super Glue Corp. v. Avis Rent A Car Sys., Inc., 557 N.Y.S.2d 959, 960-61 (App. Div. 1990) (claim regarding optional refueling charge in car rental agreement). Rather, here, Plaintiffs plead that a reasonable consumer could be misled as to the very nature of the transaction itself (depositing a refund check versus forming a contract to enroll in a plan with a monthly fee). (Pl. State Opp'n at 17.) Considering the entire solicitation as a whole, the court declines to find that the check solicitation materials are not materially misleading as a matter of law.

18

3. Injury

Injury under section 349 may be pled by alleging a monetary loss resulting from a defendant's deceptive acts, but the loss must be independent of the purchase price of the product. Servedio v. State Farm Ins. Co., 889 F. Supp. 2d 450, 452 (E.D.N.Y. 2012) (citing Small v. Lorillard Tobacco Co., 720 N.E.2d 892, 898 (N.Y. 1999)), aff'd, 531 F. App'x 110 (2d Cir. 2013). The "rationale" of this limitation "is that deceived consumers may nevertheless receive— and retain the benefits of—something of value, even if it is not precisely what they believed they were buying." Id. However, a plaintiff states a cognizable injury if she claims she paid a premium for a product based on misrepresentations about the nature of the good. Ackerman, 2010 WL 2925955, at *22 ("Injury is adequately alleged under GBL § 349 . . . by a claim that a plaintiff paid a premium for a product based on defendants' inaccurate representations."); see also Small, 720 N.E.2d at 898 n.5 ("[A] plaintiff might have a claim for the higher price the consumer paid for the product as a result of the misrepresentation . . . .").

Defendants argue that Plaintiffs fail to plead an injury under section 349 because the loss they allege is the purchase price of the home warranty plans. (CC Mot. at 17; Ocwen Mot. at 8 n.5). Plaintiffs contend that the FAC alleges a "price premium theory of injury," claiming that Plaintiffs' injury was their inflated mortgage statements. (Pl. State Opp'n at 20; FAC ¶¶ 42(xiv), 96, 118(ii), 120.)

The FAC appears to plead two theories of deception: (1) Plaintiffs were misled by Defendants' solicitation and as a result, did not know that by cashing the check they were enrolling in a home warranty plan (see FAC ¶¶ 42(xiii)-(xiv), 73(i), 74, 79); and (2) Plaintiffs were aware they were enrolling in a home warranty plan but were misled as to the nature of that

plan (see FAC ¶¶ 39, 41, 42, 50, 63-65, 73(i), 81).[10] To the extent that Plaintiffs rely on the latter theory, there is no injury under section 349. That theory alleges at best breach of contract or at minimum only buyer's remorse. To satisfy section 349's injury requirement, a "loss must be independent of the loss caused by the alleged breach of contract," Spagnola, 574 F.3d at 74, a condition that Plaintiffs' second theory does not satisfy. Therefore Plaintiffs' section 349 claim is dismissed to the extent it is predicated on allegations that Plaintiffs knew they were enrolling in Defendants' home warranty plans but were misled as to the benefits and characteristics of those plans.

Under the former theory, however, Plaintiffs do plead a section 349 injury. Plaintiffs allege that they were deceived not as to the qualities of the product purchased, but as to the existence of the purchase altogether. (FAC ¶¶ 74, 79.) Courts have recognized an injury under similar circumstances, such as where a plaintiff unknowingly purchases services not required as part of an agreed-upon contract. See Samuel v. Time Warner, Inc., 809 N.Y.S.2d 408, 418 (Sup. Ct. 2005) (holding injury alleged where plaintiff "was misled into ordering an unnecessary converter box and remote" that were not required for her basic cable contract); see also Spagnola, 574 F.3d at 74 (finding no injury because plaintiff "does not claim that he did not receive adequate insurance coverage or that he did not contract for the coverage he received") (emphasis added). Because Plaintiffs allege that they purchased home warranty plans that they did not knowingly contract for, and were subsequently charged, they plead an injury.[11]

_____

[10] The latter theory is supported by facts alleging that Cross Country and Finn misrepresented the benefits of the plans, Plaintiffs find the plans to be "useless," the plans contain many limitations and cannot be used in the first 30 days, and that Plaintiffs were charged $4 more than stated in the disclosures. (See FAC ¶¶ 39, 41, 42(xiii), 63-65, 73(i), 81.)

[11] The court finds this theory of injury to be distinct from a "price premium theory of injury." Plaintiffs did not agree to pay inflated mortgage payments based on a misrepresentation about the premium benefits of the mortgage loan. See Ackerman, 2010 WL 2925955, at *22. Rather, Plaintiffs allege they never actually agreed to pay the additional charges. As the FAC states at least one cognizable theory of injury sufficient to survive a motion to dismiss, the court offers no opinion as to whether the FAC can be construed to also allege a price theory of injury.

\* \* \*

Because the court finds that Plaintiffs have alleged all elements of a section 349 claim, Defendants' motion to dismiss this claim is denied.

### C. California Consumers Legal Remedies Act (CLRA)

In Count Two, Plaintiffs Xu and Mahood bring claims against all Defendants under the California Legal Remedies Act, Cal. Civ. Code § 1750, et seq. ("CLRA").[12] (FAC ¶¶ 122-128.) The CLRA "prohibits specified unfair and deceptive acts and practices in a 'transaction intended to result or which results in the sale or lease of goods or services to any consumer.'" Fairbanks v. Superior Court, 205 P.3d 201, 202 (Cal. 2009) (quoting Cal. Civ. Code § 1770(a)).

Defendants argue that home warranty plans are beyond the scope of the CLRA because they are insurance rather than goods or services. (CC Mot. at 17-18; Ocwen Mot. at 10-12.) The CLRA defines "goods" as "tangible chattels bought or leased for use primarily for personal, family, or household purposes," Cal. Civ. Code § 1761(a), and therefore excludes home warranty programs, which are not "tangible chattels." Thus, the key question is whether Defendant's home warranty programs qualify as "services," defined in the statute as "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." Id. § 1761(b).

California courts have recently addressed this issue in a series of cases. In Fairbanks, the California Supreme Court held that life insurance did not constitute a good or service under the CLRA. 205 P.3d at 203. While the Fairbanks court limited its holding to only life insurance, id. at 203 n.1, in Diaz v. First American Home Buyers Prot. Corp., a Southern District of California court considered whether home warranty plans that provide coverage for the repair or

---

[12] This claim is also brought on behalf of the putative California Residential MD Gold Subclass and California Cross Country Subclass. (FAC ¶ 123.)

21

replacement of household appliances fell within the ambit of the CLRA. No. 09-CV-0775, slip op. at 4-7 (S.D. Cal. June 22, 2009) (Dkt. 15) (ruling on a motion to dismiss). The Diaz court reviewed the CLRA's legislative history, which was examined in dicta in Fairbanks, and concluded that the analysis applied to insurance generally, not solely life insurance.[13] Id. at 5-6. Reasoning that "risk transference is a central and relatively important element of the warranties," and noting that the California Insurance Code lists home protection contracts under its "Classes of Insurance,"[14] the court held that the home warranty programs constituted insurance and were therefore not governed by the CLRA. Id. at 6.

This conclusion was reinforced by the decision in Campion v. Old Republic Home Prot. Co., 861 F. Supp. 2d 1139, 1145-46 (S.D. Cal. 2012). In Campion, the district court found that regardless of whether home warranty plans were actual insurance policies, they were "sufficiently analogous to insurance" to disqualify them as goods or services within the meaning of the CLRA. Id. The court rejected the argument that the home warranty plans were service contracts:

> Defendant's home warranty plans are not contracts for repair or replacement services and Defendant does not itself provide these services. Instead, the plans are designed to offer protection to home owners from potential future losses. The plans obligate Defendant to pay for the cost of the repair or replacement of covered systems and appliances that become inoperable due to normal wear and tear during the term of the contract. It is possible a claim may never be submitted and, thus, a homeowner may not

---

[13] As noted in Fairbanks, the CLRA was adapted from a model law, the National Consumer Act, that expressly included insurance in its definition of "services." 205 P.3d 201, 203-04. The California Legislature, however, omitted the reference to insurance in the CLRA, "thereby indicating its intent *not* to treat all insurance as a service under the Consumers Legal Remedies Act." Id. at 204 (emphasis in original).

[14] The California Insurance Code defines a home protection contract as "a contract or agreement whereby a person, other than a builder, seller, or lessor of the home which is the subject of the contract, undertakes for a specified period of time, for a predetermined fee, to repair or replace all or any part of any component, system or appliance of a home necessitated by wear and tear, deterioration or inherent defect, arising during the effective period of the contract . . . ." Cal. Ins. Code § 12740.

receive any "goods or services" under his or her plan. The home warranty plans provide for a transfer of risk that is not merely incidental, but rather is a central and relatively important element of the plans, and the relationship between Defendant and its plan holders and their respective obligations are consistent with the concept of "insurance," as it is defined in the Insurance Code.

Id.[15]

The reasoning of Fairbanks, Diaz, and Campion applies to the instant case. Plaintiffs allege that Defendants' marketing, solicitation, and billing for Cross Country's home warranty plans violated the CLRA. The FAC states that "Defendants' home warranty and service plans purport to extend warranties on home appliances, and provide discounts for contractors servicing systems such as air conditioning and plumbing." (FAC ¶ 1 n.1) Although Plaintiffs allege that Defendants "know their warranty plan documents state that the plans are not insurance" (FAC ¶ 83), they offer no facts supporting this conclusory allegation nor do the solicitations attached to the FAC support such a proposition. According to the solicitations themselves, one Cross Country plan "protect[s] . . . against the high cost of repairing or replacing [home appliance] systems and other items" by providing coverage in the event of damage or decline. (FAC, Ex. at 5.) Another offers "reimbursement for home insurance deductibles." (Id. at 3.) Whether the plans are labeled "optional insurance" (FAC ¶¶ 8, 80, 83) or "extend[ed] warranties" (id. ¶ 1 n.1), their purported effect is to shift risk from the consumer to Cross Country to protect against future losses. Although the plans offer other benefits such as discounts on repairs, or access to third-party service providers, the focus on the insurance-like aspects of the plans in the solicitations shows those benefits are "a central and relatively important element" of the plans, or at least account for the majority of the touted potential savings. Campion, 861 F. Supp. 2d at

---

[15] Relying heavily on Campion, the California Court of Appeal also affirmed the dismissal of a CLRA claim on the grounds that defendant's home warranty plans did not constitute goods or services under the statute. See Kaplan v. Fid. Nat'l Home Warranty Co., No. D062531, 2013 WL 6641365 (Cal. Ct. App. Dec. 17, 2013) (unpublished).

1146. Therefore, the court finds that Defendants' home warranty plans are analogous to insurance products and do not constitute goods or services under the CLRA.

Plaintiffs maintain that even if the home warranty plans are insurance, other aspects of Defendants' conduct bring this case within the purview of the CLRA. Specifically, Plaintiffs argue that CLRA liability exists because (1) Defendants exploited Ocwen's mortgage servicing relationship with its customers, (2) Ocwen engaged in "convenience services" by collecting the home warranty plan fees, and (3) the home warranty plans were not an important element of the transaction at issue. (Pl. State Opp'n at 22-26.)

As to Plaintiff's first and third arguments, the enrollment of consumers into home warranty plans for which they were charged monthly fees was "[t]he principal object and purpose of the transaction" and is "the element which gives the transaction its distinctive character." Truta v. Avis Rent A Car Sys., Inc., 238 Cal. Rptr. 806, 813 (Ct. App. 1987). Plaintiffs' action is premised on the claim that their enrollment in these plans was the result of fraud. The FAC allege that conspicuous disclosures about the plans, their cost, the mechanism of enrolling, and Cross Country's role as the seller were omitted from the solicitation. (FAC ¶¶ 38-64.) Although Plaintiffs now argue that the "central and relatively important element of the transaction" was a mortgage refund (Pl. State Opp'n at 25), Plaintiffs would not have brought this case if the transaction had in fact been a mortgage refund. In short, the gravamen of Plaintiffs' complaint concerns the manner in which home warranty plans were marketed and sold to them, not how their mortgage was serviced. That Defendants targeted Ocwen mortgage customers in their alleged scheme does not transform the deal into a mortgage transaction. Cf. Truta, 238 Cal. Rptr. at 813 (holding that the optional insurance provision in a car rental agreement did not convert the transaction into an insurance contract). Thus the cases cited by

Plaintiffs, which stand for the proposition that the CLRA applies to services related to residential mortgages, do not apply to this case.[16]

As to Plaintiffs' argument that Defendants' collection of fees for the home warranty plans constituted services, the California Supreme Court in <u>Fairbanks</u> held that "the ancillary services that insurers provide" do not constitute services under the CLRA. 205 P.3d at 206. The court observed that "the sellers of virtually all . . . intangible items . . . provide additional customer services related to the maintenance, value, use, redemption, resale, or repayment of the intangible item" and "[u]sing the existence of these ancillary services to bring intangible goods within the coverage of the CLRA would defeat the apparent legislative intent in limiting the definition of 'goods' to include only 'tangible chattels.'" <u>Id.</u> The reasoning of <u>Fairbanks</u> applies here. Furthermore, if billing services alone can be used as a hook to bring any business practice into the scope of the CLRA, then the statute's definitional limitations would be rendered meaningless for any product for which a seller sends an invoice.[17]

Therefore the court dismisses Plaintiffs' claims under the CLRA because Defendants' practices in connection with the marketing, sale, and billing of home warranty plans are not covered by the statute. This dismissal is with prejudice as, in the court's view, further

---

[16] <u>See</u> Pl. State Opp'n at 23 & n.20 (citing <u>Hernandez v. Sutter W. Capital</u>, No. 09-CV-3658 (CRB), 2010 WL 539133 (N.D. Cal. Feb. 8, 2010); <u>Hernandez v. Hilltop Fin. Mortg., Inc.</u>, 622 F. Supp. 2d 842 (N.D. Cal. 2007); <u>Jefferson v. Chase Home Fin. LLC</u>, No. 06-CV-6510 (THE), 2007 WL 1302984 (N.D. Cal. May 3, 2007)).

[17] <u>Hawthorne v. Umpqua Bank</u>, cited by Plaintiffs, does not militate against this conclusion. No. 11-CV-06700 (JST), 2013 WL 5781608 (N.D. Cal. Oct. 25, 2013). There, the court found that overdrafts and overdraft fees were within the CLRA's definition of a service because they were part of debit card banking as a whole, which the court concluded was a financial service:

> "California courts generally find financial transactions to be subject to the CLRA." . . . [D]escribing debit cards as a "service" is consistent with the benefits consumers actually receive. The relationship between Umpqua Bank and its customers is not simply a checking account relationship, and it certainly is not limited solely to the imposition of overdraft fees. Rather, the debit card relationship is best understood as encompassing convenience services that go beyond those associated with a simple checking account.

<u>Id.</u> at 10 (internal citations omitted). Thus the court did not rule that the overdraft fee collection <u>alone</u> brought the defendant's conduct within the CLRA's purview.

amendments to the pleadings would be futile. See Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000). Having dismissed this claim, the court declines to address the sufficiency of Plaintiffs' affidavit under Cal. Civ. Code § 1780(d) or whether the pleading of this cause of action satisfies Rule 9(b)'s particularity requirements.

### D.    California Unfair Competition Law (UCL)

In Count Three, Plaintiffs Xu and Mahood bring claims against all Defendants under the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq. ("UCL").[18] (FAC ¶¶ 129-139.) The UCL prohibits "unfair competition" and is violated where a business "act or practice is '(1) unlawful, (2) unfair, (3) fraudulent, or (4) in violation of section 17500 (false or misleading advertisements).'" Ackerman, 2010 WL 2925955, at *18 (quoting Lozano v. AT&T Wireless Servs., Inc., 504 F.3d 718, 731 (9th Cir. 2007)). In addition, a UCL claim grounded in fraud is subject to Rule 9(b)'s heightened pleading standards. In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litig., No. 13-MD-2451 (ADS), 2014 WL 868827, at *16 (E.D.N.Y. Mar. 5, 2014) (citing Kane v. Chobani, Inc., No. 12-CV-0242 (LHK), 2013 WL 5289253, at *7 n.4 (N.D. Cal. Sept. 19, 2013)). "Even if 'fraud is not a necessary element of a particular claim,'" Rule 9(b) will apply if the plaintiff has 'allege[d] a unified course of fraudulent conduct and relied entirely on that course of conduct as the basis of the claim.'" Id. (quoting Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103 (9th Cir. 2003)).

Plaintiffs allege distinct theories of liability under the UCL's "unlawful" and "unfair" prongs and seek restitution, disgorgement, and injunctive relief. (FAC ¶¶ 132, 135; Pl. State Opp'n at 32.)

---

[18] This claim is also brought on behalf of the putative California Residential MD Gold Subclass and California Cross Country Subclass. (FAC ¶ 130.)

1.    Standing

Defendants first argue that Plaintiffs lack Article III standing to pursue injunctive relief under the UCL. (Ocwen Mot. at 15-16; CC Mot. at 22-23.) Defendants contend that there is no imminent threat of repeated injury because Plaintiffs have cancelled their home warranty plans and could not unknowingly enroll again now that they are aware of the mechanism of enrollment. (Ocwen Mot. at 15-16; CC Mot. at 22-23.) The court finds that this argument construes standing too narrowly. Plaintiffs allege that Defendants' practices are ongoing, including conduct directed at them. The Delgados received check solicitations from Cross Country after cancelling their plan, and Mahood received an allegedly deceptive transaction statement from Ocwen even after this action was filed. (FAC ¶¶ 39 n.2, 144 & Ex.) It also appears that Ocwen still services the Plaintiffs' mortgages, exposing them to future mailings of this nature. Finding that Plaintiffs have no federal standing to enjoin a deceptive practice once they become aware of the scheme would "eviscerate the intent of the California legislature in creating consumer protection statutes." Larsen v. Trader Joe's Co., No. 11-CV-05188 (SI), 2012 WL 5458396, at *4 (N.D. Cal. June 14, 2012) (citing Henderson v. Gruma Corp., No. 10-CV-04173 (AHM), 2011 WL 1362188 (C.D. Cal. Apr. 11, 2011)). Therefore the court finds that Plaintiffs have standing to seek injunctive relief under the UCL.

2.    Unlawful Prong

"By proscribing 'any unlawful' business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the [UCL] makes independently actionable." Pellerin v. Honeywell Int'l, Inc., 877 F. Supp. 2d 983, 992 (S.D. Cal. 2012) (citing Cel-Tech Commc'ns Inc. v. L.A. Cellular Tel. Co., 973 P.2d 527, 539-40 (Cal. 1999)). Plaintiffs' unlawful practices claim is predicated solely on Defendants' alleged violation of the

27

CLRA. (FAC ¶ 133.) Since the court has dismissed Plaintiffs' claims under the CLRA, Plaintiffs' UCL claim based on a CLRA violation may not stand. See Rubin v. Wal-Mart Stores, Inc., 599 F. Supp. 2d 1176, 1179 (N.D. Cal. 2009) (dismissing UCL claim where underlying claim was invalid). Therefore this claim is dismissed without prejudice. However, because "virtually any law—federal, state or local—can serve as a predicate for a section 17200 action," Stevens v. Superior Court, 89 Cal. Rptr. 2d 370, 375 (Ct. App. 1999), the court grants Plaintiffs leave to amend should they seek to plead a different predicate violation, see Cullen v. Netflix, Inc., 880 F. Supp. 2d 1017, 1028 (N.D. Cal. 2012) (dismissing UCL claim because all predicate causes of action were dismissed and granting leave to amend).

### 3. Unfair Prong

A practice may be "unfair" under the UCL "even if not specifically proscribed by some other law." Cel-Tech Commc'ns, 973 P.2d at 540. California courts have applied several definitions of unfair practices:

> (1) An act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided.

> (2) An "unfair" business practice occurs when that practice offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

> (3) An unfair business practice means the public policy which is a predicate to the action must be "tethered" to specific constitutional, statutory or regulatory provisions.

West v. J.P. Morgan Chase Bank, N.A., 154 Cal. Rptr. 3d 285, 305 (Ct. App. 2013) (internal citations, quotations marks, and alterations omitted). Under the second definition (the "balancing test") a court must also "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." Herskowitz v. Apple Inc., 940 F. Supp. 2d 1131,

1146 (N.D. Cal. 2013). There is some dispute as to whether the first definition, borrowed from section 5 of the Federal Trade Commission Act (the "FTCA test") and third definition (the "tethering test") apply in consumer cases. See Beaver v. Tarsadia Hotels, No. 11-CV-1842 (GPC), 2014 WL 3002297, at *14-15 (S.D. Cal. July 2, 2014) (discussing division in case law); see also, e.g., Camacho v. Auto. Club of S. Cal., 48 Cal. Rptr. 3d 770, 776 (Ct. App. 2006) (declining to apply the tethering test in favor of the FTCA test)). But see, e.g., Lozano, 504 F.3d at 736 (rejecting the FTCA test and endorsing the remaining two tests).[19] However, as the California Supreme Court has not clearly weighed in on this issue, the court will assume that all three definitions remain valid.

Plaintiffs plead a substantial injury to consumers in the monthly fees charged for Defendants' home warranty plans. The FAC states not only that Xu and Mahood suffered this loss but also that Ocwen consumers in California were broadly affected. (FAC ¶¶ 12, 96, 102, 137-138.) Defendants' contend that Plaintiffs did not suffer an economic injury because they received the benefit of their bargain in the form of access to the home warranty plans' benefits. (CC Mot. at 21.) However, regardless of what services were available to Plaintiffs under the plans, the court cannot find that the transaction was a bargained-for exchange when Plaintiffs claim they were misled as to the effect of cashing the solicitation check and did not know they

---

[19] The tethering test was originally adopted by the California Supreme Court in an antitrust case as a means of supplying a more concrete analysis to the balancing test, which relied on the amorphous concept of public policy. See Cel-Tech Commc'ns, 973 P.2d at 543. Recognizing that "'[t]ethering' the concept of unfairness to existing positive law undercuts the principle that a practice is prohibited as 'unfair' or 'deceptive,' even if it not 'unlawful,'" in Camacho, the California Court of Appeal declined to apply it to consumer cases, which, unlike antitrust cases, often concern new and varied schemes that have not yet been specifically proscribed by law or regulation. 48 Cal. Rptr. 3d at 776. Instead, the Camacho court applied the FTCA test. Id. In Lozano, however, the Ninth Circuit rejected the FTCA test, reasoning that section 5 of the FTCA had only been endorsed as "guidance" by the California Supreme Court in the context of examining anti-competitive conduct, and therefore did not apply to cases involving anti-consumer conduct. 504 F.3d at 736 (citing Cel-Tech, 973 P.2d at 543). Loranzo held that the other two tests were valid. Id. at 737.

were entering a contract. Plaintiffs allege that "considering the available legal alternatives which exist for Defendants to increase their revenues," the injury outweighs any "justification, motive or reason" for Defendants' practices. (FAC ¶ 137.) Plaintiffs further allege that Defendants' practices were "immoral, unethical, unscrupulous, and offen[sive to] public policy." (Id.) Finally, Plaintiffs claim that the injury was not "reasonably avoidable." (Id.) As discussed above in regard to Plaintiffs' claim under section 349 of the New York General Business Law, multiple aspects of the solicitation materials and billing invoices could have deceived a consumer as to the nature of the transaction, despite the inconspicuous disclaimers. See supra Part IV.B.2. These allegations state a claim under both the first and second definitions of "unfair" practices, the FTCA test and the balancing test, respectively.

Plaintiffs argue that their allegations also satisfy the tethering test because their "claims are tethered to the legislative declared policy of protecting consumers from deceptive conduct . . . evidenced in both the UCL and the CLRA . . . ." (Pl. State Opp'n at 36.) In light of the court's dismissal of Plaintiffs' CLRA claim, the court finds that Plaintiffs have not identified a statutory provision to which Defendants' violation is tethered. See Herskowitz, 940 F. Supp. 2d at 1146. However, through the alternative definitions of the "unfair" prong, Plaintiffs have stated a claim under the UCL.

**E.   RICO**

To establish a civil RICO claim, a plaintiff must show: "(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 120 (2d Cir. 2013); UFCW Local 1776 v. Eli Lilly & Co., 620 F.3d 121, 131 (2d Cir. 2010). To plead the first element, a substantive violation of the RICO statute, a plaintiff must allege the "(1) conduct

(2) of an enterprise (3) through a pattern (4) of racketeering activity." Cruz , 720 F.3d at 120;

see also Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985).

      1.    RICO Enterprise

Under 18 U.S.C. § 1961(4), an "'enterprise' includes any individual, partnership,

corporation, association, or other legal entity, and any union or group of individuals associated in

fact although not a legal entity." 18 U.S.C. § 1961(4). An "association-in-fact" enterprise

requires "at least three structural features: a purpose, relationships among those associated with

the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's

purpose." Boyle v. United States, 556 U.S. 938, 946 (2009); United States v. Turkette, 452 U.S.

576, 583 (1981) (describing an enterprise as "a group of persons associated together for a

common purpose of engaging in a course of conduct"). A court in this district has recognized

that "Boyle establishes a low threshold for pleading such an enterprise." McGee v. State Farm

Mut. Auto. Ins. Co., No. 08-CV-392 (FB), 2009 WL 2132439, at *4 n.7 (E.D.N.Y. July 10,

2009). Formal hierarchy, role differentiation, regular meetings, or established procedures are not

required; rather, an informal entity may constitute an enterprise as long as "the group . . .

function[s] as a continuing unit and remain[s] in existence long enough to pursue a course of

conduct." Boyle, 556 U.S. at 948. Although by definition the pattern of racketeering activity is

separate and distinct element from the enterprise itself, "the evidence used to prove the pattern of

racketeering activity and the evidence establishing an enterprise 'may in particular cases

coalesce.'" Id. at 947 (quoting Turkette, 452 U.S. at 583); see also United States v. Int'l

Longshoremen's Ass'n, 518 F. Supp. 2d 422, 473 (E.D.N.Y. 2007).

Defendants contend that Plaintiffs fail to adequately plead an enterprise. For instance,

Ocwen argues that "[t]he FAC does not describe . . . any independently-functioning entity—

much less its structure, purpose, the relationships among the parties nor temporal allegations regarding its longevity." (Ocwen Mot. at 22.)

The court finds, however, that Plaintiffs have sufficiently pled an association-in-fact enterprise. The FAC sets forth facts describing how Defendants functioned as a unit that worked toward a common purpose, namely "limiting costs and maximizing each members' profits by engaging in the fraudulent Check Solicitation Scheme." (FAC ¶ 147.) Plaintiffs plead in detail the relationship among defendants, alleging that Ocwen shares its logo and customer lists and includes monthly charges for Cross Country's plan on its bills; Cross Country creates and mails the solicitation materials; and Finn endorses the checks and sales pitch inserts. (See FAC ¶¶ 42-43, 48-50, 67-72, 148-149.) In addition, Plaintiffs allege that this arrangement is underpinned by "contractual relationships, agreements, and financial ties," pointing out that this partnership is the sort of financial venture Cross Country touts on its website. (Id. ¶ 149.) These allegations identify the role of each Defendant and the linkages among them. As for longevity, Plaintiffs have pled facts showing that the enterprise endured for more than two years, long enough to solicit Plaintiffs, enroll them in home warranty plans, assess monthly fees, and collect the money. (FAC ¶¶ 76, 144, 163.) Plaintiffs further allege that the enterprise still exists today. (Id. ¶ 146.) Therefore the court finds that Plaintiffs have adequately pled the existence of an enterprise consisting of Ocwen, Cross Country, and Finn.

      2.    Pattern of Racketeering

A "pattern of racketeering activity" requires at least two predicate acts of racketeering activity committed within a ten-year period. 18 U.S.C. § 1961(5); First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 178 (2d Cir. 2004). "To establish a pattern, a plaintiff must also make a showing that the predicate acts of racketeering activity by a defendant are

'related, and that they amount to or pose a threat of continued criminal activity.'" Cofacredit,

S.A. v. Windsor Plumbing Supply Co., Inc., 187 F.3d 229, 242 (2d Cir. 1999) (quoting H.J., Inc.

v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989)).

### a. *Mail and Wire Fraud*

Acts of mail fraud or wire fraud may constitute predicate acts of racketeering activity as

defined in § 1961. 18 U.S.C. § 1961(1). Wire and mail fraud under 18 U.S.C. §§ 1341 and

1343, respectively, require three elements: (1) the existence of a scheme to defraud, (2)

defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails

or transmission facilities in furtherance of the scheme. S.Q.K.F.C., Inc. v. Bell Atl. TriCon

Leasing Corp., 84 F.3d 629, 633 (2d Cir. 1996) (quoting United States v. Gelb, 700 F.2d 875,

879 (2d Cir. 1983)). A scheme to defraud "has been described as a plan to deprive a person 'of

something of value by trick, deceit, chicane or overreaching.'" United States v. Autuori, 212

F.3d 105, 115 (2d Cir. 2000). In addition, "the plaintiffs must allege facts that give rise to a

strong inference of fraudulent intent." First Capital Asset Mgmt., 385 F.3d at 179; DeFazio v.

Wallis, 500 F. Supp. 2d 197, 203 (E.D.N.Y. 2007). This is done by "(1) alleging facts to show

that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that

constitute strong circumstantial evidence of conscious misbehavior or recklessness."

S.Q.K.F.C., 84 F.3d at 633.

Federal Rule of Civil Procedure 9(b) subjects RICO claims involving fraud to a

heightened pleading standard, see Lundy v. Catholic Health Sys. of Long Island Inc., 711 F.3d

106, 119-20 (2d Cir. 2013), and therefore allegations of predicate acts of mail and wire fraud

must "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b).

Specifically, the "complaint must adequately specify the statements it claims were false or

misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." Lundy, 711 F.3d at 119; see also Bologna v. Allstate Ins. Co., 138 F. Supp. 2d 310, 321 (E.D.N.Y. 2001) ("To specify acts of alleged wire and mail fraud with the necessary particularity, the complaint should contain evidence of the content, time, place, and speaker of each alleged mailing or wire transmission.").

Defendants argue that Plaintiffs' RICO claim must be dismissed because the FAC does not adequately plead the predicate acts of mail and wire fraud. (Ocwen Mot. at 20; CC Mot. at 7-10.) Defendants assert that Plaintiffs' mail and wire fraud claims amount to "various generalized allegations" and that Plaintiffs fail to identify any false or fraudulent statements by Defendants, thus falling short of the requisite particularity standard for pleading claims sounding in fraud. (Ocwen Mot. at 21; CC Mot. at 7.) Cross Country further argues that Plaintiffs do not allege facts supporting an inference of fraudulent intent or an inference that the mailing was in furtherance of a scheme to defraud. (CC Mot. at 7-8.) Finally, Cross Country contends that even if Plaintiffs have pleaded mail or wire fraud, these allegations do not demonstrate a "pattern" because Defendants' acts all relate to single transaction. (Id. at 9-10.)

Even a cursory glance at the 187-paragraph FAC reveals that Plaintiffs' claims are more than generalized allegations. This case differs from a case recently decided in this circuit, In re Trilegiant Corp., where consumers brought a putative class action alleging violations of the RICO statute predicated on acts of mail and wire fraud. No. 12-CV-396 (VLB), 2014 WL 1315244 (D. Conn. Mar. 28, 2014). In Trilegiant Corp., the plaintiffs claimed they were deceptively enrolled in membership programs through the defendants' internet offer pages, but the court found that the complaint "fail[ed] to describe specifically how any mail or wire

34

communication was used to enroll them in the Trilegiant membership programs" and did not "describ[e] the contents or details of any one mail or wire communication that was fraudulent." In re Trilegiant Corp., Inc., 2014 WL 1315244, at *12. Plaintiffs also failed to set forth when the communications were made and by whom. Id. Finding that "Plaintiffs have not even alleged how they were defrauded," the court held that Plaintiff fell short of Rule 9(b)'s particularity requirement and insufficiently pleaded a pattern of racketeering. Id.

Here, however, Plaintiffs describe the Defendants' alleged fraud in detail and "connect the allegations of fraud to each individual defendant." Colony at Holbrook, Inc. v. Strata G.C., Inc., 928 F. Supp. 1224, 1231 (E.D.N.Y. 1996). The FAC describes the content of the solicitations from Cross Country and Finn (FAC ¶¶ 43-64, 76-78, 90-92, 97 & Ex. at 1-5), the mortgage statements from Ocwen (id. ¶¶ 66-72, 81-82, 95, 100), and other communications from Ocwen (id. ¶¶ 80, 83). The FAC clearly alleges when each communication to each Plaintiff was made as well as which Defendant sent each communication. (Id. ¶¶ 76-102.) Crucially, the FAC also explains the manner in which these communications were misleading, pointing out, for example, how the use of Ocwen's name and logo would lead recipients to believe the check was a rebate from the mortgage servicer (id. ¶¶ 42, 156); how the small print disclosures on the front and back of the check were not conspicuous and contradict each other (id. ¶¶ 42, 49-50); and how the descriptions on Ocwen's mortgage statements did not clearly indicate the source of the charges (id. ¶¶ 42, 156). These misrepresentations set forth make up the alleged scheme to defraud.

The FAC also pleads materiality and fraudulent intent. Plaintiffs assert that the omissions and misrepresentations in Defendants' communication were material because, with full and accurate disclosures, "Plaintiffs would have been aware of the deceit involved in obtaining their

signatures for the useless plans and would have challenged Ocwen's unlawful assessments and billing practices, or would not have paid the monthly charges tacked on their mortgage statements." (Id. ¶ 158.) In other words, Plaintiffs were unaware that by cashing a check, they had contracted with Cross County to enroll in a home warranty plan and did not know the source of the additional charges on their mortgage statements, facts from which it may be inferred that Defendants' misrepresentations were material. As to fraudulent intent, Plaintiffs plead generally—as permitted by Rule 9(b) for allegations of intent—that "Defendants knowingly or fraudulently concealed and/or omitted material information" in their communications. (Id. ¶ 160.) Fraudulent intent may also be inferred from facts alleging a motive and opportunity for Defendants' alleged fraud, S.Q.K.F.C., Inc., 84 F.3d at 633, and here, the FAC asserts Defendants' desire to profit from enrolling customers who will not use the benefits of the home warranty plans through sending misleading solicitations to Ocwen's customers base and billing them on their preexisting mortgage statements. (FAC ¶ 42.) Cross Country claims that the presence of disclosures on the solicitations "vitiates any inference of fraudulent intent." (CC Mot. at 8.) However, Plaintiffs have pleaded that the inconspicuous nature of these disclosures nullifies their curative effect, particularly in the context of other misleading statements and characteristics of the mailing. (FAC ¶¶ 49-50 & Ex.) Drawing all reasonable inferences in Plaintiffs' favor, the court finds that they adequately plead fraudulent intent.

Having found that Plaintiffs have pleaded a scheme to defraud, the court also concludes that they have adequately alleged that the mailing was in furtherance of the scheme to defraud. Cross Country argues that because the billing statements and other notices included charges for the home warranty plans, they increased the likelihood of detection rather than furthered the alleged fraud. (CC Mot. at 8.) However, Plaintiffs have alleged that the unclear billing and

36

invoice descriptions obscured rather than revealed the origin of the charges. (FAC ¶¶ 66-72.) Even if these invoices were not themselves deceptive, Plaintiffs' allegations concerning the original solicitations still support a finding of mailings in furtherance of the alleged fraud.[20]

Finally, these mailings establish a pattern because they occurred on multiple occasions within a period of ten years of each other. (FAC ¶¶ 76, 144, 163.) Defendants' argument that Plaintiffs allege only a single predicate act because there was only a single fraud or a purchase of a single product (CC Mot. at 9-10) is incorrect. First, this argument mischaracterizes the FAC, which does not allege a "single episode of fraud involving one victim and relating to one basic transaction." (Id.) At minimum, excluding any class allegations, the FAC pleads facts concerning four victims, three transactions, and two types of home warranty plans. Second, separate mailings may qualify as individual predicate acts even if they are in support of a single fraud. See United States v. Ramirez, 420 F.3d 134, 145 (2d Cir. 2005) ("It is well-established that each use of the mails constitutes a separate offense of mail fraud."); see also North Star Contracting v. Long Island R.R. Co., 723 F. Supp. 902, 906 (E.D.N.Y. 1989) (holding that individual mailings in the course of a single fraud constitute separate predicate acts of mail fraud in civil RICO actions). Therefore, Plaintiffs state a separate predicate act with each mailing.

    b.    *Continuity*

To plead a pattern of racketeering activity, a plaintiff must also allege that the predicate acts were "related, and that they amount to or pose a threat of continued criminal activity." Cofacredit, 187 F.3d at 242. Defendants do not challenge the relatedness of Plaintiffs' predicate acts but argue that Plaintiffs have not adequately alleged continuity. (CC Mot. at 10-12.) The

---

[20] The court rejects Cross Country's argument that the disclosures on the solicitation and check reveal rather than conceal the home warranty plan enrollment and charges (CC Mot. at 8 n.4), for the reasons discussed above with respect to fraudulent intent: Plaintiffs have alleged that these disclosures did not remedy the misleading nature of the solicitation.

continuity requirement may be satisfied by showing either closed-ended continuity or open-ended continuity. Cofacredit, 187 F.3d at 242.

i.    Closed-Ended Continuity

To plead closed-ended continuity, a plaintiff must allege "a series of related predicates extending over a substantial period of time." Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 184 (2d Cir. 2008) (quoting H.J. Inc., 492 U.S. at 242). "Although closed-ended continuity is primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." Cofacredit, 187 F.3d at 242. Since the Supreme Court's decision in H.J. Inc., the Second Circuit has "never held a period of less than two years to constitute a 'substantial period of time.'" Cofacredit, 187 F.3d at 242; Spool, 520 F.3d at 184 (finding a sixteen-month period to be insufficient to establish closed-ended continuity); Metromedia Co. v. Fugazy, 983 F.2d 350, 369 (2d Cir. 1992) (finding closed-ended continuity when predicate acts occurred over a period of two years). The relevant period of time is measured by the timing of the commission of the predicate acts. Cofacredit, 187 F.3d at 243.

Cross Country argues that the FAC pleads only a "discrete scheme of mail- and wire-fraud" that lasted less than a year and ended when Plaintiff cancelled their plans. (CC Mot. at 10.) This calculation, however, accounts only for the time each Plaintiff was enrolled in a home warranty plan rather than measuring by the alleged incidents of mail fraud.[21] Focusing on Defendants' predicate acts, Plaintiffs claim the period spans at least two years and three months, from August 2011, when the Delgado Plaintiffs first received Defendants' solicitation, to

---

[21] To support its argument, Cross Country cites the FAC's allegations that "Plaintiffs were unaware that they were enrolled in a Cross country plan—a year for the Delgados, five months for Plaintiff Mahood, and two months for Plaintiff Xu." (CC Mot. at 10 (citing FAC ¶ 74).)

November 2013 when Plaintiff Mahood received a "deceptive transaction statement." (Pl. RICO Opp'n at 18; FAC ¶¶ 76, 144, 163.) Although Plaintiffs plead dates relating to only four victims, they allege that the scheme involved hundreds of thousands of solicitations and numerous other victims (FAC ¶¶ 12, 57, 147), facts that support allegations of closed-ended continuity, see Cofacredit, 187 F.3d at 242. Thus the court does not read the FAC to describe only a "discrete scheme with a narrow purpose or a single property" as its object, Gross v. Waywell, 628 F. Supp. 2d 475, 494 (S.D.N.Y. 2009), and finds the FAC to state closed-ended continuity.

ii.    Open-Ended Continuity

Plaintiffs also state facts supporting open-ended continuity. To plead open-ended continuity, a plaintiff need not demonstrate a period of activity of more than two years, but must allege that "there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." Cofacredit, 187 F.3d at 242; GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 466 (2d Cir. 1995) (describing open-ended continuity as "past criminal conduct coupled with a threat of future criminal conduct"). In considering the existence of a continuing threat, a court looks at the nature of the enterprise and of the predicate acts. Cofacredit, 187 F.3d at 242. "Where the enterprise is engaged primarily in racketeering activity, and the predicate acts are inherently unlawful," a threat of continued criminal activity is presumed. Id.; Spool, 520 F.3d at 185. However, where an enterprise is primarily engaged in legitimate business practices, there is no such presumption, and courts look to "other external factors" that suggest a threat of continued criminal activity exists. GICC Capital Corp., 67 F.3d at 466. "[T]here must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." Spool, 520 F.3d at 185.

Defendants' alleged racketeering activity occurred as part of the marketing and sale of home warranty plans and the servicing of home mortgage loans, business endeavors that are not "inherently unlawful." Thus there is no presumption of a "threat of continued criminal activity." See Kalimantano GmbH v. Motion in Time, Inc., 939 F. Supp. 2d 392, 408 (S.D.N.Y. 2013) (finding no presumption of a threat of continued criminal activity from defendant's alleged fraud in connection with marketing luxury watches). Plaintiffs allege open-ended continuity by pleading that Defendants mailed hundreds of thousands of solicitations to Ocwen customers, and that Ocwen's deceptive billing continued as of the date of the FAC. (Pl. RICO Opp'n at 16; FAC ¶ 163.) The FAC also incorporates several complaints from an online consumer message board of purported Ocwen customers who were misled by Defendants' solicitations and enrolled in home warranty plans, including commenters claiming to be from Georgia, Arizona, and California. (FAC ¶ 74.) Plaintiffs claim there are hundreds of similar internet complaints. (FAC ¶ 163.) Given such allegations describing the broad scope of Defendants' scheme, the court cannot conclude as a matter of law that Defendants' alleged criminal activity was a discrete, "isolated," or a one-time event. See Beauford v. Helmsley, 865 F.2d 1386, 1392 (2d Cir. 1989) (en banc) (holding that allegations of a one-time mailing of 8,000 fraudulent documents adequately pleaded continuity), vacated, 492 U.S. 914, adhered to on remand, 893 F.2d 1433. Nor can the court accept Cross Country's argument that the conduct is "inherently terminable" or has a "foreseeable endpoint,"[22] (CC Mot. at 12) given allegations that at least two Plaintiffs

---

[22] The cases relied upon by Defendants concern a fraudulent scheme to loot a collection of finite assets, GICC Capital Corp., 67 F.3d at 466, and insurance fraud, Cofacredit, 187 F.3d at 244. In those cases, since there were no more funds available because the assets had been completely depleted and the limit of the insurance policy had been reached, there was no threat of continued criminal activity. Cofacredit, 187 F.3d at 244; GICC Capital Corp., 67 F.3d at 466. Here, however, Defendants can and did continue to solicit Ocwen's growing customer base through the same scheme. (FAC ¶ 33 (alleging Ocwen's servicing portfolio has increased sixfold since 2009).)

continued to receive solicitations or bills for home warranty plans after cancelling their plans (FAC ¶¶ 39 n.2, 144, 163). See DeFalco v. Bernas, 244 F.3d 286, 324 (2d Cir. 2001) (finding that defendants' continuing demands for an increasing interest in a gravel pit's sales "indicated that they had no intention of stopping once they met some immediate goal"). Therefore a threat of continued criminal activity may be inferred from the facts set forth in the FAC. Since open-ended continuity is adequately alleged in this way, the court need not address whether the predicate acts represent Defendants' regular way of doing business.

       3.    <u>Causation</u>

Ocwen also challenges the third element of Plaintiffs' civil RICO claim, arguing that Plaintiffs do not allege that their injury was caused by Defendants' alleged § 1962 violation because they cannot show reasonable reliance on Defendants' representations. (Ocwen Mot. at 23.) "[I]n order to prevail on a civil RICO claim predicated on any type of fraud . . . the plaintiff must establish 'reasonable reliance' on the defendants' purported misrepresentations or omissions." Bank of China, N.Y. Branch v. NBM LLC, 359 F.3d 171, 178 (2d Cir. 2004); see also Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 368 (1992) ("In the context of an alleged RICO predicate act of mail fraud, . . . to establish the required causal connection, the plaintiff [is] required to demonstrate that the defendant's misrepresentations were relied on."). Proximate cause in RICO claims is grounded in "its common law foundations" and "[a] link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." Hemi Grp., LLC v. City of New York, 559 U.S. 1, 2 (2010) (alteration in original) (quoting Holmes, 503 U.S. at 268).

Defendants' argument essentially restates its contention that no reasonable consumer would have been misled by the solicitation materials, discussed concerning Plaintiffs' section 349 claim. See supra Part IV.B.2. Although a section 349 claim does not require proof of

reasonable reliance, Derbaremdiker, 2012 WL 4482057, at *7, in the context of Plaintiffs' RICO claim, this element is adequately alleged. The FAC details the misleading elements of the solicitations such as the use of Ocwen's name and logo on the envelope, the form of a negotiable check, and the lack of prominent disclosures or clear reference to Cross Country. (FAC ¶¶ 42, 49-50.) Based on these features, Plaintiffs claim they were "all deceived into thinking that the check was for a small-dollar refund." (Id. ¶ 48.) The court finds that this reliance was not unreasonable as a matter of law. Therefore Plaintiffs have stated a "direct relation between the injury asserted and the injurious conduct alleged." Hemi Grp., 559 U.S. at 2.

\* \* \*

Finding that the FAC pleads all elements of a RICO violation by all Defendants, the court denies Defendants' motion to dismiss this claim.

## F. RICO Conspiracy

In Count Five, Plaintiffs claim that Defendants engaged in a RICO conspiracy in violation of 18 U.S.C. § 1962(d). (FAC ¶¶ 165-170.) To state a claim of RICO conspiracy, a plaintiff must plead that a "defendant agreed to participate in the affairs of the enterprise through a pattern of racketeering activity." Allstate Ins. Co. v. Etienne, No. 09-CV-3582 (SLT), 2010 WL 4338333, at *8 (E.D.N.Y. Oct. 26, 2010) (citing United States v. Yanotti, 541 F.3d 112, 121-22 (2d Cir. 2008)). However, a plaintiff need not allege "a conspiracy to commit [specific] predicate acts." Crabhouse of Douglaston Inc. v. Newsday Inc., 801 F. Supp. 2d 64, 89 (E.D.N.Y. 2011) (quoting United States v. Pizzonia, 577 F.3d 455, 463 (2d Cir. 2009)). Having adequately pleaded the existence of a RICO enterprise, a plaintiff need only further allege "that the defendants . . . know the general nature of the conspiracy and that the conspiracy extends

beyond [their] individual roles." Id. (omission and alteration in original) (quoting United States v. Zichettello, 208 F.3d 72, 99 (2d Cir. 2000)).

Plaintiffs allege that all three Defendants "directed and controlled the affairs of the . . . [e]nterprise, were aware of the nature and scope of the [e]nterprise's unlawful scheme, and all agreed to participate in it." (FAC ¶ 168.) The facts section of the FAC supplements these somewhat conclusory allegations, describing Defendants' knowledge of the design and tactics of the conspiracy, their agreement to participate, and their different roles. (See, e.g., FAC ¶¶ 38, 42, 147-150.) Since Plaintiffs adequately plead a substantive RICO violation, the court finds these additional facts sufficient to allege RICO conspiracy as well. Defendants' motion to dismiss this claim is denied.

### G.    Remaining State Law Claims

#### 1.    Unjust Enrichment

Count Six alleges that Defendants have been unjustly enriched at Plaintiffs' expense and seeks restitution.[23] (FAC ¶¶ 171-180.) Defendants contend that Plaintiffs may not state an unjust enrichment claim where a valid contract exists between Plaintiffs and Cross Country (CC Mot. at 23) and between Plaintiffs and Ocwen (Ocwen Mot. at 24).

Several California Court of Appeal decisions confirm that under California law, "[u]njust enrichment is not a cause of action, just a restitution claim." Hill v. Roll Int'l Corp., 128 Cal. Rptr. 3d 109, 118 (Ct. App. 2011); see also Levine v. Blue Shield of Cal., 117 Cal. Rptr. 3d 262, 278-79 (Ct. App. 2010); Durell v. Sharp Healthcare, 108 Cal. Rptr. 3d 682, 699 (Ct. App. 2010).

---

[23] Plaintiffs also bring this claim on behalf of the putative New York Systems MD Gold Subclass, the New York Cross Country Subclass, the California Residential MD Gold Subclass, and the California Cross Country Subclass. (FAC ¶ 172.) Cross County argues that Plaintiffs fail to plead which state's law applies to the unjust enrichment claim brought on behalf of the various multi-state subclasses. (CC Mot. at 23.) Because Plaintiffs do not bring this claim on behalf of any of the multi-state subclasses—the putative Multistate Systems MD Gold Subclass, Multistate Residential MD Gold Subclass, and Multistate Cross Country Subclass—the court need not consider this argument. (FAC ¶ 172.)

Federal courts have followed this authority, holding that California law does not recognize an independent cause of action for unjust enrichment. See, e.g., Herskowitz, 940 F. Supp. 2d at 1148; Low v. LinkedIn Corp., 900 F. Supp. 2d 1010, 1030-31 (N.D. Cal. 2012); Fraley v. Facebook, Inc., 830 F. Supp. 2d 785, 814 (N.D. Cal. 2011); Ferrington v. McAfee, Inc., No. 10-CV-1455 (LHK), 2010 WL 3910169, at *17 (N.D. Cal. Oct. 5, 2010). Therefore Plaintiffs may pursue the remedy of restitution under their UCL claim, but the separate cause of action for unjust enrichment under California law is dismissed with prejudice.

Under New York law, however, unjust enrichment is a stand-alone quasi-contract claim that is viable in the absence of an enforceable agreement between parties governing the subject matter of the dispute. Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193 (N.Y. 1987). Here, Plaintiffs dispute that a valid contract was formed with Cross Country, reasoning that their enrollment in the home warranty plans was procured by fraud. (FAC ¶ 177.) As for Plaintiffs' mortgage loan contracts, Plaintiffs argue that those contracts are with their original lenders, not with their loan servicer, Ocwen. (Pl. State Opp'n at 38.)

At this stage, as neither contract has been annexed to the FAC, the court is in no position to determine the validity or effect of the contracts referenced in the parties' arguments. The court takes as true Plaintiffs' allegations that they do not have a valid contract with Cross Country and that their mortgage agreements do not govern Ocwen's conduct. Many courts dismissing unjust enrichment claims as duplicative of contract claims have done so on a motion for summary judgment, with the benefit of a full factual record. See, e.g., Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 578-79 (2d Cir. 2006) (appeal from summary judgment); Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 16-17 (2d Cir. 1996) (appeal from judgment following bench trial). Here, it is noteworthy

that Plaintiffs do not plead any contract claims, making assessment of whether they are limited to relief under contract all the more premature. The threshold question concerning an unjust enrichment claim is whether an enforceable contract exists that governs the subject matter; as this cannot be concluded from the FAC, Plaintiffs may maintain their unjust enrichment claims under New York law.

### 4. Breach of Fiduciary Duty

In Count Seven, Plaintiffs claim that Ocwen breached its fiduciary duty owed to mortgagors by facilitating the alleged check solicitation scheme, not disclosing the scheme to Plaintiffs, increasing Plaintiffs' mortgage bills without their consent, and receiving kickbacks from the scheme.[24] (FAC ¶¶ 181-187.) Ocwen disputes that loan servicers owe mortgagors a fiduciary duty under New York and California law. (Ocwen Mot. at 25.)

The elements of a breach of fiduciary duty claim are the same under both New York and California law: (1) the existence of a fiduciary relationship; (2) the defendant's breach; and (3) damages proximately caused by that breach. See Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 191 (S.D.N.Y. 2011); Auscape Int'l v. Nat'l Geographic Soc'y, 461 F. Supp. 2d 174, 189 (S.D.N.Y. 2006) (applying California law), aff'd, 282 F. App'x 890 (2d Cir. 2008); Neilson v. Union Bank of Cal., N.A., 290 F. Supp. 2d 1101, 1137 (C.D. Cal. 2003). The ordinary financial relationship between a mortgagor and a loan servicer does not automatically give rise to a fiduciary relationship. See Huerta v. Ocwen Loan Servicing, Inc., No. 09-CV-05822 (HRL), 2010 WL 728223, at *4 (N.D. Cal. Mar. 1, 2010) ("[A] loan servicer has no fiduciary duty to a borrower when its involvement in the transaction does not exceed the scope of its conventional role as a loan servicer."); Walts v. First Union Mortg. Corp., 686

---

[24] Although the FAC states that the breach of fiduciary duty claim is brought against all Defendants, this was in error. (Pl. State Opp'n at 39 n.38.) Plaintiffs plead facts supporting this claim only against Ocwen. (FAC ¶¶ 181-187.)

N.Y.S.2d 428, 430 (App. Div. 1999) ("The relationship between plaintiffs and [defendant loan servicers] was merely one of debtor and creditor, and therefore did not create a fiduciary relationship.").

A fiduciary duty may exist, however, where it is created by "specific contractual language" or additional special circumstances. Dolan v. Fairbanks Capital Corp., 930 F. Supp. 2d 396, 422 (E.D.N.Y. 2013). In finding a fiduciary relationship, New York courts typically focus on whether "a party . . . repose[d] confidence in another and reasonably rel[ied] on the other's superior expertise or knowledge." BNP Paribas Mortg. Corp. v. Bank of Am., N.A., 866 F. Supp. 2d 257, 270 (S.D.N.Y. 2012). Facts demonstrating a closer than arms-length relationship or rendering one party dependent on the other may be sufficient to create a fiduciary duty. de Kwiatkowski v. Bear, Stearns & Co., 306 F.3d 1293, 1308 (2d Cir. 2002) (noting a duty may exist where a client has impaired faculties or "is so lacking in sophistication" as to cede control to the broker); Universal-MCA Music Publ'g v. Bad Boy Entm't, Inc., No. 601935/02, 2003 WL 21497318, at *15 (N.Y. Sup. Ct. June 18, 2003) (finding the parties' dealings may have gone beyond an ordinary business relationship where defendant "act[ed] in several capacities in the transactions between the parties," including as co-writer of the songs, co-owner of the copyrights, and President and CEO of the record label).

California law also recognizes "special circumstances" may create a fiduciary duty where one would not normally exist. See Spencer v. DHI Mortg. Co., 642 F. Supp. 2d 1153, 1161 (E.D. Cal. 2009) ("Absent 'special circumstances' a loan transaction 'is at arms-length and there is no fiduciary relationship between the borrower and lender.'") (quoting Oaks Mgmt. Corp. v. Superior Court, 51 Cal. Rptr. 3d 561, 570 (Ct. App. 2006)). Most importantly for Plaintiffs' claim, California courts have expressly limited the principle announced in Nymark v. Heart Fed.

Sav. & Loan Ass'n, that a financial institution does not owe a borrower a duty of care, 283 Cal. Rptr. 53, 56 (Ct. App. 1991), in circumstances "where the lender's activities exceed those of a conventional lender." Champlaie v. BAC Home Loans Servicing, LP, 706 F. Supp. 2d 1029, 1060 (E.D. Cal. 2009).

The FAC alleges that Ocwen owed Plaintiffs a fiduciary duty "because Ocwen took on extra services and received a greater economic benefit than from a typical loan servicing relationship." (FAC ¶ 183.) Plaintiffs rely on Cannon v. Wells Fargo Bank N.A., 917 F. Supp. 2d 1025 (N.D. Cal. 2013), for their contention that these actions gave rise to a fiduciary relationship. (Pl. State Opp'n at 39.) Cannon, however, applied Florida law to reach its determination. 917 F. Supp. 2d at 1054 (citing Capital Bank v. MVB, 644 So. 2d 515, 519 (Fla. Dist. Ct. App. 1994); Building Educ. Corp. v. Ocean Bank, 982 So. 2d 37, 41 (Fla. Dist. Ct. App. 2008)). Accordingly, this court must focus on the law from more relevant jurisdictions.

Plaintiffs do not allege that Ocwen was contractually obligated to serve as their fiduciary. They do not plead facts demonstrating that they relied on Ocwen's superior expertise, "reposed confidence" in Ocwen, or had a closer than arms-length transaction with Ocwen. According to the FAC, the way in which Plaintiffs' relationship with Ocwen was altered from a normal loan servicing relationship was by Ocwen's collection of home warranty plan fees on Cross Country's behalf. The court finds this insufficient to qualify as "special circumstances" creating a fiduciary relationship as that language has been interpreted under New York law. However, it is possible that Plaintiffs may be able to make out a claim under California law, which allows for the possibility that a fiduciary relationship may exist where a lender "exceed the scope of its conventional role as a mere lender of money," Huerta, 2010 WL 728223, at *4 (quoting Nymark, 283 Cal. Rptr. at 56), a more permissible standard. Ocwen's billing for a third-party's home

47

warranty plans does not clearly fall within the scope of a mortgage servicer's conventional duties, and thus may have given rise to a fiduciary duty that Ocwen breached when it failed to disclose its activities with Cross Country and caused economic harm to Plaintiffs.[25]  Therefore, Plaintiffs' breach of fiduciary duty claim is dismissed with prejudice under New York law, but Ocwen's motion to dismiss is denied as to the same claim under California law.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are GRANTED in part and DENIED in part.  Specifically, the court concludes as follows:

- Defendants' motions are DENIED as to Plaintiffs' claims under section 349 of the New York General Business Law;

- Defendants' motions are GRANTED as to Plaintiffs' claims under the CLRA. Plaintiffs' CLRA claims are DISMISSED WITH PREJUDICE;

- Defendants' motions are GRANTED as to Plaintiffs' UCL claims under the "unlawful" prong of the CLRA.  Plaintiffs' UCL claims for "unlawful" practices are DISMISSED WITHOUT PREJUDICE;

- Defendants' motions are DENIED as to Plaintiffs' UCL claims under the "unfair" prong of the CLRA;

- Defendants' motions are DENIED as to Plaintiffs' civil RICO claims under 18 U.S.C. § 1962(c);

- Defendants' motions are DENIED as to Plaintiffs' claims for RICO conspiracy under 18 U.S.C. § 1962(d);

---

[25] The court's conclusion is further supported by the fact that "California courts have been reluctant to give a precise definition of a fiduciary relationship."  Auscape Int'l, 461 F. Supp. 2d at 189.  The California Supreme Court established a six-factor balancing test that some courts apply to determine where one exists, taking into account:

> [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm.

Champlaie, 706 F. Supp. 2d at 1060 (citing Biakanja v. Irving, 320 P.2d 16 (Cal. 1958)).  At the motion to dismiss stage, the court cannot conclude as a matter of law that Plaintiffs would be unable to satisfy this balancing test as the FAC states facts that support many of these factors.

- Defendants' motions are GRANTED as to Plaintiffs' claims for unjust enrichment under California law. Plaintiffs' unjust enrichment claim under California law is DISMISSED WITH PREJUDICE;

- Defendants' motions are DENIED as to Plaintiffs' unjust enrichment claims under New York law;

- Defendants' motions are GRANTED as to Plaintiffs' claims for breach of fiduciary duty under New York law. Plaintiffs' fiduciary duty claim under New York law is DISMISSED WITH PREJUDICE; and

- Defendants' motions are DENIED as to Plaintiffs' claims for breach of fiduciary duty under California law.

The parties are directed to proceed to pretrial supervision before Magistrate Judge Robert M. Levy.

      SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
       September 23, 2014

NICHOLAS G. GARAUFIS
United States District Judge