1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2

3   --------------------------------X
                                    :
4   MARGARITA DELGADO, et al.,      :
                                    : 13-CV-4427 (NGG)
5                    Plaintiff,     :
                                    : February 6, 2015
6              v.                   :
                                    : Brooklyn, New York
7   OCWEN LOAN SERVICING, LLC.,     :
    et al.,                         :
8                                   :
                     Defendants.    :
9   --------------------------------X

10
         TRANSCRIPT OF CIVIL CAUSE CONFERENCE ON AN AGREEMENT
11            ON THE FOX LITIGATION AND ESI PROTOCOL
             BEFORE THE HONORABLE ROBERT M. LEVY
12               UNITED STATES MAGISTRATE JUDGE

13
    APPEARANCES:
14

15  For the Plaintiff:          STEVEN WITTELS, ESQ.
                                JAMES BURKETT McINTURFF, ESQ.
16                              Wittels Law Firm
                                18 Half Mile Road
17                              Armonk, New York, 10504

18                              J. CHRISTOPHER JENSEN, ESQ.
                                Cowan, Liebowitz & Latman, P.C.
19                              1133 Avenue of the Americas
                                New York, New York 10036-6799
20

21              (Appearances continue on next page)
22

23
    Court Transcriber:          SALLY REIDY
24                              TypeWrite Word Processing Service
                                211 N. Milton Road
25                              Saratoga Springs, New York 12866


    Proceedings recorded by electronic sound recording,
    transcript produced by transcription service

1

2

3    APPEARANCES CONTINUED

4

5    For Defendant Cross Country    JASON WAYNE McELROY, ESQ.
     Home Services, Inc.:           Weiner Brodsky Kider PC
6                                   1300 19th Street NW, Fifth Floor
                                    Washington, D.C. 22036

7

8    For Defendant Ocwen           MATTHEW P. PREVIN, ESQ.
     Mortgage Services, Inc.:      Buckley Sandler LLP
                                   1133 Avenue of the Americas
9                                  Suite 3100
                                   New York, New York 10036

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1   (Proceedings began at 2:10 p.m.)

2             THE COURT:  All right.  We are on the record here.

3   This is <u>Delgado v. Ocwen Loan Servicing LLC.</u>, 13-CV-4427.

4             Will counsel please state their appearances for the

5   record?  Just counsel on the case at this time.

6             MR. WITTELS:  Steven Wittels from Wittels Law for

7   the plaintiffs and their class.

8             MR. McINTURFF:  Burkett McInturff from Wittels Law.

9             MR. JENSEN:  Oh.  J. Christopher Jensen, Cowan

10  Liebowitz & Latman, for the plaintiffs.

11            FEMALE VOICE:  [Inaudible].

12            MR. McELROY:  Jason McElroy from Weiner Brodsky

13  Kider for defendants Cross Country Home Services, Incorporated

14  and Sandra Finn.

15            MR. PREVIN:  Matthew Previn of Buckley Sandler for

16  defendant Ocwen Loan Servicing.

17            THE COURT:  And as an observer we have?

18            MR. JOHNS:  Ben Johns, Chimicles & Tikellis, on

19  behalf of Meghan Fox, the plaintiff in New Jersey that was

20  recently transferred to this court.

21            THE COURT:  Right.  And one of the reasons you've

22  been invited is I -- just from reading the docket sheet --

23            MR. JOHNS:  Right.

24            THE COURT:  -- and the complaint, it appears that

25  either the plaintiff or all parties thought that there should

4

1  be a transfer here so that there could be a uniform decision

2  on the cases.

3           Are all parties in agreement on that?

4           MR. McELROY:  All parties to the Fox matter are in

5  agreement on that.  I can't speak for the Delgado.

6           THE COURT:  Yeah, the Delgado people may not be.

7           MR. WITTELS:  Right.  We were actually not consulted

8  until we saw -- well, we weren't consulted at all on that

9  question.  We saw Your Honor's order directing that the Fox

10  plaintiff show up.  We've -- let me just preface this by

11  saying as I told Judge Garaufis this morning, we believe that

12  the case could and should be dismissed, and I'm referring to

13  the Fox case, under the first to file rule.

14           Because we've been litigating the case for a year

15  and a half.  Our claims encompass the entire class.  The

16  claims brought in the Fox case were substantially similar and

17  really just a mirror image of what we already have done, it's

18  a copycat complaint.  So --

19           THE COURT:  But aren't there state law claims?

20           MR. WITTELS:  We have those.

21           THE COURT:  For New Jersey too?

22           MR. WITTELS:  We have all of those.  They've --

23  there were all --

24           THE COURT:  There's nothing that's different.

25           MR. WITTELS:  They maybe a little point to one thing

5

1    but that doesn't help on the first to file rule.  Because as

2    long as its terminology, as long as it's encompassed, you're

3    really bound to rule that the first filed case goes forward.

4    Even if you don't have identical claims, even if you don't

5    have every claim that they had, it's still barred under the

6    first to file rule.  That's the what the case decisions are

7    that we believe.

8            But that said, it is our goal from the plaintiff's

9    perspective not to be fighting with the same -- other

10   plaintiffs.  I mean it's not necessarily to the advantage of

11   any party.  So what we propose today, and I believe Mr. Johns

12   is empowered to agree to it, is that we've made an application

13   for lead counsel in the case in terms of class counsel.

14           THE COURT:  Right.

15           MR. WITTELS:  I believe defendant's only opposition

16   at the time we made the motion was that it was premature.

17           THE COURT:  And that was my concern too.

18           MR. WITTELS:  Right.  I think at this stage we need

19   one voice, so it's not premature.  That's our plaintiff's

20   perspective.  Mr. Johns would support us as -- with held law

21   as in terms of lead class counsel conditioned on our not

22   filing a first to file motion to dismiss their case.  And in

23   return for that we would agree to allow, whether it's amended

24   and consolidated with us or -- we've got to talk about the

25   mechanics of it, but we would allow them as counsel to be

6

1   joined as counsel in our case subject to our being the lead

2   counsel with the discretion to sign and allocate work as lead

3   counsel deems fit.  So long as we didn't have disputes down

4   the road where we're challenged as to what work was allocated.

5   I want to make sure we don't have that.

6           Would that be something you would agree to?

7           MR. JOHNS:  Yes, that's accurate and that's -- I'm

8   sorry that we were late coming in here, Your Honor, but that

9   was what we were discussing in the hallway.  Yes, I think

10  that's an accurate recitation of our understanding.

11          THE COURT:  Okay.  Does anybody else want to be

12  heard on that or?

13          MR. WITTELS:  Well, just to follow up again, the --

14  well, I'm happy to hear them.  But our agreement would be

15  obviously on the record today that Your Honor felt it

16  appropriate Wittels Law would be appointed lead interim class

17  counsel.  Mr. Johns' firm will join as counsel subject to

18  their being delegated work at the discretion of lead counsel

19  and the stipulation that they would not contest the amount of

20  work or the allocation of work.

21          THE COURT:  Will there be other cases filed too

22  nationwide, class action with the same allegations --

23          MR. WITTELS:  No, our --

24          THE COURT:  -- from other states?

25          MR. WITTELS:  We can't stop other plaintiffs out

7

1    there.  The defendants have not informed us of any such suit,

2    so at this point we don't anticipate it.  No one's approached

3    us from any other lawsuit.

4          THE COURT:  So this is -- you don't anticipate this

5    will end up being an MDL case, for example.

6          MR. WITTELS:  No.

7          THE COURT:  All right.

8          MR. PREVIN:  We obviously have no insight.  We're

9    not aware of any, but, you know, one could be filed tomorrow,

10   there's no way for us to know.  This is the first we've heard

11   of it, so can you clarify would there be a single -- would you

12   be consolidating the two cases into one case with one

13   complaint or?  I'm a little confused as to the proposal.

14         MR. WITTELS:  Well, we wouldn't want to -- again it

15   was just an agreement discussed today for the first time in

16   light of Mr. Johns coming here.  But we would not want to make

17   it any -- create duplicative work for the defendant.  So --

18         THE COURT:  Or even the Judge.

19         MR. WITTELS:  Well, that was, yes, a primary

20   concern.  Thank you, Your Honor.

21         THE COURT:  I don't think it's primary.

22         MR. WITTELS:  One thing -- in answer to that, just

23   to advise Judge Levy, we told Judge Garaufis this morning that

24   the defendants had made a pre-motion application to file

25   another motion to dismiss --

1              THE COURT:  Right.

2              MR. WITTELS:  -- the additional counts brought for

3    18 additional plaintiffs.  And what we worked out was that we

4    as the plaintiffs would respond to the defendants by March 6th

5    -- is that right?

6              MR. McINTURFF:  March 6th.

7              MR. WITTELS:  March 6th, with our comments and

8    hopefully an agreement that we'll be talking before that time

9    about what claims we would withdraw, if any.  We might

10   withdraw claims they brought.  They've given us many reasons

11   why they think certain counts are inappropriate.  And --

12             THE COURT:  And subject for saving.  So responding

13   just to you, that's not in an opposition position.

14             MR. WITTELS:  Right.

15             THE COURT:  Okay.

16             MR. WITTELS:  We would --

17             THE COURT:  Your response to them.

18             MR. WITTELS:  -- respond to them by March 6th, so

19   they would know what they had to move on, if anything, in

20   terms of which counts.  Because they are challenging different

21   plaintiffs and different state's laws for various reasons.  So

22   we need time to look at the laws because they just gave us

23   their position on that last week.  So Judge Garaufis thought

24   it was a good idea that we try to work that out.  And then we

25   would streamline perhaps their motion to dismiss and that was

9

1   -- a briefing schedule that was set by the Judge for that for

2   a few weeks after for them to move.

3          And the reason I bring that up is because as part of

4   that process I think we would want to work out sooner rather

5   than later what to do with the New Jersey plaintiff, whether

6   they would be added as an additional plaintiff.  Probably

7   that's so but I need to look more at their plaintiff.

8          Because we already have a New Jersey plaintiff so --

9   we have another New Jersey plaintiff.  Or whether they would

10  just come on as counsel.  But it wouldn't materially affect I

11  think the case.  There is -- they might have one count, I

12  think they have a New Jersey RICO count that was not in our

13  complaint, and we might add it.

14         MR. PREVIN:  But it would materially impact from our

15  perspective whether we are filing two separate motions to

16  dismiss in each case.  Or if you're going to consolidate them,

17  then obviously we can put that other recently transferred case

18  aside and act as if there's just a single pleading.

19         MR. WITTELS:  It's -- that's how we envision it, it

20  would be one pleading.

21         THE COURT:  Uh-huh.  Well, the Court might actually

22  decide if that's the right thing to do too, so.

23         MR. WITTELS:  I mean it's been -- and Mr. Johns, you

24  would agree, I mean you would probably want one complaint.

25         MR. JOHNS:  I think that makes a lot of sense.

1   Yeah.

2           THE COURT:  Yeah, I think the Court would want that

3   too.  I can't see a reason to have two separate cases unless

4   there are separate causes of action.  If there's separate

5   causes of action --

6           MR. WITTELS:  No.

7           THE COURT:  -- then it doesn't make sense, but I

8   guess it doesn't.

9           MR. WITTELS:  No.  So we would -- we were

10  envisioning, that's how we talked about it as having one

11  complaint, just really adding, whether it's the initial named

12  plaintiff, but -- and having the Chimicles firm on as counsel.

13          MR. JENSEN:  Your Honor, I just saw -- I'm on the

14  record.  Mr. Wittels had asked our firm to join in this action

15  to assist him now that we're on the -- you know, just at the

16  beginning of what could be a lot of discovery and a lot of

17  work.  I just want to indicate for the record that, you know,

18  we're in agreement with Mr. Wittels.  To the extent that it

19  matters, we supported his application to be appointed lead

20  counsel, and we will work with him on the same basis as other

21  counsel.

22          THE COURT:  All right.  So at this point then if the

23  cases are consolidated, there's no opposition to the

24  appointment of Mr. Wittels' firm as lead counsel?  Or you'd

25  like to think about it?

1           MR. PREVIN:  I think I'd like to think about it.  I

2    mean my -- I'm not sure that the -- whatever efficiencies we

3    can create in this process would be desirable, obviously.  I'm

4    not -- I don't think anything has been said mooted my concern

5    that this was premature I think as we're not in the class

6    certification stage.  So I think it's constructive for all

7    parties if there's a common understanding of who is the lead

8    on their side, who we interact with during the litigation

9    process.  But that's a separate issue from whether they are

10   actually appointed as interim class counsel because we're not

11   at the class stage.  So I think everything we said in our

12   prior papers still stand.

13          THE COURT:  Right.  Well, wait, let me give you my

14   perspective.  I thought it was premature before because I was

15   worried that there would be other lawsuits that could be

16   filed, and I wanted to hear from essentially other counsel as

17   to what their theory is of the case and how they would like to

18   lead it.

19          The fact that some time has passed, two lawsuits

20   have been filed but no others that have come to this court

21   suggests to me that it wouldn't cause any procedural

22   complications to have an interim class counsel appointed with

23   the understanding that the words interim -- the word interim

24   means interim, and it doesn't give you any more tenure than

25   anyone else but it might give you -- you know, if your track

12

1  record is good maybe the defendants won't oppose it.  And

2  class doesn't necessarily mean the class has been or will be

3  certified.  So given that that's what's done, I think it would

4  just be an efficiency.

5          MR. PREVIN:  With that understanding, that it's sort

6  of for optics and efficiency and not sort of a prejudgment of

7  --

8          THE COURT:  Right.

9          MR. PREVIN:  -- of the underlying Rule 23

10 requirements, then I expect we can live with that.

11         THE COURT:  Because -- go ahead.

12         MR. McELROY:  I just said for the record, Cross

13 Country defendants agree --

14         THE COURT:  Okay.

15         MR. McELROY:  -- with Ocwen's position.

16         THE COURT:  In my experience, especially in MDL

17 cases, it really helps to know who's the lead counsel.  And if

18 you have a period of time where there are several attorneys in

19 the case and you don't know who the lead counsel is, it causes

20 problems, especially for the defendants, I think.  I don't

21 know if your experience has been the same, but that's -- I

22 think that makes sense at this point.  Okay.

23         MR. WITTELS:  So --

24         THE COURT:  What else?

25         MR. WITTELS:  All right.  Well, we're here -- just

1   so the record is clear, Ben Johns, you're in agreement then

2   with how I phrased it on the record here today?  Because there

3   is a record being made --

4           MR. JOHNS:  Yes.

5           MR. WITTELS:  -- of our position as interim lead

6   class counsel.

7           MR. JOHNS:  Correct.

8           MR. PREVIN:  Okay.  Can I -- and this is maybe a

9   little bit beyond the -- maybe I need to address this with

10  Judge Go, but we would obviously like then for that case to be

11  set aside until you've made a decision as to whether that case

12  is going to proceed or if it's going to be rolled into this

13  case.  We don't want to, obviously, have to move to dismiss

14  that case while you're making this decision.

15          THE COURT:  Right.  Judge Go and I have spoken

16  already about this, and that's why everything is happening

17  today.  That's why Fox counsel is here today.  Because we

18  wanted to make a decision as to how to proceed.  So I don't

19  think there will be any problem with that.

20          MR. PREVIN:  Okay.

21          MR. WITTELS:  I want to -- at the risk of not

22  arguing but just making a point.  We disagree with Mr. Previn

23  just on when he says optics.  Because interim class counsel is

24  what it is under Rule 23(g).  It's not -- it doesn't say

25  optics.  It certainly is not -- it doesn't mean that a class

14

1   has been certified --

2           THE COURT:  Right.

3           MR. WITTELS:  -- or we've met the elements.

4           THE COURT:  Or will be.

5           MR. WITTELS:  Right.  But it does mean what Rule

6   23(g) says in that you are the lead counsel to whom the

7   defendants and other counsel look to to lead the case, protect

8   the interests of the class, lead the discovery issues, and

9   make the decisions on the case.  That's the purpose of it, so

10  I just wanted to --

11          THE COURT:  Right.  And if there's discovery you'll

12  have a document bank, for example.  You'll be in charge of all

13  the efficiencies as well as the decisions.  Yeah, okay.

14          MR. WITTELS:  Judge, the other issue we're here on

15  today other than -- I think this was originally a status

16  conference that sort of morphed into these other issues of, A,

17  the class counsel issue and, B, we have before you a discovery

18  dispute on the ESI.  Both sides have presented their position,

19  and we'll go first unless defendant's chomping at the bit.

20  But we, I just wanted to introduce who we have here today.

21          We have Chuck Kellner from D4 Discovery, who is our

22  E consultant, and he has come down today because we believe it

23  is a very important issue of -- that needs to be set forth

24  right here at the opening as to how the protocol is going to

25  go forward.  And we've had a dispute with defendant that we've

1  not been able to resolve.  That's why both sides presented

2  their position and why we brought Mr. Kellner to you today.

3  And so we'd like to present that in whichever order you think

4  is appropriate, and Mr. McInturff, my co-counsel, is going to

5  describe the dispute when you're ready.

6          THE COURT:  I'm ready.

7          MR. McINTURFF:  So the parties have been able to

8  reach agreement on many of the issues in the ESI protocol, but

9  we remain, there remains a dispute regarding defendant's

10  disclosure of the custodians who will be -- both individual

11  custodians and data that will be searched as part of the ESI

12  process.  And then also the second issue is regarding

13  plaintiff's participation in the creation and application of a

14  search methodology, if a search methodology is used.

15          Essentially our position is is that it's consistent

16  with both best practices and Rule 26 as well as the model

17  protocol that we're using for this case, which is the Southern

18  District's ESI protocol, that the parties promptly exchange

19  names and locations of ESI custodians, and that also that

20  plaintiffs play a meaningful role in the search methodology.

21          We're concerned that if search terms are used

22  without plaintiff's -- and without the process being an

23  iterative process between the parties discussing what comes

24  back as a hit report.  Whether certain terms are too broad or

25  certain terms are too narrow, we're concerned that we could

1    run into the circumstance of either having a data dump of

2    millions of documents that are overly inclusive or too few

3    documents because of a search methodology that is not

4    accurate.

5            So that's been our position, and that's what we've

6    submitted as a proposed order as Exhibit 1 to our letter.  We

7    believe that our position is amply supported by both the case

8    law, Sedona principles, and, as I said before, the model

9    protocols in the Southern District of New York and the 7th

10   Circuit, which, with the aid of our discovery consultant,

11   we've been utilizing this process.  So we'd ask that Your

12   Honor would grant our proposed order so that we can proceed

13   with ESI discovery.

14           MR. McELROY:  Good afternoon, Your Honor.  Thank you

15   for having us in today.  I want to start off by saying that we

16   disagree with the idea that this is a discovery dispute.  This

17   is a dispute over what we will agree on in a proposed ESI

18   protocol pursuant to the case management order that we agreed

19   to with Your Honor back in November.

20           So pursuant to that case management order, we agreed

21   to produce initial disclosures by a certain date, which we

22   met.  We agreed to respond to the plaintiff's discovery, which

23   at the time we thought was premature for certain issues but we

24   agreed to respond to the discovery that they had served by a

25   date certain, and agreed to discuss and come to an agreement

1  on what was simply called an ESI protocol in that case

2  management order.

3          When we started speaking about the ESI protocol

4  plaintiffs made the first proposal, they sent it to us.  And

5  part of that proposal included the language that's in dispute

6  right now, which is, first of all, provisions where we provide

7  ahead of time any potential custodians that may have relative

8  information and some other ESI information.

9          Despite the fact that as part of the case management

10  order we specifically agreed to 15 interrogatories for the

11  plaintiff only to ask about ESI from the defendants. It was

12  our understanding, and I think it's a reasonable

13  understanding, that those 15 interrogatories should [be used

14  to retrieve that information that they're now seeking for us

15  to simply voluntarily provide at the beginning.

16          Secondly, the search protocol that plaintiffs

17  suggested had three rounds of search reports going back and

18  forth in between plaintiffs and defendants prior to the

19  defendants even producing anything to the plaintiffs.  So

20  effectively what the plaintiff's search protocol does is it

21  injects the plaintiffs into the defendant's responsibilities

22  in the document production process.

23          This is completely unwarranted and not required by

24  any rule in the Federal Civil Procedure.  In fact, the rules

25  are pretty clear that the responding party is responsible to

18

1  do a reasonable search for documents and produce the documents

2  back to the requesting party.

3          All of the cases which we know that the plaintiff's

4  relying on are in the procedural posture of a motion to

5  compel.  So a motion to compel had been brought after an

6  original production, that original production is deemed

7  inadequate for some reason by the plaintiffs.

8          THE COURT:  Hold on just a second.

9          Chuck?

10          JUDGE GO:  Yes.

11          THE COURT:  We've kind of -- let me just brief you

12  really quickly.

13          JUDGE GO:  All right.

14          THE COURT:  There's no problem.  There has been an

15  agreement, proposed agreement on how to deal with the two

16  cases.  And I can say it although I'll let Mr. Wittels say it,

17  you can put it on the record.

18          MR. WITTELS:  Okay, I'll give it a shot.  This is?

19          THE COURT:  The [inaudible].

20          MR. WITTELS:  Okay.  The agreement will be that

21  within a few weeks we will likely either amend our complaint

22  or enter a stipulation with the defense counsel about how the

23  New Jersey plaintiff will be entered in our case.  But it's

24  likely that that case will be voluntarily dismissed and that

25  counsel for the Fox case will be joined in as counsel in this

19

1  case, the Delgado action.  That's probably how it will

2  proceed.

3           THE COURT:  And otherwise if it doesn't, it's likely

4  it would be consolidated with it, with the Delgado case.  So

5  it doesn't appear that Fox is going to proceed separately.

6           JUDGE GO:  All right.

7           THE COURT:  But counsel both will be up to see you

8  all in a little while.  You're welcome to sit in but we're

9  just talking about ESI.

10           JUDGE GO:  [Inaudible].

11           THE COURT:  I don't think so.  Do you all think you

12  need to see Judge Go?

13           MR. WITTELS:  At this point I don't believe so.

14           MR. McELROY:  I don't believe so.

15           THE COURT:  Okay.

16           JUDGE GO:  Okay.  Thank you.

17           THE COURT:  Sure.  Take care.

18           Let me just jump in a second.

19           MR. McELROY:  Sure, absolutely.

20           THE COURT:  Do you -- so you're saying that this is

21  premature.

22           MR. McELROY:  Absolutely, yes.

23           THE COURT:  Do you disagree that plaintiffs are

24  following the Southern District protocol?

25           MR. McELROY:  I don't disagree that they have based

1   their protocol on the SDNY pilot project, which has been

2   terminated.   However, our -- at the end of the day this was an

3   agreement to -- in the case management group to try and come

4   to agreement on how we were going to produce ESI, not

5   necessarily how we were going to search for it, and have

6   plaintiffs be a part of our search requests.

7           However, after the first round of them sending us

8   the protocol and us objecting to those provisions, and most of

9   the provisions we had no problem with.   It's about probably 85

10  to 90 percent of this protocol we came to agreement on pretty

11  quickly.

12          THE COURT:   Right.

13          MR. McELROY:   It's simply really the disclosure of

14  the information they're seeking even though they requested

15  interrogatories to seek it, and the involvement of the

16  plaintiffs in the search process that we are objecting to.   In

17  response to that, we had a conversation and it was my

18  understanding after our conversation that what they were

19  really seeking was to know what our methodologies were and

20  have an opportunity to request, to tweak to the methodology,

21  if you will, in order to ensure that, as Mr. McInturff just

22  said, that it's neither over broad or under broad.

23          Initially I can state for the record that I'm not

24  the kind of attorney who simply does document dumps, and my

25  client is not interested in footing the bill for a document

1   dump either.  However, to talk about the idea of discussing

2   search terms before we even looked at the documents.  You

3   know, we've had the conversations with our -- with the

4   custodians we believe are going to have that information.

5   We've started to look at what we think would be relevant

6   documents.  We're starting to formulate what our methodology

7   will be.

8           The plaintiffs have -- you know, us as defendants'

9   attorneys, we have very little knowledge to go on, so we're

10  relying very heavily on our client, we're discussing with our

11  client, working with our client on the best ways to find

12  stuff, documents and ESI that would be responsive.  The

13  plaintiffs have even less information than we as defense

14  counsel do.  We honestly don't understand how they would even

15  add value to discussions before anything is even produced,

16  before they see anything of ESI.

17          So in response, what we offered was after our

18  production we would give them the methodology.  I have no

19  problem with providing them with the methodology that we used.

20  And once we provide them with the methodology that we used, if

21  they have a good faith basis to believe that there are

22  inadequacies in the search, we suggested five additional

23  search terms with a 250 megabyte cap for specific search

24  terms.

25          That's in addition to what will have already been

22

1   produced.  So we thought that was relatively reasonable.  I

2   would personally be willing to negotiate on those terms but

3   plaintiffs simply came back to us with their original proposal

4   and completely redlined our counterproposal.  And at that

5   point we decided that we should discuss it with you.

6           Again we've come to agreement on approximately 90

7   percent including what the format of the production will be,

8   the metadata fields, and everything else.  We just think that

9   it's inappropriate to inject the plaintiffs from the very

10  beginning into our search and retrieval of documents that are

11  responsive to the plaintiff's document requests, which is

12  clear under the Federal Rules that it's the responding party's

13  duties.  And it's also clear under the Sedona conference

14  papers that the plaintiffs have relied on that it is the

15  responding party that is best suited and best situated to

16  determine what is responsive to a request and how they should,

17  how the materials should be preserved and produced.

18          After that we are happy to discuss it with them if

19  they have a good faith basis to believe that searches were

20  inadequate.  Unfortunately, given the push and the language

21  that the plaintiffs have placed into this initial ESI

22  protocol, it appears to me that the plaintiffs want to assume

23  the inadequacy of our document production and our response to

24  their request.

25          THE COURT:  Okay.  So let me just jump in and give

1  you my perspective on this.  I think the Southern District

2  pilot project was interesting.  I'm sure Judges Scheindlin and

3  Francis had a lot to do with that, and I respect their

4  knowledge of these issues.  They do a lot of judge training,

5  so we've all been trained by them.  So I don't think that

6  there's anything wrong with what you're proposing at all.

7          My experience has been, both in criminal and civil

8  cases, that there is going to inevitably be a fight over

9  search terms.  I just -- I don't think I've had a single case

10 where people have not fought over the search terms.  Because

11 even if you've done a terrific job in filtering through, you

12 know, what you think the proper search terms will be, the

13 other side usually says, well, what I'm looking for isn't here

14 and maybe if we just tweaked it a little bit we'd be able to

15 do it.

16          And I think the purpose of having a protocol like

17 this is to have everybody meet and confer beforehand and see

18 if you can come up -- cut out the stage of disagreeing with

19 what's already been produced and perhaps save you money in not

20 having you go through several searches.

21          So my philosophy would be that -- and my experience

22 has been that if you just get the tech people together at some

23 point and just have them talk through the issues of what the

24 search terms would be and why you think a particular search

25 term would be better and why you think it -- you know, why you

1  think you need one and why you think you don't, I find that

2  that really helps.

3          I personally -- on the issue of whether or not we

4  have to use the Southern District protocol or there's another

5  way to do it, it doesn't matter to me as long as you have an

6  efficient way of discussing what ought to be in the search

7  before you start going through the search.  And that doesn't

8  mean that the plaintiffs can dictate to you now, but I think

9  when you're ready to go ahead and do a search, before you do

10  that search I think your experts ought to sit down with the

11  plaintiff's experts and just find out beforehand if there's

12  some kind of agreement or disagreement on that.

13          Does that work for all of you?

14          MR. WITTELS:  It does, Your Honor.  And if --

15          THE COURT:  Do you have a problem with it?

16          MR. WITTELS:  No.  If I can defer to our ESI

17  consultant so that he can describe the nature of the

18  methodology we propose for the search terms.  Because I

19  disagree with counsel that it necessarily the plaintiffs

20  simply positing search terms.

21          Chuck, if you could talk about this --

22          THE COURT:  Okay, before you do that.

23          As a concept, does that work for you?

24          MR. McELROY:  Well, as a concept, I think that is

25  relatively consistent with what we had proposed in our

1   counterproposal.  The --

2              THE COURT:  Except that you don't conduct the search

3   first before you meet and confer.

4              MR. McELROY:  The thing that I'm concerned about is

5   that when does it stop, when does the meet and confer stop

6   before ths search terms?  If we can't come to agreement on the

7   search terms, which in my experience trying to agree on search

8   terms is rarely capable of being done, if we can't come to an

9   agreement on the search terms, then the discovery process

10  comes to a halt at the very beginning.

11             Because instead of us seeing what we view as

12  responsive to the plaintiff's requests and even if we were to,

13  you know, simply say preliminarily this is the type of

14  information that we've been getting back, I just don't see how

15  the plaintiffs with less knowledge of the subject matter, with

16  no knowledge of the companies' inner workings, with my

17  client's inner workings or Mr. Previn's client's inner

18  workings, can add any value at the beginning of the process.

19             And, you know, honestly the only time I've ever

20  received a request like this is in litigation with the

21  Government. I've never received a request like this for an ESI

22  protocol prior to discovery from a private plaintiff.

23             THE COURT:  I've seen it in criminal cases.

24             MR. McELROY:  Oh.  However, it just -- in the cases

25  with the Government at the very least they will have had some

26

1    materials already produced to them --

2            THE COURT:  Right.

3            MR. McELROY:  -- so they will have some knowledge or

4    maybe have done some depositions or some investigational

5    hearings so they'll have some knowledge in which to really

6    sort of narrow the scope of what they're looking for.

7            THE COURT:  So the question is -- just before I hear

8    from you, the -- so you don't disagree that it wouldn't be

9    harmful for both sides to meet and confer beforehand, but the

10   question is if you don't reach an agreement, do you conduct

11   the search before you come to the Court or do you go to the

12   Court first and then conduct the search?  Is that essentially

13   the -- at issue?

14           MR. McELROY:  Well, I think that is an issue.  I

15   think that Judge Fachola [phonetic], the District of Columbia

16   where I am, has said it very gracefully, that, you know, this

17   is not really the place for lawyers and lay people, this is

18   the place for people who have knowledge of the information

19   systems.  So where I worry about it is that if we're trying to

20   come to search terms beforehand that it's going to be

21   virtually impossible to come to agreement on the search terms

22   without knowing what materials are even potentially responsive

23   out there.

24           THE COURT:  I agree with you and I agree with him.

25   And I've heard him speak about this.  That's why I think that

1   the IT people have to speak to each other, and that if you're

2   going to ask me at some point to resolve a dispute I'm not

3   going to just listen to the lawyers, I'm going to hear from

4   your tech people.

5           MR. McELROY:  Right.  One concern I have about that

6   is that plaintiff's IT person and my IT person, my IT person

7   I'm going to be using at the outset [inaudible] an IT person

8   [inaudible] have more information about the way the systems

9   are kept.  But the IT people at the company aren't necessarily

10  going to have information about who's going to have relevant

11  information or, you know, the same way that if we were to go

12  about discussing -- which is what we're doing right now,

13  speaking with the relevant custodians, finding information,

14  seeing what other worlds may exist for this information, that

15  to me seems the most efficient way of doing this.  And then

16  having the discussion about whether or not there are even any

17  deficiencies or things they thought they might see that are

18  appearing.

19          And to be honest, Your Honor, this isn't going to be

20  a case with millions upon millions of documents.  I mean this

21  is a relatively small business area for my client.  I believe

22  I'm not going out on a limb by saying I think it's a

23  relatively small business line for Mr. Previn's client as

24  well.

25          THE COURT:  So how many documents do you think we're

1    talking about?

2            MR. McELROY:  I think we're probably going to talk

3    about a grand total of in the range of maybe 100,000 pages of

4    documents.  We're not going to talk about millions of pages of

5    potential documents.  I mean I'm having a lot of this

6    information pulled, and I don't have the numbers yet because

7    I've wanted to wait until we came to the ESI protocol.

8            MR. WITTELS:  Before Mr. Kellner begins, I think

9    we'd like to make it clear that any concern that counsel has

10   about plaintiffs not being educated about the systems before

11   we engage in this interactive process, that's the purpose of

12   what we included in our protocol of whereby defendants would

13   provide us with their custodian.  So we haven't -- I do think

14   it's a little bit unfair to say they're not going to know

15   anything because we're not going to get -- and our response

16   is, well, of course we're not going to know anything if you

17   don't give us anything.

18           And so we would expect that to be entered in as part

19   of the order.  And Mr. Kellner can talk about the methodology

20   that was laid out to make sure that the search is both

21   efficient and appropriate.

22           MR. KELLNER:  Your Honor, if I may?

23           THE COURT:  Sure.

24           MR. KELLNER:  I'm Charles Kellner, I work with D4.

25           THE COURT:  Pull that microphone a little closer to

1   you, the little one.

2            MR. KELLNER:  My experience is in working with

3   counsel and assisting counsel in drafting and executing E

4   discovery protocols.  And also in a few cases assisting the

5   court in moderating disputes about E discovery protocols.

6            In the proposal that we initially presented to

7   plaintiffs, you know, it wasn't, you know, it wasn't the

8   boilerplate from the Southern District's pilot project but

9   sort of a morph between that and the 7th Circuit pilot project

10  and some other E discovery protocols as well as orders that

11  we've seen around the country.

12           The components are basically to disclose the sources

13  of electronic information.  So that would be custodians from

14  the various business units that might have potentially

15  relative information.  You know, in this case we would expect

16  to see business people, accounting people, marketing people,

17  and not inconsequentially, data base people that have lists of

18  mortgage accounts and insurance accounts from -- to which

19  these mailings were done, marketing materials and so on and so

20  forth.

21           So that for us would set the parameters of the scope

22  of discovery and allow us to in fact narrow or agree on a list

23  of custodians.  And we think that that gives us some

24  visibility but in ways -- you know, because it's assigned

25  protocol, makes it fair for them to understand what their

1   scope is going forward.

2           Search terms, you know, as we all know from Judge

3   Fachola's instruction as well as others, they're not exact.

4   And it is in fact guesswork, and there is the opportunity to

5   both include over breadth as well as miss important responsive

6   data.  The protocol that we recommended had essentially three

7   rounds of looking at search reports.

8           And we would anticipate that they would be doing

9   that on ESI that they had collected so that they're actually

10  being able to look at search reports and evaluate their review

11  obligation, which is the most expensive part of the discovery

12  process.  So it would give them some visibility on scope, and

13  it would give us some visibility on at least potentially the

14  volume of information that we're likely to receive.

15          And the iterations of looking at the search results

16  would allow us -- would allow them to present to us

17  information about over breadth.  So here is a search term that

18  has so many search hits that aren't included in any other

19  documents, you need search hits; it would obviously be a

20  target to reduce over breadth.  And we would look at search

21  results, for example, that we thought would deliver some

22  recall but were low in numbers.  And so obviously we're

23  guessing wrong, but since they own the corpus they could help

24  us adjust that.

25          And so to answer counsel's concern about it going on

1  forever without conclusion, it's been our position that if we

2  go a few rounds of this, and I've seen it go as many as seven

3  rounds but three rounds in a case like this of looking at the

4  reports and modifying it and go back to search, that it would

5  be reasonable to do that.

6          One of our concerns is to put all of this in a

7  protocol that's actually written and, if necessary, can be

8  signed into an order, both the sources of ESI and the

9  custodians as well as the search protocol, so that we're not

10  here six months from now talking about, well, we agreed in

11  that order to talk about it afterwards but then never actually

12  set the stage to agree on it.  So we actually want it in the

13  protocol rather than laying out a procedure to discuss it

14  later and decide on it later.

15          THE COURT:  Now, the way I feel about it is we're

16  all dealing with crystal balls here.  Because nobody really

17  knows for sure what you're going to find.  And my experience

18  has been that oddly enough we all have a common interest in

19  trying to make this as precise as possible and as inexpensive

20  as possible so you don't spend, you know, all your vacations

21  looking, reviewing documents.

22          And the way it's going to end up, because I'm not

23  going to be any better at this than any other judge, is that

24  I'm going to be asking you for the same kinds of things that

25  we're just talking about right here if there is a dispute.  So

32

1   it's probably going to make sense to have a protocol designed

2   beforehand that will get all the information that the Court is

3   going to need to be able to resolve any disputes you have and

4   to rely on you hopefully to be as reasonable as possible to

5   make the compromises you have to make, you know, to avoid the

6   expense and the over breadth.

7          It just seems like a question of timing, your

8   differences.  And all I can say is that I'm going to want to

9   have the information that Mr. Kellner has discussed before you

10  come to me anyway.  And the question is what's cheaper and

11  better.  And I'm going to want to know that whoever your IT

12  people are have talked to each other and have tried to do

13  this, you know, modify the search terms.

14         You know, I've had cases with large corporations

15  where -- with the Government involved and without the

16  Government involved where we've gone through, you know,

17  individual search terms names and people have asked me to

18  decide whether a particular search term makes sense or not.

19  And in the end I'm going to be going to the IT people and

20  asking them, well, what's -- how many hits you going to get

21  with this one, what do you with the other one.

22         And so to the extent you've done all that homework

23  before you've cut out, you cut out the need to come to the

24  Court and ultimately the Court deals with these things with a

25  blunter instrument than you will.

1          MR. McELROY:  Well, and Your Honor, I do believe

2     that our counterproposal envisions all of that.  You know,

3     plaintiffs said in their letter something to the effect of

4     they're worried about what our methodology will be or -- it's

5     our responsibility to be able to defend our methodology.  And

6     we certainly offered to give the plaintiffs our methodology

7     and then to discuss that and negotiate that well before we

8     would ever come to you with the issue.

9          THE COURT:  Can I just stop you?  But isn't the

10    difference really whether you conduct a search before you go

11    through these protocols with plaintiffs?

12         MR. McELROY:  Yes.  I --

13         THE COURT:  That's the difference, right?

14         MR. McELROY:  Correct.  And I do not believe that

15    it's appropriate nor required to allow the plaintiffs to be a

16    part of our original search.  And that I think is where the

17    ultimate --

18         THE COURT:  Why does it make a difference?

19         MR. McELROY:  -- objection comes.  Because in my

20    experience these things cannot be negotiated and settled very

21    well ahead of time.

22         THE COURT:  But what if you had an agreed -- well,

23    so the modification to the agreement to get what both sides

24    really want is you'd have to meet and confer before you have

25    the search.  But if you can't agree, you conduct the search

1   and then counsel would meet and confer with you one more time

2   before coming to the Court and the Court would make the

3   decision.  Is that essentially --

4           MR. McELROY:  I think that is a reasonable

5   compromise, yes, Your Honor.

6           THE COURT:  Would that work for plaintiff?  Is there

7   any reason for them -- are you harmed, are you prejudiced in

8   any way by having input before they conduct the search trying

9   to agree, you don't agree, they conduct the search, you look

10  at it and say, ah, my worst fears were realized or I was wrong

11  and then come to the Court?

12          MR. KELLNER:  It is without a doubt much more

13  effective to conduct searches and develop search criteria

14  based upon data that they've already got available to search.

15  We're actually looking at results while we're testing and

16  proposing search terms.  So in that regard I would have to

17  agree.

18          THE COURT:  Okay.

19          MR. KELLNER:  Not knowing in advance on what even

20  the scope is, in other words whose email, whose files, what

21  locations of information.  And then even beyond the search

22  terms, because you can't apply search terms to structured data

23  information, lists of customers and account holders and so on

24  and so forth.

25          We need to know the parameter of that so that we at

1  least know the pool of custodians and ESI that we're talking

2  about.  We need to know that, I think that the data that we're

3  looking for in this case is going to be in the case.

4      MR. McELROY:  To be fair, Your Honor, we have agreed

5  to provide all that information with the, any production that

6  we give to them.

7      THE COURT:  Right.

8      MR. McELROY:  We've agreed to give the custodians,

9  the file names.  In addition, we provided them previously with

10  our Rule 26 disclosures, which are relatively detailed in who

11  the people are that have the most knowledge about marketing

12  materials.  Those are the people that I'm going to now to get

13  the information that I need to do further searches.  So to the

14  extent that we would have any disclosure of whose -- what

15  custodians or ESI we're going to be searching, we're going to

16  be starting with those people.  We don't know beyond that this

17  morning.

18      Because those are the people who are primarily

19  focused on this particular program, so we start with them and

20  then it can expand from there.  And of course our protocol

21  envisions that idea.  Nothing of course would prevent the

22  plaintiffs from coming back and asking us to, you know,

23  reasonably to expand the custodians that we previously

24  searched based on the information provided.  Or propounding

25  additional document requests of course, based upon information

1  they found in the initial document requests of our initial

2  interrogatory response.

3          THE COURT:  Okay.  So --

4          MR. KELLNER:  I mean, Your Honor, if I may.  From a

5  production perspective, that puts a lot of burden on

6  plaintiffs to wait to see and go through an entire production

7  to see if it's got the people in it that they're looking for

8  only to then have to ask for another production including a

9  subsequent review.  So we really would like to see the sources

10 of ESI, to see the custodians, and to see the shared

11 resources, the noncustodian resources.  And to know what that

12 list is about and to understand even the date range scope.

13         THE COURT:  Before the search is conducted.

14         MR. KELLNER:  Right.

15         THE COURT:  Okay.

16         MR. KELLNER:  We would expect at this time they've,

17 you know, evaluated their systems, they've preserved ESI and

18 so on and so forth, that they know that much about it to be

19 able to tell us about it.

20         THE COURT:  Okay.  And as I understood, counsel,

21 what you were saying is you just want them to use up one of

22 the interrogatories to do that.

23         MR. McELROY:  Yeah, we specifically agreed to 15

24 interrogatories regarding ESI for the plaintiff.  If they're

25 going to request this information of ESI protocol, I suggest

1    that those 15 interrogatories should --

2              THE COURT:  Well --

3              MR. McELROY:  -- [inaudible] case management.  I

4    don't see what other information they would be seeking about

5    ESI in those interrogatories they specifically request.

6              THE COURT:  I don't want to spend a lot of time

7    arguing over the number of interrogatories.  Because I think

8    ultimately they're entitled to have this information.  And if

9    they reasonably propound interrogatories and they've used up

10   their 15 and they have to ask one more to find out the

11   custodians and the source, I'm probably going to give it to

12   them.

13             MR. McELROY:  That's understood, Your Honor.  I just

14   -- I think that we agreed to what I thought was the process

15   was going to be and now --

16             THE COURT:  Yeah.

17             MR. McELROY:  -- it seems that, you know --

18             THE COURT:  Expanding.

19             MR. McELROY:  Yeah, expanding.  [inaudible].

20             THE COURT:  Okay.  But it sounds like one or two

21   interrogatories is all you're going to need, right?

22             MR. WITTELS:  Well, Your Honor, first of all, we

23   believe that the disclosure of this information is part of the

24   Rule 26 meet and confer process.  So we would have never put

25   interrogatories into the case management order that would

38

1  intentionally postpone our ability to gain relevant

2  information.

3          I mean the interrogatories were put in the case

4  management order sort of as a cleanup of after the Rule 26

5  meet and confer process goes through.  I mean it just

6  occasions more delay to have to propound interrogatories and

7  have objections and responses.  I mean the information that

8  we're requesting is consistent with best practices.  We've put

9  in --

10          THE COURT:  Okay.  So I don't think we need to

11  discuss it anymore.  I think you do need to produce that

12  custodian information and the sources beforehand.  That's

13  something that we've always done in other cases I've dealt

14  with.  And I just think it makes the process more streamlined

15  and efficient in the end.  And you can supplement it if you

16  wish afterwards, you know, if something -- if there are other

17  sources.

18          MR. KELLNER:  Sure.

19          THE COURT:  And this goes both ways, of course.  I

20  don't know if there's anything -- you don't really have any

21  ESI, do you.

22          MR. WITTELS:  Minimal.  It's a consumer class

23  action.

24          THE COURT:  Right.

25          MR. McELROY:  To be fair, we have produced our Rule

1   26 disclosures.  I haven't heard anything from plaintiffs

2   where they think there's any deficiency in them, but I will go

3   back and look at that to see if there's [inaudible].

4               THE COURT:  Okay.

5               MR. WITTELS:  Which would include, you know, data

6   sources, data bases, as we put forth in our Exhibit B to our

7   proposed order.  That's the information that we're requesting

8   as part of the meet and confer process.  And it does go well

9   beyond the initial disclosures.  It relates to much more of

10  the technical nature of what's going to be searched and the

11  location of various data.

12              THE COURT:  Okay.  I think that -- yeah, Exhibit B,

13  yeah.  Well, that has to be provided at sometime anyway, and I

14  think it makes sense doing it at the outset.  That's just been

15  my experience.

16              Okay.  So do we have an agreement on this protocol

17  then?  You know, you'll meet and confer beforehand.  Hopefully

18  you'll be able to work most things out.  If you can't work

19  them out, then defendants can go ahead and conduct their

20  search.  It's not going to go on forever if you don't agree.

21  And then you'll review what happens afterwards.  Meet and

22  confer again to see if you can deal with any problems and then

23  come to me.

24              MR. WITTELS:  Well, we would like to use the process

25  of the stage searching where the defendants go through and

40

1   check their search terms and inform us of the range of what is

2   uncovered through their search.  We think that that's going to

3   be a much more efficient process than defendants conducting a

4   search and then telling us what they found.

5           THE COURT:  No, but beforehand they will tell you

6   what the search, their methodology will be, what their sources

7   of data, what the data range will be, the search terms, et

8   cetera.

9           MR. WITTELS:  They would also need to provide the

10  hit reports of the search terms.  So they pick 15 search terms

11  that hit nothing, without a hit report we can't tell until

12  after the production comes whether or not those search terms

13  are either over broad or under inclusive.  Which is why we put

14  in this process in our proposed protocol that we would go back

15  and forth three times.  And as Mr. Kellner said, that's

16  relatively circumspect, that we would go back and forth --

17          THE COURT:  Yeah, I'm adopting your initial -- the

18  only change that I'm making to it is that if you don't all

19  agree on the ultimate methodology, that the defendants are not

20  barred from going ahead and conducting the search.  Because

21  I'm going to want to see actually who was right and have a

22  better idea of what the search turns up.  And then you can all

23  meet and confer and talk about it if you still have

24  disagreements, and then come to me afterwards.

25          MR. McELROY:  Your Honor, if I may.  Their system

1  system does have what I believe to be the likely side effect

2  of adding a lot of additional cost up front for us by

3  including the plaintiffs effectively in our decision making up

4  front.  So we'll say we ran these searches, we gave you these

5  hit reports, and they say no, go back and run these search

6  terms.  We go back and run those search terms and say we got

7  back.  They'll say, no, that's still not good enough, go back

8  and run another one.  Once we go through that three times

9  we'll have spent a pretty decent amount of money on what we

10 normally would probably have spent on our first production

11 before we even get to the point of production.

12         I think that if the plaintiffs are going to be

13 involved so heavily up front in the decision making of what

14 documents we are going to produce and what is relevant to our

15 production, that some of that cost should be shared.

16         MR. KELLNER:  And, Your Honor, the way that we

17 typically have seen it done -- and it might be useful to draw

18 your E discovery expert, your vendor into the process -- is

19 that once you've decided on the sources of electronic

20 information to collect it, and then when it's collected it's

21 indexed and available for search.

22         So, you know, one or a number of search terms could

23 be applied against the collection all at once and to generate

24 a search report.  And then the incremental cost of revising

25 the search or adding some other search terms, you know, it

42

1  really isn't any additional cost other than some tech time to

2  revise the syntax and run another report to see it.

3       THE COURT:  From the search, what you're saying the

4  search really isn't where the cost comes, it's the data

5  collection.

6       MR. KELLNER:  Well, the data collection, they're --

7  we would expect that they would target the data collection to

8  the sources of ESI, the people that they think have relevant

9  information about these transactions.  And that either as part

10 of their preservation of the collection they would collect it,

11 and that would be the corpus against which the search terms

12 were applied.

13      THE COURT:  But do you disagree as to where the cost

14 is?  In other words, Mr. Kellner is saying the cost doesn't

15 come from the search as much as it comes the collection of the

16 data.

17      MR. McELROY:  Well, I suppose if the only thing

18 we're going to be looking at is hit reports, and honestly I

19 don't understand how that assists in getting to where we want

20 to go, but if the only thing we're going to do is be looking

21 at hit reports, I agree that the incremental cost is probably

22 not going to be that great.  However, in order to determine

23 whether or not responsive documents are actually being

24 provided, something more than just hit reports needs to be

25 done.  That includes likely enlisting either some sort of

1    technology assisted review or enlisting, you know, a small

2    army of folks to view this stuff and assist to see whether or

3    not there are actual responsive documents being produced.

4              So let's say hit reports, we come back with hit

5    reports that they agree to.  Okay.  So now we have the hit

6    reports and we go through them.  Are these responsive

7    documents, is that -- and they get it and they look at it and

8    they say, ah, this isn't what I wanted.  So we go back and

9    refine the search again.  Personally that's my experience with

10   this type of --

11             THE COURT:  But isn't that their expense?

12             MR. KELLNER:  I think that that's reading more into

13   what we've got in the protocol than that.  If you've got the

14   corpus of data and you've got the ability to search it and to

15   provide hit reports, you've got the opportunity to look at the

16   content, the results of those searches to see whether

17   something is responsive or over broad.  You haven't made any

18   productions to us yet at that point.

19             MR. McELROY:  No, but these -- in reviewing a

20   determination of the responses, this is actually where the

21   cost is involved, which I'm sure you'll agree with me on.  The

22   actual processing for production is a relatively minor cost

23   compared to the actual determination of responsiveness.

24             MR. KELLNER:  Right.  But anything that's responsive

25   you're going to produce anyway.  Anything that's a search hit

44

1  that's not responsive, you're going to review a few of those

2  and say it's too broad, you know, we need to narrow it.  That

3  way it's recalling all sorts of things that don't have

4  anything to do with the case.

5        THE COURT:  I mean what I would be likely to do is

6  what happens in most cases, someone says, well, why don't we

7  look at a small sample just to see whether this -- these

8  search terms were accurate or not.  And my guess is that's

9  what you'll do.  And it sounds as though the expense would be

10 more on the plaintiff's side than on your side.

11       MR. McELROY:  Perhaps.  I'm not sure about that.

12       THE COURT:  Yeah.

13       MR. McELROY:  I mean at the end of the day we have

14 to do both a privilege review and actual review [inaudible]

15 documents.  I don't think the plaintiffs will probably be very

16 happy if we review the 5 or 10 percent of the documents and

17 [inaudible].  You know, at the end of the day my concern is

18 where does this end.  Because being able to have this

19 iterative process sounds nice, but it assumes the ability to

20 agree and compromise, which, based upon our attempts to

21 compromise just on this [inaudible], it appears will not be

22 possible.

23       Because we didn't even get any compromise back on

24 there yet [inaudible] insisting on their original language

25 over and over again even after we attempted to compromise.

1   Originally we didn't want to agree to any of it.  We said

2   fine, compromise, we'll agree to that.  If that's what it

3   takes to get this moving forward we'll compromise [inaudible]

4   up front with an opportunity to [inaudible] and come back to

5   us for searches [inaudible] for that.  And they rejected that

6   completely and came back to us with their original language.

7            So it all comes back to my concern --

8            THE COURT:  We're back to trust.

9            MR. McELROY:  No.

10           THE COURT:  Yeah, it comes back to trust ultimately,

11  which is hard to establish in litigation.  But is it really

12  just a question of how many rounds they're entitled to go back

13  to?  I mean they're requesting three rounds.  If they just had

14  one, would you go back one time and then come to the Court?

15  Does that work for you?  Because otherwise I'm just going to

16  come up with an arbitrary number.

17           MR. McELROY:  One round was effectively our

18  counterproposal.  I would be happy to agree with that.  And

19  discuss with them ahead of time potential searches as well.

20  But the idea of going back and forth three times with a need

21  to have a certain percentage responsiveness or [inaudible] I

22  worry that that sets us up for never really being able to get

23  in a position where we can say [inaudible].

24           Whereas under the normal rules we provide our

25  production and we say this, these are all the documents that

1   we found.  Reasonable methodology [inaudible].  And if there's

2   something that you think is inadequate you have to show us

3   some reason, show the Court some reason that that production

4   is inadequate.   And I think that's a fairly uncontroversial

5   statement.

6              MR. WITTELS:  Well, we disagree with the counsel's

7   characterization of their proposal.  They offered us five

8   additional search terms in one shot.

9              THE COURT:  No, I'm not going off their proposal.  I

10  think what we've established so far is that there's going to

11  be this exchange of data sources, scope of time, all that plus

12  this process that we talked about.  And that the process would

13  be that you would all meet and confer before the search is

14  conducted.  But if you don't agree on the search terms,

15  methodology, et cetera, then defendant is permitted to go

16  ahead with the search.

17             Once that search is conducted, then the results will

18  come back to you, and now we're just talking about at the end

19  how -- whether there'll be three rounds, two rounds or one

20  round of trying to meet and confer and you have to try to work

21  things out beforehand.  And I think one round perhaps might be

22  before you come to see me, might be the compromise that's

23  reasonable, one or two, that's it.

24             MR. WITTELS:  We would think at least two, but the

25  reason we asked for three is because the incremental costs of

47

1    additional searches are small.  So why not front load the --

2              THE COURT:  Right.

3              MR. WITTELS:  I mean it's essentially discussion and

4    we're saying let's build in more time into the discussion up

5    front because the costs are small so that we can avoid

6    potential --

7              THE COURT:  No, I understand what you're saying.

8    Apparently there's a dispute about where the cost is.  And if

9    I -- it sounds to me as though the costs would be small

10   incremental costs.  And if you come back to me in, let's say,

11   after two times and counsel can show me that the cost is

12   great, then I'll make a decision.  But if it's not great, then

13   I'll probably send you back one more time.

14             MR. McELROY:  And, Your Honor, if plaintiffs would

15   be willing to agree to some sort of provision where if we have

16   this iterative process of three times going back and forth,

17   then they're going to be -- you know, we complied with our

18   obligation and we have some agreement like that, then maybe

19   that's something we can look into.

20             THE COURT:  How about presumptively complied?

21             MR. McELROY:  Sure.  The --

22             THE COURT:  Presumptively and then it's their burden

23   to overcome it.  I think that's probably the way it works

24   best.

25             MR. McELROY:  Because the thought --

48

1          THE COURT:  That's a very good suggestion.  Let's do

2     it that way.

3          MR. McELROY:  Yes.  The thought of them having to

4     file a motion to compel on top of it.

5          THE COURT:  Right.  You don't want to have to do

6     that.  So why don't we take you try to work it out three

7     times.  Then it's presumptive compliance.  And then it's your

8     burden to show there's more that has to be done.  Okay?  Are

9     we good?  I have another case that I --

10          MR. PREVIN:  Your Honor, very quickly, is it --

11          (Court and Clerk confer.)

12          THE COURT:  Okay.  Quickly.

13          MR. PREVIN:  Yeah, very quickly.  If we do actually

14     reach agreement on the terms --

15          THE COURT:  You write it up.

16          MR. PREVIN:  Pardon me?

17          THE COURT:  Do you want to write it up?

18          MR. PREVIN:  Well, no.  I meant at that point and

19     then we make our production, is it fair to say that the

20     plaintiffs cannot after the fact object and say, no, you've

21     got -- we don't like the sample, we don't like what you

22     produced under those searches, we want you to go back and use

23     others searches.  I mean if we agree up front in this process

24     and we can reach a resolution, that's the end of it, right?

25          THE COURT:  If you agree as to what the search terms

49

1  would be, yeah, you've agreed to them, right.

2  MR. WITTELS: We -- your Honor, if I -- we did add a

3  sentence saying that if they should find any responsive

4  information outside of what was recalled by the search terms,

5  they're obligated to produce it.

6  THE COURT: Right.

7  MR. WITTELS: We can't be --

8  THE COURT: Right.

9  MR. WITTELS: -- held to actually guess at every

10  right term --

11  THE COURT: No, exactly. And this is all

12  presumptive, right? So there's a presumption. I mean nothing

13  is ever barred in the courts.

14  MR. PREVIN: No, I understand. Your Honor, just

15  with respect to that one sentence, we do really ask for one

16  modification to that language. It says that, their proposal

17  said that we uncover any responsive document at anytime, we

18  have to produce it within seven days. Instead of a seven

19  day --

20  THE COURT: What -- substitute a number of days.

21  MR. PREVIN: A reasonable period of time. I mean

22  this is going to -- there's going to be rolling productions.

23  You know, we're going to make --

24  THE COURT: Thirty days?

25  MR. PREVIN: We can -- well, it can't be that every

1  time we find a document at any point in the process we have to

2  produce it within seven days.  There are going to be rolling

3  productions, we're going to be --

4       THE COURT:  Within a reasonable time is what you

5  want.

6       MR. PREVIN:  Yeah, I mean instead of a seven day --

7       THE COURT:  Do you have any objection to that?

8       MR. WITTELS:  (No audible response.)

9       THE COURT:  Okay.

10       MR. WITTELS:  Your Honor, we have -- the differences

11  in the proposed protocol, we have a redline here.  You can see

12  what we had proposed to insert. It includes more than just the

13  Exhibit B that we submitted.  It's a couple of additional

14  paragraphs.  Perhaps we should submit the redline for your

15  review so you can --

16       THE COURT:  I want to have what we've worked out

17  here today to be the agreement.  If you think it's not

18  complete enough, then I think -- I've given you the template

19  and I'd like counsel just to agree on it.

20       MR. McELROY:  [Inaudible] with this as the basis --

21       THE COURT:  Yeah, just work on it.

22       MR. McELROY:  -- [inaudible].

23       THE COURT:  I think you know what I'm looking for,

24  and I'm trying to make it work for both sides.

25       MR. WITTELS:  Thank you, Your Honor.

51

1        MR. PREVIN:  Thank you.

2        THE COURT:  All right.  Do we need another

3  conference?

4        MR. WITTELS:  Yes.

5        THE COURT:  Okay.  So two months?  Okay, let me see

6  what we have in two months.  April 14th?

7        THE CLERK:  [Inaudible].

8        THE COURT:  What time?  Okay, we're looking at April

9  14th.  April 14th at 12:00?

10        MR. McELROY:  That works for Cross Country, Your

11  Honor.  Would that be a telephone conference?

12        MALE VOICE:  Telephone conference or?

13        THE COURT:  It's up to you how you want to do it.

14        MR. WITTELS:  Judge, could we do the 17th, a Friday?

15  Is that possible?

16        THE COURT:  No, and I'm not sure why but we have a

17  do not schedule anything.  No, Friday can't be done.  The 14th

18  and the --

19        MR. WITTELS:  How about the 16th?

20        THE COURT:  No.  The 14th is the last day that we

21  [inaudible].

22        MR. WITTELS:  The 14th is the last day, sorry, for?

23        THE COURT:  That I'm free that week.

24        MR. WITTELS:  Oh, that week.

25        THE COURT:  It's the only day that --

1          MR. WITTELS:  20th?

2          THE COURT:  -- [inaudible] or not.  I'm sorry?

3          MR. WITTELS:  The 21st?

4          THE CLERK:  Not the weekend, the 21st, and I have

5    arraignments the following week.  So really the only time in

6    April -- yeah, April is a terrible month.

7          MR. WITTELS:  Then what was the only --

8          (Court confers with Clerk.)

9          THE COURT:  Okay.  If you can --

10         MR. WITTELS:  How about the 5th?

11         THE COURT:  No, there's a do not schedule on that.

12   I don't know why.  We have a do not schedule on that.  I don't

13   know if we're holding it for a trial or -- I have on idea what

14   it's for.  The 14th you cannot do?  Okay, I'm going to ask you

15   -- I'm going to have to deal with this other case so --

16         MR. WITTELS:  We'll take it.

17         THE COURT:  Okay.

18         MR. WITTELS:  14th, whatever time.

19         THE COURT:  At 12 o'clock.

20         MR. WITTELS:  12 p.m.?

21         THE COURT:  Uh-huh.  So it's up to you whether you

22   want to do in person or by phone.  If it's like today, it's

23   probably an expense to do it in person.

24         MR. WITTELS:  Thank you, Judge.

25         MR. McELROY:  Thank you, Your Honor.

53

1          MR. WITTELS:  It might be better to revisit in

2  person.

3          THE COURT:  Okay.  Thank you.

4  (Proceedings ended at 3:15 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

54

1

2          I certify that the foregoing is a court transcript from

3     an electronic sound recording of the proceedings in the above-

4     entitled matter.

5

6                              _____

7                                        Sally Reidy

8     Dated:     February 23, 2015

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25