UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X     Docket#
MARGARITA DELGADO, et al.,    :     13-cv-4427-NGG-RML
            Plaintiff,        :
                              :
    - versus -                :     U.S. Courthouse
                              :     Brooklyn, New York
                              :
OCWEN LOAN SERVICING, LLC,    :
            et al.,           :     June 18, 2015
            Defendant         :
------------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
BEFORE THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE

A  P  P  E  A  R  A  N  C  E  S:

**For the Plaintiffs**:     **Steven L. Wittels, Esq.**
                            **James Burkett McInturff , III**
                            **Tiasha Palikovic, Esq**
                            Law Offices of
                            Steven L. Wittels
                            18 Half Mile Road
                            Armonk, NY 10504


**For the Defendants**:     **Matthew P. Previn, Esq.**
                            Buckley Sandler LLP
                            1133 Avenue of the Americas
                            Suite 3100
                            New York, NY 10036

                            **Bruce E. Alexander, Esq.**
                            **Weiner Brodsky Kider PC**
                            1300 19th Street,
                            NW, 5th Floor
                            Washington, DOCUMENT 20036

**Transcription Service**:  **Transcriptions Plus II, Inc.**
                            740 Sharon Road
                            Copiague, NY  11726
                            laferrara44@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE COURT:  This is docket number 13-cv-4427,

2   Delgado v. Ocwen.  Will counsel please state their

3   appearances for the record.

4          MR. WITTELS:  Steven Wittels from Wittels Law

5   for the plaintiffs.

6          MR. MCINTURFF:  Burkett McInturff for the

7   plaintiffs from Wittels law.

8          MS. PALIKOVIC:  Tiasha Palikovic from Witells

9   Law for plaintiffs.

10          THE COURT:  Could you spell your name for the

11   record, please?

12   .          MS. PALIKOVIC:  T-I-A-S-H-A P-A-L-I-K-O-V-I-C.

13          THE COURT:  Thank you.

14          MR. ALEXANDER:  Bruce Alexander for Cross

15   Country Home Services and Sandra Finn.

16          MR. PREVIN:  Matthew Previn for Ocwen Loan

17   Servicing.

18          THE COURT:  Okay.  Who would like to go first?

19          MR. WITTELS:  Well, we're fine going first,

20   your Honor.  First, did your Honor have a chance, I know

21   we gave it to you very late, to review our letter

22   submission?

23          THE COURT:  I skimmed it but I would say I am

24   not on top of it.

25          MR. WITTELS:  Okay.  So if I may, I'll just

3

Proceedings

1   give you a brief summary of what the issues are today.

2           THE COURT:  Right.

3           MR. WITTELS:  This obviously is the check

4   solicitation scheme case --

5           THE COURT:  Right.

6           MR. WITTELS:  -- in which the plaintiffs are

7   alleging that they were deceived by solicitation checks

8   sent to them by the enterprise composed of Cross Country

9   and Ocwen.  Ocwen gives its list of customer names out to

10  Cross Country and is part of the inducement by Cross

11  Country to do so.  Ocwen will receive, we call it a

12  kickback, they call it a premium, for giving out their

13  names of their customers.

14          They then -- Ocwen -- excuse me, Cross Country

15  then sends what we allege is a deceptive check with

16  tendered material to the customers and they cash it and

17  find out months later, for the most part, from our

18  plaintiffs that they've been enrolled in various warranty

19  or service plans that are set up by Cross Country.

20          We've had motion practice on this extensively

21  in front of Judge Garaufis and he issued a decision

22  denying in great part, the defendant's motion to dismiss.

23  He sustained our RICO count and various consumer fraud

24  counts for California and New York.

25          At the time, the four named plaintiffs who are

4

Proceedings

1  listed actually on the case management order, were the

2  only four plaintiffs.  We've since added 26 more

3  plaintiffs who represent 18 total states now, alleging

4  various state law claims in addition to the RICO claim we

5  had initially.

6          As your Honor will recall from the last case

7  management order, well, the first one that was entered in

8  November, that ensued after we had had conferences with

9  your Honor and discussed how we were going to proceed

10 going forward in terms of discovery and thereafter we

11 finally entered a ESI protocol that your Honor entered

12 and that was again the result of long negotiations with

13 the defendants and the propriety of it.  And we had

14 experts on the phone.  We actually had one here from our

15 side to describe why we should obtain the protocol we

16 wanted.

17         Since that time of the ESI protocol being

18 entered, the parties have still been negotiating ESI in

19 terms of the number of custodians, the names of the

20 custodians, and that is I believe winding down to where

21 we hope to get the set request that will be put into the

22 mix for the discovery by -- in the next two weeks,

23 hopefully -- one to two weeks.

24         The issues today that we would like your Honor

25 to address are first regarding a discovery dispute that

5

Proceedings

1  we have with Cross Country concerning non-check

2  solicitations.  That's just the topic.

3           The second topic is the scope of what

4  plaintiff's depositions will look like.  The defendants

5  are asking for all 30 at this time and the third issue is

6  -- we want to bring up is the discovery cutoff which

7  under the current order is -- under number 12 of this

8  case management plan is August 30th.  And we would like

9  to have an extension of that and discuss that with you.

10          By way of one of one other issue of background

11 that we addressed briefly in the letter that we sent to

12 you, defendants have moved to dismiss in great part, many

13 of the added claims brought by the 18 plaintiffs in the

14 different states.  They filed a motion, I think it was

15 May 21, so somewhat recently here, less than a month ago,

16 and our response would -- under an order that would --

17 well, under a schedule that we had entered before we had

18 gotten the motion was early July, July 3rd.  We asked the

19 defendants to consent to a brief extension I think of 28

20 days, just under a month and they've taken that -- and

21 said no, but they've taken it under advisement, I think

22 contingent upon how we work out our schedule today.  So

23 that's an issue that's hanging out there.  We need a

24 little extra time.  You know, they've not only filed a

25 motion to dismiss but they've also filed a motion to

Proceedings

1    compel arbitration that was not discussed with your Honor

2    last time but was brought up with Judge Garaufis where

3    they said they have arbitration provisions that they felt

4    compelled arbitration.

5           We feel those arbitration provisions that they

6    have are invalid for a number of reasons, most of all the

7    clients didn't -- our customers never knew they were

8    enrolled in any plans and there's no assent that is

9    mandatory under the Second Circuit and other law.  So we

10   don't think that motion will succeed but we are briefing

11   both those motions.

12          So the first issue is a discovery dispute

13   concerning non-solicitation checks and just to give you a

14   brief overview again, the solicitation check -- I don't

15   know if we showed you a copy last time but it's attached

16   to our complaint, it comes in an envelope, sort of a tear

17   open envelope and on the outside it says Ocwen.  So the

18   customer receiving it, who is an Ocwen loan mortgage

19   customer, thinks it's from Ocwen, opens it up and there's

20   a check, some other promotional solicitation material and

21   signs the check.  It's $250 or $350.  Signs the back.

22   Cashes it, thinking it's a refund or an overage of his

23   mortgage payments.

24          What we've now learned from the first wave of

25   written -- of hard copy discovery that was given to us by

7

Proceedings

1   the parties -- by the defendants, is that Cross Country

2   did an extensive analysis and survey of how fruitful,

3   probably is the best word, the check solicitation type of

4   mail promotion would work as compared to non-check

5   solicitations.  Non-check solicitations mean a direct

6   mail to a customer where they would have to take

7   affirmative action to say I want to sign up for this

8   warranty plan you're giving me, as opposed to signing a

9   check and suddenly finding themselves enrolled.  Taking

10  action.

11          In other words, if you don't do anything,

12  you're not enrolled.  That's the typical sort of

13  marketing that one expects that we allege is the

14  deception here because this is their scheme.  It's a

15  trick.  It's an artifice to get people to sign up for

16  this.  That's what our experts will say.  That's what the

17  Ninth Circuit has said.  That's what attorney generals

18  all over the country have said.  This is not some fair

19  way of dealing with customers and that's been repeatedly

20  stated by attorney generals in virtually every state.

21  There have been major settlements throughout the country

22  and the Ninth Circuit said that in an almost identical

23  check solicitation scheme that they affirmed where the

24  FTC won many millions of dollars for customers who were

25  unwittingly signed up who signed the checks.

8

Proceedings

1        So the question here, and I'm going to ask

2   permission for my colleague Burkett McInturff to address

3   it, is whether we are entitled from Cross Country to non-

4   check solicitation materials that we have learned about

5   in the first instance from the discovery that they've

6   produced because just briefly, when Cross Country decided

7   what type of marketing to do, it did very extensive

8   analysis and Burkett will get into it of what the -- we

9   can take you through the document but of how effective

10  the check solicitation would be versus non-check.  They

11  gave us this document.  It's relevant.  It's producible

12  and now we want the information regarding the non-checks

13  and they're arguing against it.  So if I can turn that

14  over to Mr. McInturff.

15            THE COURT:  Sure.

16            MR. WITTELS:  Thank you.

17            MR. MCINTURFF:  A little bit more background.

18  Cross Country's offerings are warranty and service plans.

19  You have to call and make a claim, say your appliance is

20  broken or your HVAC is not working.  And they, as my

21  colleague, Mr. Wittels said, they use a variety of means

22  to market these programs.  They also track data such as

23  how long a customer stays in a program and why the

24  customer decides to leave.

25            They've produced data for their check

9

Proceedings

1   solicitations that show that customers in the thousands

2   are disputing that they ever enrolled in the first place.

3   They've also produced data showing that the -- and I can

4   show you this, that the profitability meaning the amount

5   of premiums paid by consumers, versus the amount of

6   claims paid out by the company of the check solicitation

7   and in this particular case it's about four times as

8   profitable.

9          So we're looking for data related to the non-

10  check campaigns.  They call them campaigns because they

11  do them in sort of a big push.  We're looking for data

12  related to the non-check campaigns because we feel that

13  it's almost a survey in and of itself for a scientific

14  experiment in and of itself to look at how consumers are

15  responding to the non-check campaigns, if they are four

16  times less profitable, are consumers reacting differently

17  and that will help us show that this conduct is

18  misleading and fraudulent.

19         In addition, this information will be very

20  relevant to our expert because our expert will talk about

21  consumer perception and what numbers like this indicate.

22  So we think it's relevant data.  We've offered to Cross

23  Country to confer with them to reduce any burden.  We're

24  not looking for massive amounts of documents.  We're

25  looking for basically downloads from databases which

10

Proceedings

1    Cross Country has shown that they can do.  These are

2    Cross Country's responses to our interrogatories where

3    Cross Country went through -- went to their customer data

4    base.  This is an example, would be their customer data

5    base for reasons consumers decided to cancel and here's

6    one example:  this is consumers who dispute enrollment

7    authorization.  This is for the check campaign.  There's

8    nearly 8,000 consumers called Cross Country and said I

9    didn't enroll in this.

10          And so we would like to see data, for example,

11   for the non-check campaigns, to see what the numbers are

12   concerning consumers who dispute enrollment.  There's

13   other pertinent data here and so we don't think it's

14   terribly burdensome because Cross Country's already done

15   it for its check campaign.

16          THE COURT:  So what level of detail are you

17   looking for?

18          MR. MCINTURFF:  As I said, basically downloads

19   of certain statistical data that the company keeps which

20   we've seen that they keep it for check customers and we

21   believe it's kept for non-check customers and again,

22   we'll offer to confer with Cross Country to narrow the

23   data, so that it's not overly burdensome.  We're not

24   asking for communications necessarily.  We're not asking

25   for marketing documents.  It's simply -- well, we would

11

Proceedings

1  ask for a limited number of marketing documents, so that

2  our expert could look at and compare what consumers

3  perceive from the non-check marketing.

4          THE COURT:  Statistical data similar to the

5  kinds on this chart?

6          MR. MCINTURFF:  Correct.  This is reasons for

7  cancellations.  We would also want percentages of -- so

8  the company tracks a metric called response rate which is

9  if you mail out the check to 600,000 customers and a

10 certain percentage responds, that's the response rate.

11 We're looking for the response rate of the non-check

12 campaigns because data produced to date shows that the

13 check campaign, aside from being much more profitable, is

14 also -- has a much higher response rate.  Consumers are

15 opting in at much higher levels.

16         And then we would look for data concerning how

17 long a consumer remains on a plan.  So Cross Country,

18 it's plaintiff's position that Cross Country's consumers

19 who are Ocwen's customers who are enrolled through a

20 check, stay on the plan a very limited number of time,

21 basically until they see the charge on their Ocwen bill.

22 Then they call and dispute enrollment and cancel.

23         A consumer who knowingly entered into a --

24 basically an insurance-like product, we would expect that

25 they would stay on the product for longer than three to

Proceedings

1    four months, five months, and that when they canceled,

2    they wouldn't cancel because they disputed enrollment.

3    They would cancel because they were for some other

4    reason, unsatisfied.

5           THE COURT:  Uh-hum.

6           MR. MCINTURFF:  So we think the data is

7    germane.  We also think that Cross Country has put the

8    data at issue because in the documents that Cross

9    Country's already produced, it shows that the relevant

10   employees at the company are comparing the effectiveness

11   of the campaigns in making decisions in terms of which

12   campaigns to use, also in terms of how much of a premium

13   to pay Ocwen for the use of Ocwen's logo and customer

14   lists.

15          THE COURT:  All right.

16          MR. WITTELS:  To follow-up on what Mr.

17   McInturff said, we've already given the questions to

18   them.  In paragraph 3, we asked -- this is where we got

19   the chart.  We first asked, this is -- sorry -- number 3

20   of our second set of interrogatories.  We asked for each

21   non-check solicitation campaign for Ocwen to provide the

22   following info:  number of Ocwen customers solicited and

23   the campaigns response (indiscernible).  They object to

24   that.  Whereas they had given us that data for the check

25   solicitation information.

13

Proceedings

1          Then in paragraph --

2          MR. MCINTURFF:  This is -- if I may interrupt,

3    this is the response rate for the check campaigns.

4          MR. WITTELS:  Yes.  So then they have all that

5    data.  This is something that obviously Cross Country

6    supposedly looks at, because that's their business of

7    seeing how effective their marketing is to get people

8    enrolled in their different warranty and service plans.

9          We asked in question -- I think this is

10   question 4, if we're --

11         THE COURT:  So the objection is on relevance

12   grounds largely, right?

13         MR. WITTELS:  Correct.

14         THE COURT:  And you're saying it's relevant

15   because --

16         MR. MCINTURFF:  It tends to prove -- it will

17   serve as a control for us to be able to show that the --

18   this vastly more effective and vastly more profitable

19   marketing mechanism is, in fact, deceptive.

20         THE COURT:  Right.

21         MR. WITTELS:  As compared -- and for example,

22   here we ask for the proof of enrollment request.  That

23   term is a term of art from Cross Country where people who

24   call up and say I didn't enroll in this, why am I getting

25   billed by Ocwen, this $44.95 a month or whoever much

14

Proceedings

1    they're getting billed.  The company says well, Ocwen --

2    you first call Ocwen and Ocwen says well, it's not us,

3    and the customer says what do you mean it's not you?  And

4    by the way, we know this is how it operates and we're

5    going to get to this in the second part of this

6    discussion today -- we know this is how it operates

7    because Cross Country has recorded all of the client's

8    calls complaining, including our named plaintiffs, the

9    Delgados.

10        They called up Ocwen, the loan service unit and

11   said what's this on my bill?  The company says it's a

12   charge.  Well, who is it from?  What's it about?   And

13   then they pass them on to Cross Country, a company

14   they've never heard of and Cross Country starts telling

15   them oh, well, you have enrolled.  How's that?  Well, let

16   me give you our proof of enrollment.

17        So then they send them the check and say you

18   enrolled and the customer and like our plaintiffs, the

19   Delgados said, what are you talking about.  You know, I

20   signed a check for -- it was a refund.  And it's all on

21   tape, so we know this.

22        So we asked here in question, I think this was

23   4, provide the proof of enrollment request issued for the

24   customers who cashed the check because they had told us

25   from the first interrogatories, 55,000 customers.  Then

Proceedings

1   we asked for the Ocwen customers who enrolled in a Cross

2   Country plan without a solicitation check, broken down by

3   the marketing method used and they gave us the

4   information for those who were done by -- who enrolled by

5   solicitation but for the non -- without a solicitation

6   check.  So that's another issue we're looking for which

7   is 5(ii).

8           And then on 6, again it's related to -- they

9   have a data base where we showed you -- accounts

10  receivable transactions database, they set up where they

11  record when someone calls up what the customer is calling

12  about.  And here we know with respect to check

13  solicitations and the 55,000 who cashed it, that there

14  were many, many calls regarding dispute authorization.

15  Another big category was non-payment.  We have to ask

16  them a little bit more about some of these terms but

17  billing vehicle no longer available, 17,000 people.  That

18  seems to be people maybe who no longer had the house or

19  the mortgage.

20          So we want that data for those who enrolled in

21  a Cross Country plan without a check solicitation broken

22  down by the marketing method, because they used

23  telemarketing, they used direct mail, they used --

24          MR. MCINTURFF:  And statement marketings that

25  they would send along with Ocwen's monthly mortgage

16

Proceedings

1   statement, they would include a solicitation pitch in the

2   statement.

3            MR. WITTELS:  We want the chart answer for

4   this.

5            THE COURT:  Right.  So

6            MR. ALEXANDER:  I'll (indiscernible) the rest

7   of the story, your Honor.

8            THE COURT:  Slowly.

9            MR. ALEXANDER:  This is an exercise of getting

10  very, very far afield.  The standard we have here is

11  whether the material that the plaintiffs signed and

12  deposited was objectively deceptive or misleading and

13  they keep talking about something that's grasped grossly

14  more profitable, something that's grossly more effective

15  that has nothing to do with whether the marketing

16  material is objectively misleading or not.

17            They are trying to get into this information

18  for some purpose that is not apparent to me but I think

19  is going to yield a lot of false positives and let's just

20  talk about one.  They talk about how the enrollment is

21  much more effective for a check marketing than otherwise,

22  as a posit.  There's are lots of different other kinds of

23  marketing and how comparable they are is highly dubious

24  but let's just talk about the objective evidence that we

25  have before that we've produced here.

17

Proceedings

1   More than 90,000 people in the relevant time

2   frame cashed one of these checks.  More than 30,000

3   canceled before ever paying anything.  They full knew

4   well what was happening.  They had something.  They got a

5   chance to get a couple of bucks for free, they cashed it

6   and then they canceled.  They knew exactly what was going

7   on.

8   The response rates for these programs that they

9   say are so grossly more effective, 97 or 98 percent of

10  the people do not respond at all.  So you're talking

11  about very small percentages of people who receive this

12  material who do anything with it at all.

13  Then he said that well, we want to know about

14  the cancellation because people, as soon as they figure

15  out that they're in this program, they cancel.  So we

16  want to know how long they stay on the programs.  We've

17  already given them information that there are more people

18  who renewed with this program after getting a separate

19  notice than don't.

20  So it is hard for my client to understand how

21  any of this information leads reasonably to the discovery

22  of evidence that bears on a claim or defense in this

23  case.  That whether it's telemarketing and they're not

24  even given anything to look at, whether it is something

25  that a company's -- a statement that is not arriving

18

Proceedings

1  separately.  The relationship -- they say that this works

2  as a baseline but you have to be able to establish that

3  the baseline has comparability and that the baseline

4  shows some similarities and your Honor, they have not

5  shown this at all.

6         And they cannot show comparatively --

7  comparability.  I mean this information is going to lead

8  to all kinds of separate, rabbit-hole disputes about

9  well, the fact that these people kept the program for

10  this long and these people didn't keep the program for

11  this long.

12         Well, it may indicate that the reason for the

13  high enrollment -- so-called high enrollment is that the

14  people -- most of the people, a good percentage of the

15  people who choose -- who bothered to choose, fully

16  understand exactly what's going on and that's why they

17  cancel right away.  And it's the people who are careless,

18  who don't bother to read, who sign their name to a check

19  without bothering to see what the endorsement or the

20  accompanying material means.  So that's what the issue is

21  going to be.  And so where we're going with this other

22  discovery is really to our point of view, pretty far off

23  the main path here.

24         THE COURT:  Well, you know, as happens with a

25  lot of these discovery issues they really do require an

Proceedings

1  analysis of the merits and whose argument is more

2  powerful on the merits and I think each side is arguing

3  somewhat differently as to how the Court should be

4  looking at the merits of the case and the discovery that

5  leads to it would -- well, the question really is by

6  precluding an avenue of discovery, am I precluding an

7  argument that the Court should be considering when

8  looking at the merits.  That's -- and I think you're

9  essentially saying that the plaintiff's argument doesn't

10  hold any water, that the comparison of these two

11  different --

12         MR. ALEXANDER:  I don't see how they show it.

13  They -- basically they're saying, your Honor, it's more

14  profitable, it's more effective and therefore, it's

15  deceptive.  They string those terms together in the same

16  sentence and they're completely unrelated.

17         THE COURT:  All right.  So you're saying the

18  motive, the reason why someone would want to do this is

19  different from what is deceptive.

20         MR. ALEXANDER:  Whether it's objectively --

21  yeah.

22         MR. PREVIN:  Your Honor, just very briefly, if

23  I may, just point out maybe the obvious that that class

24  definition very explicitly is limited to enrollment in

25  check solicitation programs.  So they are asking very

Proceedings

1  explicitly for information that is not relevant to the

2  class claims and the -- as I think you effectively

3  captured the fundamental issue, that the motive has

4  nothing to do with whether or not the solicitation

5  materials were deceptive.  That's an objective standard

6  and either Judge Garaufis will decide it or a jury will

7  decide the issue but it's not going to hinge on whether

8  or not the solicitation was profitable.

9         MR. WITTELS:  It's not only a matter of profit

10  and they're pointing that out because that's really all

11  we -- that's one factor we know about.  Let's start with

12  the fact that their own analysis, Cross Country's

13  analysis in the document that they've produced shows --

14  it cries out that it's relevant because they're analyzing

15  it -- you can look here, your Honor, the check -- this is

16  their different campaigns and this is an e-mail in 2012,

17  just when they were getting really geared up for sending

18  out a lot of these, they did it I think from 2009, but

19  they compare values claims costs.  This is what it's --

20         MR. MCINTURFF:  That's what they pay out to

21  claims.

22         MR. WITTELS:  -- what they pay out on claims in

23  check versus non-checks.  So the defendants themselves

24  think it's germane, the comparison.  So for them to sit

25  here and say it has no relevance is just belied by their

Proceedings

1    own document.

2            Their own people are analyzing how effective

3    check solicitations are versus non-check.  If they were

4    getting as high a rate with non-check solicitations to

5    get customers to go into these warranty plans, do you

6    think they'd really bother sending out checks and -- of

7    course not, wouldn't do it that way because again, the

8    Ninth Circuit says it's a scam.  I mean, you can read the

9    decision.

10           THE COURT:  Well, let's assume it's deceptive

11   hypothetically, okay?

12           MR. ALEXANDER:  Thank you.

13           THE COURT:  How does the motive -- in other

14   words, how does this comparison fit into your analysis of

15   the deception?

16           MR. MCINTURFF:  If I can challenge the

17   assumption because the -- we have to prove it's

18   deceptive --

19           THE COURT:  Right.

20           MR. MCINTURFF:  -- and if consumers are -- say

21   for example, for telemarketing or for the direct mail

22   campaigns, if they're not canceling it as high a rates

23   and they're not disputing enrollment, they're not saying

24   how did I get signed up to this, that tends to show that

25   the other mechanism, the check is deceptive.  So that's

Proceedings

1    really what we're going after.

2           And we're going to employ a marketing expert

3    and the way marketing experts work is they try to

4    recreate the circumstances under which the consumer would

5    have made this decision and they -- it's basically a

6    scientific study where they control for various factors.

7    They would control, say for example, for the length of

8    time that the consumer was allowed to read the material.

9    They would control for colors, different logos, such

10   things.

11          This is very pertinent information for our

12   expert because Cross Country has its own internal data

13   that is itself relevant.  Basically, it's its own study.

14   It's comparing its other marketing materials to its check

15   campaigns and we think that that is relevant because it

16   will go to show deceptiveness.

17          For example, in the Ninth Circuit, when the

18   Ninth Circuit ruled that a very similar check campaign

19   was deceptive, they relied on the fact that consumers

20   used the product at a very low rate.  So if we have a

21   lower usage rate of check -- enrollees via check versus

22   enrollees from non-check campaigns, that will help us

23   prove our case.

24          MR. PREVIN:  Your Honor, if I may just very

25   briefly, I do want to make this Ninth Circuit case that

23

Proceedings

1   is referenced -- --

2          MR. ALEXANDER:  Yeah.

3          MR. PREVIN:  It did not hold that check

4   solicitations are per say deceptive.  It involved a

5   different company with different disclosures that the

6   Ninth Circuit concluded were deficient.  That's a

7   different -- you know, it does not stand for the

8   proposition that plaintiffs are suggesting it does and we

9   don't need to resolve that now but I do want the record

10  to be clear that there is no case law that stands for the

11  proposition.

12         MR. ALEXANDER:  To the contrary, your Honor,

13  that court opined about the various kinds of disclosures

14  that it thought would be appropriate and then the

15  question is whether these disclosures measure up to that,

16  as opposed to no disclosures at all.  So, I mean it's a

17  much different situation than you're being presented at

18  this particular point.

19         But in further point, I mean any business who

20  is trying to run a business is going to keep track of its

21  performance and different kinds of categories.  The

22  question is not whether some things are effective.  If it

23  was designed to be a deceptive program only because it

24  was so effective and so money making, why do anything

25  else?  I mean that sort of begs the question really.

24

Proceedings

1   Their argument really begs to say well, why would we do

2   anything else if this is so successful, if our measure of

3   how we're going to do our business is only going to do

4   this, that they use a variety of marketing techniques

5   precisely for the purpose of reaching different kinds of

6   customers because no one really knows what they're doing

7   and so they keep records about this but the question is

8   not whether it's effective, the question is not whether

9   it's enrollment.

10          We're going to be arguing about whether people

11  enrolled, and then canceled because they knew everything

12  that was about it, whether they enrolled and then more of

13  them actually re-enrolled after a year, not necessarily

14  within a few months but after a year.  It's going to be

15  about whether a fairly small number of participants

16  comparatively -- now they're going to say it's thousands.

17          THE COURT:  Excuse me just a second.

18          MR. ALEXANDER:  Sure.

19          (Pause)

20          THE COURT:  All right.  I'm going to have to

21  take this call.  You won't have to move at all and then

22  I'll be able to give you more uninterrupted time here.

23          MR. ALEXANDER:  Thank you very much, your

24  Honor.

25          (Off the record)

25

Proceedings

1          THE COURT:  All right.  So let me just ask you

2     a couple of questions.  We've looked at the relevance

3     benefit side.  Tell me about the burden.

4          MR. ALEXANDER:  There have been hundreds of

5     marketing campaigns during the -- more than a hundred,

6     I'm sorry, not hundreds, but more than a hundred, most of

7     which are not check solicitations.  Now I don't know

8     exactly what the names are -- the numbers are but there

9     are more non-check solicitations and many of them are

10    telemarketing, where they're not looking at materials.

11    They were talking to somebody over the phone about

12    materials.

13          So we're opening the door to a level of

14    discovery here if we're going to go through this much,

15    much broader than what the complaint is about, which is

16    about these check solicitations that they say are so

17    deceptive.

18          And when you're saying, you know, what is the

19    burden?  The burden is just a lot of other stuff that is

20    -- I mean, where do we cut this off, I guess is the

21    question.  You know, when you say the burden, I mean are

22    we going to be doing ESI about telemarketing?  I mean, it

23    just --

24          THE COURT:  So let me hear --

25          MR. ALEXANDER:  Yeah.

Proceedings

1          THE COURT:  So what's the least burdensome,

2    most focused way to get the information you need.

3          MR. MCINTURFF:  The downloads from their

4    database, the response to a limited number of

5    interrogatories and sample marketing and in the case of

6    telemarketing, call scripts.  We think it probably would

7    take a technician an hour to download the relevant

8    information.

9          MR. WITTELS:  Well, because they have a

10   cancellation code and database where they record this

11   information and we want -- request for that information

12   and that pop right out here.

13         THE COURT:  What time period are we focused on?

14         MR. MCINTURFF:  The relevant period for the

15   complaint?  It's -- Ocwen began these -- this check

16   campaign in November of 2009 and they ceased shortly

17   after we filed the complaint in the summer of 2013.

18         THE COURT:  Okay.  Let's assume that what

19   plaintiff is saying, they believe strongly, do you think

20   your IT expert will agree with that, that it's that

21   unburdensome?

22         MR. ALEXANDER:  For the gross data on the other

23   programs, probably not that burdensome.  Getting the

24   actual marketing materials, when they say a sample --

25         THE COURT:  Uh-hum.

27

Proceedings

1      MR. ALEXANDER:  -- your Honor, there are dozens

2  and dozens of these going back in time and putting those

3  together and pulling the information is not that easy and

4  the scripts for the telemarketing, the same way.

5          I mean, I really -- I can't understand why

6  telemarketing is even part of the discussion.  I mean,

7  this is a written offer and now they're talking about

8  verbal communications.  I just -- I fail to see any

9  connection at all between the two.

10         MR. WITTELS:  It's a marketing method that they

11  used and that's their whole -- the whole case involves

12  marketing, the effectiveness of the marketing.  How

13  people respond to what's written, whether what they've

14  put in the offering is objectively misleading or not and

15  that depends on how you present it to the people.  How

16  they're doing a telemarketing and the response rate, how

17  people cancel, all of that is germane because that's

18  their whole business is comparing different types of

19  marketing. So it is germane and our experts have told us

20  it's germane.  So we do believe that how they did it, the

21  methodology and the scripts -- you know, they also told

22  us at the beginning that it was going to be burdensome to

23  give us all the material regarding their different check

24  solicitations.  It turns out that they're pretty uniform.

25  There's very little variation in the few that they used.

28

Proceedings

1   The Gold Plan is very similar to the MD Gold Plan.

2            THE COURT:  Uh-hum.

3            MR. WITTELS:  So I know what counsel's -- I

4   don't think counsel has all the information

5   (indiscernible) as to how many were solicited to Ocwen

6   customers because it seems like there's a limited batch

7   right here in 2012 where they list the campaign and it's

8   not hundreds.

9            THE COURT:  Well, starting with telemarketing,

10  do you know for a fact that there was telemarketing, as

11  well as a written solicitation?

12           MR. WITTELS:  Yes.

13           MR. MCINTURFF:  To Ocwen customers?

14           MR. WITTELS:  Yes.

15           MR. MCINTURFF:  Yes, we do know that.

16           THE COURT:  Okay.  Do you have any idea of how

17  significant that was?

18           MR. WITTELS:  Meaningful.  It wasn't

19  insignificant certainly.  There are calendars that the

20  defendants have produced that show the different

21  campaigns during different months and telemarketing is

22  there --

23           MR. MCINTURFF:  Along with direct mail.

24           MR. WITTELS:  -- along with direct mail.

25           THE COURT:  Okay.  Do you know for a fact that

Proceedings

1    telemarketing scripts are not accessible?

2            MR. ALEXANDER:  I do not know that for a fact.

3            THE COURT:  Okay.

4            MR. ALEXANDER:  I do not know that for a fact.

5    I mean, I would be speculating to talk about that, your

6    Honor.

7            THE COURT:  So I think what might make sense --

8    well, okay, assuming you get the telemarketing script,

9    what would your dream script say?

10           MR. MCINTURFF:  It would fairly apprise a

11   consumer of what they were entering into and by way of

12   background, to enroll through a telemarketing mechanism,

13   a consumer has to do something to manifest assent.

14           THE COURT:  Right.

15           MR. MCINTURFF:  It might be provide ideally it

16   would -- if they wanted to be the most up front, the

17   would ask the consumer to provide their Ocwen account

18   number.

19           THE COURT:  Uh-hum.

20           MR. MCINTURFF:  But there may be other

21   manifestations of assent and the script would describe

22   what the consumer was doing and then have them manifest

23   assent in a fashion that was customary within the

24   marketplace.

25           The crux of our claim here is that by having

30

Proceedings

1   people manifest assent through a check disguised as a

2   refund from their mortgage company, they don't realize

3   they're manifesting assent.  It's like me saying you

4   agree to purchase something when you lift up your pen and

5   if you're not accustomed to purchasing things by lifting

6   up your pen, you might inadvertently purchase something.

7           THE COURT:  So it's different from putting your

8   sticker in one part of the solicitation.

9           MR. MCINTURFF:  Correct.

10          MR. PREVIN:  But the telemarketing script is

11  going to be completely irrelevant to that analysis

12  because their theory is premised on the notion that all

13  of the disclosures that accompanied the check were

14  irrelevant because consumers weren't trained to read them

15  and just deposited the check thinking it was a refund.

16  So sort of -- I guess I don't understand what the

17  disclosure in a script would do for them.  I mean, they

18  both disclosed one in writing, one verbally, what the

19  consumer is doing.  Their theory is that the consumers

20  don't read the accompanying disclosures with the check.

21          THE COURT:  So are you looking to find

22  liability with telemarketing schemes, as well as --

23          MR. MCINTURFF:  No.

24          THE COURT:  No, nit at all, right?

25          MR. MCINTURFF:  No.

31

Proceedings

1          MR. WITTELS:  But the point is what Mr. Previn

2     said was what could be the relevance?  Again, it's how

3     they present it.  If they're presenting the script in

4     what they say to the consumers in a certain way, the

5     marketing expert -- and I'm not one -- I believe would

6     look at it and say oh, well, okay, they said three or

7     four things that are clear that the customer would

8     understand were signals to them, now you were now

9     enrolling in some versus --

10          THE COURT:  It's a contrast basically.

11          MR. WITTELS:  It's a contrast.  I mean that's

12     why it's germane.

13          MR. ALEXANDER:  So they want to say well, some

14     of your marketing is better than some of your other

15     marketing and so this other marketing is deceptive by

16     extinction.

17          MR. WITTELS:  Well --

18          MR. ALEXANDER:  That can't be the standard.

19          THE COURT:  Or that they could do it.  Are you

20     basically saying that if they want to, they could have

21     non-deceptive marketing but --

22          MR. MCINTURFF:  Correct, and the context is

23     important here.  The attorney generals from 48 states

24     achieve massive settlements on this type of marketing

25     starting from 2003 to 2008.  Cross Country's customers

32

Proceedings

1    over -- none of their other customer or none of their

2    other partners, other than a very limited number, engaged

3    in check solicitations post-2008.  There was a -- these

4    attorney general actions and actions by the Federal Trade

5    Commission in the mid-2000s sent a message to the

6    industry that most participants got.

7              So the reason that Cross Country was engaging

8    in other marketing campaigns is because they had to.

9    There are e-mails -- we have e-mails where Cross Country,

10   the employees who were involved in the plan are talking

11   about the rough regulatory climate on check solicitations

12   because during this period, various states were outlawing

13   the device itself.

14             THE COURT:  Uh-hum.

15             MR. MCINTURFF:  It's illegal in Minnesota to

16   send someone a check that allows them to assent by

17   signing it.

18             THE COURT:  So why do you need discovery on

19   this?  Is this a dispute of fact?

20             MR. ALEXANDER:  Judge --

21             THE COURT:  I mean, it sounds as though --

22             MR. ALEXANDER:  That's exactly the point, your

23   Honor.

24             THE COURT:  Are you disputing these facts?

25             MR. ALEXANDER:  They're facts.  I mean, now you

33

Proceedings

1   can --

2           THE COURT:  So there --

3           MR. ALEXANDER:  (Indiscernible) some of the

4   facts but I mean some of these facts are (indiscernible).

5           MR. MCINTURFF:  So they're saying the

6   disclosures on -- so their argument is the disclosures on

7   the check are sufficiently prominent to where no

8   reasonable consumer could have been deceived.

9           THE COURT:  Right.

10          MR. MCINTURFF:  Your clients are --

11          THE COURT:  Right.  You're disagreeing about

12  the check but about the other mechanisms that you're

13  going to say are better and that could be used --

14          MR. MCINTURFF:  Well --

15          THE COURT:  -- are they going to disagree that

16  their telemarketing schemes were not deceptive?  They

17  probably won't.

18          MR. WITTELS:  No, but they're going to say that

19  the information was that -- Mr. Alexander said it.  He's

20  going to say these people were dumb, they didn't read it.

21  So they're going to argue that there's no difference

22  between the check solicitation and the non-check

23  solicitation and we want to say yes, there is.

24          THE COURT:  Okay . Stop right there.  Are you

25  going to argue that?

34

Proceedings

1      MR. ALEXANDER:  It hadn't occurred to me to

2  argue it that way.  I don't know why we would argue it

3  that way.  The objective here is what does the check say?

4  What does the endorsement line say?  What does the

5  material say?  It says what it says.  If they didn't read

6  it, that's one thing.  If they were too stupid when they

7  read it, they didn't understand it, and they still --

8  that's another thing but I mean who read it and said oh,

9  this is a mortgage refund, that's the issue, the factual

10  issue.  Who read that material and said oh, this is a

11  mortgage refund.

12      THE COURT:  I mean, the cases I keep thinking

13  about are the ones that I have that involve soft drinks,

14  which I probably mentioned earlier, and everybody makes

15  similar arguments here and I am trying to figure out,

16  after especially having had discussions with marketers,

17  what you're really going to disagree about here and what

18  you really need discovery on and it may be -- is it

19  possible that you can stipulate as to some facts and

20  disagree about others and limit the amount of discovery

21  that's needed?  That's the question I have and it may be

22  a naive one because I am not very deep in this area the

23  way you are.

24      MR. WITTELS:  Oh, certainly, we can't.  I mean

25  this is really our only dispute thus far in terms of what

35

                              Proceedings

1   we can't agree on, in terms of what documents we're

2   requesting that are relevant.

3              THE COURT:  Right, but what you want -- you

4   want to -- tell me if I am missing this.  You want to

5   show that through telemarketing as opposed to sending

6   checks, there can be very non-deceptive, clearly --

7              MR. WITTELS:  Disclosed.

8              THE COURT:  -- illuminated, disclosable form of

9   marketing.  I don't think they're going to disagree about

10  that, are they?

11             MR. WITTELS:  No.

12             THE COURT:  So what is it you need?  You need

13  one template marketing script to show that it can be done

14  and it is done and then -- do you need every single

15  script?  Would a stipulation work that they ran a non-

16  deceptive, fully disclosed marketing campaign?  What do

17  you need to show a jury or a judge?

18             MR. MCINTURFF:  Well, we would really need the

19  consumer responses to the campaign.  So the response rate

20  of the campaign.

21             THE COURT:  Okay.  So that's in the data --

22             MR. MCINTURFF:  Yeah, yeah.

23             THE COURT:  -- which apparently is not too

24  burdensome.

25             MR. MCINTURFF:  We would need the reasons for

                        Transcriptions Plus II, Inc.

36

Proceedings

1   cancellation, which is also in the data.  We would need

2   the amount of claims paid because again, the central

3   premise here is you don't utilize a service that you

4   don't know you're purchasing.

5              THE COURT:  Uh-hum.

6              MR. MCINTURFF:  And then some representative

7   sample of marketing material which if the check

8   solicitation is any guide, there's not that much

9   variation in the marketing materials.  The defendants

10  essentially use the same template during the relevant

11  period.

12             THE COURT:  Right.  But you're not challenging

13  the marketing materials.  You're using them as a

14  contrast, right?

15             MR. MCINTURFF:  Right.

16             MR. PREVIN:  But, your Honor --

17             MR. MCINTURFF:  And that goes into -- if I just

18  real -- that goes into a number of additional factors

19  that our experts are going to consider in opining about,

20  for example, for purposes of class certification, whether

21  these representations are material.  And then in terms of

22  purposes for motion for summary judgment, whether they're

23  likely to cause a consumer to manifest assent without

24  understanding it.

25             THE COURT:  So would you be saying that if

37

Proceedings

1   let's say a good market -- telemarketing script was

2   shown, that whatever is in that script is in effect,

3   material?  Would you be using that script to show what's

4   material or would you be using to show that they could do

5   it when they wanted to?

6           MR. MCINTURFF:  We would be using it to show

7   that --

8           THE COURT:  Or something else?

9           MR. MCINTURFF:  -- they could do it when they

10  wanted to and that if you look at the numbers of people

11  who canceled and made claims, that they were much more

12  likely -- consumers were much more likely to understand

13  what they were signing up for through the telemarketing

14  method rather than this particular solicitation.

15          THE COURT:  So this was good.  They could do it

16  and it didn't deceive consumers.

17          MR. MCINTURFF:  Correct.

18          THE COURT:  Or at least they didn't cancel.

19          MR. MCINTURFF:  Correct.

20          THE COURT:  Okay.

21          MR. MCINTURFF:  Or as in as higher rates.

22          THE COURT:  So how many marketing scripts do

23  you need?  I mean --

24          MR. WITTELS:  It's not only the scripts because

25  they have direct -- they have a lot of direct mail, as

38

Proceedings

1     well.

2            MR. MCINTURFF:  So these are templates.  They -

3     - for the direct mail, they send templates to a mail

4     company who then inserts names and addresses.  So the

5     direct mail, it's the templates.  For the marketing

6     campaigns, we would want the scripts.

7            But we can meet and confer.  If it turns out

8     there are a thousand scripts, then we'll back off but if

9     it turns out that there are five --

10           MR. PREVIN:  Your Honor, I'm concerned that

11    this is being used to sort of -- as not solely for

12    putative control purposes but to grossly expand the scope

13    of the lawsuit.  I mean Mr. Witells has even conceded --

14           THE COURT:  Okay, well let me just stop you

15    there.

16           MR. PREVIN:  -- not sure if it was facetious or

17    not, but he's not presently claiming that those other

18    materials were deceptive.  If this is going to be a

19    vehicle then to bring a fourth amended complaint to get a

20    direct marketing and telemarketing, as well, then

21    obviously --

22           THE COURT:  That's a different issue.

23           MR. PREVIN:  -- then that's a completely

24    different issue.

25           MR. ALEXANDER:  And that's what we're --

39

Proceedings

1      THE COURT:  I know that's what you're worried

2  about.

3      MR. ALEXANDER:  -- open the door, clearly.

4      THE COURT:  And that's what I am trying to

5  filter out.

6      MR. WITTELS:  Look at, we brought a lawsuit on

7  those issues and that's not currently what we're planning

8  on doing, but that's not based on what -- it could be

9  based on the materials we had and that our customers

10  already knew about.

11      MR. PREVIN:  But you obviously don't have the

12  direct mail materials yet and that's why you're asking

13  for them.

14      MR. WITTELS:  Well, we have some I believe.

15      MR. PREVIN:  Are you --

16      MR. WITTELS:  That was produced I think --

17      MR. PREVIN:  -- prepared to stipulate now that

18  you're not going to try to expand the lawsuit in this

19  way?

20      MR. WITTELS:  I mean first of all, that's an

21  unconscionable stipulation to ask a plaintiff as an

22  attorney.

23      MR. PREVIN:  Well, but then --

24      MR. WITTELS:  I mean as (indiscernible) law --

25  (Cross-talk)

40

Proceedings

1     MR. MCINTURFF:  (Indiscernible).

2     THE COURT:  I can tell you something though,

3  that I would only order the disclosure of that on

4  condition that if there were a motion to amend the

5  complaint, I would not look as favorably on that motion

6  -- the leave to amend would not be as freely granted if

7  it appeared that a previous discovery ruling was used as

8  a vehicle -- a fishing expedition to try to expand the

9  complaint.  And we're on the record and I can say that.

10     MR. PREVIN:  Thank you, your Honor.

11     THE COURT:  Because I mean I understand that

12  that's a concern you have and I'm really trying to filter

13  out what each side's interests are here to see if there's

14  a way that we can do what's necessary.  I don't want to

15  preclude either side from making an argument on the

16  merits in the end or from -- and I don't want to shut off

17  discovery that would in effect, prejudge an issue on the

18  case.  That's what I don't want to do.

19     I also want to decrease the burdens on you and

20  make sure that this isn't being used as -- you know, sort

21  of trawling for new plaintiffs.

22     So if we can -- my summary, at least in my mind

23  at this point, is that the downloads are relatively

24  simple.  The marketing material, we don't know yet but

25  there's a concern that it might be a little bit more

41

Proceedings

1  burdensome.  Counsel are willing to meet and confer about

2  that and if it is burdensome, I will -- and you can agree

3  that's fine.  If you can't agree, then I'll make a cut

4  and we'll do something like a template or a small number

5  of marketing materials that wouldn't be burdensome

6  because this is not -- that's not the purpose of this

7  discovery.  Will that work for you?

8           MR. ALEXANDER:  Whatever you say, your Honor,

9  is --

10          THE COURT:  Okay.

11          MR. ALEXANDER:  -- we're going to make work.

12          THE COURT:  Okay.  But --

13          MR. ALEXANDER:  That doesn't necessarily mean

14  I'm  happy about it.

15          THE COURT:  Well, I'm not asking you to say yes

16  that's my -- the ruling I would like.

17          MR. ALEXANDER:  Yes, right.

18          THE COURT:  But I do think that this is --

19          MR. ALEXANDER:  We will in good faith comply

20  with that, whatever your Honor feels is fair.

21          THE COURT:  Okay.  All right.  So obviously

22  this means I do believe that what plaintiffs are looking

23  for is reasonably calculated to lead to the discovery of

24  admissible evidence as we've just discussed now and I

25  want to keep the burden on the defendants to minimize

42

Proceedings

1  that with respect, especially to the marketing materials.

2  If it turns out that the download of consumer response

3  rates, rate of cancellation and amount of claims being

4  paid is more complicated or more burdensome than you

5  thought, you know, you obviously have leave to come back

6  but it sounds as though that's not going to be a problem.

7  And then again, with respect to expanding the scope of

8  the lawsuit, I've already told you how I feel.

9           MR. ALEXANDER:  Very well.

10          THE COURT:  Okay.  What else?  Anything else?

11          MR. WITTELS:  Yes, your Honor.  Point two was

12  depositions and this should be thought of perhaps in

13  light of the discovery cutoff which we believe we cannot

14  make for various reasons.

15          THE COURT:  Okay.  Not a problem.  Do both

16  sides agree that we need to extend or is there is a

17  dispute about that?

18          MR. PREVIN:  There is a dispute about that.

19          THE COURT:  Okay.  So?

20          MR. WITTELS:  So the first point is that until

21  last week there were not discovery -- I think until last

22  week, there was no discovery sent to the plaintiffs

23  whatsoever by the defendants in terms of interrogatories

24  and we started last week getting scattered notices to

25  admit and interrogatories to some of the named

43

Proceedings

1  plaintiffs.

2          THE COURT:  Okay.

3          MR. WITTELS:  And I got an e-mail, I think it

4  was from (indiscernible) to depose the named plaintiffs.

5  As we said there are 30 named plaintiffs from the various

6  18 states.  When we move for class cert, we intend to

7  move only at this point, for the RICO certifications --

8          THE COURT:  Uh-hum.

9          MR. WITTELS:  -- which has been sustained and

10 for California and New York --

11         THE COURT:  Right.

12         MR. WITTELS:  -- which importantly, have a very

13 large number of potential class members.

14         THE COURT:  Okay.

15         MR. WITTELS:  They're the largest in two

16 states, I think, maybe Texas --

17         MR. MCINTURFF:  Three -- the largest

18 (indiscernible).

19         THE COURT:  And the laws are reasonably

20 similar?

21         MR. WITTELS:  Yes.

22         THE COURT:  I remember the case law is slightly

23 different in California from New York but I can't

24 remember exactly.

25         MR. WITTELS:  Right, a little bit

44

Proceedings

1    (indiscernible).  So we're going to move under those.

2              We've said to the -- we had a long discussion

3    yesterday with the counsel on the record, and we said we

4    will produce the four, although we said you'll probably

5    you get what you need from -- I think Ms. Delgado was

6    more lead than her husband, Mr. Sheppard but we said if

7    you need them, we'll give you both and the two California

8    plaintiffs.

9              We thought that it would be prudent to do those

10   four first, then regroup and assess whether, in fact,

11   they want to do the rest or whether there was an

12   alternative method that the Court, which has its power --

13   inherent power under Rule 23 to direct the management of

14   the class, might say well, look, why don't you ask the

15   rest on deposition questions.  You have the large class

16   action that's sometimes done, and approved by the Court

17   as an alternative method to avoid burden because the

18   plaintiffs are scattered all over the country.

19             And we thought that might be a good way to at

20   least come back and talk to your Honor about it or talk

21   to the defendants first obviously to see whether they

22   wanted to continue on that.

23             THE COURT:  Have you thought about phone

24   depositions?

25             MR. WITTELS:  Yes, we proposed it and we --

45

Proceedings

1        THE COURT:  Okay.

2        MR. WITTELS:  -- defense counsel who is not

3   here says he doesn't like it but I mean, I've done phone,

4   I've done video.  I mean it's -- I think other than

5   President Obama who was on the video looking at -- I

6   mean, well, a lot of things are done --

7        THE COURT:  Yes, but look at how the world is.

8        MR. WITTELS:  -- about electronic.  But I was

9   also going to say to your Honor, the defendants have

10  pending motions to dismiss entirely, a number of these

11  states.  So does it really make sense to do all of the

12  other plaintiffs at this point when if we get certified

13  in a RICO, yes, we're not saying that they wouldn't

14  necessarily get to question them but the defendants do

15  know quite clearly what the claims are and why do I say

16  that, because they (indiscernible).

17        I'm not trying to foreclose, just as I wouldn't

18  ask that they foreclose our question but I'm saying let's

19  try to do it in a reasoned fashion.  Do the four and then

20  let's regroup and see if they want to go forward on the

21  rest or how to go forward.

22        THE COURT:  The motions to dismiss, can you

23  tell me about them a little bit?  Are they -- which

24  states do they involve and are they on only state law

25  claims?

46

Proceedings

1          MR. PREVIN:  Yeah, they're state law claims.  I

2    think all of the new state law claims.  I'm can't

3    remember if it's 16 or 18.  Judge Garaufis in the first

4    motion to dismiss --

5          THE COURT:  Garaufis.

6          MR. PREVIN:  I'm sorry, Garaufis, dismissed

7    some portions of the New York State claims and portions

8    of the California State claims.  We'd move to dismiss the

9    new state claims based on what we think are similar

10   theories and additional theories.

11         Your Honor, the way we look at this, discovery

12   is not unilateral.  The obligations of discovery are

13   bilateral.  The plaintiffs are the ones who decided to

14   name 30-named plaintiffs.

15         THE COURT:  Uh-hum.

16         MR. PREVIN:  We have a right to depose in

17   person each of those named plaintiffs if we want to.

18   Maybe we'll do some by phone, that's -- you know, we can

19   talk about that further but we shouldn't be required to

20   do that.  Each of those named plaintiffs represents a

21   different putative state law claim and it's absurd to say

22   that we don't get to depose them at this point.  This

23   sort of how we view those named plaintiffs will impact

24   case strategy for the defendants and I see no

25   justification for delaying our right to propound

47

Proceedings

1   discovery on them and depose them, unless we want to just

2   say okay, well let's just stay all discovery and until

3   our motions are resolved, you know, then we can talk

4   about that.  Then that's sort of mutually beneficial.

5          But we shouldn't be put through the ringer

6   including, I might add, plaintiffs have included in their

7   proposed search terms, the names of those very same

8   plaintiffs who they say we shouldn't be deposing now.

9          So they want us to produce information about

10  them.  They don't want to offer them up for our own

11  discovery.  I mean, that's just blatantly unfair.

12         THE COURT:  Have you talked about proceeding

13  with discovery just for the California, New York and RICO

14  claims and holding the other states?  It sounds though

15  that's a little bit of the staging that you're talking

16  about now, as well.

17         MR. WITTELS:  We wouldn't move on those state

18  claims until the motions are resolved.  It took Judge

19  Garaufis, you know, a while.  If we get an extension

20  here, briefing probably wouldn't be submitted till -- I'm

21  saying September.

22         THE COURT:  Right.

23         MR. WITTELS:  Right now it would be -- it

24  wouldn't be August, but we're asking for September,

25  possibly end of September.  It took Judge Garaufis about

48

Proceedings

1    eight months --

2              MR. MCINTURFF:  Nine -- eight --

3              MR. WITTELS:  -- eight, nine months.

4              THE COURT:  He's got a lot of cases.

5              MR. WITTELS:  He's very busy and it's going to

6    be complicated because they've made --

7              MR. PREVIN:  Your Honor, we shouldn't have to

8    defend serial class certification briefs.  The deadline

9    in the existing CMO is February for the class

10   certification briefing.  The additional motion is -- I

11   mean, I don't see any reason why that can't be met.  We

12   take the plaintiff's deposition.

13             These are not going to be full-day depositions.

14   We're talking, you know, I don't know, maybe three hours

15   per plaintiff.

16             THE COURT:  Right.  But you want to take the --

17   even though you think you might have some of the state

18   law claims knocked out, you would want to take their

19   depositions --

20             MR. PREVIN:  Yes.

21             THE COURT:  -- on the state law claims still?

22             MR. PREVIN:  Yes, yes.

23             THE COURT:  Okay.

24             MR. PREVIN:  I mean, we don't want to wait

25   until that motion is decided to find out -- to assess the

49

Proceedings

1   viability of the named plaintiff's claims.  We want to

2   proceed -- unless we just stay discovery and say okay,

3   let's wait and see what the operative complaint is going

4   to be and then we'll proceed with discovery.

5            But as long as we're producing information, we

6   want to be able to assess and test the claims.  I haven't

7   heard, for example, the recordings of the plaintiffs.  I

8   represent Ocwen.  These are Cross Country recordings.  I

9   want to be able to assess the veracity of the named

10  plaintiffs.

11           THE COURT:  Right.

12           MR. PREVIN:  And there's still purporting to

13  represent RICO claims and serve as putative named class

14  representatives on a theory that apparently plaintiffs

15  are still proceeding with.  So we're entitled to depose

16  them.

17           THE COURT:  Remind me what the classes are that

18  are to be certified.  There's a RICO class, I assume.

19           MR. PREVIN:  Nothing's been certified.

20           THE COURT:  No, I mean that would be certified.

21           MR. PREVIN:  Well --

22           MR. ALEXANDER:  They're seeking to certify a

23  RICO class nationwide --

24           THE COURT:  Right.

25           MR. ALEXANDER:  -- and 18 separate consumer

Proceedings

1   fraud state law claims.

2          MR. PREVIN:  And I've never heard of doing sort

3   of two different full rounds of class certification

4   briefing in a staged way.  That's extraordinarily

5   cumbersome.

6          MR. ALEXANDER:  Well, anything -- no, anything

7   can be done, with all due respect.

8          THE COURT:  Yes.

9          MR. PREVIN:  Yes.

10          MR. ALEXANDER:  Anything can be done but that's

11   not the way it was set up in this.  And when we were

12   looking at this case management order, they knew they

13   were adding at least 15 other states, if not 16 other

14   states in the fall.

15          THE COURT:  Right.

16          MR. ALEXANDER:  Now there is another factor

17   here but I want to get clarification.

18          THE COURT:  Uh-hum.

19          MR. ALEXANDER:  And it cuts sort of both ways.

20   We have a motion to compel arbitration against most of

21   these additional 16 plaintiffs.

22          THE COURT:  Right.

23          MR. ALEXANDER:  And we sure don't want to run

24   afoul of the discovery deadline that we have, that we

25   thought we could meet -- we thought we could meet and

51

Proceedings

1   have the argument well, you've waived discovery because

2   -- you've waived your arbitration because you're getting

3   discovery from the plaintiffs.

4           I mean, we brought this issue up to Judge

5   Garaufis in February, so this is no surprise to the

6   plaintiffs, despite what they said in their letter.  This

7   has been on the table that we would be moving for

8   arbitration in connection with our motion to dismiss

9   since February.

10          THE COURT:  Right.

11          MR. ALEXANDER:  And it's our understanding,

12  maybe improper, but our understanding that Judge Garaufis

13  wanted the case to move along.  It already addressed some

14  of the motions to dismiss and these were going to be

15  other state law claims.  But we have this discovery

16  deadline and so we felt that we were proceeding within

17  the meaning and the spirit of the case management order

18  by asking for discovery even though we have a motion to

19  compel arbitration.  We don't want to take an unfair

20  advantage but we're also bound by the case management

21  order.

22          So as my co-counsel has said here for Ocwen,

23  fair is fair.  This case management order does not have a

24  staged class certification process.  It doesn't have a

25  staged discovery process and if they feel that discovery

52

Proceedings

1  of their clients for the claims that they voluntarily

2  brought should be stayed, then fair is fair.

3          But by the same token, this case has been

4  pending for a while and we feel that if the Court wants

5  us to do discovery without prejudice to our motion for

6  arbitration, we're prepared to go forward and in good

7  faith meet those burdens and what we discussed with the

8  plaintiffs is look, you have a lot of moving parts to

9  what you want.  Why don't you get some ESI?  I mean we

10 have spent -- and I have to say it -- we predicted this.

11 It would be a long time going back and forth to try to

12 negotiate all these custodians and search terms, whether

13 -- if we had just been doing what we were supposed to do

14 and producing the data, they would have that and then we

15 would be talking about the second round but we haven't

16 got any ESI yet.  We're close and I think that the

17 process has ultimately worked so that we are at least in

18 agreement tentatively at this point, for custodians, very

19 close to search terms and we hope to be producing ESI

20 starting, you know, in another few weeks after we get the

21 final bells whistles attached to this.

22          So I put a lot on the table for the Court's

23 consideration here but --

24          THE COURT:  But, you know, the one thing that I

25 keep thinking and I know you're all going to say how

53

Proceedings

1   could he be thinking this but it sounds -- I'm just

2   trying to imagine 18 classes, state classes certified and

3   how they're going to be decided.  I mean I had an MDL

4   case where we had five -- maybe eight states and we

5   decided that it just didn't make sense to have a court

6   that's not sitting in that jurisdiction, that's not

7   familiar with the law let's say of Ohio or the Virgin

8   Island or Montana or whatever else, to make a decision as

9   to what a particular class for that state is entitled to

10  and what the state law is.

11          Often, you know, there's -- well, I know in

12  California, there are even splits on certain issues

13  between the state and federal court, I believe, but in

14  other states, the law is evolving and I'm just wondering

15  how you ultimately see this case, I mean, on all sides,

16  just from a sanity point of view.  How you're going to be

17  resolving cases where you have the laws of 18 different

18  states and classes for 18 different states.  You're going

19  to have separate jury trials for each one?  Are you going

20  to have like a 90-page verdict sheet for the jury for

21  different state law questions or is it less complicated

22  than I am thinking?

23          And I think the big picture might be helpful to

24  me in figuring out how to manage this case because I'm --

25  every time I think about the issues you're talking about

54

Proceedings

1  now, I run up against that bigger issues of my God, if I

2  were plaintiff's counsel or even defendant's counsel, how

3  would I be managing 18 separate classes, different law?

4         MR. WITTELS:  What you've raised is exactly why

5  a management of a class action is not set in stone from

6  the first initial November case management plan.  Things

7  have happened and transpired which have changed the ball

8  game and although defendants are saying you knew what was

9  going to happen, we didn't know what was going to happen

10  because we didn't know the defendants were going to move

11  to compel arbitration on grounds that we think is

12  frivolous, frankly utterly frivolous because no one

13  signed anything.  No one has sent it to those arbitration

14  clauses --

15         THE COURT:  Okay.  I'll assume you win just for

16  purposes of your argument.

17         MR. WITTELS:  Okay.  But that's one element.

18  We didn't know that was going to happen.  We also when we

19  were in front of you, contemplated going back and forth

20  with defendants to see what claims they would actually

21  agree to or not agree to in the amended complaint.

22         THE COURT:  Uh-hum.

23         MR. WITTELS:  We didn't know we were going to

24  be briefing so many states.  We thought we could maybe

25  reach some agreement because the law is pretty similar.

55

Proceedings

1   We've already won on New York and California state fraud

2   claims, yet they want to do a nuanced -- you know,

3   somehow distinguish the judge's decision on the other

4   states.

5          But your Honor has hit it on the head which is

6   why class actions and Mr. Alexander recognized it, are

7   fluid in terms of management and approach.  You can

8   certify some classes.  You can do things in stages, which

9   is exactly what we're proposing here which is that we're

10  not saying you're not going to get all 30.  We're not

11  saying that because if you do, you do a wage an hour

12  case, and we -- I'm sure both sides have done that, you

13  often end up doing 50, 60 plaintiffs but some sub amount

14  of the representative class.

15         Here, 20 is not a -- or 30 is not an exorbitant

16  number.  It's a lot of depositions but we're saying for

17  purposes of this case, we're going to move first on RICO

18  because if we get RICO, maybe we don't need to move for

19  class certification or hold that in abeyance under the

20  Court's management authority.  We'll hold that in

21  abeyance, not necessarily that we wouldn't move on it but

22  we would have RICO, which covers all the class members

23  and we'd have two representative states of consumer fraud

24  that a jury could more easily get its arms around.

25         So we thought put up the four.  They could hit

Case 1:13-cv-04427-NGG-ST Document 78 Filed 07/17/15 Page 56 of 83 PageID #: 1508

Proceedings

1  -- they could serve, after we do the four, if they really

2  think we need to ask each individual questions, follow-up

3  with written questions.  Ask us interrogatory questions

4  or ask us written questions on depositions which are

5  provided for in the rules.  You don't like that, if

6  that's not good enough for you after that, okay, then you

7  can depose them.

8          Or we come back and we discuses after you do

9  the four, do you really want it?  Mr. Previn says he

10  hasn't heard the tapes.  Well, he'll listen to the tapes.

11  I mean, he's got a sharing agreement with Cross Country.

12  He can get the tapes pretty easily.  They were, you know,

13  giving -- they were getting paid by Cross Country to do

14  this deal.  So we can easily get the tapes.

15          And he has his own tapes where our customers

16  call -- I don't know if they actually tape them but our

17  customers certainly called his customer service to

18  complain and they were shunted to Cross Country.

19          So we're asking for a reasonable process that

20  obviously in a class action, which is of a substantial

21  size here.  They collected over 20 -- close to $24

22  million --

23          MR. MCINTURFF:  Close to 24.

24          MR. WITTELS:  -- close to $24 million dollars

25  in -- from this check solicitation scheme.  If it's

Transcriptions Plus II, Inc.

57

Proceedings

1   trebled by RICO, that's very large numbers.

2          So we're suggesting that we do it in stages and

3   to do a class action, yeah, we think it was very

4   ambitious.  I mean we signed off on the date of August.

5   We've all been working towards that.  It's taken longer

6   than we've wanted on the ESI.  We think our procedure in

7   going back and forth is going to save time in the end

8   rather than them producing and us having to go back.

9   That's why we did it.  We had an ESI consultant expert

10  who told us don't agree to them doing it that way because

11  that's what defendants want to do.  When we saw their

12  first word list, we knew why we didn't because it didn't

13  have the words we thought should be on it for the ESI.

14         So look, we're working cooperatively.  We have

15  one dispute here.  Now we have a dispute about extending

16  the time.  I understand defendants want to end the case

17  quickly.  It's a large class action.  It can't end that

18  quickly.  Class motions, you probably know in your cases,

19  three or four years later sometimes people are moving.

20  Okay?  We're not looking for that long.  We hope to get a

21  class motion on much sooner than that.

22         But certainly this discovery is taking time and

23  the August date, we think has to be moved and we would

24  like your Honor to order us to produce or we'd stipulate

25  to produce the first four and come back and then work out

58

Proceedings

1   whether we have to be ordered or whether we'll

2   voluntarily come up with a good method for those other

3   depositions.

4         THE COURT:  What do you lose by doing that?  In

5   other words, if I told you that I would generally like to

6   stage discovery and when there's a dispute like this, it

7   makes sense to just take the four that you agree on first

8   and then come back and talk about the rest and that I'm

9   inclined to let you go ahead with all the discovery you

10  want but I would want to hear, you know, whether you

11  agree on a different method.  Would that be a problem for

12  you?

13        MR. PREVIN:  It would, your Honor.  I think

14  it's prejudicial to us to force us to go through two

15  rounds of class certification briefing which is a very

16  cumbersome and expensive process with experts.

17        THE COURT:  Okay.  Stop.  Why would the

18  deposition schedule mean that you have to have two rounds

19  of --

20        MR. PREVIN:  Because I think what Mr. Witells

21  is proposing is that we depose four -- only four of the

22  30 plaintiffs.  He will then move for class certification

23  on the RICO claim and then after that, we get to depose

24  the other plaintiffs and then he will move to certify the

25  state law claims.

59

Proceedings

1          THE COURT:  Is that what you're requesting?

2          MR. WITTELS:  Well, I don't -- I don't --

3  that's our plan.  But as I said, we're not going to move

4  with pending motions to dismiss, I mean we could

5  conceptually and procedurally, we have the right to file

6  a class motion on whatever want but the whole point of

7  the class certification device is to allow you to do it

8  in a manageable way and subclassing is envisioned.

9          And fluid management of classes, the Court

10 itself can change the definition of the class.  Our first

11 definition is going to be a RICO class and New York and

12 California.  So we are going to move on those.  Whether

13 we even had -- I mean, we can move now.  We may move soon

14 on those but we can't be precluded.  I mean, I've never

15 heard of a court saying well, you've got to move on

16 everything.  It wouldn't make sense for me to move on

17 everything anyway when they've gotten pending motions to

18 dismiss and arbitrator.  It wouldn't even feasibly make

19 sense.  It would just be a waste of judicial effort

20 unless the Court wants to decide it at the same time, you

21 know.  Look at the 15 states they want to dismiss and

22 then say denied but grant class cert and that could be

23 done but we're not doing it that way.  We think that's a

24 burden to the Court.

25          THE COURT:  Uh-hum.

Proceedings

1        MR. WITTELS:  So we are asking.  They're not

2    prejudiced.  There's no prejudice here at all.  We

3    already have a RICO claim sustained by Judge Garaufis.

4    What's the prejudice?  How are they prejudiced?

5        THE COURT:  I don't see that I am going to

6    decide here today whether or not you can move for class

7    certification in two stages.  That's not the issue really

8    before me.  The issue is discovery.  I know it's what

9    you're thinking of but I think Judge Garaufis may want to

10   weigh in on that, too.  I'm just trying to image what

11   summary judgment -- well, even forget summary judgment,

12   just even the class certification motion is going to look

13   like when you have 18 states and a RICO.  It's going to

14   be a pretty huge, complicated motion.

15       MR. PREVIN:  We think it will be unmanageable

16   but that's their -- I mean, obviously that's their

17   complaint and they're entitled to try to move under that

18   theory.

19       THE COURT:  Right.

20       MR. PREVIN:  We think there will be significant

21   variances in the state law that will preclude those kinds

22   of classes.  But the --

23       THE COURT:  Well, but there may be a California

24   class and maybe a New York class and an Ohio class.

25       MR. PREVIN:  There may be and that's presumably

61

Proceedings

1    what they're going to seek to certify.

2            THE COURT:  And there may be a few states that

3    are similar but who knows?

4            MR. PREVIN:  Yeah, maybe.

5            THE COURT:  Who knows?

6            MR. PREVIN:  Obviously, it's our preference to

7    deal with that all in one class certification but --

8            THE COURT:  Right, but --

9            MR. PREVIN:  -- I understand that that's not

10   the issue for today.

11           THE COURT:  And I think Judge Garaufis is the

12   one that has to really weigh in on that because it's

13   going to be his motion unless he refers it.

14           MR. PREVIN:  Understood, your Honor, but

15   regardless, each of the named plaintiffs proposes to be a

16   class representative on the --

17           THE COURT:  On the RICO claim.

18           MR. PREVIN:  -- at the very least, the RICO

19   claim.

20           THE COURT:  Right.

21           MR. PREVIN:  We are entitled to depose --

22           THE COURT:  Yeah, I agree with you on that.

23           MR. PREVIN:  They have signed up to be --

24           THE COURT:  I agree with you.  I agree with you

25   on that.  So I don't see that the class -- for me, I

62

Proceedings

1   haven't seen this as the timing of the class

2   certification motions, as much as the timing of the

3   discovery and should you take the depositions of the

4   state class representatives -- putative class

5   representatives before you know what the state law claims

6   are going to be and that's the question.

7           So my inclination would be to have you -- I

8   don't know how long it's going to take to do the

9   discovery you have now and take four depositions but just

10  have you come back when those are done and with the idea

11  that you continue with the other depositions unless there

12  seems to be a good reason not to.

13          MR. PREVIN:  I mean, your Honor, we can take

14  the first four first and proceed in that kind of a serial

15  fashion but I really do object to the notion that we

16  wouldn't be allowed to proceed with the others if we

17  wanted to.  I mean, that's sort of the -- there's --

18  those are relevant considerations in how we want to

19  defend the case.  So assessing whether they are adequate

20  class representatives and they purport to be that, even

21  just on the RICO claim, unless the plaintiffs want to --

22  those other 26 plaintiffs want to withdraw their RICO

23  claims and only have the four pursue RICO claims.

24          But as long as they're going to be pursuing

25  RICO claims --

63

Proceedings

1      THE COURT:  Right.  No, I agree with you on

2  that.  I don't disagree on that.  I think you are

3  entitled to take the deposition of anyone who is going to

4  be a class representative on any claim and the question

5  is how do you stage it and if the pending motions are not

6  going to have an affect on the RICO claim, then there's

7  no reason you can't do that.

8      The question for me though is it efficient to

9  try to see whether or not you can come up with a better

10  mechanism for deposing all these plaintiffs but it seems

11  to me that the burden is more on the defendants than on

12  the plaintiff in taking that number of depositions.  The

13  plaintiffs chose to be plaintiffs in the case.  They have

14  to make themselves available for depositions.  If it's a

15  great burden on defendants to depose all of them, and

16  it's better for defendants to have telephone depositions

17  or video depositions or something else, then I would

18  think you would be more entitled to that.  I don't see

19  holding up the discovery other than to see whether

20  there's a more efficient way to handle all the

21  depositions.

22      MR. PREVIN:  And we will talk about that with

23  our clients and then with plaintiffs if -- you know,

24  there may be some that we decide we want to do

25  telephonically.  You know, it's premature to -- I'm not

64

Proceedings

1   in a position to say one way or the other but we ought to

2   have the right to do it the way we want to do it and if

3   it's more -- if we decide we can some of the depositions

4   by phone or by video, then we'll make that decision and

5   confer with plaintiffs.  If we decide we want to do them

6   in person or some or all of them in person, then we'll do

7   that.  But I don't think we need to make that decision

8   now, we'll --

9           THE COURT:  Right, I mean they're your

10  depositions because of the plaintiff and the expense of

11  going to the different states is largely yours because

12  the plaintiffs chose to bring their case here in New

13  York.

14          So I think on most of the factors, the burden-

15  benefit or whatever cost issues would be, they would

16  probably be on your side.

17          MR. PREVIN:  Well, I think we're allowed to

18  make them come to New York.  Now we may decide to go

19  elsewhere in the spirit of cooperation and try to get the

20  depositions done as quickly as possible.  We'll talk to

21  plaintiffs about that and see if there are some ways we

22  can make this.  I mean it's in all of our interest for

23  this to be done as efficiently as possible.

24          MR. ALEXANDER:  We may be able to just have

25  different sites.  In other words, have three or four

65

Proceedings

1    plaintiffs --

2              THE COURT:  Regional office.

3              MR. ALEXANDER:  Yeah, regional sort of hubs or

4    something.

5              THE COURT:  Okay.  No, I don't disagree with

6    you on that but as to the timing the motions, I think

7    that's something that you're going to have to talk to

8    Judge Garaufis about.

9              MR. WITTELS:  All right.  Well again, I'm not

10   sure if your Honor's ruled.  You've kind of indicated.

11   Our proposal would be to do the four.  We've offered to

12   do those.  And then --

13             THE COURT:  Meet and confer.

14             MR. WITTELS:  -- discuss -- meet and confer and

15   see if we can agree on a plan for how to do the others,

16   whether --

17             THE COURT:  Right.

18             MR. WITTELS:  -- again it's on questions on

19   paper or --

20             THE COURT:  Right.

21             MR. WITTELS:  -- by interrogatory or by video

22   or whether they want to go forward.  Let's just take it

23   one thing at a time.

24             THE COURT:  Right, but I can tell you that my

25   inclination is that the defendants have a right to decide

66

Proceedings

1   how to do it because the plaintiffs chose to bring the

2   case and as long as -- any plaintiff who is going to be a

3   class -- a putative class representative for a RICO claim

4   under any briefing theory would be discoverable, so --

5           MR. WITTELS:  If I may, can I confer with

6   counsel?

7           (Counsel confer)

8           MR. WITTELS:  Yeah, well they are on the

9   complaint as named plaintiffs.

10          THE COURT:  Uh-hum.

11          MR. WITTELS:  We haven't moved for their

12  certification as class representatives on RICO on

13  everyone.  I can tell you that it is likely and that's

14  why we've offered the four, that they will be.  If we do

15  decide as Mr. Previn said, if the plaintiff's decide they

16  don't want to have certain class members as class

17  representative for RICO --

18          THE COURT:  Uh-hum.

19          MR. WITTELS:  -- then we can discuss that.

20          THE COURT:  Right.

21          MR. WITTELS:  Then we wouldn't have to produce

22  them until perhaps the state claims were decided and we

23  knew whether to proceed.

24          THE COURT:  Right.  And then you may -- again,

25  I'm not sure what the best way to manage this case is

67

Proceedings

1   going to be but there might be some thought that you

2   might want to proceed with one -- you might want to

3   bifurcate the discovery or the claims or you might now.

4   I mean, do you really want to go through the briefing of

5   all the state law claims?  Is this case settleable if you

6   have a decision on the RICO claims?  I don't really know

7   how you're all thinking about that but I am guessing that

8   since the RICO is a bigger stake damages type of claim,

9   once you have a result on that, or once you have the

10  discovery done, you may be more inclined to talk

11  settlement without the time and expense of 18 different

12  state law claims being litigated.

13         MR. WITTELS:  Which is why, your Honor, we're

14  offering the first four named plaintiffs and to move

15  forward in that fashion and to move forward on --

16         THE COURT:  No, I understand.

17         MR. WITTELS:  -- RICO, New York and California

18  because if that gets certified, that is an ideal time to

19  come to the table.

20         THE COURT:  Uh-hum.

21         MR. WITTELS:  And certainly the thinking going

22  into the certification of the RICO and the New York and

23  the California claims would affect any subsequent motion.

24  Neither party would be able to abandon whatever

25  certification motion was initially -- order was initially

68

Proceedings

1   entered.

2            MR. PREVIN:  Your Honor, it sounds like the

3   plaintiffs are pretty committed to this sort of staged

4   process.

5            THE COURT:  Uh-hum.

6            MR. PREVIN:  And so maybe we need to tee that

7   up --

8            THE COURT:  Right.

9            MR. PREVIN:  -- because I think if we do it

10   that way, this case is going to last forever because I

11   mean we plan to move for summary judgment on the RICO

12   claim.  We're pretty optimistic about that.  Obviously,

13   we don't need to talk about that now but that motion

14   isn't going to get decided, you know, till some time next

15   year and so, you know, if we're going to go through all

16   of this on RICO and then all of this on state law claims,

17   this case is going to last years.

18            I think it's our preference to do it --

19   everything all at once --

20            THE COURT:  Uh-hum.

21            MR. PREVIN:  -- because I think it's more

22   efficient that way.  There's a lot of overlapping

23   evidence So I'm opposed to the idea of doing it.  I'd

24   like to give it more thought.  You know, this is -- you

25   know, we haven't heard this until recently.  But it

69

Proceedings

1  sounds like that's an issue that probably needs to --

2  that we ought to -- need to address before Judge Garaufis

3  if that's the way the plaintiffs are planning to proceed.

4          THE COURT:  I think so ultimately.  I mean, we

5  can talk about it here.  If you all agree on a strategy,

6  or if you all want to think about it a little bit more, I

7  think you all have a common interest in trying to figure

8  out the most efficient way to litigate this case because

9  it could be a monster at some point.  And the question

10  is, you know, how to do it.  And I think if everybody

11  just steps back a little bit and tries to figure out

12  what's best, that might be an approach to take.

13          MR. PREVIN:  I think that's well said, your

14  Honor.  I mean, I guess the only -- I don't -- it seems

15  to me that while these issues are being decided,

16  notwithstanding that there were going to be some open

17  issues, I still feel pretty strongly that we want to take

18  -- we want to have the right to take all of the named

19  plaintiff's depositions, unless they want to withdraw

20  from the case without prejudice, then as long as they're

21  at --

22          THE COURT:  Well, I've already made a ruling

23  that if they're going to be the class representatives for

24  certain --

25          MR. PREVIN:  The problem is we don't know -- I

70

Proceedings

1  mean, they've indicated that they may or may not include

2  them in their class certification.

3          THE COURT:  Unless they don't.  Unless they

4  affirmatively tell you that they're going to be withdrawn

5  as potential class representatives, you're entitled to

6  take depositions.

7          MR. PREVIN:  Well, when will we know that?  I

8  mean, they don't file --

9          THE COURT:  When you notice their depositions.

10         MR. PREVIN:  Oh, and so at that point, they

11  will then tell us whether or not they consent --

12         THE COURT:  Yeah, I think they would have to.

13         MR. PREVIN:  Okay.

14         THE COURT:  Because that would be the only

15  reason to decline to take a deposition.

16         MR. PREVIN:  Okay.

17         THE COURT:  But I think after -- I think

18  plaintiff's point is well-taken, that after the first

19  four, New York and California plaintiffs have been

20  deposed, you should meet and confer and try to figure out

21  if there's a more efficient way to resolve the discovery

22  issues.

23         And if you don't think there is and there's no

24  real legal issue to present to me, then I think you would

25  start noticing the other depositions and unless the

71

Proceedings

1  plaintiffs withdraw a particular putative class

2  representative or plaintiff from being a putative class

3  representative, then you would be entitled to take the

4  depositions.

5          MR. PREVIN:  Okay.  Thank you, your Honor.

6          THE COURT:  Okay.  Is that clear?

7          MR. PREVIN:  Yes, your Honor.

8          THE COURT:  Okay.

9          MR. MCINTURFF:  The final issue -- we're now

10  almost at the dinner hour.

11          THE COURT:  Yes.

12          MR. MCINTURFF:  -- is whether your Honor would

13  entertain our request because it is apparently opposed,

14  unless we changed their mind, on an extension of the

15  discovery schedule and we know it's not the end of August

16  yet but we contemplate that we won't have what we need in

17  terms of depositions, discovery, et cetera.

18          THE COURT:  You mean you won't finish 30

19  depositions by the end of August?

20          MR. MCINTURFF:  Correct.

21          THE COURT:  I don't think you will either.

22          MR. PREVIN:  It's not clear to me that we're

23  getting 30 depositions, your Honor.

24          MR. ALEXANDER:  Yeah, we may not --

25          MR. PREVIN:  I mean, they can't have it both

72

Proceedings

1   ways.

2          MR. ALEXANDER:  We may only have four.

3          MR. MCINTURFF:  Well --

4          MR. ALEXANDER:  You ought to get four done by

5   August.

6          MR. MCINTURFF:  Well, I'm -- obviously there's

7   just not -- you know the Court was not setting only 30

8   depositions.  There's our depositions.  There's ESI.

9   There are further interrogatories.

10          THE COURT:  Yes.

11          MR. MCINTURFF:  There's a lot of material that

12   has to be (indiscernible).

13          THE COURT:  So I think it's important to keep

14   the case moving but I think August 31st is not a

15   realistic time.  So we can extend it and then we'll have

16   another conference and see how everything is going.  So

17   do you want to agree on an extension time or shall I just

18   make an arbitrary date?

19          MR. ALEXANDER:  Since we can't agree --

20          MR. MCINTURFF:  We should probably confer.  I

21   think like -- now that we've got this issue settled, I

22   think we probably could agree on it.

23          THE COURT:  Think about your vacation

24   schedules.  Think about your families.  Think about your

25   clients.  Think about the case and what has to be done

Proceedings

1    and work out something that works fine for you.  If not,

2    I'll just set an arbitrary date and without really

3    knowing what's good for all of you.

4            MR. MCINTURFF:  Do you want to at least attempt

5    to agree and --

6            MR. ALEXANDER:  Well, we had an offer from you

7    yesterday which, you know --

8            MR. MCINTURFF:  Well, I said I thought --

9            MR. ALEXANDER:  -- that (indiscernible).

10           MR. MCINTURFF:  -- nine months was a good

11   control date to see what we accomplish.  I mean, I --

12           MR. ALEXANDER:  Nine months seems a little

13   long.

14           THE COURT:  So come back with another number.

15   What do you think?

16           MR. PREVIN:  I mean, I think we should do this

17   in stages to keep the pressure on.  I think we should

18   have, I don't know, maybe a sixty day extension.

19   Obviously, we can come back if it looks like that's not

20   going to work.

21           THE COURT:  Right.

22           MR. PREVIN:  Your Honor seems to be pretty

23   flexible about these things.

24           THE COURT:  Uh-hum.

25           MR. PREVIN:  But there's -- to sort of to push

74

Proceedings

1   all of this to next spring and have -- I mean, my concern

2   about this case is that the way plaintiffs are

3   approaching it -- and I'm not saying this in an

4   accusatory way, it's just the way it's happening, sort of

5   is making this very expensive to defend.  We're going

6   through all of this sort of back and forth on ESI.

7              THE COURT:  Uh-hum.

8              MR. PREVIN:  They intend to do serial class

9   certification briefing which is much more of a burden on

10  us, sort of in an open-ended way without reciprocal

11  discovery obligations.  You know, that puts no -- that

12  puts all of the burden on us, no pressure on them and

13  that's unfair and sort of forces us into a box that's

14  just --

15             THE COURT:  Uh-hum.

16             MR. PREVIN:  -- that's not appropriate.  So, I

17  mean, I think -- I've said my peace.

18             THE COURT:  How about the middle of November?

19             MR. WITTELS:  May I respond to that, your

20  Honor?

21             THE COURT:  Uh-hum.

22             MR. WITTELS:  I don't understand what defendant

23  really is saying here.  This case is no different from

24  any large class action and to say that this is more

25  expensive than any other case, or any other involved

75

Proceedings

1    case, they've engaged in a very large fraud here.

2          To ferret it out, and get all the discovery you

3    need takes time.  We have the right to take ten fact

4    depositions of the employees, up to ten depositions of

5    non-parties.  There's going to be a lot of pressure on

6    them if they don't feel enough pressure, we can put more

7    pressure on them.  There's plenty of pressure on the

8    plaintiffs obviously to produce the named plaintiffs.  We

9    didn't get any discovery demands from defendants until

10   last week on the plaintiffs.  So I don't understand what

11   they mean by putting pressure on us.

12         If you put November in here, we'll be back here

13   in the end of the summer asking to extend it.  It's

14   unrealistic in a large class action of this magnitude to

15   do it in the time frame that's been contemplated and

16   we're asking, you know, for a reasonable arbitrary, far

17   out date that we could try to meet.  We're not sitting

18   around doing nothing.  We've got demands going out and --

19         THE COURT:  Let me tell you how I approach it

20   because I think we spent maybe 120 days arguing the case

21   involving Aeropostale about all of their e-mails.  I

22   mean, it just -- it took a long time.

23         If I set the deadline as the middle of

24   November, it means that at that date, I will reassess

25   where discovery should go but it gives you some kind of

Proceedings

1   -- it gives you a benchmark and also you have to trust me

2   that I'll be reasonable and I'll extend it, as

3   reasonable, but I won't give too much time if it's not

4   reasonable to do that.  Okay?  I mean, that's the only

5   way to do it.  There's no way to really predict.  If I

6   give you too long, then it will take too long to finish.

7   If I give you too short, it's going to make your lives

8   miserable and you'll just come back for more.

9           I mean, I have a case in front of -- that I

10  heard about recently where the parties were told that

11  they've got to go to trial in ten days and the discovery

12  had just ended.  There was a motion pending and the

13  discovery was still going.  I mean, this was in another

14  court.  And the witnesses had to come from China.

15          So I mean I know that's not a reasonable way to

16  conduct a docket and that's not going to happen here but

17  at the same time, there have to be benchmarks and, you

18  know, we have -- in a case involving 18 states -- just

19  imagine what the Court's burden's going to be, how Judge

20  Garaufis is going to have to deal with a RICO class

21  certification and certification for 18 different states

22  in one particular motion.  Obviously, you want to

23  bifurcate it so that you won't have to do all of that and

24  you think that that may not be such a good idea because

25  it may be more burdensome in the end.  We'll have a

77

Proceedings

1    better idea, I think in -- by November of how this case

2    should really be managed.  You'll have more facts.

3    Discovery will be done.

4                MR. ALEXANDER:  Make it work.  Again, my only -

5    - I still am concerned that if we conduct discovery of

6    the plaintiffs now, we will not be waiving our

7    arbitration argument.

8                MR. MCINTURFF:  If I may?  We're not going to

9    challenge that.  You raised your arbitration argument

10   initially.

11               MR. ALEXANDER:  Okay.

12               MR. MCINTURFF:  We're not going to do a

13   waiver --

14               MR. ALEXANDER:  We're on the record here now.

15               THE COURT:  We're on the record.

16               MR. ALEXANDER:  Yeah, right.

17               MR. MCINTURFF:  Yeah.  No, we're not going to

18   challenge that.

19               THE COURT:  You're not waiving your arbitration

20   argument.

21               MR. ALEXANDER:  Okay.

22               THE COURT:  Okay?

23               MR. ALEXANDER:  I mean you can have other

24   arguments against arbitration,

25               MR. MCINTURFF:  Yeah, yeah.

78

Proceedings

1        MR. ALEXANDER:  I understand that.  But there

2   is case law --

3        MR. MCINTURFF:  The waiver issue.

4        MR. ALEXANDER:  -- about engaging in discovery

5   acting as a de facto waiver and I don't want that to be a

6   problem here.

7        THE COURT:  There's also case law that says

8   that whatever judges say in certain context, really

9   doesn't mean anything.  So the Supreme Court has told us

10  that.  But you do have that stipulation right.

11       MR. ALEXANDER:  Okay, okay.

12       THE COURT:  Okay.  So look, let me just tell

13  you, I'm going to try to work with you but where you

14  can't agree, I'm going to issue deadlines and guidance.

15  I'm going to try to do my best on this.  But it's really

16  important that you continue to work together and try to

17  come up with schedules that make sense.  And there's no

18  perfect solution here.  Nobody's going to be totally

19  happy with everything.  So the more you can do it, the

20  less I'll have to be the necessary evil.

21       MR. PREVIN:  Your Honor, I apologize, maybe I

22  just need a little bit of clarification just on the named

23  plaintiff's deposition issue.  I apologize.  It's a

24  little -- I understood your ruling as to sort of the RICO

25  claim but given that -- sort of the uncertainty as to

79

Proceedings

1  whether or not there will be a bifurcated class

2  certification briefing --

3          THE COURT:  Uh-hum.

4          MR. PREVIN:  -- it seems like that, if I

5  understood your ruling, controls whether or not we can

6  take the other named plaintiff's deposition.  Did I

7  misunderstand that?

8          THE COURT:  You mean the ones who are not RICO

9  representatives?

10          MR. PREVIN:  Yes.

11          MR. MCINTURFF:  The other six --

12          MR. PREVIN:  Well, if we notice the additional

13  depositions and they say okay, we're just going to

14  withdraw them from the RICO claim --

15          THE COURT:  Right.

16          MR. PREVIN:  -- then I'm not quite sure where

17  we proceed.  At that point, do we go to Judge Garaufis

18  and ask for a ruling?

19          THE COURT:  No, you come back to me on the

20  discovery because there's a -- even if discovery is going

21  to be -- even if the briefing will be bifurcated, it

22  doesn't necessarily mean that the discovery has to be

23  bifurcated.

24          MR. PREVIN:  Right.

25          THE COURT:  And I think it's a -- in my book,

Transcriptions Plus II, Inc.

80

Proceedings

1  it's a separate issue as to whether discovery continues

2  while a motion pends.  And there are two schools of

3  thought but one school of thought is let's get as much of

4  that discovery done, so that as soon as one motion is

5  done, if it's bifurcated, then the second one can be teed

6  up and briefed.

7           MR. PREVIN:  Okay.

8           THE COURT:  Okay?

9           MR. PREVIN:  Thank you, your Honor.

10          THE COURT:  And I think that may make sense but

11 I really want to hear how this is playing out and how you

12 see the class claims for the different states.

13          Okay.  Should we set a date for a conference in

14 November?

15          MR. WITTELS:  Yes, your Honor.

16          Does the week of Thanksgiving work, before the

17 Thanksgiving, Monday, Tuesday, Wednesday?

18          THE COURT:  It works for me.  I don't know how

19 it works for everyone else.

20          MR. ALEXANDER:  Wednesday is notoriously a

21 terrible day to travel.

22          THE COURT:  Right.

23          MR. ALEXANDER:  Monday or Tuesday but --

24          THE COURT:  Okay.  Is that better for you then

25 the week before?

81

Proceedings

1          MR. ALEXANDER:  I can do Monday and Tuesday.

2          THE COURT:  Okay.

3          MR. ALEXANDER:  If that's preference or the

4    week before except for the prior Monday.

5          THE COURT:  All right.  So the week before, I

6    can give you the 19th if you would like and I could give

7    you the morning or the afternoon, whichever is better.

8          MR. WITTELS:  The 19th is fine, your Honor or

9    the 20th.

10         MR. PREVIN:  I don't travel, so it won't matter

11   to me, your Honor.

12         MR. WITTELS:  Which do you like?

13         MR. ALEXANDER:  The 19th is fine.

14         THE COURT:  Okay.  Do you want 10:30 or do you

15   want noon or do you want 2 o'clock?

16         MR. ALEXANDER:  I'd rather have noon.  Noon

17   works very well for me, your Honor.

18         THE COURT:  Okay.

19         MR. ALEXANDER:  If that's all right.

20         MR. WITTELS:  As well, your Honor, thank you.

21         THE COURT:  All right.  We're set.  So we'll

22   make the 19th the discovery (indiscernible) date, too at

23   this point to be reconsidered at the next conference but

24   that will be the discovery deadline.

25         MR. WITTELS:  Very well, your Honor.

82

Proceedings

1          MR. MCINTURFF:  Thank you.

2          MR. ALEXANDER:  Thank you very much, your

3     Honor.

4          MR. MCINTURFF:  Thank you for your time.

5          MR. PREVIN:  Thank you.

6          THE COURT:  Thank you.

7               (Matter concluded)

8                    -o0o-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

83

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **16th** day of **July**, 2015.

*Linda Ferrara*
Linda Ferrara

CET**D 656
Transcriptions Plus II, Inc.