1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
2

3    --------------------------------X
                                     :
4    MARGARITA DELGADO, et al.,      :
                                     : 13-CV-4427 (NGG)
5                    Plaintiffs,     :
                                     : May 18, 2017
6               v.                   :
                                     : Brooklyn, New York
7    OCWEN LOAN SERVICING, LLC.,     :
     et al.,                         :
8                                    :
                     Defendants.     :
9    --------------------------------X

10       TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
           BEFORE THE HONORABLE STEVEN L. TISCIONE
11             UNITED STATES MAGISTRATE JUDGE

12   APPEARANCES:

13   For Plaintiffs:          STEVEN L. WITTELS, ESQ.
                              JAMES BURKETT McINTURFF, III, ESQ.
14                            TIASHA PALIKOVIC, ESQ.
                              Law Offices of Steven L. Wittels
15                            18 Half Mile Road
                              Armonk, New York 10504
16
     For Ocwen:               BRUCE ALEXANDER, ESQ.
17                            MICHAEL TRABON, ESQ.
                              Weiner, Brodsky, Kider
18                            1300 19th Street N.W., Fifth Floor
                              Washington, DC 20036
19
                              ROSS MORRISON, ESQ.
20                            DANA KUMAR, ESQ.
                              CARRIE COHEN, ESQ.
21                            DAVID FIOCCOLA, ESQ.
                              Morrison & Foerster
22                            250 West 55th Street
                              New York, New York 10019
23
     Court Transcriber:       SHARI RIEMER, CET-805
24                            TypeWrite Word Processing Service
                              211 N. Milton Road
25                            Saratoga Springs, New York 12866


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.

2

1   (Proceedings began at 12:48 p.m.)

2              THE CLERK:  Civil Cause for Status Conference, 13-

3   CV-4427, <u>Delgado, et. al v. Ocwen Loan Servicing LLC, et. al.</u>

4              Counsel, please state your appearances for the

5   record.

6              MR. WITTELS:  Steven Wittels for the plaintiffs in

7   the class.  Good afternoon.

8              MR. McINTURFF:  Burkett McInturff, Wittels Law for

9   plaintiffs in the class.

10             MS. PALIKOVIC:  Tiasha Palikovic from Wittels Law

11  for plaintiffs in the class.

12             MR. ALEXANDER:  Bruce Alexander, Weiner, Brodsky,

13  Kider for Cross Country Home Servicing and Sandra Finn.

14             MR. TRABON:  Michael Trabon from Weiner, Brodsky &

15  Kider for Cross Country Home Servicing and Sandra Finn.

16             MR. MORRISON:  Ross Morrison and Dana Kumar from

17  Buckley Sandler for Ocwen Home Servicing.

18             MS. COHEN:  Carrie Cohen, Morrison & Foerster for

19  Cross Country.

20             MR. FIOCCOLA:  David Fioccola also from Morrison &

21  Foerster for Cross Country.

22             THE CLERK:  Good afternoon.  The Honorable Steven

23  Tiscione presiding.

24             THE COURT:  My list of counsel for these seems to

25  get longer and longer.  So where shall we start?

3

1          MR. WITTELS:  Judge, can I say a few preliminary

2     things, please?

3          THE COURT:  I'm sorry.

4          MR. WITTELS:  Could I just make a few preliminary

5     comments to open up --

6          THE COURT:  Sure.  It's okay not to stand.  Just

7     keep sitting like we always do.  It's better for the

8     microphone since I'm sure you'll transcribe this and use it

9     sometime in the future.

10          MR. WITTELS:  Well, to bring you up to date, I don't

11     know where we are, just with a quick overview.  One of the

12     things we've been talking about since Your Honor became the

13     magistrate on this case was the fact that regulatory agencies,

14     AG, et cetera, had been investigating companies for years and

15     shutting them down due to check solicitations.

16          Well, now it's happened and it's happened in our

17     case.  The CFPB has sued Ocwen for a number of its mortgage

18     practices including the check solicitations which they did in

19     this case with Cross Country.  So that finally occurred and

20     it's obviously been a big we believe, a big point of knowledge

21     that the defendants should have been aware of and now the CFPB

22     obviously wants to shut them down for what Ocwen did.  They

23     haven't gone after Cross Country yet but who knows.  That's

24     number one.

25          Number two, we did make a settlement demand back in

4

1    February and that we put in writing.  It was detailed and

2    pretty explanatory.  We haven't heard any response other

3    than -- we haven't heard any response.

4              Three.  One of the big objections to the motions

5    that we brought for this discovery and the remaining time we

6    have for the class period is that we're adding expense.  It's

7    burdensome.

8              I'd like to just say briefly that the data that we

9    want, say the tapes or other discovery, is something that is

10   a) very essential to the case; and b) something we're entitled

11   to.  It's not something that's cumulative in the sense of you

12   have enough, you can prove your case because you, Mr. Wittels,

13   said on the record we're ready to go to trial.  That's not the

14   issue because when I said that to Judge Garaufis it was with

15   the intent that if the judge wanted to give us a quick trial

16   date he would have.  Instead he said no, we're going to

17   continue this case in the normal course, we're going to finish

18   the motions to dismiss.  Then we're going to do class

19   certification and we went to Your Honor and Your Honor said

20   well, we're going to finally have a cutoff of discovery.  So

21   that meant we could finish the discovery we wanted and needed.

22             We believe that we are entitled to know whether, for

23   example, the number of people who disputed enrollment is

24   17,000 as recorded by Cross Country out of the 90,000 or so

25   who cashed the check, 55,000 who actually cashed it and paid

5

1   on it.  So you're looking at a percentage of 20 percent

2   roughly or is it much higher which we believe it is, probably

3   half, maybe 50 percent based on tapes that both sets of

4   defendants maintain for one reason.  What is the reason that

5   when you call customer service you get recorded because you're

6   supposed to have a record of it.  The defendants -- the

7   plaintiffs are not making the record of it.  You're not

8   recording your conversation.  The defendants, the companies

9   are making those records because they want to have something

10  in case someone calls up, in case there's a question about

11  what that person said.

12          So now they want to use it normally you would think

13  against why they're recording it because they want to have a

14  record of it.  We want to see what their record shows and

15  we're looking -- and there's no argument that it's relevant.

16  We know it's relevant.  The only question is is it too

17  burdensome and defendants have given us no alternative to our

18  sampling suggestion which we think is not burdensome but -- so

19  we --

20          THE COURT:  Let me just stop you there on this one

21  point and then we can talk about all of them individually.

22          MR. WITTELS:  Right.

23          THE COURT:  But here's my only issue with this.  I'm

24  not disputing that it could be relevant.  But when you start

25  talking about the proportionality analysis I don't think

6

there's any question that this particular type of discovery is
burdensome and onerous.  So I have to look at not just whether
it's relevant but how relevant is it, how probative is it.  I
understand your desire to have a number at the end of the day.
They say okay, what's the actual number of people that
disputed enrollment.

        But my question to you is how can you ever get that
number without looking at every single call because a sampling
might tell you, for instance, that their number is lower than
it should be, lower than the actual number.  But the only way
you're going to get an actual number would be to go through
every single call.

        MR. WITTELS:  Your Honor, respectfully, in any case
that -- say you do a discrimination case gender, you do a race
case and I've done them both, you never look at all of the
data if you're trying to -- if you're trying to show that
African Americans are paid less than whites, you're trying to
show that women are paid less or promoted at less of a rate
you can only do it by regression analysis.  You hire an
expert.  He takes the data.  He takes out -- out of that data
he takes the normative factors that would skew the data,
education, how long you were on the job, et cetera, and he
tries to figure out what was it that caused those people not
to be promoted or not to be paid the same.  It's statistics
and I hate to point to it but that's what we have here.

7

1          But we have a more accurate view here because our

2    sampling of the first set of data of calls they gave us for

3    the 50 people who used the plan is statistically significant

4    in that there's a confidence range.  Within a 95 percent

5    confidence you can say that had we sampled all 5,000 of those

6    calls between 66 and 93 --

7          MR. McINTURFF:  12 percent.  Around 77.  So it's --

8    plus or minus.  77 plus or minus 12.

9          MR. WITTELS:  77 plus or minus 12.  About 90 to 66.

10   You know if you sample them all that many people would be

11   disputing enrollment who called up as -- we're asking for the

12   same data.  We will not get -- right, it's true.  You have to

13   look at every one of them but that's not what you can do in a

14   class action.  That's what you can't do in a large litigation.

15         But in terms of proportionality and expense, the

16   defendants seem very intent to show you how expensive it is.

17   The person they're going to have is very low level to do it.

18   It's not that expensive in that sense and they do maintain

19   this data.

20         The defendants have put in a motion now to dismiss

21   our case entirely, a new motion, and it's now based on you

22   can't prove a class action.  We want to dismiss all your class

23   claims.  We think it's an objectionable motion because that's

24   not what Judge Garaufis told them to do.  He said you can

25   supplement your motion.  The motion to dismiss was on state

8

1  claims we had added.  State claims.  That's it.  Now they've

2  moved to dismiss the entire case including RICO which they had

3  an opportunity to do years ago but in the face of a class

4  motion that's fully briefed they're now trying to dismiss this

5  on the pleadings.  So we can talk about that.  I just raised

6  it with Mr. Fioccola outside before that we'd like him to

7  withdraw that part of the motion.  The case law disfavors that

8  in this circuit and most circuits and that's because the

9  people when they move to dismiss the defendants they usually

10 do it early before there's discovery.  We have a fully briefed

11 class motion.

12         But that's to show you that they don't -- the

13 defendants don't view the burden or expense of having a large

14 team of lawyers put in motions that are causing -- that would

15 cause us delay, cause us in a sense harass us, the plaintiffs,

16 because you're responding to something that is -- doesn't need

17 to be responded to when you have a fully briefed class motion.

18         So what I would suggest to you when we get into the

19 discussion here is that the proportionality really favors the

20 plaintiff here because we're entitled to know -- like if this

21 were a case -- I always go back to the Pinto because that was

22 the first thing I learned about but the exploding Pinto in law

23 school -- and that follow through in all the tort cases, all

24 of your cases about notice and knowledge.  How many times did

25 that Pinto explode before the company did something or know

9

1   it.  I believe we can win this case but can I convince a jury

2   of that.  Defendants don't think so.  They want to dismiss our

3   entire case.  Defendants -- we're not negotiating.  So we're

4   in a situation where we're going to go to trial unless

5   something different happens here.

6          One of the things we want to be able to tell the

7   jury is it wasn't just 17,000.  We've got these other figures

8   which show you that it was much, much higher, and that goes to

9   the punitive aspect because we think this is a punitive case.

10  The punitive case has not been moved -- they haven't moved to

11  dismiss that.  They've only moved to dismiss our class claims.

12         So punitive damages are in the case.  Fraud is in

13  the case from RICO.  How can I tell a -- how will I prove that

14  to the jury.  I think telling a jury 20 percent of the people

15  disputed enrollment versus half the people disputed enrollment

16  may push them to give us punitive damages and it may push them

17  to give us the fraud claims.

18         So getting back to that issue of did I concede we

19  needed no discovery.  No, what I said was we could try this

20  case today.  Do we need any?  I think we can win it.  It

21  wasn't about the judge -- it wasn't a decision as to whether

22  we needed more discovery.

23         So with that I'd like to turn it over to maybe if

24  Your Honor feels it makes sense we start talking about the

25  motions in order from our letter yesterday.

10

1      THE COURT:  Why don't we just do it in order from

2  the docket?  294 is the first one which is the motion to

3  compel Cross Country and Ocwen.

4                    [Pause in proceedings.]

5      THE COURT:  The call sampling is the first item on

6  that list.  So we may as well start there.

7      Let me ask you.  Why did you pick these five

8  categories?

9      MS. PALIKOVIC:  They are -- they are the largest

10  categories.  Well, first we picked categories, initially

11  picked seven categories and then picked five of the largest of

12  those.

13      THE COURT:  But other than size is there any

14  particular reason why you picked those categories as opposed

15  to others categories?  Because there's 43, right?

16      MS. PALIKOVIC:  They are -- some of them are -- a

17  lot of them have very, very few numbers -- I think most of

18  them have very, very few numbers in them.  So I'm pretty sure

19  that these five are the largest out of the 43 to begin with.

20  So the size factor is itself determinative.

21      A lot of the categories are named.  I don't have the

22  cancellation codes in front of me but they're named various

23  versions of the same thing.  So it will say like billing

24  vehicle not available.  I'm making it up.  But it will say

25  billing or billing vehicle non available notice or something.

1   So that will be like five categories of the same thing and

2   then one big billing vehicle not available that has whatever

3   it is, 20, 30,000 people in it.

4        MR. WITTELS:  If you look in Exhibit A to this,

5   Judge, you'll see the table.  This was defendant's on response

6   where they list the different categories and they tell you how

7   many people were categorized in the various categories.  So we

8   went for the largest also because it's statistically -- we

9   understood from conferring with our expert that that's really

10  where you want to go with the bigger numbers.  You get a more

11  significant -- if it's over a certain threshold you can do a

12  sample.  That was the point.

13       MR. McINTURFF:  Just to clarify, Your Honor.  If

14  there are too few we can't accurately do a sample.  It has to

15  be a large enough number to be able to sample.

16       THE COURT:  Some of these, like you can probably

17  just do them all.  I mean you're asking for 50.  Some of these

18  only have like 25.

19       MR. WITTELS:  Again, Your Honor, we're trying to do

20  the narrowest possible sampling sort of cost benefit analysis.

21  If we're going to look at 50 we get a much --

22       THE COURT:  Don't you have to also look at what the

23  categories are and how likely it is that you're going to find

24  the information you're looking at?  I mean some of these

25  categories maybe you're more likely to find these hidden

12

 1    dispute enrollment versus others.

 2          MR. WITTELS:  Well, that's true but that's why we --

 3    it's not only the size.  If you look at the ones we picked.

 4    Let's look at the first one.  That's the DVNLA billing vehicle

 5    no longer available.  This is one we know was of great

 6    importance to Cross Country because they tried to ferret out

 7    by calling and contacting people from their retention

 8    department by contacting the Ocwen customers who canceled why

 9    did they cancel and they realized they couldn't retain any of

10    these people because they were so mad about it.

11          We believe that those phone calls are going to show

12    that that category really contains a significant if not --

13    probably far in excess of 50 percent of those people disputed

14    enrollment.  Their coding in that sense was not -- they

15    weren't -- they should have coded it as a dispute enrollment.

16    It's probably how it should have been done.  Those came -- the

17    reason that Cross Country apparently couldn't know necessarily

18    that it was a dispute enrollment was because those came from

19    Ocwen.  They came over -- what happened in this lawsuit and

20    what makes it so --

21          THE COURT:  These are the ones where presumably if

22    your theory is correct customers called Ocwen directly and

23    instead of Cross Country and they were cancelled through Ocwen

24    not through Cross Country.

25          MR. WITTELS:  Yes.  No --

1            MR. McINTURFF:  If I could add, Your Honor.

2            THE COURT:  Then why do you need it through Cross

3    Country as well?  Why not just ask for that through Ocwen?

4            MR. McINTURFF:  So what we've heard over and over on

5    the calls we've listened to is the customer invariably calls

6    Ocwen first because they don't know Cross Country exists.

7    Ocwen's customer service representatives tell the customer you

8    can cancel with Ocwen but if you want a refund here's the

9    number for Cross Country.  So there is -- there is some number

10   of customers including --  I don't remember the names but some

11   of the named plaintiffs who said okay, Ocwen, cancel and when

12   you cancel with Ocwen you're automatically coded as billing

13   vehicle no longer available and then give me the number for

14   Cross Country and I will call and then they dispute enrollment

15   on that call.

16           So there are -- there is a subset of customers who

17   are coded billing vehicle no longer available who ultimately

18   did call Cross Country.

19           MS. PALIKOVIC:  And that subset actually includes

20   some of our plaintiffs.  It includes four of the plaintiffs --

21   sorry.  Five of the plaintiffs were coded as billing vehicle

22   no longer available and others of the plaintiffs who we know

23   obviously disputed enrollment were also coded in the

24   categories that we've set forth.  Two were coded as duplicate

25   coverage.

14

1        THE COURT:  What does that mean exactly, duplicate

2    coverage?

3        MR. McINTURFF:  We understand it means that you have

4    the same -- the same product twice.  This was a red flag that

5    we -- we believe this was a red flag that the check

6    solicitations resulted in customers buying the same product

7    multiple times.  So you would call. You would dispute

8    enrollment and then the Cross County customer service

9    representative would discover that in fact you enrolled in the

10   same product twice.

11       MR. WITTELS:  And you enrolled -- not to keep tag

12   teaming here but you enrolled unwittingly when you signed the

13   checks.  So Cross -- when Cross Country found this out early

14   on, and we know this from the discovery, they wanted to hold

15   back the mailings because they didn't want to have them too

16   close together and Kevin Walsh who was the, sort of the

17   overseer from Ocwen got very perturbed and angry about the --

18   he said we didn't want -- I don't want to hold up the checks.

19   Remember that?  He said I want to keep doing them while Cross

20   Country wanted to slow down because what was happening is they

21   kept sending them out so close to each other, people just

22   cashing the checks under our theory and they got signed up for

23   the same program twice.  So that's why they really here is

24   duplicate coverage.

25           So, again, we picked a limited sample of calls that

1  they maintain in the ordinary course of business.  They're

2  saying they're hard to find but they kept them.  They made it

3  difficult to find but that's what they're supposed to do is

4  since we sued them in 2003 -- '13, they're supposed to have

5  maintained these and now they're claiming a burden because

6  they don't want us to get as accurate a number as we're

7  entitled to have to present to the jury.

8                    [Pause in proceedings.]

9            MS. PALIKOVIC:  Just so you have it, Your Honor, the

10  categories that we chose were -- this is in Footnote 3 of our

11  motion and it states the numbers.  Billing vehicle no longer

12  available with roughly 35,000 people, budget constraints with

13  2,100, duplicate coverage with roughly 1,800 people, non

14  payment 14,785 and refuse to give reason which is 1,989

15  people.

16                    [Pause in proceedings.]

17            MR. WITTELS:  One further thing, Your Honor, as

18  you're considering this is that it would be one thing or at

19  least a defined end point if defendants had stopped collecting

20  money when we sued them in 2013 but their view of the world

21  here is that they've done nothing wrong and therefore they're

22  perfectly entitled -- they stopped sending check solicitations

23  which you can argue was an acknowledgment that something is

24  awry with this methodology of marketing but they've continued

25  to collect checks to charge money from people for coming on

1  four years now and in this group that we're looking to sample

2  are people who they're still collecting from.  So it's

3  probative to their continuing fraud.  This is not a fraud that

4  ended.  It's ongoing.  It's alleged in the complaint.  They're

5  getting over 250,000 a month from this which certainly --

6          THE COURT:  Are you moving on to the next category?

7          MR. WITTELS:  No, I was --

8          THE COURT:  This is all people who cancelled.

9          MR. WITTELS:  Right.  But these are people -- in

10 this first group we're looking for a random sample and they

11 include some of those people.  I'm saying it goes to the

12 ongoing fraud.  We're not only looking for it --

13         THE COURT:  It may include some of what?

14         MR. WITTELS:  Well, sorry.  These numbers for those

15 fixed numbers, 35,000 are as of the date -- as of the date

16 [inaudible] responses which likely changed.

17         THE COURT:  I see what you mean.  So since that time

18 there might have been more people who cancelled in the first

19 category.

20         MR. WITTELS:  Correct.

21                 [Pause in proceedings.]

22         MR. WITTELS:  If you look at our Footnote 4 on Page

23 3 we tried to really work with -- I'm sorry that these are

24 long, longer.  We did this as a joint motion.  It is longer

25 than the three pages Your Honor requires.  We made it against

17

1  both sets of defendants who are approaching this case

2  differently.

3          THE COURT:  I mean here's what I'll say about that.

4  This is really more like five motions together.  If you really

5  want to go down that road I can insure that everyone adheres

6  to the three page limit and have you file multiple motions.

7  That might actually make the docket a little clearer because

8  the ultimate result of doing it this way is that every single

9  motion is granted in part and denied in part and you're going

10 to have to look at the transcript every time because I'm sure

11 as hell not writing on every single one of these.

12         MR. WITTELS:  Right.

13         THE COURT:  So I think to make things easier you may

14 want to in the future file the separate motions so that

15 they're docketed separately so that when I deny part of a

16 motion or grant part of a motion it's clearer from the docket.

17 I understand your incentive to do it this way and generally

18 speaking that's probably a better way to do it but in this

19 case in particular there's so many entries on the docket and

20 it gets so confusing that it might actually be easier for

21 everyone concerned if we just keep it to the three page limit

22 and if it means you have to file multiple motions, file the

23 multiple motions because at least then it will be easier to

24 keep it straight.

25         MR. WITTELS:  All right, Your Honor.

1           THE COURT:  It might avoid some of the problems that

2    we've had in the past with having to go back and revisit what

3    I had ruled on certain motions because the parties were either

4    misremembering or misinterpreting what I had said on

5    particular aspects of motions since -- like I said I'm not

6    writing on these.  So if you're not keeping very detailed

7    notes about what I say during these conferences you might not

8    exactly get right what parts of the motion I granted or

9    denied.

10           MR. WITTELS:  Right.  Well, I was -- that's well

11   taken, Your Honor.  We will try to do that.  Again, we only

12   did it because we thought it would be more streamlined.

13           THE COURT:  My preference would be there were no

14   more further motions in the case but I know that that's a pipe

15   dream.  So I'm taking note of that.

16           MR. WITTELS:  Well, we didn't file in the other two

17   before this motion today that we are hearing but we have

18   another two that will shortly be filed.  So Your Honor is

19   aware of that.

20           Footnote 4 is a summary of the law on punitive

21   damages in this circuit and those cases again support why we

22   need this sampling to show how egregious that the conduct is

23   and whether it was deliberate, intentional, ongoing and -- so

24   we think those cases support us.

25           We're not -- finally, we're not asking for the moon

1  here.  Your Honor suggested that don't you have to look at all

2  of them and our response was no, we're looking for a limited

3  sample which will be probative and we don't think given the

4  amount of money they're collecting, over $250,000 a month.

5  That used to be a lot more apparently but people are dropping

6  off.  They've collected -- when this lawsuit started they had

7  $14 million collected.  Now they're up to over $36 million in

8  three and a half years.  So that's a tremendous amount of

9  money.

10        We don't think it's a big burden given the amount of

11  money they've taken from the class to have them have one

12  person or one and a half people, whatever it is, spend the

13  time and pull the tapes that they keep and certainly if the

14  customer calls up and complains about something they could

15  pull that tape and they would pull the tape.  Here we're

16  trying to use those tapes to support our case and I think

17  we're entitled to hear them and particularly since we already

18  have a sample that shows that they are probative and helpful.

19        THE COURT:  Well, let me ask you this.  Is it -- how

20  do you plan to use this information?  In other words, are you

21  showing the customer complaints to try to prove knowledge in

22  which case isn't the more relevant data the information that

23  is conveyed from the line customer service people to the upper

24  management, or are you using it for some other purpose?

25        MR. WITTELS:  Well, we're using it to show a

1  punitive damages that they're on knowledge, on notice of

2  wrongdoing because people are calling up and saying such

3  things as we quoted from the happy users tricked, didn't know,

4  I don't remember, never signed up for this, and this is --

5          THE COURT:  But if that's not being conveyed to the

6  people who are actually making decisions, does that actually

7  support your argument?

8          MR. WITTELS:  Well, it goes to the customer service

9  department monitored by -- and retention department which is

10 monitored by people who are putting their head in the sand and

11 should have known about this.  It's remarkable, I will tell

12 you, that Harold Duckenic [Ph.], the head of retention, was

13 asked at his deposition by the plaintiff's counsel did you

14 listen to any tapes of people who called to dispute enrollment

15 and unbelievably he said no.  Yet he listened to other tapes.

16         The point is they -- you can disregard or

17 consciously disregard knowledge that you have in your

18 possession.  They're collecting this data for a reason.

19 They're coding these things for a reason.  If they're

20 miscoding them that --

21         MR. McINTURFF:  If I can add, Your Honor.  It also

22 goes to -- and this goes to the case law in Footnote 4 it goes

23 to the actual size of the consumer harm that this conduct has

24 caused.  We have an understanding now of thousands and

25 thousands of customer complaints and customers disputing

21

1   enrollment but the closer we can get to -- the more precision

2   we can get in that regard given that we -- the evidence

3   collected thus far suggests that the number is even higher

4   than the current number allows us to prove the components of

5   our case including willful misconduct, fraudulent conduct and

6   conduct that is gross, wanton and willful.

7           MR. WITTELS:  And it also brings in -- there's

8   another element, Judge, which we haven't talked about.  You

9   have a --

10          THE COURT:  How is this stuff relevant or how is

11  this stuff admissible?  I mean this is basically hearsay

12  statements.  They're admissible for purposes of knowledge

13  because if you show customer complaints I suppose you can get

14  them in to show that the defendants were aware of the

15  complaints but I mean to the extent that you want to try to

16  use this stuff for something else I think that might be

17  outside the scope of admissibility --

18          MR. WITTELS:  Well --

19          THE COURT:  Partly because -- other than for your

20  testifying plaintiffs obviously.

21          MS. PALIKOVIC:  We briefed sort of this issue for

22  the user tapes in the context of a motion in limine and --

23  well, with --

24          THE COURT:  It's never got ruled on.

25          MS. PALIKOVIC:  It's never got ruled on but we tried

1   to direct Your Honor to that briefing in here because we just

2   didn't have the room to address it fully.  But another way

3   around any hearsay issues is the state of mind exception and

4   callers expressing confusion on calls repeatedly and these

5   calls to both sets of plaintiffs fits the state of mind

6   exception because they're basically calling to say they don't

7   know what's happening, they don't know when they were

8   enrolled, they don't know who this company is.

9           If I may just build on what my colleagues have said.

10  A third reason for why we need these tapes and what we will

11  use them for is to also show the reasonableness of plaintiff's

12  deception, i.e. that they were reasonable in being deceived,

13  that this isn't -- wasn't a one off occurrence and that they

14  weren't as defendants have repeatedly tried to paint them

15  during depositions careless individuals who just didn't read

16  when they were supposed to read.  They were just normal

17  consumers who like other normal consumers were tricked by

18  checks which were designed to function in exactly the way they

19  did.

20          MR. WITTELS:  There's one other element, Judge,

21  which is that you have two sets of defendants here.  They act

22  as one now when they come in and they file a joint motion to

23  dismiss the complaint but there are two entities who teamed up

24  in a partnership and Ocwen has tried to keep itself out of

25  this but Ocwen fielded all of those phone calls.  We haven't

23

1   got calls from Ocwen.  We only have the calls from -- I mean

2   we have some for the plaintiffs and we know from those calls

3   that the plaintiff, all of our plaintiffs never -- no one

4   calls Cross Country.  I mean I haven't seen calls where you

5   call Cross Country because that's not how -- that's not how

6   the trick works.  You don't know your customers.  You call

7   Ocwen and that's when you discover on the bill that you call

8   Ocwen and that's when you get past over.

9           So these calls will also show how the enterprise

10  worked, where they -- what was Cross Country doing when they

11  knew all of these BBNLA's were disputing enrolled.  What do

12  they do with that?  They just let it go.  They try -- we know

13  in one sense, in one instance, right -- was it one or multiple

14  where they tried to ferret out what the BBNLA was?

15          MR. McINTURFF:  They did -- they -- again, the BBNLA

16  are cancellations that originate with Ocwen.  So Cross Country

17  doesn't have a window into the reason for the customer

18  canceled and so they reached out to -- and Ocwen doesn't

19  separately -- correct -- correct, Ocwen doesn't separately

20  code.  So Cross Country assembled a team and reached out to

21  these customers to determine why they were canceling and they

22  called off the operation because of the customers they were

23  able to contact so many of them were check solicitation

24  customers and disputing enrollment that they deemed it not

25  worthy of their resources to attempt to save these customers.

24

1          [Pause in proceedings.]

2          MR. WITTELS:  I mean in one sense --

3          MR. McINTURFF:  My counsel makes a good point which

4    is that the issue here is that these codes are fundamentally

5    not accurate and my colleague makes the point that if they

6    were more accurate once Cross Country had contacted these

7    customers and determined that they were disputing enrollment

8    they should have changed the cancellation code but we don't

9    have any evidence that that ever happened and it's underscored

10   by the fact that our named plaintiffs, people who took the

11   time and effort to get involved in the lawsuit they're not

12   even all uniformly coded as disputing enrollment.  I mean

13   that's what this case is about.  They're disputing their

14   enrollment.

15         MR. WITTELS:  Yes.  There's no dispute to use a pun

16   here that defendants were aware people -- 17,000 people were

17   disputing enrollment.  That's their code.  You can't argue

18   reasonably that those two words don't mean what they say.  If

19   you call up and you code it as disputing enrollment what did

20   it mean in a check solicitation context, it meant I didn't

21   know what the heck I was signing when I signed this.  I

22   thought it was a refund check or I thought it was an

23   overcharge, rebate to me.

24         But we do know these other codes are in play because

25   our people were categorized in them and now we know that they

25

1   -- the defendants were inaccurately coding this other group.

2        So what does that show?  It shows more than

3   sloppiness.  It shows deliberate -- gross willfulness in terms

4   of their continuing a fraud when they have a whole department

5   with --

6        THE COURT:  Were any of these multiple coded?  In

7   other words, when somebody canceled and gave more than one

8   reason were they coded under both categories or only one?

9        MR. McINTURFF:  We don't know the answer to that,

10  Your Honor.

11       MR. WITTELS:  We haven't seen it.

12       MR. McINTURFF:  We haven't seen double codes.  Like

13  our clients, for example, when they gave us the codes for our

14  clients it's only one code.  I've seen the drop down menu that

15  the customer service representative has available to them.

16  I've seen a Power Point presentation with an image of the drop

17  down menu and I can recall from looking at that that it

18  doesn't seem to have the option for multiple codes but we

19  don't know the answer.

20                    [Pause in proceedings.]

21       THE COURT:  Do you know the answer?

22       MR. ALEXANDER:  I don't know the answer to that but

23  I believe --

24       THE COURT:  That might be an explanation for why

25  some of these are miscoded.  I mean if there were more than

1   one -- if there was more than one reason to cancel and you can

2   only pick one --

3        MR. WITTELS:  Well, we did depose or defendants

4   deposed Wilkins.  He was in the retention department.  We went

5   down to South Carolina.  I was there for his deposition.

6   There was no indication.  He said we would code -- there's no

7   indication of multiple coding.

8        MR. McINTURFF:  This was the former head of --

9        THE COURT:  That's what I'm saying.  If you can't

10  code more than one that might be an explanation -- look, I

11  don't know that it necessarily matters but it might be an

12  explanation for why some of these are miscoded.  If that

13  customer gave multiple reasons for why they wanted to cancel

14  and you can only pick one --

15       MR. McINTURFF:  We haven't heard that --

16       THE COURT:  I understand why you are focusing on the

17  disputed enrollment but the customer service rep -- if a

18  customer calls up and says I don't want this, I didn't know I

19  signed up for it and whatever, I can't afford it, they might

20  have coded that as budget constraint.  I could see why you're

21  focused on that.  I'm not sure that's deliberate miscoding.  I

22  guess that's my only point.  I think there are other

23  explanations for it but I don't think it really matters all

24  that much.

25       MS. PALIKOVIC:  I don't know if this fully answers

1  it but I know that looking back on my notes I know that some

2  plaintiffs seem to have been coded different under different

3  categories but for separate phone calls.  So I don't know

4  where that leaves us with people who only called once or why

5  some were coded --

6          THE COURT:  Those numbers are based on the phone

7  call, not on -- so there would be a particular customer that

8  made multiple calls and different calls would be coded under

9  different categories?

10         MS. PALIKOVIC:  Right.  Each call gets its own

11  category and sometimes it's as simple as they get disconnected

12  or you get transferred to the next person or they call you

13  back or whatever.  Or you just call on different days.

14         THE COURT:  How many instances are there where you

15  have calls as opposed to people where there's a disputed

16  enrollment that got categorized under a different category?

17         MS. PALIKOVIC:  I don't think we have the

18  information to know that.  The only calls we've heard are the

19  sampling of the user calls and the calls from the plaintiffs.

20         MR. WITTELS:  But that's --

21         THE COURT:  But you had said that there were

22  instances of the calls that you have where somebody was

23  miscoded.

24         MR. WITTELS:  But, Judge, I think to clarify this.

25         THE COURT:  The whole basis of your request for this

1   stuff ultimately comes down to you don't think these

2   classifications are accurate and the basis for that belief is

3   because you've seen from the calls you've reviewed that that's

4   the case.

5           MS. PALIKOVIC:  Not just from the --

6           MR. WITTELS:  These are cancellation codes.  Forget

7   the other codes.  You got to focus in on what these are.

8   These are the reasons that people cancelled.  It's not billing

9   vehicle no longer available when you call up and you say I

10  don't know what --  I want this canceled right away when you

11  discover it on your bill.  That's the whole point.  When our

12  customer -- all of our plaintiffs.  There's no doubt since

13  they were deposed fully called up and said I don't know what

14  the heck this is, I want it cancelled immediately.  How can

15  they be coded as duplicate coverage.  That was not the reason.

16  So they were mis -- the point is there may have been other

17  calls but that's not -- that is not the numbers we have on --

18  these are the --

19          MS. PALIKOVIC:  And we started from seeing how the

20  plaintiffs were coded.  That was sort of the icing on the cake

21  that we realized at the end of our -- we started because we

22  couldn't get adequate explanations for how people were coded

23  or why customer service representatives were instructed to

24  choose a particular code.  When we deposed the person who had

25  signed off on these he just didn't know how they worked at

29

1  all.

2         And we also just -- there is no answer that we could

3  find about the BBNLA category.  That just is the big mystery

4  and that is by far the largest category.

5         MR. WITTELS:  It's 35 -- it's 35,000.

6         MS. PALIKOVIC:  Actually I'm sorry.  It's not so

7  much a mystery because we know they -- Cross Country abandoned

8  their effort to try to figure out whether these were related

9  to checks because -- whether they could be saved.  So from

10 that we can extrapolate that all of the check or vast majority

11 of the check BBNLA's were people disputing enrollment.

12                    [Pause in proceedings.]

13        MR. WITTELS:  That in a nutshell is why they don't

14 want us to hear them.

15        MR. McINTURFF:  Which is exactly is the same

16 argument we heard for the user tapes and the result we derived

17 from listening to those tapes was -- we believe is one of the

18 more important data points we have in this case.

19        MR. ALEXANDER:  Would you like to hear from the

20 defendants?

21        THE COURT:  Yes, let me hear from the defendants on

22 this point before we move to the next one.

23        MR. ALEXANDER:  So plaintiffs have made clear that

24 these tapes are not material to their case.

25        THE COURT:  It's not the standard.

1          MR. ALEXANDER:  Well, instead that these are just

2     additional data points but --

3          THE COURT:  That's not the standard.

4          MR. ALEXANDER:  Excuse me but we're not dealing with

5     discrete data points here that can be used to perform

6     regression analyses.  These are amorphous calls that need to

7     be reviewed by attorneys and then conclusions need to be made

8     as a result of those reviews.  Plaintiffs have sampled a small

9     grouping of calls and made their conclusions.  This is not --

10    and as a result of that sampling over 85 percent of the calls

11    that were sought were missing or incomplete or otherwise

12    unable to be retrieved.  So it's unclear to defendants how

13    plaintiffs intend to sample these several thousand calls and

14    make conclusions based on that small sampling assuming

15    sufficient calls are able to be located.

16         Functionally, two of the categories that plaintiffs

17    have identified are applied automatically based on the

18    customer's payment mechanism.  Exhibit A to defendant's

19    submission lists the numerous codes from the finance

20    department that were applied automatically based on

21    information received from Ocwen and accordingly --

22         THE COURT:  Which table is that?

23         MR. ALEXANDER:  Exhibit A.  This is the entire --

24    the table itself.  There are --

25         THE COURT:  There's multiple tables here.

31

1          MR. ALEXANDER:  -- one, two, three, four, five, six.

2                    [Pause in proceedings.]

3          MR. ALEXANDER:  Excuse me.  It's Defendant's Exhibit

4  A.

5          THE COURT:  Ah, okay.

6                    [Pause in proceedings.]

7          MR. ALEXANDER:  So two of the largest cancellation

8  code categories requested by plaintiffs are applied

9  automatically and therefore are not likely -- would not have

10  resulted from a telephone call to Cross Country.

11          THE COURT:  Which categories are those?

12          MR. ALEXANDER:  These are all of the categories

13  listed under cancellation disposition in Exhibit A.

14          THE COURT:  These are all automatic is what you're

15  saying?

16          MR. ALEXANDER:  Yes.  So including billing vehicles

17  discontinued, billing vehicle no longer available, billing

18  vehicle non payment and non payment.  Plaintiffs have asked

19  for billing vehicle no longer available and non payment to be

20  sampled.

21          If they're trying to determine refund information

22  resulting from plaintiffs who called Ocwen and then

23  subsequently called Cross Country, that information has

24  already been provided to them in an aggregate basis.

25          MR. WITTELS:  Could we just get a clarification,

1    Your Honor, on the exhibit you were reading from?  What we

2    looking at?

3              THE COURT:  Exhibit A to their response.  So at

4    least from -- so from Cross Country's perspective the billing

5    vehicle no longer available is an automatic thing and that's

6    when basically they're no longer with that bank?  So if Ocwen

7    is no longer servicing their loan?

8              MR. ALEXANDER:  That's a possibility where the loan

9    refinanced or --

10             THE COURT:  Yes.  And they paid off the loan and

11   there's no loan.

12             MR. ALEXANDER:  Right.  Exactly.  Servicing

13   transfers.

14             THE COURT:  And that's how all of them -- what would

15   -- let's assume --

16             MR. ALEXANDER:  All of the coding.

17             THE COURT:  Let's assume plaintiff's theory is

18   correct that there are some people who canceled directly

19   through Ocwen.  How would those be coded?

20             MR. ALEXANDER:  Depending on the information

21   received from Ocwen they would be coded as any one of these

22   numerous categories.

23             THE COURT:  In other words, there's no way to

24   determine.

25             MR. ALEXANDER:  From Cross Country's perspective,

33

1    that's correct.

2            THE COURT:  Doesn't that foster plaintiff's argument

3    that they need a sampling from all the categories?

4            MR. ALEXANDER:  Well, the point of the fact that

5    these were applied automatically is that these codes were not

6    likely the result of any telephone call to Cross Country.  In

7    other words, whereas other cancellation codes were for calls

8    as a result of the consumer's conversation with a customer

9    service rep whereas these were not.

10           THE COURT:  So some of them I think you have a valid

11   point and so non payment, one or more payments not received.

12   That could be done automatically.  But some of these it says

13   the client has indicated.  How does the client indicate it or

14   the client is Ocwen --

15           MR. ALEXANDER:  The client being Ocwen, that's

16   correct.

17                     [Pause in proceedings.]

18           THE COURT:  But then some of these actually would be

19   relevant.  So, for example, under billing vehicle no longer

20   available the customer has requested that the warranty is

21   canceled but will not call CCHS directly.  Isn't that exactly

22   the category of cases that the plaintiff is talking about?

23           MR. ALEXANDER:  That's correct but that may have

24   occurred in some cases but the issue is that -- I think that

25   the primary issue with these calls is that they're not easily

34

1    coded as -- it's not a piece of binary data that can say yes

2    or not this person was confused or not confused or intended to

3    be enrolled or not.

4           THE COURT:  I get it and I think that's the problem.

5    The problem is if they were easily coded and they were put in

6    the proper categories we wouldn't need to do samplings of

7    other categories because then we could be confident that the

8    people who actually disputed enrollment were in the correct

9    category.

10          I think the plaintiff's point is that there weren't

11   for whatever reason -- I'm not necessarily faulting you for

12   the improper characterization.  I mean it could be like I said

13   maybe a customer service rep hears multiple reasons for the

14   cancellation and picks one but the problem is if there are --

15   if there are calls that are talking about disputing enrollment

16   that are not properly coded under disputed enrollment I think

17   those are relevant.

18          MR. ALEXANDER:  Your Honor, what --

19          THE COURT:  I think there needs to be some

20   limitation obviously because I don't think all of these

21   categories are equal in terms of how likely it is that you're

22   going to be able to find the information that you're looking

23   for.

24          MR. ALEXANDER:  Your Honor, back to your original

25   point on the -- even if customers called in and were coded as

35

1    disputes enrollment authorization, that could mean any number

2    of -- or that could mean any number of circumstances

3    regardless of whether the customer was actually confused or

4    not and that may have just been the customer's statement on

5    the call.  These are out of court statements that are not

6    reliable or --

7             MALE VOICE:  Your Honor, if I may, Your Honor, can I

8    say something?  We listened a long time for plaintiffs to talk

9    about the various reasons they need this but the way Your

10   Honor started this was really I think where it ends and I

11   don't know why we need to go much further.

12            The standard under Rule 26, the relevance standard

13   for this issue is proportionality and the need for this

14   information.  Plaintiffs have said repeatedly on the record --

15   we're not making this -- it's not just defendant's argument.

16   They've stated they don't need this information.  They have

17   sufficient information.  They told you in their long colloquy

18   about how they can make their case, what percentage -- they

19   have a percentage -- they can say what percentage of people

20   were deceived by these products.

21            What they've said on the record repeatedly is they

22   need the additional information just to bolster that.  It's

23   cumulative.  It's not necessary.

24            MALE VOICE:  It's not cumulative.  They want to make

25   the number higher.  If they think your number is not accurate

1  they --

2          MALE VOICE:  The 90 percent quote is not high enough

3  I guess.  Well, in any event, they have a number.  They've

4  determined it but they don't know if they can do that.  In

5  fact, it may lower the number.  So that's a little

6  speculative.

7          THE COURT:  It's not going to lower the number

8  because there's 17,000 that disputed enrollment.

9          MALE VOICE:  We don't know why.

10         THE COURT:  They're saying that that number --

11  well --

12         MR. WITTELS:  That's the point, Your Honor.

13         MR. ALEXANDER:  If I could finish.  But, Your Honor,

14  they've made their case and he said it -- I don't know how

15  many times he said it but they don't need anything to prove

16  it.

17         THE COURT:  Again, that's not the standard.

18         MR. ALEXANDER:  The word needed is in Rule 26, Your

19  Honor.  It is in fact part of the standard.  I can read --

20  Rule 26 says that it allows for discovery that is relevant to

21  any party's claim and defense and proportional to the needs of

22  the case considering the importance of discovery in resolving

23  issues and whether burden or expense [inaudible] discovery

24  outweighs its likely benefit.

25         What we have here, Your Honor, is a statement by

1   plaintiffs that they don't need the discovery.  They have --

2   they made their case.  They have a percentage that they can

3   prove that they think entitles them to X number of damages.

4   On the other side what we have --

5            THE COURT:  Are you planning to dispute their

6   expert?  Are you planning to challenge the statistical

7   analysis?

8            MR. ALEXANDER:  Obviously --

9            THE COURT:  Then how can you say that they can't get

10  more to bolster those conclusions?

11           MR. ALEXANDER:  Because they said they don't need it

12  and what you do, Your Honor, is -- it's a relative balance.

13  Of course they can always get more but you weigh that with --

14  what they had, what they can use to prove their case against

15  the burden on defendants which is significant here.

16           THE COURT:  I didn't decide how you were going to

17  keep these things.  You decided to keep them in a burdensome

18  manner in terms of being able to retrieve them.

19           MR. ALEXANDER:  I'm not sure -- okay.  Well, the

20  burden is there, Your Honor, regardless.  The rule says you

21  weigh the needs against the burden.  So on one side we have

22  some of the plaintiffs stating he doesn't have a need against

23  the burden which is very significant.  It took hundreds of

24  hours for Ocwen to produce the 30 plaintiffs, the plaintiff's

25  tapes, a little over 100 tapes.  We're talking now multiple of

1    that.  We're talking hundreds upon hundreds of hours, let

2    alone attorney time that would be on top of this at this late

3    stage of the case when discovery is supposed to be completed

4    in two or three months and to allow this and to consider it

5    now I think is way beyond what we -- what was scopped out here

6    at the last conference about what we're trying to do here now

7    that we're moving ahead with the case.

8            Rule 26 is clear, Your Honor.  Proportionality

9    against -- proportionality.  Need against burden.  It's not

10   very close here based on the statements -- the admissions of

11   plaintiff's counsel.

12           MALE VOICE:  Your Honor, if I may, please.  I think

13   you put your finger on the point here is that this is all

14   hearsay.  They would have the court believe, and they are

15   operating as if this is dispassionate accurate data that is

16   useable in a regression analysis.  These are statements by

17   interested parties.  They may call up and say I don't know

18   anything about this and actually their spouse entered this.

19   They may call up and say I don't know anything about this.

20   What the hell is this.  And they just have buyer's remorse.

21   There's any one of a number of explanations for why someone

22   would call and say I don't know what this is, I think this --

23   I don't -- I want a refund.  I'm confused.

24           What you're inviting and what should be invited by

25   this kind of inquiry is an individual analysis of each person

1   that they sampled.  What kind of class action is that?  This

2   is supposed to be proven by representative data that applies

3   across the class and this data can't be applied beyond the

4   person says -- and only after cross-examination.  This is a

5   preposterous way of going about getting data points.  These

6   aren't data points.  That's a disgrace to the term.  They're

7   not data points.  They are argumentative points that the

8   plaintiffs want to use and have the court accept as data

9   points where actually they are questions of fact that are open

10  to dispute.

11          There are points of dispute even among their class

12  plaintiffs.  They don't want to admit it.  We have one from

13  Indiana whose wife signed up.  The plaintiff never saw it.

14  They dropped out before we deposed that wife.  There are

15  points of dispute on each one of these and if we're going to

16  go down the path of saying we're going to sample what people

17  say -- they're not excited utterances at the time of the

18  event.  These are sometimes many, many months after the events

19  have taken place.  These are simply statements out of court

20  that they want the court to accept as being true on their face

21  and they're not.

22          They are hearsay.  They are inadmissible.  Any data

23  points relying on these should be inadmissible and if we're

24  going to go down this port then we're going to open up a whole

25  panoply of rabbit holes as to whether or not this data is

40

1   acceptably accurate for purposes of statistical sampling or

2   not.  So they can do 100 of them or a 1,000 of them.  All they

3   do is just continue to open doors into a panoply of problems.

4                    [Pause in proceedings.]

5            THE COURT:  I don't particularly want to argue the

6   in limine motion now but how are you -- how exactly are you

7   going to use these data points as part of your analysis?  I

8   mean he raises a legitimate point.  It's very -- it's

9   difficult to look at these in the abstract.  I mean obviously

10  each individual call is going to involve certain judgments and

11  that's assuming that they're even accurate in terms of what

12  people are saying.

13           MS. PALIKOVIC:  Well, I'm not sure if we're -- if

14  this is a credibility determination or if we're talking about

15  something else but we -- first of all, we should have this

16  fight when it's time to have that fight and I don't think the

17  time is now.  I mean we've shown how we're going to use this

18  evidence more clearly than is normally the case when you're

19  requesting discovery.  Because we have the user tapes and

20  because we've already submitted our expert's analysis of the

21  tapes and then we also argued a motion in limine about how to

22  use those tapes, that's already happened.  That's not normally

23  the case when you're just requesting discovery to get answers

24  that you're entitled to.  But, like I said, in this case we've

25  already done that and gone above and beyond.

1          I can -- I'm not sure what the point is of me

2    arguing with counsel for defendants about regurgitating the

3    same arguments we made in the motion in limine to exclude

4    these tapes but the bottom -- the basic point of our

5    opposition was that the hearsay exceptions were state of mind

6    and that we're not using these statements to prove the truth

7    of the matter asserted therein but just to show that the

8    company was on notice and we cited a very long line of cases

9    in which tapes that were analogous to these were used for the

10   same purpose, to show that a company was on notice about

11   various misdeeds whether it was fraud or something else.

12          MR. ALEXANDER:  Your Honor, if that's the probative

13   value of this exercise why haven't they got that six times

14   over already?  So the question if they're talking about notice

15   then you've asked those question to him and you got a whole

16   bunch of gobbly gook back as an answer the issue is is this

17   probative, this kind of evidence probative given its burden at

18   this point as to how it's going to possibly -- could possibly

19   be used in this trial and where is it going to lead.  Is it

20   going to lead down rabbit holes, down to the side, or is it

21   unfairly prejudicial on its face without more or is it

22   appropriate on its face.  They want to use it on its face,

23   Your Honor.  They want to be able to wry that someone called

24   and said I don't know what this is and that means they

25   disputed enrollment and that's just not true.  They cannot

42

 1   rely on that.

 2          MS. PALIKOVIC:  But, Your Honor, it is -- we think

 3   it's foolhardy of defense counsel to ask whether this is

 4   probative.  It is obviously probative. It is the central

 5   question, one of the central questions in the case.  How many

 6   other people called defendants and said your checks fooled us,

 7   we didn't even know we were paying for this, we don't even

 8   know who you are.  This is -- Cross Country is a company, a

 9   marketing company that analyzes customer response constantly

10   in every way possible.  They use data points every way they

11   can to maximize the effectiveness of their marketing and their

12   renewal rates and every other way in which they make money.

13          So to say that this company which received thousands

14   upon thousands and maybe it's 17,000 or maybe it's 57,000

15   calls from people saying we didn't even understand this

16   enrolled us in a program and that they ignored it because it

17   was somehow not credible or because it's confusing or who

18   knows what the person on the call was saying that's strange

19   credulity.  They were on notice because thousands of people

20   called them.  They were on notice because they were paying

21   attention to what people were saying.

22          MR. ALEXANDER:  Isn't that the point, Your Honor?

23   Isn't that the point?  We're on notice and so whether it's

24   17,000 or 25,000 or 16,000 unless they're going to have some

25   way --

1          MS. PALIKOVIC:  Unless you're stipulating to that

2    right now then --

3          MR. ALEXANDER:  -- of ascertaining these people in

4    the class this is not common proof within the meaning of --

5          MALE VOICE:  And that's cumulative, Your Honor.

6    What you have on the flip side is --

7          THE COURT:  Is counsel acknowledging --

8          MALE VOICE:  -- the burden of hundreds of hours

9    asking to undertake at this stage of the case is excessive

10   given that the lack of any real relevance -- speculative

11   nature of whether it's going to be relevant [inaudible] and

12   it's not.

13         MR. WITTELS:  Judge, it took us motion practice,

14   conferences, motion practice to get these tapes.  They've been

15   fighting them for the very reason that they're continuing to

16   fight them and now telling you well, it's the end of

17   discovery, we're finally able to cut off discovery.  The only

18   reason it's ending in the short period is because we're trying

19   to get to the class motion which they're trying to block.

20   I've never heard defendants once in three and a half -- well,

21   it's coming on four years say that we're on notice and we

22   admit we knew.  They claim that there's no uniformity, no

23   typicality.  They didn't know anything and now counsel comes

24   in here and says we know, you don't need more.  They're not

25   acknowledging punitive damages.  They're not acknowledging

44

 1   notice of anything.  The people we deposed said we didn't hear

 2   a thing.

 3            MR. ALEXANDER:  But you have whatever you need to

 4   make your argument.

 5            MR. WITTELS:  Do we?  Are you acknowledging we have

 6   a punitive damages case?

 7            MR. ALEXANDER:  You've said you do.

 8            MR. WITTELS:  No.  What I said was we were ready to

 9   go to trial.  I did not say --

10            MR. ALEXANDER:  No, you said you don't need

11   anything.  You said we don't need anything in court.

12            MR. WITTELS:  Look, Counsel, I'm not the judge --

13   both judges have allowed us to have discovery to finish this

14   case.  To prove our case under the rules we're entitled to

15   this discovery.

16            MR. ALEXANDER:  Under the rules, that's key.  That's

17   right.

18            MR. WITTELS:  And you're blocking legitimate

19   discovery.

20            MR. ALEXANDER:  No, we're not blocking it.

21            MR. WITTELS:  Now it's amazing to hear the

22   defendants say we've listened to the tapes and they don't say

23   what they say.  That's what Bruce Alexander just said.  We

24   don't know what these people were saying.  What we do --

25            MR. ALEXANDER:  We know what they say but we don't

1  know what was actually meant and you don't either.

2      MR. WITTELS:  When someone says I'm confused, I

3  don't know what the heck is, you tricked me, you don't know

4  what they meant?  I know what they meant and so did your

5  client.

6      MR. ALEXANDER:  No, because they could have had

7  their wife sign up and they didn't sign up.

8      MR. WITTELS:  Please.

9      MR. ALEXANDER:  Or their spouse signed up.

10     MR. WITTELS:  Okay.  Tell that to the jury.

11     MR. ALEXANDER:  But that's the point.  It's a fact

12  question on every single one of these.  That's the point and

13  thank you for making it.

14     MR. WITTELS:  Your Honor, it might be -- it might be

15  a glimmer --

16     THE COURT:  I'm going to give you some limited

17  additional tapes but the only category that I think you've

18  made a good argument as to why they may have the type of

19  information you're looking for is this billing vehicle no

20  longer available because there's potentially people who

21  cancelled through Ocwen that just were never coded.  But I

22  think that's the only one.

23     MR. WITTELS:  Well, could I argue to you, Judge,

24  that duplicate coverage is very relevant here when we know

25  that was a problem as to the check solicitations that caused

1    them to pause in sending them out?  They were sending out so

2    many on top of each other that people were sending -- cashing

3    the checks not knowing.  I think that category is highly

4    pertinent because that's going to also show people -- why

5    would you sign up for more than one if you knew what -- if you

6    really wanted a warranty program why are you signing up for it

7    twice.  Those people --

8           MR. ALEXANDER:  All that demonstrates is they're not

9    reading.

10          MR. WITTELS:  Judge --

11          MALE VOICE:  Your Honor, I might add with respect to

12   duplicate coverage I'm under the understanding that that was

13   actually an automatic process as well.  It wasn't a result of

14   calls.  It was a result of Cross Country learning that the

15   same product was assigned to the same location and then

16   customer service reps would come in and enter that one of the

17   products was canceled.

18          MR. McINTURFF:  Your Honor, we'd also like to

19   request the non payment category because similar to the

20   billing vehicle no longer available the non payment category

21   in addition to the name it's a -- it's a little bit difficult

22   to understand what's going on here because remember the

23   premiums are collected along with the customer's mortgage.  So

24   when you pay your mortgage you pay for the Cross Country

25   product.  It's also the second largest category.  So just from

47

1    an operational standpoint it's --

2              THE COURT:  Maybe people are not paying their

3    mortgage.

4              MS. PALIKOVIC:  I think they have a code for that

5    that's separate and when service transfers occur and they

6    don't collect --

7              MR. ALEXANDER:  That's billing vehicle no longer

8    available according to counsel's chart.

9              THE COURT:  What does the non payment category mean?

10   If people are paying through their mortgage statement what

11   does it mean there's non -- they're canceled for non payment?

12             MR. ALEXANDER:  They're not submitting sufficient

13   funds to pay for the warranty product.  People who actually

14   don't have it on automatic they may only pay the amount of

15   their mortgage, principal interest and nothing more.  So there

16   is nothing to transmit from Ocwen to Cross Country.

17             MS. PALIKOVIC:  But does this category include

18   people who carve out of their payment specifically the amount

19   for these programs?

20             MR. WITTELS:  Have you listened to any of the tapes,

21   Bruce, do you know or are you just speculating?  Because all

22   that I've heard from counsel is mostly speculation.  They

23   never listened to the tapes.  They just tell you what they

24   think.  We don't have affidavits from people telling us.  We

25   deposed all these people.  They can't -- counsel here cannot

1  tell you what these codes mean because they didn't code them.

2  They didn't listen to the tapes.  They don't know.  I haven't

3  heard anyone with any information about the tapes other than

4  the fact that we have listened to the tapes and presented to

5  you what they say and we will be able to put into evidence at

6  trial these tapes in summary form because when you have

7  voluminous evidence the Federal Rules of Evidence allow you to

8  summarize the evidence and if the judge says we'll play some

9  of the tapes we'll play some of the tapes and the jury will

10  decide for themselves but we're not going to hear defendants

11  contest what these people were saying because they don't want

12  these tapes heard.  Once you hear a few of these tapes you

13  understand very clearly that this -- that these people were

14  confused and utterly deceived when they signed these checks.

15         All I hear from defense counsel is what these codes

16  mean and they have no idea.  They don't have anyone with

17  personal knowledge who's told us.

18         MR. ALEXANDER:  Again, Your Honor, a question of

19  fact.  That's Mr. Wittels rendition of the facts.  That may

20  not be the facts as subject to a cross-examination of the

21  person actually speaking.

22         MR. WITTELS:  A class action --

23         MR. ALEXANDER:  They -- a class action is supposed

24  to be about proof across the class, not by individual contest.

25         MR. WITTELS:  It's --

1          MR. ALEXANDER:  This issue about going back about

2    people who haven't paid, Your Honor, we're going to be here

3    for three days if this is going to continue to be debated on a

4    line by line basis.  If your ruling is we're going to have to

5    do one sample of one category, fine.  If you're going to allow

6    them to go and argue about other categories then we're going

7    to be here for a while.  But the non payment is supposed to

8    be -- it's a human system that a human being tried to code to

9    provide some level of information.  Is it accurate all the

10   time?  No.  Is it even truthful by the person who is

11   communicating the information?  Not necessarily.  It is an

12   indication of some piece that needs further investigation in

13   order to analyze exactly the truth of the matter stated.  By

14   definition this is all hearsay.  This is all hearsay.

15          So for them to ask me does this mean that everybody

16   does it this way.  No, I know that some people did not pay

17   that way from our own investigation.  That's attorney work

18   product and we can debate whether I've listened to tapes, how

19   many I've listened to and how many Mr. Wittels and maybe his

20   dog is bigger than mine but I don't think that's really the

21   issue here.  The issue here is what is probative of where they

22   need to be in a class action setting that has a reasonable

23   proportionality to it.  This opens the door -- if you're going

24   to go down this path we're going to open the door as to what

25   is the truth of each one of these statements.

50

1          THE COURT:  I'm going to give you the BBNLA ones

2     because I think those are the ones most likely to have the

3     information you're looking at and frankly those alone should

4     be able to allow you to make the argument you want to make

5     which is that the actual numbers are higher than what the

6     defendants have reported them to be because the billing goods

7     are not accurate.  I don't know that you need more than that.

8          Again, you're never going to get an actual number.

9     So you're still just talking about here's the number of people

10    that they admit were disputing enrollment and we think the

11    number is even higher because we've looked at these others

12    that were coded differently and even among those there's

13    people that disputed enrollment and I think the BBNLA ones you

14    have a much greater chance of finding that because if they're

15    canceling through Ocwen they just were never coded really in

16    the same way that other ones were.

17         Yes, will you find a few ones in some of these other

18    categories?  Maybe.  But I think in terms of the best bang for

19    your buck I think the BBNLA ones are where we should focus.

20    I'm not extending discovery.  We're not keeping this case

21    going forever.  So I'm limiting it to just those for now.

22         MS. PALIKOVIC:  Your Honor, can I just ask for the

23    non payment category?  I think if -- if this is -- if I

24    understand defense counsel's representations correctly then

25    there shouldn't really be any calls associated with this

51

1   number because -- with this code because if this was an

2   automatic code and it only refers to people who just stopped

3   paying and they weren't doing -- they weren't specifically

4   carving it out of their Ocwen mortgage then I can't see that

5   Cross Country would have calls canceling -- calls regarding

6   anything from these customers.

7         MR. ALEXANDER:  That's preposterous assumptions,

8   Your Honor.  The person could call to find out what kind of

9   coverage they have.  They could call for any one of a number

10  of reasons --

11        MS. PALIKOVIC:  Right.  But that call wouldn't be --

12  that call wouldn't be classified as non payment.  That might

13  just be -- these are cancellation codes.  So to the extent --

14        MR. ALEXANDER:  You have asked for all calls.

15        MS. PALIKOVIC:  May I just finish what I was saying?

16  I'm just -- if these people are canceled automatically as

17  counsel suggested which is what I think Exhibit A is meant to

18  represent then there really shouldn't be any calls that are

19  coded non payment because they weren't coded because they

20  called and said I'm not going to pay or here's why I haven't

21  been paying.  They have just been canceled because they

22  haven't paid whatever it is, one to three months.  So I'm just

23  saying --

24        MR. ALEXANDER:  But that's not your request.  Your

25  request is for all calls for anyone in this category.

1          MS. PALIKOVIC:  At this point I'm not even

2     requesting anything.  I'm just saying because this is also a

3     large, a fairly large category, it's half the size of BBNLA

4     but it's seven times the size of any other ones, could we at

5     least get clarity on this?  Could we find out how many calls

6     there are in this category?

7          MR. WITTELS:  I think their counsel has represented

8     that it was automatic.  We don't know that.  There's no one

9     with evidence who's told us that.  I think looking at --

10    they're pulling 50 on BBNLA to pull another 50 on non payment

11    is not very burdensome considering --

12          MR. ALEXANDER:  Your Honor, it is burdensome.

13          MR. WITTELS:  Can I finish?

14          THE COURT:  It's double the burden.

15          MR. ALEXANDER:  It's double, exactly.

16          MR. WITTELS:  Okay.  But that's what they're there

17    for.  If they had 100 people who called up today and said I

18    have a problem with you, Ocwen, and we look we know they're

19    being investigated -- look, this company is being

20    investigated, Ocwen.  They've been sued by the CFPB and

21    they're telling us there's -- I mean I'm sure if --

22          MR. ALEXANDER:  Your Honor, in [inaudible].

23          MR. WITTELS:  Can I finish?  Can I finish?

24          THE COURT:  One at a time, please.

25          MR. WITTELS:  I let you speak.  Please.  If the CFPB

53

1    asked them for those tapes they're going to turn over the

2    tapes.  We're entitled to it in civil discovery in the same

3    manner.  We're asking for 50 tapes from two highly germane

4    categories where we know their coding is wrong.  They've

5    acknowledged it.  And we don't think it's burdensome when they

6    have 12 -- 13 lawyers on the case and they're making motions

7    that -- they're putting a lot of money into making motions on

8    a class motion to dismiss where we already have a class motion

9    pending.  So I would --

10            THE COURT:  [Inaudible] non payment --

11            MR. WITTELS:  Non payment is because we don't know

12   what's going on with non payment.

13            MS. PALIKOVIC:  We don't know.

14            MR. McINTURFF:  If I could add, Your Honor.  If you

15   look in Exhibit A of plaintiff's letter on this table just

16   eyeballing it billing vehicle no longer available, disputes

17   enrollment and non payment, it looks like it's 90 percent.  So

18   that's our -- billing vehicle no longer available is the

19   biggest.  Disputes enrollment we have and then non payment is

20   the third largest.  So we've got the vast, vast majority of

21   cancellation reasons within those three.  So as a compromise

22   we think non payment makes sense because again I understand

23   it's accurate that the burden would be doubled if they did two

24   but at the end of the day it's really half of what we're

25   asking for.

54

```
 1              MR. ALEXANDER:  Judge, it's 150 calls out of --
 2              MR. McINTURFF:  No, it's 50.  It's 100 -- it's a
 3    100.
 4              MR. WITTELS:  But that's what I'm saying.  It's 150
 5    calls out of 55,000 people.  What kind of burden is that?
 6    That's not a burden at all given how they're defending this
 7    case with a --
 8              MR. ALEXANDER:  That's not the standard.
 9              MR. WITTELS:  Well, the standard is --
10              MR. ALEXANDER:  Your Honor, we spent hundreds of
11    hours on the plaintiff's which is about 100 odd tapes or so.
12              MR. WITTELS:  Because their people maybe are
13    inefficient in finding the tapes.  That's not our fault
14    that --
15              MR. ALEXANDER:  No, it's -- there's no --
16              MR. WITTELS:  It's not our fault.
17              MR. ALEXANDER:  Counsel, please don't speculate
18    about how -- don't cut me off.  Now I'm speaking.  Now I'm
19    speaking.  I'm speaking now.
20              MR. WITTELS:  I was speaking because we've had --
21    Judge, we've had no evidence from --
22              MR. ALEXANDER:  Your Honor, what I was saying was
23    with the burden before counsel interrupted me was that for the
24    plaintiffs that -- the tapes we produced for the plaintiffs
25    here there's about 100 plus tapes that took hundreds of hours.
```

55

1   The burden for 50 is significant.  For 100 as Your Honor just

2   surmised it likely would be double at least.  There's multiple

3   -- one thing I actually didn't say earlier in terms of the

4   burden is that Ocwen receives multiple calls from its customer

5   sometimes about service related issues as a mortgage servicer.

6   All of those calls actually need to be reviewed as well.  So

7   it's not just reviewing the 50 calls.  It's reviewing

8   additional tapes.

9            THE COURT:  Do they separate out the cancellation

10  calls?  Why don't you start there?  Why do you need the other

11  calls?

12           MR. ALEXANDER:  I believe -- you're asking me, Your

13  Honor?

14           THE COURT:  Well, I'm asking anyone who knows.

15           MR. ALEXANDER:  From Ocwen's --

16           THE COURT:  In other words, if somebody cancels is

17  there -- is there a separate categorization for this call?

18           MR. ALEXANDER:  My understanding of Ocwen's system

19  is that once we get the information from Cross country, a name

20  and an account number we will need to find, locate all the

21  tapes related to that person and those tapes need to be

22  reviewed to see if they're responsive or relevant here.

23           MS. PALIKOVIC:  Your Honor, we've seen transactional

24  logs produced by Cross Country for people where it shows I

25  believe the date when they called, the customer service

56

1    representative they spoke with, a kind of shorthand made by

2    the customer service representative about what was said and

3    then the code applied.  We've seen these for the plaintiffs.

4    So I would think that that would be -- once they've identified

5    50 people to sample they could just go to that transactional

6    histories, pinpoint the date of the cancellation by the code

7    and then pull up that tape.

8              MR. ALEXANDER:  That shows that they don't

9    understand, Your Honor.  For a call in the last 12 months, the

10   company is much bigger than Cross Country -- than Ocwen and

11   just [inaudible].  I mean there are tens -- hundreds of

12   thousands of customers calling all the time.  The system

13   works.  We record a phone call, keep it for a year for ready

14   access.   It's not meant to go back and so once it's recorded

15   in an archive status then it's not so simple any more and you

16   have to be able to locate the person who took the call because

17   they have a code and it's explained in our brief about the

18   process you have to go through for these archives for calls

19   that over a year.  That's what the burden is.

20             If you're limiting it to the last year that's not

21   such a problem.  That's what the system was made for is for

22   calls within the last year.  It's calls that are three, four,

23   five years old.  Those are the problems because people -- the

24   codes that --

25             THE COURT:  What about -- what about once this

1   lawsuit was filed?  Was there any difference in terms of how

2   the company kept this stuff or did they continue to still

3   archive stuff?

4             MR. ALEXANDER:  The system just doesn't allow it.

5   They kept it the same way.  The system --

6             MS. PALIKOVIC:  Your Honor, also this is a company

7   that per various regulation --

8             THE COURT:  One at a time.  Let him finish.

9             MS. PALIKOVIC:  I thought you were finished.

10            MR. ALEXANDER:  Your Honor, when the lawsuit was

11  filed there was no change in the process for the telephone

12  calls except the calls for the named plaintiffs were kept.  We

13  thought this was a class action.  We didn't think we were

14  going to be getting down into questions of what individual

15  people said because those are questions of individual fact.

16            MR. WITTELS:  You want to use the word preposterous,

17  that is preposterous.  When you have a class action brought

18  against you alleging that tens of thousands of people have

19  been ripped off you have an obligation as the counsel to tell

20  your client you better start segregating these calls and the

21  people who cancelled.  You knew in 2013 that thousands of

22  people were challenging this and now you went and archived

23  this stuff without changing your methodology.  I would say

24  that probably alone is the admission that we should get these

25  tapes.  They've created their own burden deliberately and are

58

1    now using it to try to deflect attention from the fact that

2    we're entitled to these tapes.

3           We're only asking here now with Your Honor's ruling

4    for 100 more tapes excluding -- except for the next section

5    which is why does he keep ripping people off.  We want to hear

6    those tapes since you apparently didn't listen to them.  This

7    is not a burden not when you have 13 lawyers on the other side

8    generating motion -- ten in limine motions causing us six

9    months of trial preparation and then on the eve of trial

10   pulling out after we've wasted thousands of hours apparently

11   preparing for trial and we have that sanction motion at the

12   end of this case.  If not before.

13          MS. PALIKOVIC:  I just wanted to point out, Your

14   Honor, that for the telemarketing calls the Cross Country does

15   they have to keep those calls on record for I believe it's

16   seven or eight years.  It's certainly longer than one year.

17   So they do have a system in place when they choose to deploy

18   it for keeping those tapes more accessible.

19          MR. WITTELS:  We're asking for two of the categories

20   which as counsel said show the bulk of the calls.  That's not

21   unreasonable, Judge, considering we're not asking to hear

22   every call.

23          MR. ALEXANDER:  You are asking for every call.  Your

24   motion is for every call --

25          MR. WITTELS:  A sample.  It's a sample.

59

1          MR. ALEXANDER:  -- for those people.  Every call.

2     The first time you did it you wanted the first call because

3     that would indicate whether they were surprised or not.  Now

4     you need every call.

5          MALE VOICE:  Your Honor, I think we could stick to

6     your ruling and move on.

7                    [Pause in proceedings.]

8          THE COURT:  How many of these of non payment forms

9     were there?

10         MR. WITTELS:  14,785.  So there are 35,000 billing

11    vehicle no longer available and then there are 14,000 non

12    payment and then the other two that we were requesting were

13    around 2,000 each.

14         MS. PALIKOVIC:  And that's as of I believe December.

15         MR. WITTELS:  Your Honor, if I may.  These figures

16    include individuals who have not paid.

17         THE COURT:  Okay.  So non class members.

18         MR. WITTELS:  They're not related to the class, yes.

19         MALE VOICE:  Well, but that's a very non complete

20    statement because we now know that the happy users, the 5,000

21    are not happy users.  They people -- 77 percent of them from

22    the calls disputed enrollment.  So their evidence is certainly

23    probative and relevant to whether our clients were reasonable.

24         Also, Your Honor, that's -- counsel's statement is

25    inaccurate.  There are three -- based on their own

60

1   interrogatories there are three -- no, more than 5,000

2   individuals who did pay and became active.

3        MALE VOICE:  Counsel, I'm referring to your footnote

4   and stating that it includes individuals who do not pay. I'm

5   not stating that all of those individuals did not pay.

6        MALE VOICE:  So just to be clear, there are more

7   than 5,000 of the non -- of the 14,000 non payment who did pay

8   and who are class members.  So it's indisputably a very large

9   category and it's the second largest and like I said before it

10  looks like it's around -- with the three categories that we're

11  looking at it's around 90 percent of the total number of

12  cancellation reasons.

13       THE COURT:  Between those three categories.

14       MALE VOICE:  Between the three.  And disputes

15  enrollment we've got the information on that.

16                      [Pause in proceedings.]

17       THE COURT:  I'm going to give you the BBLNA and the

18  non payment but this is the last time we're dealing with this

19  issue.  So don't come back and ask for more.

20       MR. ALEXANDER:  Your Honor, since this seems to be

21  effective, can -- may I ask you to reconsider the second

22  category again because the burden is really significant on

23  Ocwen to put this time.  Can we cut the number of tapes in

24  that category to maybe 25 as a compromise?

25       MR. WITTELS:  We can't cut the number of tapes.

1          THE COURT:  I don't think you can do that without

2    making it -- to the extent they're able to make it

3    statistically relevant anyway.

4          MR. ALEXANDER:  75 more tapes is better than 100.  I

5    reiterate my argument.  There's really -- they're making their

6    case the data they have and the burden on the flip side is

7    significant.

8          THE COURT:  The burden on all of us in this case is

9    significant.

10          MR. ALEXANDER:  It doesn't necessarily need to be,

11    Your Honor.  I think that's one of the issues here.

12          THE COURT:  I tried the settlement route.  Nobody

13    seemed to want to do that.

14                    [Pause in proceedings.]

15          THE COURT:  I'm giving you those two categories but

16    that's it.  No more.  No more tapes.

17          Let's talk about the last -- the next one, the

18    sampling for the cancellations in the last two years.  I'm

19    going to make this one very simple.  You said the

20    cancellations from the last year are kept in the easier access

21    system.  I'm limiting it to just the last year.

22          MR. WITTELS:  Very good, Your Honor.  100, Your

23    Honor, that's what we asked for on that.  Not hard to get.

24          THE COURT:  The last year.  Just the last year

25    because those are the easier to access ones.

1          Why do you need metadata for the Finn agreement?

2          MR. WITTELS:  Your Honor, defendant Finn told us at

3   her deposition that she had been kept on at the company and

4   was in an advisory role and was being paid her regular salary

5   for a number of years.  That was before we had Ms. Finn's

6   advisory agreement which in addition to her regular salary Ms.

7   Finn had admitted during her -- omitted from her testimony

8   that she was going to receive two $1 million lump sum

9   payments.  We then asked Ms. Finn as to why she was receiving

10  $2 million lump sum -- two $1 million lump sum payments and

11  she didn't know.

12         The date of the agreement was the same day that

13  plaintiffs served their motion for class certification and it

14  was one business day before the first mediation in this case.

15  We strongly -- we want to see the metadata first because the

16  defendants agreed to produce the metadata associated with all

17  documents and we've used metadata and various documents in

18  this case but specifically we want to see the metadata because

19  we want to test when this document was actually signed or not

20  signed.  When it was actually negotiated and we want the

21  drafts because we want to see what was exchanged, what -- what

22  did -- why did defendant Finn get $2 million on the eve of

23  mediation in a class certification motion.

24         MALE VOICE:  There's a credibility issue here,

25  Judge.  I asked her and she was very evasive at many points

63

1   including padding -- giving inaccurate descriptions of her

2   prior history in terms of her resume in public -- public

3   things on the internet.  She wasn't accurate how she

4   categorized herself but I ask you, what were you paid here.

5   She said -- you're going to continue on.  She says well, my

6   only payment I'm just going to be getting is my salary.  Well,

7   that wasn't true because we came back at the second deposition

8   and after Your Honor ordered them to produce we found out that

9   the advisory agreement was two million bucks.  She didn't tell

10  us that and then I asked her at the deposition so what are you

11  getting that for.  I don't know, that's what they decided to

12  give me.  That doesn't seem reasonable.  You don't give

13  someone $2 million to hang on defending your case for nothing.

14  So there's obviously something here that we'd like to again

15  ferret out and we need the metadata to do it.

16              MR. McINTURFF:  Again, Your Honor --

17              THE COURT:  I don't understand in any way how the

18  metadata is going to help you ferret that out.

19              MR. McINTURFF:  Again, if we go back to square one

20  the ESI protocol requires the defendants to produce the

21  electronically stored versions of any of the documents that

22  are responsive to our document requests.  They had to

23  produce --

24              THE COURT:  This isn't really -- this isn't part of

25  the ESI.

1          MR. McINTURFF:  Well, it's only not part of the ESI

2    because the defendants chose to produce the hard copy version.

3    They didn't produce any electronic versions of this agreement.

4    So to the extent there are electronic versions and it wasn't

5    typed on a typewriter those are discoverable and the

6    defendants agree that when you produce electronic documents

7    the metadata should be intact.  So we want the electronic

8    versions and the metadata produced intact as is consistent

9    with the ESI protocol and is consistent with e-discovery case

10   law.  There's a lot of information in the metadata.  There's

11   when it was edited.  There was when it was created.  There's

12   when it was last saved.  There's authors.  We're not even

13   asking for all of that.  We're asking for a limited number of

14   metadata that comes along with the document.  It's -- in fact

15   it's more work to take it out than it is to turn it over.

16          THE COURT:  I just don't understand why you need it.

17          MR. WITTELS:  Because we believe that the document

18   was actually created or modified significantly after we filed

19   a motion for class certification.  There's a $2 million

20   payment built in to her agreement that she can't even explain

21   why.

22          THE COURT:  But the date of the agreement is after

23   your class certification motion, isn't it?

24          MR. WITTELS:  No, it's the same day.  It's the same

25   day.

1        THE COURT:  So you think they modified it to add the

2   $2 million after the fact?

3        MR. WITTELS:  I don't know.  It's just -- it smells

4   and we are entitled to relevant discovery.  Why did she get $2

5   million?

6        THE COURT:  I'm just struggling to understand why

7   it's relevant.  What do you expect the metadata to show?

8        MR. WITTELS:  I expect it to show that it was

9   negotiated after May 6th.  I suspect.  It might not.

10       THE COURT:  And why does that matter?

11       MR. WITTELS:  Because May 6th was the day that we

12   showed them with the class certification motion the bulk of

13   the evidence we have against them.

14       THE COURT:  I'm still missing -- I guess I'm missing

15   the connection here.  Let's assume that that's true.  What is

16   the -- let's assume even that you're right that they

17   renegotiated the contract after that.  What is that supposed

18   to show?

19       MR. WITTELS:  $2 million payment to continue to stay

20   on to exclusively defend a lawsuit bears on Ms. Finn's

21   credibility as well as when it was negotiated bears on Ms.

22   Finn's credibility.

23       Again, this -- we shouldn't even have to have asked

24   for this.  They should have turned it over when Your Honor

25   ordered that the advisory agreement be produced.  They should

66

1  have turned over the electronic versions as well as the

2  metadata as they agreed to.

3  THE COURT: What is the problem with the metadata

4  here?

5  MR. ALEXANDER: Your Honor --

6  THE COURT: Frankly I don't see the relevance but --

7  MR. ALEXANDER: I don't see the relevance either,

8  Your Honor. This grand conspiracy that somehow their class

9  cert motion filed at 11:59 at night or whatever --

10  THE COURT: I don't even want to go down this road.

11  I don't see the relevance but what's the big deal with just

12  producing the metadata for this rather than sitting here and

13  trying to argue and fight about this. It's metadata for one

14  document.

15  MR. ALEXANDER: One document. It's not the

16  agreement that misrepresented that to the court. The ESI --

17  the protocol says for responsive emails metadata will be

18  produced. Exhibit A, this emails with metadata will be

19  produced and that metadata has been produced. Now they want

20  to change the agreement. They're always changing everything.

21  So you say what's the big deal with the metadata here. It's

22  here. It's there. It's something else tomorrow. I mean

23  we're -- you're getting exacerbated. We're getting

24  exacerbated, Your Honor, with this continual barrage of

25  information requests that have marginal, marginal effect on

1   this case at best.   We don't understand.   They have this

2   argument.   First they say they didn't have this and they did

3   have it.   They had a chance to cross-examine her.   If she

4   didn't remember they can make whatever they want out of that

5   but to go back and have to redo this because it's not in your

6   agreement and they want to renegotiate the agreement in front

7   of Your Honor is just inappropriate.

8           MR. WITTELS:   Your Honor, all we're requesting is

9   any native versions of this agreement.   There may be two

10  drafts, there may be three drafts, there may be five drafts,

11  there may be one draft.   We would like the native version and

12  we would like it to have the metadata intact.   That's how it

13  exists.

14          MR. ALEXANDER:   Well, some of those are going to be

15  work product because an attorney agreement is involved.   So --

16          MR. WITTELS:   Then we would need an appropriate

17  privilege log.

18          MR. ALEXANDER:   And on and on.

19          THE COURT:   I don't understand why you need this

20  stuff.

21                  [Pause in proceedings.]

22          MR. WITTELS:   Your Honor, should we move on to the

23  next topic?

24          MALE VOICE:   Just to be clear, Your Honor, the

25  [inaudible] the native version.

68

 1          THE COURT:  I'm still waiting for you to tell me why

 2    it's relevant.

 3          MR. WITTELS:  Because it goes to Ms. Finn's

 4    credibility.  We want to look at the native version of the

 5    documents.  They should have produced it anyway.  We don't

 6    understand why they're withholding it.  If they're withholding

 7    it on the basis of privilege then they should have given us a

 8    privilege log.

 9          Again, it's an agreement to do nothing and get paid

10    $2 million for doing nothing.  And she doesn't know why they

11    paid her.

12          MR. McINTURFF:  In addition to 17 months of --

13          THE COURT:  Again, the metadata is not going to say

14    any of that.  I understand your questions and they're

15    legitimate questions but it has nothing to do with metadata.

16          MR. McINTURFF:  The draft -- what's in the draft --

17    maybe the draft has comments.  That's going to --

18          THE COURT:  That's work product.

19          MR. McINTURFF:  Not necessarily.  That's only if an

20    attorney was working on it.  We don't know the answer to that.

21    She's a defendant.  She's the only individual defendant in

22    this case yet she's the one withholding the document -- the

23    backup document for this agreement.

24                    [Pause in proceedings.]

25          THE COURT:  Who -- did you ask during the deposition

69

1    who negotiated this agreement and the timing of it?

2            MR. WITTELS:  We did.

3            MS. PALIKOVIC:  We were told Ms. Finn had counsel.

4    She couldn't -- I think she couldn't recall the name and then

5    -- I don't remember the specific questions but I know the next

6    one was blocked on attorney client privilege grounds.  I'm

7    sorry it's not more specific.

8            THE COURT:  This goes to her credibility on what

9    basis?

10            MR. WITTELS:  On denying among other things

11    knowledge of the fraud as well as her position that the -- all

12    of the disclosures on the check solicitation are prominent and

13    it is unreasonable for customers to be deceived by the check

14    solicitation was her testimony.

15            MR. ALEXANDER:  Your Honor, I think that answers the

16    question how the metadata can possibly bear on any of that

17    information is --

18            THE COURT:  I'm sorry.  I just don't see any

19    relevance to that.  So I'm not ordering them to produce it.

20            MR. WITTELS:  Judge, moving on.  We skipped over one

21    aspect of the prior motion which was --

22            THE COURT:  Sorry.  What did I miss?

23            MR. WITTELS:  Which was that we had also moved for

24    the logs of these recordings which are important ancillary

25    information to the tapes.  If they're producing the tapes they

1    can easily pull the log when they pull for that customer.

2            THE COURT:  What is the logs again?  They have --

3            MR. WITTELS:  these are the customer service people

4    who record -- we heard from Wilkins that they had -- when

5    they're doing the phone calls they make notes of it.  So in --

6    you'll often see sometimes in the log something about what was

7    said but not everything which is why we need the calls.  So

8    the point is these are confirmatory and when defendants say

9    well, we didn't have to listen to the calls okay, well did you

10   look at the logs.  No, we don't look at the logs either.

11           MR. ALEXANDER:  Your Honor, the request for the logs

12   just reinforce my point.  These are questions of fact.  We are

13   going to go down so many different rabbit holes with whether

14   that information is accurate because it's all hearsay.

15           MALE VOICE:  I'm not sure why we need the logs in

16   addition to the tapes, Your Honor.  The tapes seem to be -- to

17   the extent they have relevance here that seems to be more than

18   sufficient.

19           MS. PALIKOVIC:  We're talking about a document per

20   person.

21           MR. ALEXANDER:  There are additional documents.

22   Everything would be searched and found.  So there's a burden

23   on that.

24           MALE VOICE:  If I may, Your Honor.  The logs are

25   notes from the calls  So anything that's in the call is

71

1  presumably in the log and the logs are not single pages per

2  customer.  They are dozens of line entries per customer and

3  plaintiffs have not just asked for logs of every call.

4  They've asked for all documents and data from any of the

5  customer's sample.  So this is far broader than even the

6  request for the call --

7          MR. WITTELS:  Judge, they're denying knowledge that

8  people called up to complain.  They're saying it's all

9  hearsay, we don't know why they were calling.  If their

10  people, their customer service people wrote down a summary of

11  the call we're entitled to see it.  This is discoverable

12  information.  This is stuff that they knew, they wrote.  Now

13  they want to tell us it's burdensome to produce the log for

14  the people that they're recording.  It's absurd.

15          MR. ALEXANDER:  No.  This is absurd for a class

16  action, Your Honor.

17          MR. WITTELS:  That's what a class action is, Bruce.

18          MR. ALEXANDER:  We're going to be going down every

19  piece of information because the data -- your information,

20  your evidence is not applicable to the class.

21          MR. WITTELS:  Well, that's your judgment.

22          MALE VOICE:  Your Honor, this is a good example of

23  why there's -- this is ad infinitum.  Your Honor made a ruling

24  as to the tapes.  We moved on and now we're seemingly back on

25  them and related documents that have no additional probative

72

1  value of the tapes.

2          MR. WITTELS:  You don't know that.  You said --

3  counsel said presumed.  He doesn't know what's in the log.  He

4  knows from --

5          THE COURT:  If you've got the tapes why do you need

6  the logs?

7          MR. WITTELS:  Because defendants are denying

8  knowledge, Your Honor, about any --

9          THE COURT:  But the tapes show knowledge.  So what

10  do the logs actually do?

11          MR. WITTELS:  Some -- it depends on the tape.  So,

12  for example, in the last production we had -- there were a

13  couple of tapes where it's actually Cross Country was calling

14  the customer and I think if I remember correctly it was Cross

15  Country like left somebody a voice mail.  That was the only

16  call that we had for that customer.  If we had the log we

17  would then be able to tell whether or not there was any

18  additional information in the log to make a determination

19  whether or not there was evidence that the customer had

20  disputed enrollment.  So that's why we want the log as a cross

21  check.

22          THE COURT:  So if there's only the one call how

23  would there be additional information in the log?

24          MR. WITTELS:  Because maybe they didn't produce all

25  the calls.  They couldn't find sometimes the calls.  Like we

1  had calls, we asked -- Your Honor ordered --

2          THE COURT:  So, in other words, so for particular

3  customers there might be calls that were no longer preserved?

4  Is that --

5          MR. ALEXANDER:  The other exercise we went through,

6  Your Honor, first we produced all calls and then they cut back

7  and admitted that they only needed the first call because

8  that's when the surprise or their evidence of disputing

9  enrollment would be evidence.  Now they want to go back and

10  get all calls again.  I mean this is for, if I understand it,

11  the people for whom we find calls and since we're on this I'd

12  like to just get clarified.  Are we to produce all calls for

13  50 random people in each one of these or only the first call

14  for 50 random people out of each of these categories?

15          MS. PALIKOVIC:  Your Honor, we can't -- there's no

16  simple answer to that because we need the cancellation call

17  which may or may not be the first call and sometimes they'll

18  add the cancellation code to three different calls because it

19  gets cut off or somebody calls back asking for a refund and

20  wants to talk to a supervisor.  So it's a little bit more

21  complicated but not that complicated.  Basically we need the

22  call that they logged as a cancellation with the cancellation

23  category and if there's three of those then maybe it's three

24  but those are few and far in between.

25          THE COURT:  So the answer is cancellation calls.  If

1  there's one cancellation call that's all you need to produce.

2  If there's multiple cancellation calls as coded in your system

3  then that's what you produce.

4        MR. ALEXANDER:  Fair enough, Your Honor.

5        MS. PALIKOVIC:  And the log --

6        MR. ALEXANDER:  Wait, wait, wait.  That might --

7        MR. WITTELS:  Your Honor, that --

8        MALE VOICE:  That's not how it works, Judge.  First

9  you call, you call and you say I don't know what this is and

10  then the customer service rep says oh, I'm so sorry you don't

11  know what this is.  It's a great product.  Some people as we

12  know eventually use the product.  We know from our sampling of

13  the people that used the product 77 percent of those people

14  initially called saying I don't know --  I don't know why I've

15  got this.  That's why we focused in on the first call.

16        We can discuss focusing in on the first call here

17  with Cross Country.  We can't do that with Ocwen because Ocwen

18  has an ongoing relationship with its customers.  So we have to

19  have all calls from Ocwen.  From Cross Country if we had to

20  pick one call it would be the first call, not the cancellation

21  call.

22        MALE VOICE:  We have people, our own plaintiffs

23  called up multiple times.  They would also -- they would call

24  up -- first they'd call Ocwen.  Then they'd get transferred

25  over.  Then they might call back and say I thought about it

1   and you're trying to convince me to use this.  I'm not using

2   this.  I didn't know anything about it.  Like counsel said

3   here, you might get cut off so it might be a series of calls.

4   It's very difficult to pinpoint which call it is.  If you just

5   say the cancellation call we don't know -- particularly

6   without a log you don't know when that person at the company

7   is logging that's the cancellation call.

8          I think we should get -- I think we should get --

9   have all the calls.  Really.  It's the only way to do it.

10          MR. McINTURFF:  If they're going to look for them --

11          MR. WITTELS:  They're going to pull all the calls

12   anyway for that person and they don't have all the calls

13   because that happened last time where they said we don't have

14   all the calls for the people.  So it's going to be very

15   difficult if they don't produce all the calls for that person

16   so we can understand the context and how it ends up with that

17   person cancelling.  It may have been in the first call.  It

18   may not have been.

19          MR. ALEXANDER:  Your Honor --

20          MR. WITTELS:  Because they may have logged it.

21          MS. PALIKOVIC:  For the transactional histories

22   we'll go along with [inaudible].

23          MR. ALEXANDER:  For Ocwen's purposes your expanding

24   numbers of calls quite a bit because they get many calls on

25   service related issues.  So now you're talking review and

1    production of expedentially more than 50 calls.

2              THE COURT:  Is there any coding in your system as to

3    what the calls relate to?

4              MR. ALEXANDER:  No.

5              THE COURT:  I don't see any way around it then

6    because you're going to have to look through all the calls

7    anyway to figure out which would be the cancellation call

8    then.

9              MR. ALEXANDER:  That's one reason it's very

10   burdensome, Your Honor.

11             MR. WITTELS:  Well, they can --

12             THE COURT:  Again, I didn't make up your system.

13             MR. ALEXANDER:  I'm not sure that's the test, Your

14   Honor, but in any event it is very burdensome and I think we

15   could take a shot at reviewing them for responsiveness and

16   producing those with the responsive calls.

17             MR. WITTELS:  Well, what does he mean responsive,

18   Judge?  If someone is calling up --

19             THE COURT:  You just said the cancellation call;

20   right?

21             MR. WITTELS:  It's a sampling of all -- it's a --

22   it's not whether it's responsive.  You're supposed to produce

23   50 random calls here and then 100 from the last year.  50

24   random calls of people who are in a certain code.  It's not

25   whether it's responsive or not.  You're producing all the

1   calls.  That's what Cross Country did and when they did that

2   we discovered that 77 percent of the people were disputing

3   enrollment.

4            MR. ALEXANDER:  Your Honor, clearly there are some

5   calls that are clearly not responsive here.  There's going to

6   be calls about escrow or tax questions, things like that,

7   which have absolutely nothing to do with this case.  Ocwen --

8   and that's probably the bulk of the calls that Ocwen receives

9   from a typical customer.  So we would have to -- we'll review

10  them.  There's no need for us to produce them.

11           MR. WITTELS:  It's 50 random customers.  I misspoke

12  but -- that's why we think --

13           THE COURT:  I think any of the calls related to --

14  look, I mean I can limit it by saying calls related to Cross

15  Country products.

16           MR. WITTELS:  Well, Judge, what's going to happen

17  here is first the call is going to go --

18           THE COURT:  Look, if they want to go through every

19  one of those calls and determine which one of them relates to

20  Cross Country products or not I mean let them do it.  It will

21  save you some work.  For you it might be easier to turn them

22  all over and let them go through them all.  I don't understand

23  why we're fighting about this.  Somebody is going to have to

24  look at all of them one way or the other.  At this point now

25  we're just talking about who actually reviews them.  I would

78

1    think you would want them to do it.

2                    [Pause in proceedings.]

3            MS. PALIKOVIC:  Your Honor, for the record, we're

4    amenable to exactly what you had proposed a moment ago which

5    is all calls that relate to [inaudible] to Cross Country.

6            THE COURT:  I'm happy to limit it that way if you

7    want me to do it that way but that puts more -- well, look, I

8    agree with you.  There's no need to turn over calls that are

9    relating to a completely extraneous issue like an escrow issue

10   or something unrelated to the Cross Country products.  So I'll

11   limit it to just the calls related to Cross Country products.

12                   [Pause in proceedings.]

13           THE COURT:  What is it -- how are the logs -- how

14   are the logs stored?

15           MALE VOICE:  The logs are stored in Time-X which is

16   just a transactional database maintained by Cross Country.  So

17   they're not logs in a traditional sense.  It's just you can

18   recreate or identify all of the call records that are

19   associated with any individual customer.  So although

20   plaintiffs intend to rely on these logs for notice or

21   knowledge it's unclear exactly how they would show that senior

22   managers at Cross Country actually had notice of these calls

23   absent communications from the managers in the customer

24   service department which is an issue that we dealt with this

25   very time last year when plaintiffs were asking for emails

79

1  from managers in the customer service department to senior

2  management and they -- they ultimately got those emails.  So

3  to the extent that senior management was put on any kind of

4  notice that would be counted in the ESI, not in these call

5  logs themselves.

6          MALE VOICE:  Your Honor, call logs are really

7  more --

8          THE COURT:  I guess the only relevance I see to the

9  call logs would be if you're talking about gaps.  So if

10  there's calls that should be there that for whatever reason

11  are not there maybe there would be something in the logs that

12  would cover that but is that something that has happened?  It

13  sounds like that's something that happened the prior

14  productions, correct, that there were some calls missing for

15  whatever reason?

16          MR. WITTELS:  Or couldn't be found.

17          THE COURT:  Or couldn't be found.

18          MR. WITTELS:  Right.

19          MR. ALEXANDER:  Your Honor, and also from Ocwen's

20  perspective none of the logs will contain all the calls that a

21  customer makes.  They have to then be reviewed for the

22  relevant entries to the extent they exist.  It's a significant

23  burden.  Again --

24          THE COURT:  But other than the log is there any way

25  to tell whether there's calls missing?

1          MR. WITTELS:  Or can't be found.

2          THE COURT:  Or can't be found?  I think you have to

3   produce the log then because otherwise you're not going to

4   know whether or not there's any calls missing.

5          MR. ALEXANDER:  So this would be -- so Your Honor's

6   order is for us to find 50 calls for 50 different people and

7   then the logs associated with that and if there's more calls

8   for those people produce all the calls, whatever we can find,

9   and whatever logs we have for those people about the calls.

10  I'm just trying to understand what it is that you want us to

11  do.

12          THE COURT:  So 50 random customers, the calls for

13  those customers limited to just the Cross Country products in

14  terms of Ocwen but I think you need to produce the logs just

15  to show whether or not there's missing calls unless there's

16  some other way that you can show whether or not there's

17  missing calls.

18          MR. McINTURFF:  Just to be clear, from a

19  methodological standpoint, what we did last time was

20  plaintiffs generated a list of random account numbers and that

21  was the list that was then used to search through so that it

22  was truly random.  We'd like to follow that same procedure

23  that we did on the last random calls and then also since this

24  has overlapped between -- we're looking at two different

25  categories here.  We're looking at billing vehicle no longer

81

1   available and non payment.  So we want the customer from each

2   -- from both Ocwen and Cross Country to line up.  So if Cross

3   Country has a billing vehicle no longer available customer

4   that's the customer who's Ocwen calls we need as well so that

5   it's -- so that we're not sampling two different groups of

6   customers from Ocwen on the one hand and Cross Country on the

7   other hand.

8           THE COURT:  So come up with your list of 50 and then

9   that will be the same 50 that are used by both Ocwen and Cross

10  Country.

11          MR. McINTURFF:  And as before what we did because

12  there were gaps we had a much larger list of account numbers

13  and Cross Country just went through them where --

14          THE COURT:  Figured out which ones actually had

15  calls.

16          MR. McINTURFF:  Correct.  We would propose the same

17  methodology.

18          MR. ALEXANDER:  We'll have to give them more than 50

19  because --

20          THE COURT:  Give them a list and they'll go through

21  and they'll find the first 50 I guess.

22          MR. McINTURFF:  But we will need from them a list of

23  account numbers that are pulled by their -- because they have

24  thousands of account numbers.  We need a list of account

25  numbers from each of the two categories to randomize.  So it's

1   random.

2          THE COURT:  So they give you a list of account

3   numbers from those two categories.  You give them --

4          MR. ALEXANDER:  A randomly generated --

5          THE COURT:  -- a randomly generated list of however

6   many and they do the first 50.

7          MR. ALEXANDER:  Correct.

8          THE COURT:  So you got the calls, you get the logs.

9   What other data?  You said there was other customer things.

10  I'm not giving you every piece of information they have on

11  each of those individuals.  The calls and the logs should be

12  enough.

13         MR. WITTELS:  Yes.

14         THE COURT:  The indemnification information.  You've

15  got the agreement.  Why do you need more than that?

16         MR. WITTELS:  Because this is not a typical

17  situation where just knowing that we have an agreement is

18  enough.  What we need to know here is in light of Ocwen

19  sending a letter saying we don't want to collect from you any

20  more, what is the reason that they continued billing and

21  collecting over 20 million bucks from these customers when

22  they knew that there was a problem and they wanted to stop.

23  Is -- are there bills being indemnified or not.  It's a very

24  simple question.  They're not telling us and they're not

25  saying whether they're paying for the lawyers.  It goes to the

83

1    whole RICO case.  When we go to trial --

2            THE COURT:  You have the agreement.

3            MR. WITTELS:  No.  But we don't know if they're

4    doing it, Judge.  We don't know the arrangement.

5            THE COURT:  The agreement says they have to do it.

6            MALE VOICE:  Yes, but they don't always follow their

7    [inaudible].

8            MR. WITTELS:  We don't know.  They must have cut

9    some sort of deal when they said we want out of this

10   arrangement.  Then Cross Country's Ms. Finn wrote them and

11   said well, they better know that they've got to keep

12   collecting.  If they want out it's going to cost them over 60

13   million bucks.  When we go to trial we want to be able to say

14   this is an enterprise that two judges already sustained.

15   These people worked together  and when one company said I want

16   out of this, I don't want to collect any more, the other

17   company said don't worry about it, I'll keep paying your bills

18   and I'm going to indemnify you.  They act like they're

19   separate companies but they're not.  They're a joint

20   enterprise.

21           We need to know how the scheme worked and whether

22   they're actually getting their bills reimbursed.  The jury is

23   entitled to know who's paying -- who's going to pay in the end

24   ultimately because they're working together.  It goes to why

25   they would keep going.  Obviously they didn't think it was

84

1   proper to keep going.  They knew it was a scam.  They said

2   they wanted to stop.  Somehow they were convinced not to stop.

3   Why?  We want to know is it because they're being paid because

4   Cross Country is paying -- footing all the bills.  They seem

5   to have a lot of money because now they have 13 lawyers.  Are

6   they paying for 13 lawyers or is Ocwen paying for it?

7        THE COURT:  I mean again I think you have the

8   indemnity agreement that shows the relationship.  I don't know

9   why -- I mean whether or not they're actually paying and how

10  much they're paying I think goes beyond what you really need

11  here.  I'm just not sure that the case law supports getting

12  it.  The agreement, yes, and you've already got that.

13       The questions that you want answers to might be

14  legitimate questions but that's not exactly what you're asking

15  for in terms of the indemnity stuff.  That might be the reason

16  but maybe -- did you -- have you asked the question?

17       MR. WITTELS:  Yes.  We haven't gotten the answer.

18  Now we're going to be deposing Howard Wolf, the head honcho

19  here, this summer and is he going to be answering.  Is he

20  going to say I don't know.  That's something the lawyers know

21  because no one has answering.

22       MALE VOICE:  He may be instructed not to.

23       THE COURT:  I mean we've asked before and they've

24  instructed all the people not to answer.  So they don't want

25  the jury to know who's paying for this and who's paying Ocwen

1   to continue billing because that's really what's happening

2   here.  We think that's part of the scheme.  The whole idea is

3   they get money back for collecting this money and being part

4   of the scheme.  Now why would they do -- keep doing the deal

5   if they're going to face a big exposure.  Only if someone is

6   going to indemnify them for the whole amount and they won't

7   tell us.

8              THE COURT:  Let's assume all that's true.  If you

9   have an indemnity agreement that says they have to indemnify

10  them, why do you need anything more than that?

11             MR. WITTELS:  To know --

12             THE COURT:  If they were to come back and say no,

13  no, we just ignored that contract --

14             MR. WITTELS:  Well --

15             THE COURT:  I mean that would be a different story

16  but the indemnity contract says they have to indemnify them.

17  So if you want to make this argument that's fine but it sounds

18  like you could already make it based on the agreement.  I just

19  don't know why you need more than that.

20             Again, legitimate question as to why they continued

21  to bill even if they didn't want to.  You can certainly ask

22  that question but that's not what you're asking for in terms

23  of the indemnity stuff.  If that's ultimately what the answer

24  is is that we decided to keep billing these customers because

25  we're fully indemnified by Cross Country that might be --

1   again, that might be ultimately what the answer is.  I don't

2   know.  You'll have to depose the witness from Ocwen to

3   determine why they continued to bill.

4          MR. WITTELS:  We deposed the president and I believe

5   we asked him that and he couldn't answer.  Didn't know.

6   Farris, the president.

7          THE COURT:  Like I said, you can make this argument

8   based on the agreement.  I'm not sure that you need more than

9   that.

10          MR. WITTELS:  Why don't we move on, Your Honor.

11          THE COURT:  The reliance -- this is the same issue

12   that keeps popping up.  I mean I think the problem is your

13   request for admission is just poorly worded.  I get what

14   you're trying to get an answer to and I think they've said the

15   answer multiple times on the record but perhaps not in the

16   form that you're looking for.  So I don't know what the best

17   way is to get the answer that you're looking for but it's not

18   the way that you've asked it.

19          MR. WITTELS:  We'd just like to avoid motions in

20   limine on this issue when we get to trial.

21          THE COURT:  Look, I get it.  I understand what

22   you're trying to do.  I'm struggling to figure out the best

23   way to get what you want.  I mean --

24          MR. WITTELS:  We know they have lawyers.  That we

25   know but that's not what we were asking and they know that's

1   not what we were asking.

2          THE COURT:  I know.  What you're asking is are any

3   of their witnesses going to rely on the advice of counsel to

4   explain away their actions basically.  Maybe there's a better

5   way you can phrase that that doesn't implicate these lawyers

6   and their current advice that I hope that their clients are

7   actually taking during the course of this litigation since

8   that is the very purpose of hiring a lawyer.  I think you just

9   need to reword it.  I understand what you're getting at.

10  Obviously I think they know what you're getting at.  You just

11  have to word it better.

12          MS. PALIKOVIC:  Your Honor, that's exactly the

13  point.  They know what we're getting at.  This has been the

14  subject of extensive briefing.  Their answer is facetious and

15  cheeky.  I mean it's making everyone in the courtroom laugh.

16  It made me laugh when I read it but it's -- sure, we can go

17  back and write another RFA but that's sort of rewarding

18  defendants for being obstructive.

19          MR. ALEXANDER:  I'm glad everybody is enjoying this

20  because when I read the request for admission I laughed.  I

21  said you can't be serious.  I mean these are lawyers that use

22  words and they know they have words that have a meaning and

23  they're deliberately ignoring what the applicable words are

24  for what it is -- it's not that hard.  Not my job to do it for

25  them.  We got on the record many times about the issue.

1          MALE VOICE:  Your Honor, just to note.  I don't mean

2   to note anything.  We denied it because of the way it was

3   written but then we went on to say gratuitously that we have

4   not as we -- we have now asserted on advice of counsel defense

5   and we have no intention, present intention of doing so.

6   That's in the answer to the admission.  I think it's all we

7   can say if anything.  So I think it's done.

8          MS. PALIKOVIC:  But that's not -- we keep asking for

9   -- we keep asking a different question.  You could not be

10  asserting an advice of counsel defense but your witnesses as

11  they have during depositions could repeatedly be invoking

12  advice of counsel.  That's what got us in this situation is

13  that you're not asserting this defense but your witnesses are.

14         MR. ALEXANDER:  No, Ocwen hasn't done that but in

15  any event what I said at the end of my statement seems to be

16  yours.  Is we have no present intention to assert such a

17  defense, Counsel.

18         MR. WITTELS:  He's been talking about a motion in

19  limine.  In other words, he's trying to get at what people may

20  say on the stand I guess.

21         THE COURT:  I think -- I'm not sure that an

22  interrogatory is the right way to -- or a request for

23  admission.  Look, I get your point.  This is the problem that

24  we ran into before.  I don't know what the witnesses are going

25  to say when they get on the stand at trial.

1        MR. WITTELS:  Well, we know what they said in their

2    depositions and they did rely on counsel.  They've all said

3    it.  So how are we not going to face that.  We have to face up

4    to what's going to happen at this trial.

5        THE COURT:  Well, some of the questions that were

6    asked and can be asked at a deposition are not questions that

7    would be permissible at trial.  So part of the question is

8    going to be whether the questioning at trial is going to lead

9    into this area and if it does are the witnesses going to rely

10   on the advice of counsel in which case then it raises all of

11   these problems.  This was -- this is the problem that I was

12   struggling with the last time we went through this advice of

13   counsel defense and the motion for the attorney client

14   communications.  It's a difficult question to deal with at

15   this stage.

16       I mean they haven't -- they've represented on

17   numerous occasions that they're not asserting an advice of

18   counsel defense.  I understand that you're worried that their

19   witnesses are going to do so notwithstanding that.  But until

20   they actually do that on the stand at a trial there's not much

21   I can do.  I just think the fact that they've said certain

22   things during a deposition in response to your questions

23   doesn't mean that they're going to say that at trial and it

24   doesn't mean that you're even going to be allowed to ask those

25   questions at trial.  So I just cant make that kind of a ruling

90

1  based on the current record.

2         I think that they've represented they're not going

3  to seek to rely on the advice of counsel formally and without

4  knowing exactly what the testimony is at trial it's difficult

5  to make a ruling on whether or not the attorney client

6  privilege needs to be breached for that purposes.

7         So I think what I said at the last time was you need

8  to collect all of that and segregate that information out

9  because this is a decision that's going to ultimately have to

10 be made probably by the trial court depending on what happens

11 at trial.

12        MR. WITTELS:  Judge, we'll try again with maybe

13 another [inaudible] and see where we are.  Thank you.

14        THE COURT:  Update on the ESI productions.  What

15 specifically do you want to update?

16        MR. WITTELS:  So in terms of the collection what we

17 did was we identified custodians.  Their email accounts were

18 collected and then they were sorted using the parties search

19 terms.  Those productions occurred in late 2015 before we were

20 made aware that despite Ocwen's request to cease collecting

21 payments in 2014 I believe the defendants continued to collect

22 payments.

23        So what we're requesting is is that the same

24 custodians have their data from 2015 onwards from the date

25 they first collected and produced to the present to have that

91

1  data collected, sorted with the search terms and produced

2  because not only had the defendants continued to collect, they

3  likely have continued to have discussions about customers

4  complaining. We believe customers still continue to complain

5  and cancel. There were media inquiries regarding check

6  solicitations in the old ESI. We think there may be new media

7  inquiries in the new ESI and at bottom it's all discoverable

8  because they continue to collect and they continue to operate

9  the program.

10           We also wanted, for example, because of the CFPB's

11  recent lawsuit against Ocwen concerning check solicitations we

12  think there is likely quite a bit of email generated from that

13  by the same custodians that we produced and identified. So

14  it's --

15           THE COURT: This is all post filing the lawsuit

16  though.

17           MR. WITTELS: Right.

18           MR. ALEXANDER: Well, Judge --

19           THE COURT: Aren't you basically asking for an

20  entirely new essentially basically redoing everything?

21           MR. WITTELS: No. It's updating. It's not --

22  excuse me.

23           MR. ALEXANDER: Yes, Your Honor, that's what they're

24  asking for.

25           MR. WITTELS: Excuse me. It's not redoing. It's

92

1    updating.  I mean they've continued this practice.  They

2    continue to receive emails and complaints from customers.  We

3    thought they stopped.  We thought in 2015 they had stopped.

4    So that was the cutoff.  We didn't learn until much later that

5    they've continued to collect.  So they continue to perpetrate

6    the scheme, to give an analogy of a defective product.  The

7    defective product is still out there.

8              THE COURT:  Okay.  They're continuing to collect

9    payments but they're not doing the check solicitations any

10   more.  So they might -- let's say they are continuing to

11   receive complaints, why is that -- I'll give you relevance but

12   why do you need that when you got all of the complaints from

13   all the prior years and I'm giving you the call sampling for

14   all the cancellations in the last year?

15             MR. WITTELS:  Punitive damages, Your Honor.  The

16   conduct is ongoing.  We have emails from -- internal emails

17   where the defendants own personnel are objecting to check

18   solicitations.  Yet they're continuing to collect.  They have

19   a refund policy where it's a secret refund policy but if

20   anybody calls up and disputes enrollment and says the right

21   words they'll get their money back.  So there's going to be

22   emails on that score.

23             MALE VOICE:  Judge, you recall that the -- there

24   were -- there was great panic where the words were used we

25   shouldn't panic when they found out about G investigations,

1   when we found out about CFPB was asking for their -- it was

2   the -- portfolio.  The Sally Mae.  They got very exercised

3   when they started asking for these documents.

4           In the last year here obviously the CPFB has been

5   going after Ocwen at a minimum and asking --

6           MR. ALEXANDER:  You --

7           MALE VOICE:  Can I finish?  And asking them what's

8   going on and they're still collecting.  It's not -- the fraud

9   didn't end, Judge, because the fraud -- collecting the money

10  is part of the fraud.  It's nice that they stopped.  Thank

11  you.  So that they couldn't deceive more people but there are

12  the people who were deceived and what have they done about it

13  in the last year?  What are the emails showing?  Why are the

14  still collecting?  That's all an update to what we knew.  I

15  mean it's an ongoing scheme.  It doesn't end.  Surprisingly it

16  has not ended.  I guess that's why --

17          MR. ALEXANDER:  Your Honor, if I could just --

18          THE COURT:  Where does it end?  At this point like

19  you basically keep coming back with the same argument.

20          MALE VOICE:  Judge, it would be -- discovery will

21  end in the next months but, you know, it didn't end -- most

22  people who get caught doing something that looks bad stop it.

23  Not these defendants.  They still do it.

24          MR. ALEXANDER:  Your Honor, if I could just --

25          THE COURT:  They stopped it.  They just are

94

1   continuing to collect from customers that were previously

2   enrolled.  I understand.  Your point is well, these people

3   never should have been enrolled in the first place.  Fine.

4   But that's not the same.  They're not continuing to do the

5   same thing that they were doing before you filed the lawsuit.

6          MR. WITTELS:  Well, you mean they're not deceiving

7   more people?  These people are deceived.  That's our argument.

8   All the people who were continuing to bill from we argue are

9   still deceived.  The users, 77 percent of them, and it could

10  be higher given the statistics, are deceived.  They just were

11  convinced to use it.  We haven't found any happy people who

12  signed up for this thing and said hey, I -- that's not what

13  the evidence is showing.  What I wanted when I signed that

14  check I wanted that warranty program.  I haven't seen those

15  customers.

16         MR. ALEXANDER:  Your Honor, if I may.  The CFPB case

17  is never mentioned.  I think four times.  It has zero

18  relevance to this case.  The CFPB's allegation, and it's a

19  voluminous complaint, contain almost all the servicing.  It

20  has nothing to do with this case.  There's a brief mention of

21  the conduct that's at issue here and what it does note about

22  that is it ceased in 2013.

23         MR. WITTELS:  Well, I would --

24         MR. ALEXANDER:  Let me finish.  So it has no

25  relevance here whatsoever.

95

1          MR. WITTELS:  Judge --

2          MR. ALEXANDER:  It certainly has not relevance to

3     justify the reopening and the recollection since they're

4     asking us to redo an ESI production which I doubt we can even

5     finish in -- it would take months to finish this because it

6     would be an entirely new undertaking which essentially amounts

7     to a speculation on their part that there might be additional

8     responsive documents which clearly as Your Honor has pointed

9     out you they do not need in any shape or form.

10         THE COURT:  This just goes on and --

11         MR. WITTELS:  Judge, a) it doesn't because it would

12    be a cutoff.

13         THE COURT:  You can't just say oh, there's a

14    discovery cutoff so you just need to keep redoing ESI until

15    the date of discovery --

16         MR. WITTELS:  Judge, let me pose it this way.  If

17    they were -- if this were the Ford Pinto they recalled -- they

18    didn't put out any new Ford Pintos with the defective gas tank

19    in the back but they let all the Ford Pintos out there stay

20    out there.  Is that an ongoing fraud?  I think it is.  It's

21    the same analogy.  They recalled checks but they haven't

22    recalled all the people who are getting deceived.  Only if

23    they call up and ask for their money and they refused to allow

24    us to get notice out of that automatic refund policy.  We

25    tried.  We tried for it.  We moved for it in class

1  certification.  They blocked that by artfully manipulating the

2  trial so that we could avoid having the class motion decided

3  and now they've brought a new motion to dismiss the class

4  claims on the pleadings not even -- ignoring the fact that we

5  briefed the class motion.

6         So we're asking to -- and counsel was inaccurate in

7  saying the CFPB has no count.  It's marginal.  There's two

8  full counts.  I would think if someone -- if you put in a

9  complaint, a full count of a deceptive practice that's not

10  marginal.

11         MR. ALEXANDER:  Your Honor, are we going to be

12  arguing the motion to dismiss because the judge said we can

13  make the arguments and motion to dismiss.  So I don't

14  understand why this has been brought up not once, not twice.

15  Four or five times now.  I mean it doesn't move the ball for

16  Your Honor or for this court or for the day at all.

17         The issue is whether or not this kind of discovery

18  after the lawsuit where lawyers are involved where you're

19  going to have -- you're going to have a privilege log that is

20  larger than the production log on this.  You're asking for all

21  kinds of sideshows here.  If there was something they want to

22  have calls from people who canceled recently.  They want to

23  have updates to how much premiums have been collected.  These

24  are all claims that have been happening.  We're going to give

25  them the calls and we're in protest.  We have updated answers,

97

1  interrogatories about the premiums that have been selected.

2  That is stuff we've been doing and will continue to do but

3  this is opening a whole new panoply of side issues that again

4  the probative value and the burden on this issue are just way

5  out of line.

6          MR. WITTELS:  I don't think they're way of whack at

7  all, Judge.  These are core issues that a company is

8  continuing their fraud, continuing to collect, continuing to

9  have discussions, getting investigated by a major bureau in

10  this country.  CFPB is trying to shut down Ocwen for check

11  solicitations.

12          MR. ALEXANDER:  (Laughter)  Sorry.  I'm sorry.  Can

13  we [inaudible] statements on the record?  It's so inaccurate

14  it's laughable.

15          MR. WITTELS:  Is it laughable?  They sued you for

16  it.  They sued you for your conduct engaged and your

17  conduct --

18          MR. ALEXANDER:  Your statement was a 100 percent

19  correct, Judge, as most of your other statements.  In fact, I

20  dispute almost the things you said -- almost everything you've

21  said about the CFPB lawsuit and before you start making

22  misrepresentations or I'm going to have to correct them on the

23  record.

24          MR. WITTELS:  Really?  Well, we'll see what the CFPB

25  does because it hasn't been -- it hasn't been enough to stop

98

1   this company from collecting money for Cross Country.

2           THE COURT:  Okay.  This case is ending.  We're not

3   going to continue this on ad infinitum.  I haven't heard any

4   specific ideas as to why this is necessary.  Considering all

5   of the discovery that's already been done in this case, we're

6   not going to do this.

7           We're not going forever.  If there's something

8   specific that you want that can be narrowly tailored, ask for

9   it but I'm not going to order them to do a completely new ESI

10  discovery basically forever into the future until the

11  discovery cutoff deadline.

12          MR. WITTELS:  Well, there are a bunch -- they're a

13  narrow category of --

14          MR. ALEXANDER:  Your Honor, I hope you ignore this.

15          THE COURT:  I'm not going to deal with it.  Make the

16  request and if they object to them, then we'll deal with it.

17  But I'm not going through this again.  I'm not letting you --

18  I'm not making them do a completely new ESI discovery for all

19  of this stuff.

20          So unless there's some very narrow category of

21  information that you're requesting --

22          MR. WITTELS:  Well, I would argue to you and we'll

23  ask them for it, but certainly ongoing ESI regarding customer

24  complaints and their response about it is certainly germane

25  given that all we've heard from the upper management is --

99

1          MR. ALEXANDER:  Your Honor, you're opening --

2          MR. WITTELS:  -- what people were --

3          MR. ALEXANDER:  -- the Pandora's Box here by doing

4   this.  We're going to be back here in two weeks arguing the

5   same issues and --

6          MR. WITTELS:  -- it's -- Judge, it's not our problem

7   that the defendants continue to engage in a fraud.  I mean --

8          THE COURT:  I don't --

9          MR. WITTELS:  -- I don't know what --

10          THE COURT:  You already have --

11          MR. WITTELS:  -- to say to that.

12          THE COURT:  -- the customer complaints past when you

13   filed the lawsuit.  What possible thing do you think you're

14   going to find over -- what do you have them up to, 2015?  So

15   what possible additional stuff are you going to find between

16   then and now that's different than what you already have?

17          MR. WITTELS:  Well, it's difficult to know what you

18   don't know, but I can -- I can represent that --

19          THE COURT:  No, but there needs to be a logical

20   cutoff at some point.  I mean otherwise we'll be going up to

21   the day of trial and you'll still be asking for more stuff

22   because technically it's relevant and, you know, they're

23   continuing to bill.

24          Because -- I'm assuming they're going to continue to

25   bill until they're forced to stop doing so, if that happens.

100

1    I mean at what point do we stop it?

2            MR. WITTELS:  Well, we argue that you stop it at the

3    end of discovery.

4            THE COURT:  Well, I say that I'm stopping it now

5    unless you can tell me a specific reason why I shouldn't, and

6    you haven't done so.  Not yet.

7            MR. WITTELS:  All right, Judge.  We'll make the

8    demand and then we'll be back perhaps to argue later.  So

9    moving onto E in the -- in the letter, we have an update.

10   There was a number of document -- a number of these issues

11   were answered yesterday and this morning.

12           THE COURT:  So what's still outstanding?

13           MR. WITTELS:  The first one is we got an answer.  We

14   haven't had a chance to -- I'm sorry?

15           (Counsel confer.)

16           MR. WITTELS:  We've gotten a partial response on one

17   and we need to -- we need to analyze the response before we

18   can move forward, so we'll need to table 1 for now.

19           THE COURT:  Okay.

20           MR. WITTELS:  We still have not gotten a response to

21   2.

22           MR. ALEXANDER:  With respect to 2, we are still

23   obtaining information and can provide more clarity to that in

24   a couple weeks.

25           MR. WITTELS:  Part of the reason for bringing to

1  Your Honor's attention is, is we've sent multiple emails and

2  had multiple meet and confers about this and so we would like

3  a firm date for the projection of these items.  It's been

4  many, many, many months for -- for many of these.

5          MR. ALEXANDER:  There's no items to be produced in

6  response to number 2.

7          MR. WITTELS:  What?  What did you say, counsel?

8          MR. ALEXANDER:  Are you referring to item or

9  romanette number 2?

10          MR. WITTELS:  Yes.  I mean the information that's

11  been requested.  We've been asking for the name of the

12  database housing this information for many, many months.  So

13  can we have a firm date on when Cross Country's going to

14  respond?  Yeah, and the reason we're asking --

15          MR. ALEXANDER:  Like I said, Your Honor --

16          MR. WITTELS:  -- the reason we're asking, Judge, is

17  because we had to make this -- we had meet and confers.  We

18  couldn't get information.  We had to take a motion.  And

19  today, or yesterday, we got information.

20          It's only when they're teeth are about out of their

21  mouth that they give us this information.  We don't want to

22  make motions if they produce this stuff.  They put us to the

23  task of doing it.  It's apparently a strategy.

24          MR. McINTURFF:  Just by way of background, we

25  requested this information as part of an informal meet and

102

1   confer process.  They demanded that we follow up with an

2   interrogatory.  We followed up with an interrogatory.  They

3   now still not produced the information.  The interrogatories

4   were in January.

5           MR. ALEXANDER:  Your Honor, I say that we can

6   provide this information in two weeks.

7           THE COURT:  All right.  Fine.  That'll be August 1st

8   -- I'm sorry, July 1st.  What am I talking about?  June 1st.

9           (Laughter.)

10           MR. McINTURFF:  Okay.

11           THE COURT:  See what you're doing to me?

12           MS. COHEN:  You're giving away our summer, Your

13   Honor.

14           THE COURT:  All right.

15           MR. WITTELS:  We've already requested Cross

16   Country's audited financial statements from 2013 to the

17   present.  We'd like a firm date on when that's going to be

18   produced.  Could we have June 1 for that, Judge, please?

19           MR. ALEXANDER:  Your Honor, if I may?

20           THE COURT:  Uh-huh.

21           MR. ALEXANDER:  They keep talking about their

22   punitive damages case.  They have a RICO case that has three

23   trouble damages.  They have a Consumer Protection Act cases,

24   most of which do not allow for punitive damages.  I'd like to

25   know what really justifies this at this point.

1          I mean this is intrusive information about the

2     company and the viability of their class claims on fraud are

3     at issue now in the motion to dismiss and so if and when they

4     need that, it can be provided at a later date but I certainly

5     don't think they need it now.

6          And the fact that they got a few years inadvertently

7     through an ESI production, it happens.  No large ESI

8     production I know of has ever gone off without something going

9     out it shouldn't or some minor mistake along the way but

10    they've got some information on this.

11         And I don't think they need any more information at

12    this point and it can be held until they have a viable

13    punitive damage claim.

14         MR. WITTELS:  Respectfully, Your Honor, we disagree

15    with counsel's characterization of the Consumer Protection

16    statutes.  Many of the Consumer Protection statutes that we're

17    bringing claims under, including some of the ones that Judge

18    have already -- Judge Garaufis has already sustained to allow

19    for punitive damages.  So --

20         MR. ALEXANDER:  No, they allow for multiple damages,

21    Your Honor.  Most of them do not allow for punitive damages

22    so --

23         MR. WITTELS:  New York has --

24         MR. ALEXANDER:  Very few.

25         MR. WITTELS:  New York has punitive damages.

1  California has punitive damages.  So --

2          THE COURT:  And those are sustained.

3          MR. WITTELS:  Those are sustained.  I went to a

4  trial, Judge, where we got punitive damages and one of the big

5  problems was the court said, well, why didn't you get the

6  financials during discovery?  And there was a big problem.

7  We're in discovery with five months left.

8          We're entitled to see that information.  They should

9  be ordered respectfully to produce them by June 1.  We have

10  viable claims.  They have not moved to dismiss of punitive

11  damages.

12          MR. ALEXANDER:  Yeah.  And that's what I did.

13  Again, Your Honor, I think that that would easily --

14          MR. WITTELS:  That was sustained.

15          MR. ALEXANDER:  -- be reserved.  This could easily

16  be reserved until the future date when they have a viable

17  class or --

18          THE COURT:  What?  I mean the problem is we're

19  proceeding to try to finish this in the next couple of months.

20  I have no idea when Judge Garaufis is going to rule on any of

21  these motions and I definitely don't want to table stuff

22  pending decisions on motions and then have that force us to

23  basically restart discovery all over again.

24          MR. ALEXANDER:  But, Your Honor, this is a very

25  discreet bit of information.  They're going to open discovery

1   on the finances because if it's just the -- if it's just the

2   documents with the information, that's very narrow and what

3   are they going to use it for between now and then?

4           I mean how does it lead to other information they

5   need?  How does it lead to anything they have to present for

6   purposes of deposition or for purposes of any motion that they

7   have to do?  It's simply a matter of a piece of information

8   that is relevant for their proof at trial if and when we get

9   to there.  So it's an easily --

10          THE COURT:  Okay.  But I guess I'm not --

11          MR. ALEXANDER:  -- cabined piece of --

12          THE COURT:  -- understanding what your objection is.

13  If it's stuff that you can easily produce and is clearly

14  something you're going to produce at some point --

15          MR. ALEXANDER:  It's not.  That's what's not so

16  clear.  That's the point, Your Honor.

17          THE COURT:  Are you moving to dismiss all of their

18  punitive damage claims?

19          MR. ALEXANDER:  No.  We're moving to deny a class --

20          THE COURT:  Okay.

21          MR. ALEXANDER:  -- on all their claims.  We'll be

22  moving for summary judgment.

23          THE COURT:  Yeah, but by that definition, 90 percent

24  of this stuff could be --

25          MR. ALEXANDER:  But yeah, but --

106

1           THE COURT:  -- could be held off on.

2           MR. ALEXANDER:  -- Your Honor, you know that

3  information about the ability to pay a judgment is handled

4  differently than other kinds of information because it's not

5  relevant to a defense.  It's not relevant to a liability.

6           THE COURT:  I completely agree with you, but you're

7  not talking about me ordering that discovery at the beginning

8  of this case.  You're talking about now, what, three months

9  away from the close of discovery in a case that's been going

10 on since 2013?

11          I mean I think we're at the point where everything

12 needs to be turned at this point.  I get your point about, you

13 know, maybe holding off on this until the end but it -- I mean

14 we're really getting close to the end at this point.  I'll

15 tell you what.

16          Why don't I give you -- I'll give you a little bit

17 of time to -- to produce it.  Why don't we say -- I mean what

18 are you going to use this for before trial?  Nothing, right?

19          MR. WITTELS:  Well, we're going to depose Walk.  I

20 don't know if we're going to use it with him.  He's the CFO.

21 I mean the CEO.  We might ask him about the finances.

22          THE COURT:  When are you deposing him?

23          MR. WITTELS:  Well, we probably --

24          (Counsel confer.)

25          MR. WITTELS:  Probably July.

 1              THE COURT:  Okay.

 2              MR. WITTELS:  So could we get it by June 15th

 3  please?

 4              THE COURT:  June 30th.  You're going to depose him

 5  in July, you'll have it by then.  I can't guarantee you that

 6  anything's going to change between now and June 30th, but

 7  frankly that's the -- the most I'm willing to hold off on it.

 8  Maybe you can get Judge Garaufis to rule on some of your

 9  motions before that, although I doubt it.

10              MR. WITTELS:  For --

11              MR. MORRISON::  Your -- I'm sorry, Your Honor.

12  Could I just interrupt for a second?  I'm sorry.

13              THE COURT:  Uh-hum.

14              MR:  I'm going to need to depart shortly.

15              THE COURT:  Okay.

16              MR. MORRISON::  Ms. Kumar will remain but I was

17  hoping that we could -- there's only two issues for Ocwen that

18  are listed remaining.  I don't think neither is an issue.  I

19  just wanted to confirm that there was no issue.

20              THE COURT:  Okay.

21              MR. MORRISON::  Investor concern (indiscernible -

22  3:12:17).

23              THE COURT:  That's fine.  Which ones?

24              MR. MORRISON::  Well, the plaintiffs to tell me if

25  they had any issue on their letter.

108

1          MR. WITTELS:  Counsel's correct.  Those issues are

2    -- there's one that's outstanding but the ball's in our court

3    on that.

4          THE COURT:  Okay.

5          (Counsel confer.)

6          MR. WITTELS:  Romanette 4, we received a response

7    early this morning.

8          THE COURT:  Okay.

9          MR. WITTELS:  There may be additional issues, but

10   right now it's not ripe.  If you can bear with me one second.

11         (Counsel confer.)

12         MR. WITTELS:  Okay, Your Honor.  Romanette 5 is

13   actually number 3 on the agenda letter that we submitted

14   yesterday and I can turn it over to my colleague, Ms.

15   Palikovic.

16         MS. PALIKOVIC:  Okay.  So the first one is providing

17   an answer to our question about who made the decision at Cross

18   Country to continue check solicitations.  We did receive a

19   response to that this morning, which I've not yet had a chance

20   to review.

21         So maybe we can table that and apprise you via

22   another letter if it's not sufficient or if there's any other

23   problems with it.

24         THE COURT:  Okay.

25         MS. PALIKOVIC:  The next one is -- so at the last

1    conference, Your Honor made a number of rulings about motion

2    to compel we had filed seeking essentially documents regarding

3    reasons given by other check solicitation partners for no

4    longer wanting to do check solicitation, reasons given to

5    Cross Country.

6            And Your Honor ordered Cross Country to produce a

7    limited number of subcategories that we were requesting.  We

8    had received a production, which is for lack of a better word,

9    a little bit confusing.

10           It has certain emails that are responsive to what

11   Your Honor ordered to be produced, limited emails, I would say

12   maybe 10, that discuss, out of several hundred, that discuss

13   where -- I'm sorry, internal Cross Country emails discussing

14   reasons given by other check solicitation partners or reasons

15   for stopping.

16           And then it also includes a lot of documents that

17   are basically different versions of documents that have

18   already been produced and were responsive to our initial

19   document requests and out ESI search terms that we had

20   negotiated.

21           So we're confused about why certain documents were

22   produced now but not before.  We're concerned about are there

23   other documents, other versions of chains, later responses to

24   chains that were produced that are being withheld.  And if so,

25   on what grounds.

1          So what we're really seeking with this one is why,

2    if we could get some kind of understanding from Cross Country

3    about how they -- how it is they search for these documents

4    and how they came up with them because we can't discern any

5    sort of logical way that these documents could've been arrived

6    at.

7          THE COURT:  I'm not even sure about which documents

8    you're talking about.

9          MS. PALIKOVIC:  So these are -- it's number -- it's

10   Page 2 of our agenda letter.  It's 3B and it's documents

11   showing the reasons given by other marketing partners for

12   stopping check marketing.

13         THE COURT:  Okay.

14         MS. PALIKOVIC:  If you'll recall at the last

15   conference, we had -- we had gone through.  We had sort of A

16   through D for every check partner, Huntington PHH, Option 1,

17   however else it was seeking various categories of documents

18   related to their -- their cancellations.

19         And Your Honor ruled, if I may paraphrase you to

20   you, that basically anything showing the reasons expressed to

21   Cross Country by any of those partners --

22         THE COURT:  Right.

23         MS. PALIKOVIC:  -- would be relevant and should be

24   produced.

25         THE COURT:  Okay.

1        MS. PALIKOVIC:  So that's what this production

2   should've -- should've included.

3        THE COURT:  Okay.

4        MS. PALIKOVIC:  However, the production doesn't

5   include any documents from prior check partners and it only

6   includes a limited number of documents, internal Cross Country

7   documents referencing campaigns, nothing that really gives us

8   an answer.

9        What my question is, is how this production was

10  arrived at.  It just doesn't make any sense.  It doesn't seem

11  to be totally responsive to what Your Honor ordered to be

12  produced and it includes a lot of documents that are not

13  necessarily responsive to what you ordered to be produced that

14  have to do with analysis of Ocwen cancellation reasons in the

15  Summer of 2013 and retention efforts by Harold Zuckenick

16  (phonetic) with respect to Ocwen.

17       So documents that are not responsive to what you

18  ordered to be produced, but that would've been responsive

19  months ago when documents that were more logically grouped

20  with them were produced.

21       MR. ALEXANDER:  Your Honor, I can provide some

22  clarity as to what was produced and why communications by PHH

23  Huntington and GMAC were likely not produced.  But I don't

24  believe that plaintiffs are entitled to discovery into our

25  discovery processes themselves.

112

1            We reviewed many thousand documents and produced 130

2      documents, far fewer families.  The mast majority of those

3      reflected communications about PHH Huntington or GMAC's

4      indication that they were no longer going to market by check.

5      All this have been produced.

6            THE COURT:  Okay.

7            MR. ALEXANDER:  In reviewing those thousands of

8      documents, we came across several or I believe it's fewer than

9      25 Ocwen 1 -- or, excuse me, Option 1 documents that are

10     responsive to the greater review.  And even though they may be

11     duplicative or similar to documents that were previously

12     produced, we produced those in abundance of caution.

13           MS. PALIKOVIC:  They're not duplicative or similar.

14     I mean they're documents that should've been produced and

15     hadn't been produced.

16           MR. ALEXANDER:  Understood.  And in the process of

17     reviewing several thousand documents, we found -- I believe

18     the number is only 25 and those were produced.  With respect

19     to why there are few communications directly from PHH, GMAC or

20     Huntington, that's likely the cause -- it's likely because

21     Cross Country worked directly with their broker in

22     communicating to those entities and received all of their

23     information from that broker regarding the entity's decisions

24     to move forward with campaigns or not to.

25           THE COURT:  And were the communications from the

113

1  broker part of the production?

2          MR. ALEXANDER:  That's correct.  They were.

3          THE COURT:  Okay.  But presumably you wouldn't have

4  the communications between the entities and the broker.

5          MR. ALEXANDER:  That's correct.

6          THE COURT:  Okay.  Did you identify who the broker

7  was?

8          MR. ALEXANDER:  The broker is WMC and they've

9  already received discovery in this -- in this case.

10          THE COURT:  Remind me never to schedule these during

11  lunchtime.

12          MR. McINTURFF:  Does Your Honor want to take a

13  break?

14          THE COURT:  No, I'd rather finish.

15          (Laughter.)

16          MR. McINTURFF:  Yeah.

17          MS. COHEN:  Let's just move -- let's move.  The next

18  one is a Cross Country (indiscernible - 3:20:52).

19          THE COURT:  All right.

20          MS. PALIKOVIC:  Before we move on, this raises a

21  concern for us because it appears that a review of -- I'm not

22  sure how many you said, but I believe it was about 1,000

23  documents.

24          MR. ALEXANDER:  I said many thousands.

25          MS. PALIKOVIC:  Many --

114

1              THE COURT:  How many thousands?

2              MS. PALIKOVIC:  -- many thousands.

3              MR. ALEXANDER:  Again, are you entitled to discovery

4    into our discovery process?

5              THE COURT:  When you're producing documents three

6    years after when you should've produced them, it -- it raises

7    some red flags for us.

8              MS. PALIKOVIC:  And some of these are really

9    pertinent documents that were just really glad to have gotten

10   our hands on, but it's a little bit alarming that we got them

11   through a completely random production that Your Honor may or

12   may not have ordered to be produced.

13             MR. McINTURFF:  Your Honor, this was --

14             MS. PALIKOVIC:  And this was just a -- not the

15   normal course in which you receive documents.

16             MR. McINTURFF:  Yeah, Judge, we need to sit and

17   discuss the process.  When you find -- when you order

18   something that should've -- that we get and it was

19   discoverable and it's key helpful documents that obviously,

20   you know, are probative, what -- how do we deal with the fact

21   that they're -- the way they reviewed the documents was

22   obviously not proper because they should've produced them.

23             MS. PALIKOVIC:  And also the way they produced the

24   documents.  I mean they sort of seemed to have packaged these

25   documents that should've been produced earlier along with

1  this production.  They didn't say this is responsive to X or

2  counsel, we wish to inform you that we found an additional 25,

3  but don't be alarmed.  We've adequately QC'd the rest of the

4  production.

5         They just sort of snuck them in there and if we

6  hadn't brought it up, we wouldn't have even known that these

7  were actually not responsive to Your -- to Your Honor's ruling

8  from last week but responsive to document requests from months

9  or years ago.

10         MR. ALEXANDER:  Your Honor, I have never been in a

11  major production --

12         THE COURT:  Has anyone heard of a telephone?  I mean

13  I don't understand why you don't pick up the phone and, if you

14  have questions about it, and talk to each other.  I mean why

15  do we have to argue about this stuff in court?

16         MR. McINTURFF:  Because we don't get answers, Your

17  Honor.  We don't get straight answers.

18         MR. WITTELS:  We do that.  That's why we get into

19  these motions because we -- we ask repeatedly with -- first to

20  set up a meet and confer is agony and then when we finally get

21  it, we're not giving it to you.  That's usually what we hear.

22  And we don't have to tell you.  That's usually what we hear.

23  That's why we have so many motions.

24         MR. ALEXANDER:  And these are documents you get and

25  so you're just ignoring them.  Your Honor, there is no major

116

1   ESI production on Earth that has ever been 100 percent

2   accurate.  None.  They have done study after study after

3   study.  This is 20 documents out of more than 100,000

4   documents.

5           I mean it's a minuscule number and they don't want

6   us to be --

7           THE COURT:  What are they?  Are they emails?  What

8   kind of documents?

9           MR. ALEXANDER:  Yeah.  They're a few emails, 20

10  emails.

11          THE COURT:  Okay.

12          MS. PALIKOVIC:  Emails, presentations from --

13  there's actually an email -- sorry, several drafts of

14  presentations where Sandy Finn discusses the reasons given by

15  other check market -- the panic expressed by other check

16  marketers about continuing to do this.

17          MR. ALEXANDER:  And you know we asked her at her

18  deposition, "Did you -- what did other people say?"  "I don't

19  know.  I don't know what they said."  They emails to this

20  effect.  I couldn't even impeach her with that.

21          Now I find out after a second deposition that

22  producing emails regarding Sandy Finn, that's -- that's -- I

23  don't understand that.  That's not legitimate.

24          THE COURT:  These are emails from Sandra Finn

25  regarding this stuff?  Are they just not -- I don't know.  I

117

1    mean I understand obviously when you're using search terms and

2    limiting documents, sometimes not everything gets captured but

3    I would think that Sandra Finn's emails regarding check

4    solicitations would be something that would pop up.

5              MR. ALEXANDER:  If I'm not mistaken, isn't this the

6    2007, 2009 time frame?

7              MR. ALEXANDER:  This is the 2005 to 2010 time frame.

8              THE COURT:  Okay.

9              MR. McINTURFF:  That's also news to us, Your Honor.

10   They slipped it into production.  They didn't notify us --

11             MR. ALEXANDER:  These --

12             MR. McINTURFF:  -- that it was even there.

13             MR. ALEXANDER:  These were documents that were

14   discovered in connection with that very review --

15             MS. PALIKOVIC:  But why wouldn't you --

16             MR. ALEXANDER:  -- and we identified that --

17             MS. PALIKOVIC:  -- just note that in an email and

18   let us know?

19             MR. ALEXANDER:  In the email, we stated that these

20   were documents produced in response to Judge Tiscione's order

21   and to the review -- or and to just other discovery.

22             THE COURT:  I mean that's a very ambiguous way of --

23             MR. ALEXANDER:  Well --

24             MS. PALIKOVIC:  No.  That's --

25             THE COURT:  Yeah.  Identifying that you found other

1   documents that were related to previous discovery requests

2   that should've been produced and you just found them now.

3   Look, I get it.  ESI production is never 100 percent accurate

4   but I still think you should've identified what those were

5   instead of just included them in the production of something

6   else.

7          MR. ALEXANDER:  In the future, we'll identify any

8   supplement productions.

9          UNIDENTIFIED SPEAKER:  Judge, could we take a

10  bathroom break.

11         MS. COHEN:  We --

12         UNIDENTIFIED SPEAKER:  And come back.  We'll finish.

13  I mean I think the other motions -- well (indiscernible -

14  3:26:02) if you plan on doing those.

15         MR. ALEXANDER:  We need to have those discussions.

16  You know, we're learning --

17         THE COURT:  Can we finish just this part first

18  before?  And then just take a break before the next motion?

19  What's left in this.

20         MR. McINTURFF:  Your Honor --

21         MR. ALEXANDER:  That's been produced.

22         MR. McINTURFF:  -- our proposed solution to this is

23  I'll test the rest.  Defendants have -- they collected

24  documents.  They produced certain documents as responsive and

25  they -- the other documents they did not produce.

119

1          We propose that the defendants collect and produce a

2    statistically significant number of documents that they

3    initially marked as non-responsive or not relevant and -- and

4    turn them over so we can get a handle on the scope of -- of

5    yes, no ESI production is perfect but how imperfect this one

6    is because the documents that -- that were recently produced,

7    it's very troubling to us that these documents were -- were

8    held back from discovery.

9          And this is not the first time we've had issues with

10   defendants' view of what documents were supposed to be

11   produced.  So we would ask that --

12          THE COURT:  Look.  I don't have anything in front of

13   me.  I don't have the documents.  Let's table this for another

14   time.  If you want to make a motion, make a motion or see if

15   you can work it out.

16          MR. ALEXANDER:  With respect to romanette number 6,

17   we've already produced this document and with respect to

18   romanette number 7, I believe that we've reached agreement on

19   the depositions of Tammy Throm (phonetic) and Joan Kadella

20   (phonetic).

21          THE COURT:  Okay.  And the Ocwen ones you said were

22   dealt with, correct?

23          MR. MORRISON::  Yes.

24          MR. ALEXANDER:  That's correct.

25          THE COURT:  All right.  If you want to take a 10

120

1    minute break for a bathroom break, we'll deal with the other

2    motion.

3                        [Pause in proceedings.]

4              THE COURT:  All right.  So are we ready to move on

5    to the other motion now?

6              MR. WITTELS:  There was one item, Your Honor, that

7    we neglected to mention.  My colleague, Ms. Palikovic, is

8    going to talk about it.  This relates to the letter we filed

9    yesterday in continuation of what we're discussing, that

10   number 3 on Page 2, of the letter.

11             MS. PALIKOVIC:  It was just subpart C.  Cross

12   Country was going to confirm whether any documents related to

13   the GMAC subpoena were being withheld on privilege grounds.

14   This is something that they had agreed to do during our last

15   conference and we're just following up.

16             MR. ALEXANDER:  Your Honor, I can answer that.  In

17   connection with our review for the PHH Huntington and GMAC

18   documents, we identified two documents that had not been

19   previously marked responsive and that -- that are privilege

20   that we do intend to add to our privilege log.

21             THE COURT:  Okay.

22             MR. ALEXANDER:  And our current privilege log that

23   existed at the time of that conference does not contain any

24   other documents related to GMAC subpoena except for several

25   documents that have been redacted and produced.

121

1          THE COURT:  Okay.  So you'll update the privilege

2     log accordingly to add those -- those documents?

3          MR. ALEXANDER:  That's correct.

4          MR. WITTELS:  If we could have a firm date on that,

5     Your Honor?

6          THE COURT:  June 1 like the others.  Can you do that

7     by June 1st to add to -- what is it, two documents, the

8     privilege log?

9          MR. ALEXANDER:  That's correct.

10          THE COURT:  Okay.

11          MR. ALEXANDER:  Yes.

12          THE COURT:  All right.  So do that by June 1st.  All

13     right.  That brings us to Document 295.

14          MS. PALIKOVIC:  I'll try to keep it brief.  We're

15     moving to compel because we don't believe that the responses

16     from Cross Country Group, either their responses nor their

17     production, satisfy Cross Country Group's obligations under

18     the federal rules.

19          The responses are boiler plate identical responses

20     to each of those six main categories.  Documents that we're

21     seeking literally identical.  They contravene the December

22     2015 amendments to the federal rules insofar as they don't

23     state -- they make the objection that the requests are over

24     broad but they don't state how they're over broad nor

25     construed in a way that is not over broad.

122

1          And they also don't state whether they are

2   withholding any documents.  So this makes it impossible for us

3   to determine how they arrived at the production that they gave

4   us or what it is that -- how they construed response in this

5   or how they interpreted our -- our requests in responding to

6   them.

7          And you know they didn't interpret them in the way

8   that we meant for them to be interpreted because it's a very,

9   very limited production consisting mostly of these monthly

10  financial reports.

11         It's a production of I think about slightly over 200

12  documents, most of which are these monthly financial reports

13  that just get sent out to the same number of people and

14  there's no comments.  Nothing.  It's just something that's --

15  that's received in a boilerplate fashion by a bunch of people

16  at Cross Country Group.

17         So that's with respect to the responses.  Basically

18  they make it impossible for us to have a meaningful

19  conversation about what's being produced and what's being

20  withheld.

21         With respect to the production itself, it seems to

22  have all kinds of deficiencies indicia of a strange -- strange

23  interpretation of relevance in responsiveness in this case.

24  For example, there's no documents from 2004 to 2008.  We've

25  asked counsel to explain that.  They said they would.  We

1   haven't gotten a response.

2          Another thing is the, again, the vast majority is

3   these monthly financial statements, which strange codility to

4   think that check solicitations were just not discussed among

5   the top brass of Cross Country Group to a greater extent.

6          And then the third one is that defendants have just

7   -- sorry, Cross Country Group has completely refused to talk

8   to us about anything regarding this process.  So they've

9   refused to identify custodians who may have relevant data or

10  non-custodial sources.

11         They've refused to provide a hit report that

12  basically any kind of conversations that -- that might lead to

13  a fruitful compromise on this issue, which is why we find

14  ourselves before you, Your Honor.

15         So I'll ask for this because we're trying to find

16  some -- some common ground or some -- some way to, I guess,

17  get out of where we find ourselves now, which is not asking

18  Cross Country Group to produce all 10,000 documents that they

19  said the search terms pulled up.

20         We're asking them to provide a hit report based on

21  the search terms that they said that they had used and produce

22  a relevancy log that would enable us to test their claims of

23  irrelevance and non-responsiveness and cooperate fully in the

24  collection of production of its ESI.

25         So that, again, would be discussions about who they

124

1    -- they collected documents from or who they didn't collect

2    documents from, non-custodial data sources and the like.

3              THE COURT:  All right.

4              MR. ALEXANDER:  If I can be heard, Your Honor?

5              THE COURT:  Uh-hum.

6              MR. ALEXANDER:  Thank you.  There's a number of

7    things to be said.  Bear with me.  Let's take it -- let's take

8    the easy one first.  The emails for Cross Country Group only

9    go back to 2008.  The fact that we found emails back in time

10   beyond 2008 was just because some emails were attachments to

11   other emails, not necessarily email strings but attachments.

12             And so we found some emails back beyond 2004, but we

13   didn't find anything in 2004 to 2008 because basic email

14   repository only goes back ton 2008.  So that's the reason for

15   that.

16             They seem to think that Cross Country Group would

17   have a lot of emails about the subject of check marketing.

18   That's a fallacy that they continue to operate under.  Check

19   marketing was a very small part of the business of Cross

20   Country Home Services.

21             Cross Country Group provides advisory services.  It

22   is not the parent corporation to Cross Country Home Services.

23   They know that.  We've told them many times.  They seem to

24   ignore it conveniently from time to time.

25             The people that were pulled were discussed with them

125

1    is the people in the subpoena; Mr. Graham, Mr. Sharnak

2    (phonetic), Mr. Walk and Mr. Jones by separate subpoena, and

3    all their emails were pulled and then searched for the terms

4    relating to check marketing basically, anything to do with

5    check marketing.

6           And it's true that we didn't reproduce documents

7    that have already been produced because a sender or receiver

8    at Cross Country had already produced the document that was a

9    sender or receiver from a corresponding person from the

10   advisory group for Cross Country Group -- advisory board for

11   the Cross Country Group.

12          So there were 10,000 emails that were found as a

13   response to the terms, but only a small number, about 800, you

14   know, pages were responsive to their actual request.  Again,

15   after de-duplication because some of them would've been

16   duplicated from emails that have already been produced.

17          So we don't think that it's appropriate to do

18   discovery into discovery.  They have no basis to believe that

19   -- that we're doing anything other than trying to find the

20   documents they've asked for.

21          When we give them additional documents that we find

22   pursuant to whatever exercise we're going through we've turned

23   over, that's just creating more controversy.  Nothing's

24   perfect, but the point of the matter is that there is no

25   reason on Earth why a listing of all non-responsive documents

126

1   should be called for in this case.

2          That would be a precedential thing way out of

3   proportion and really not leading to anything productive here.

4   They have received all the -- all the emails and attachments,

5   the families, complete even if some of the attachments or

6   other families were not relevant to their questions for the

7   subpoena of the documents that they wanted.

8          They all have to do with check marketing from Cross

9   Country Home Services.  There's not much, but that's what

10  there is and they just don't like it but that's all there is.

11         MS. PALIKOVIC:  Your Honor, if I can -- if I may add

12  something.  The reason we're seeking to do discovery into

13  discovery, in quotes, is because we didn't have a proper

14  conversation when these documents were produced.  This is,

15  we're doing discovery into discovery now because I think Cross

16  Country Group didn't comply with its obligations under the

17  federal rules.

18         We were supposed to have discussed these things.  We

19  were supposed to have received information.  We were supposed

20  to have received robust responses that explain how you define

21  responsiveness, which even in your letter, and I struggle to

22  understand what you mean by this, you put responsive in

23  quotes.  I don't -- I truly don't know what that means.

24         If we had received robust responses and a production

25  of 234 documents and an explanation that you don't keep emails

1    -- emails prior to 2008, then maybe we wouldn't -- that

2    wouldn't have sort of gotten our antennae up.  But we didn't.

3              This is you -- both things are deficient in our

4    view.  Your responses say absolutely nothing.  We don't know

5    what you're withholding or on what basis and then this

6    production is just struggle to believe that all there is is

7    monthly reports that nobody comments on.

8              And yet, Cross Country has produced emails where

9    people are discussing checks and the importance of renewals

10   and whether to pursue this marketing method or not.

11             And yet, you have an answer to that, which is that

12   you de-duped those against this but it's -- it just seems,

13   frankly, convenient that the only email communications about

14   this check marketing method over the period of over 10 years

15   happened to be the ones that you've already produced from a

16   completely separate computer and email system at a different

17   company.

18             MR. ALEXANDER:  It's not convenient.  That's the way

19   it would work.  In other words, if there's emails from one

20   company to the next company that if the first company hasn't

21   -- that's the same repository of emails from the second

22   company.  There's nothing nefarious or --

23             MS. PALIKOVIC:  No, then --

24             MR. ALEXANDER:  -- unusual about --

25             MS. PALIKOVIC:  -- that's not how --

 1            MR. ALEXANDER:  -- that, Your Honor.

 2            MS. PALIKOVIC:  -- each company keeps its own copies

 3    of its -- of its emails, so Cross Country Group's had a

 4    separate -- separate repository of emails that it's -- it's

 5    really astounding that they happen to have exactly the same

 6    kind of email chains that were already produced in this other

 7    production by this other company.

 8            THE COURT:  Well, the only thing that would've have

 9    been presumably already captured would've been, I guess,

10    internal communications that weren't with anyone from the

11    defendants that have already produced --

12            MR. ALEXANDER:  That's correct, Your Honor.

13            THE COURT:  -- the records.

14            MR. McINTURFF:  And follow up --

15            MR. ALEXANDER:  There are very little.  They're

16    just, this is not the issue of momentous proportions that the

17    plaintiffs would like to think that captured the imagination

18    of everyone of the -- on the board of advisors out of Cross

19    Country Group.  It just wasn't.

20            MR. WITTELS:  But Cross Country Group will not

21    produce a hit report showing the search terms and what

22    documents they pulled.  Cross Country Group will not revise

23    its responses to the subpoena in accordance with the federal

24    rules.

25            Cross Country Group, when they met and conferred

129

1   with us told us that they were standing on their objections

2   and they've fully complied with the rules.

3             MR. ALEXANDER:  Cross Country Group is not a party

4   to this lawsuit, Your Honor.  They're a third party.  They are

5   -- sure, they have to abide by the federal rules, just like

6   they do.  But the same kind of discovery burdens and

7   extensiveness for these kinds of things just don't apply to a

8   third party.

9             MS. PALIKOVIC:  We're not talking about --

10            MR. ALEXANDER:  And so I don't know why they need a

11  hit report.  I don't know why they need all this other kinds

12  of extraneous sort of subsidiary or ancillary information for

13  this.

14            We've -- we have searched in good faith for

15  documents in the -- in the Cross Country email domain that had

16  anything to do with check marketing at Cross County Home

17  Services.  And it just --

18            MS. PALIKOVIC:  But if you were searching for

19  anything that had to do -- anything to do with check

20  solicitations, that would've been covered by a request and

21  then your objection that they were over broad would --

22  would've been unnecessary.

23            But you did object that they were over broad and we

24  want to know in what sense.  How were they over broad?

25            MR. McINTURFF:  And you --

130

1        MR. ALEXANDER:  Well, no.  If that's what the issue

2   is, Your Honor, we'll -- we'll amend the answer if that's what

3   the issue is.

4        MR. WITTELS:  Well, no.  The issue is also --

5        MS. PALIKOVIC:  To what terms?

6        MR. WITTELS:  -- you didn't -- you didn't tell us

7   where you looked.  You didn't ask --

8        MR. ALEXANDER:  We don't have to tell you where we

9   looked.  We've looked --

10       MR. WITTELS:  You do.  You do.

11       MR. ALEXANDER:  We've looked.  You've subpoenaed the

12  company and you subpoenaed the -- the individuals.

13       MR. WITTELS:  That's part of your obligations under

14  best practices for electronic discovery, we were supposed to

15  have an open and transparent conversation about where you're

16  going to look, which you did not do.

17       You didn't tell us that you were limiting your

18  custodians to just the people who -- who were subpoenaed and

19  you didn't produce a hit report that would give us any idea of

20  how out of more than 10,000 documents only 344 are responsive.

21       MR. ALEXANDER:  Because you're --

22       MR. WITTELS:  Or non-duplicative.

23       MR. ALEXANDER:  -- that are non-duplicative.  And

24  because your list of inquiries is over 30,000 requests, your

25  terms.  That's how you get such a high number.  It's over

131

1   broad to begin with.

2           (Counsel confer.)

3           MR. ALEXANDER:  We're not -- we are not holding back

4   out, of any email that we reviewed, anything to do with check

5   marketing.

6           MS. PALIKOVIC:  Why are we playing these games?

7   Why?

8           MR. ALEXANDER:  Yeah.  Why are we playing --

9           MS. PALIKOVIC:  I mean why can't you --

10          MR. ALEXANDER:  -- these games?

11          MS. PALIKOVIC:  -- just tell us --

12          MR. ALEXANDER:  Exactly.

13          MS. PALIKOVIC:  -- how they were over broad?  What

14  was withheld on the basis of non-responsiveness that was

15  pulled up by the search terms.  There had to have been some

16  kind of macro high level --

17          MR. ALEXANDER:  Yeah.  But didn't --

18          MS. PALIKOVIC:  -- directions --

19          MR. ALEXANDER:  -- have anything to do --

20          MS. PALIKOVIC:  -- that were given --

21          MR. ALEXANDER:  -- with check marketing and it

22  didn't have anything to do with --

23          MS. PALIKOVIC:  -- well, then why --

24          MR. ALEXANDER:  -- check marketing.

25          MS. PALIKOVIC:  -- but then your objection, which

132

1    you've made repeatedly and 12 separate times, was completely

2    unnecessary and false.

3                MR. ALEXANDER:  That's what you're saying.  If this

4    is the -- if the issue is your --

5                MS. PALIKOVIC:  That's what you're saying.

6                MR. ALEXANDER:  -- the nature of the answer, then

7    we'll amend our answer.

8                MR. WITTELS:  Now, Judge, the issue is that we're

9    now getting documents on the eve of the discovery close that

10   should've been produced three and a half years ago in the main

11   case and now we have the same counsel representing a different

12   company saying, "We don't have to comply with the ESI

13   obligations because we're a third party," making up that

14   construct, which is not true, refusing to give us a hit report

15   and we are suspicious that we're not getting the discovery

16   we're entitled to because they've taken an overly descriptive

17   review and didn't do a proper review.

18               We want to -- we want proper discovery.  We want to

19   see the hit report.  We want what we're entitled to.  We don't

20   want to hear that they're a third party when it's basically

21   the same individuals involved.  Walk's the CEO.  He worked for

22   Cross Country Home Services.  He was the president.

23               And now all of a sudden, he's trying to hide behind

24   Cross Country Group.  I don't think so.

25               MR. ALEXANDER:  There's no hiding here, Your Honor.

133

1  And this hit report that they're talking about, a hit report

2  was used to come up with the -- more than 30,000 search terms

3  that were agreed to or be applied to this third party.

4          MR. WITTELS:  How could there be 10,000 documents

5  with a hit and -- and none of them are responsive except for

6  300.  Doesn't make sense.

7          THE COURT:  So you agreed on the search terms.  You

8  did the search and you got 10,000 documents, is that accurate?

9          MR. ALEXANDER:  Ten thousand that came back

10  responsive to their terms basically.  Over 30,000 --

11          MR. WITTELS:  What, basically?

12          MR. ALEXANDER:  Yes.

13          MR. WITTELS:  No, no, we agreed exactly.

14          MR. ALEXANDER:  Yeah.

15          MR. WITTELS:  Was it exactly or was it basically?

16          MR. ALEXANDER:  Well --

17          MR. McINTURFF:  It was exactly.

18          MR. ALEXANDER:  -- when you say it was exactly the

19  search terms, but to the degree to which it was negotiated was

20  forced down our throat from Judge Levy.  He didn't put any

21  restriction on it.  I mean 10,000 search -- 30,000 search

22  terms is an outrageous number of search terms, but that's what

23  we did.

24          Whatever we were forced to agree to in the basic --

25  and the Cross Country Home Services case were used for the

134

1   Cross Country Group email search.

2          THE COURT:  Okay.  And that produced 10,000 hits

3   basically?

4          MR. ALEXANDER:  Ten thousand hits basically, Your

5   Honor.

6          THE COURT:  And then from that 10,000 hits, you

7   removed any duplicate --

8          MR. ALEXANDER:  Removed --

9          THE COURT:  -- lines that were --

10          MR. ALEXANDER:  -- duplicates and --

11          THE COURT:  -- already produced.

12          MR. ALEXANDER:  -- that didn't have anything to do

13   with check marketing.

14          MS. PALIKOVIC:  When you say check marketing, are

15   you referring only to check marketing with Ocwen or with any

16   of the --

17          MR. ALEXANDER:  Anything with check --

18          MS. PALIKOVIC:  -- prior check solicitation?

19          MR. ALEXANDER:  Any check marketing.

20          MR. McINTURFF:  Who's the person who did this, you,

21   Bruce, or Mr. Trabon or who in the company?  Because we didn't

22   have any discussions with you, right?

23          MR. ALEXANDER:  No.

24          MR. McINTURFF:  So how do we know --

25          MR. ALEXANDER:  Yeah.

135

1          MR. McINTURFF:  -- you're telling us stuff.  You

2   wouldn't even talk about it with us, so you weren't on the

3   phone.  How do you know this is -- did you look at any

4   documents?  Did you look at any of the 10,000 document?

5          MR. ALEXANDER:  Yes.

6          MR. McINTURFF:  Because you're making

7   representations.

8          MR. ALEXANDER:  I have looked at some of them.

9          MR. McINTURFF:  How many did you look at?

10          MR. ALEXANDER:  And I'm not going to be answering

11   your questions because I'm not a witness here and that's the

12   whole point of this is --

13          MR. McINTURFF:  The whole point is he's --

14          MR. ALEXANDER:  -- we want to have discovery into

15   discovery or what --

16          MR. McINTURFF:  He's not the --

17          MR. ALEXANDER:  -- on this issue?

18          MR. McINTURFF:  -- one with knowledge, Judge, and

19   they're -- they're making statements without giving us full

20   disclosure here.

21          MR. ALEXANDER:  The full disclosure is, they have

22   all the documents that concern check marketing that could be

23   found from the search.

24          MR. McINTURFF:  With who?  Only Ocwen?  What about

25   the other?  What about the other --

136

1          MR. ALEXANDER:  It wasn't --

2          MR. McINTURFF:  -- companies?

3          MR. ALEXANDER:  It wasn't restricted by company.

4          MR. McINTURFF:  Is that true, Mr. Trabon?

5          MR. ALEXANDER:  Don't answer that.  What?  Who the

6     hell do you think you are?

7          MR. McINTURFF:  Do you mind not cursing?

8          MR. ALEXANDER:  You mind not being an asshole?

9          (Laughter.)

10         MR. McINTURFF:  All right, Judge.  You know, I would

11    like to maybe have him sanctioned for commenting that way on

12    the record.

13         MR. ALEXANDER:  Please.  I'd like to have him

14    sanctioned for attempting to make a witness out of -- of an

15    attorney.

16         MR. McINTURFF:  I mean that's improper -- improper

17    conduct of a lawyer on the record, bad enough a lawyer --

18         MR. ALEXANDER:  Right, very improper conduct.

19         MR. McINTURFF:  Yeah.  You know, Your Honor, this is

20    improper for him to speak this way and --

21         MR. ALEXANDER:  It's improper for him to be asking

22    these kinds of questions.

23         MR. McINTURFF:  Really?

24         THE COURT:  Stop.

25         MR. McINTURFF:  And to call people --

137

1          THE COURT:  Stop.

2          MR. McINTURFF:  -- curse -- to curse people on the

3     record --

4          THE COURT:  Stop.

5          MR. McINTURFF:  -- Judge?  I mean that's crazy.  If

6     you can't control yourself, Bruce, maybe you should find

7     another profession.

8          MR. ALEXANDER:  Follow your own advice.

9          (Pause.)

10         THE COURT:  How many of these.  Do you know how many

11    of these documents were of the 10,000 were not produced

12    because they were duplicative of stuff that was already

13    produced.

14         MR. ALEXANDER:  I do not have the answer to that

15    particular question, but I can certainly get that for you,

16    Your Honor.

17         THE COURT:  Find that out because if the -- the

18    reason that the bulk of them weren't produced was because

19    they're duplicative, I don't think you need to produce them

20    again.

21         (Pause.)

22         THE COURT:  I mean I think we need to have some

23    basic information just about what -- what was actually

24    searched in terms of I think you mentioned you searched the --

25    for the emails for the individuals that were listed on the

138

1  subpoena, is that correct?

2          MR. ALEXANDER:  Correct, Your Honor.

3          THE COURT:  Okay.  So I want -- why don't you find

4  out -- figure out how much of that 10,000 was not produced

5  because it was duplicative.

6          MR. ALEXANDER:  Yes, Your Honor.

7          THE COURT:  And what other information are you

8  looking for in terms of --

9          MR. McINTURFF:  We'd like a hit report showing which

10  documents were pulled by the search terms and which were

11  unique because that will give us an -- insight into the type

12  of documents were pulled.

13          So, for example, one of the search terms is check

14  package, which is how the defendants referred to check

15  solicitations in their communications.  So we want to see how

16  many documents containing the word check package and they're

17  -- they're -- these are pre-negotiated search terms and when

18  you see the hit report, you see how many documents were

19  recalled by those terms.

20          You also see how many unique documents were recalled

21  by a particular term.  So then that shows that the document

22  is, you know -- that other -- if it, but for that term you

23  wouldn't get the document.  It shows the overlap so you can --

24  you get an idea about what is being produced or -- or what is

25  being recalled and that will give us insight into this 332

1   documents that were produced out of 10,000.

2        THE COURT:  The 30,000 search terms, is that -- that

3   was the -- those are the same search terms that were used for

4   production in the underlying case, correct?

5        MR. WITTELS:  That's correct, with Cross Country

6   Home Services.

7        THE COURT:  So there was no limitation.  I mean --

8        (Pause.)

9        THE COURT:  You've got to give them some explanation

10  as to why that number is so low.  If the explanation is that

11  the vast majority of the stuff was just duplicative, I mean

12  that might be the answer but from 10,000 to, you know, 300 or

13  so is a fairly significant drop off.

14       So the part of the problem might be the search

15  terms, which is too over broad in the first place, but, you

16  know, I'm not going to go through 10,000 documents to figure

17  out whether that's the case.

18       MR. WITTELS:  Your Honor, we're asking that the

19  defendants update their answers, responses and in -- in

20  accordance with the federal rules where they identify whether

21  they're withholding documents.

22       What they think is so broad about the request and

23  what is not and what they consider to not be overly broad so

24  that we have an idea on -- on what, for example, are the basis

25  that they're -- they're using to determine that a document is

1  -- is either irrelevant or non-responsive.

2         THE COURT:  Well, I think they just told you.  They

3  said they had limited it to just things that mentioned check

4  solicitation.  Is that the only limitation or did you remove

5  stuff for other reasons?

6         MR. ALEXANDER:  No, it was based -- well, check

7  marketing, check solicitation, check packaging and anything to

8  do with check marketing.

9         MR. WITTELS:  There were no other grounds that you

10 excluded a document?  That was the only criteria that was

11 used?

12        MR. ALEXANDER:  Was the criteria used to produce the

13 document.  Everything else was excluded.

14        THE COURT:  Meaning if it had to do with check

15 marketing --

16        MR. ALEXANDER:  It was --

17        THE COURT:  -- check solicitations --

18        MR. ALEXANDER:  Right.

19        THE COURT:  -- check packages, that kind of stuff?

20        MR. ALEXANDER:  It was produced.  Right.

21        MR. McINTURFF:  Then a hit report should reflect

22 that.  I mean we'll see all the documents that mention the

23 word check package or check solicitation.

24        THE COURT:  What is this hit report?  Is this

25 something that get self-generated when you use the software?

1          MR. TRABON:  A hit report is basically a report of

2   any hits on any search terms that were applied to the

3   documents that are being looked at.  And so it's a listing of

4   all the search terms and the corresponding number --

5          THE COURT:  How many documents for each one?

6          MR. TRABON:  Yes, that's correct.

7          THE COURT:  Okay.

8          MR. ALEXANDER:  And they overlap and then as he

9   said, you know, they will overlap unless they are indicating

10  as unique.

11         MR. McINTURFF:  And also a hit report says how many

12  documents are in the same family like an attachment or

13  otherwise related -- a reply to an email.

14         THE COURT:  All right.  Let's --

15         MR. ALEXANDER:  Your Honor, we're prepared to go

16  back and provide the explanation you're talking about, update

17  our answers if that pleases the Court and confirm the

18  information in writing that I've just informed the Court.  I

19  don't think there's anything else to be done.

20         MR. McINTURFF:  We think there are a couple of more

21  things to be done.   The defendants haven't identified, or

22  Cross Country Group has not identified its sources of

23  electronic information, non-custodial electronic information.

24  In other words, where electronic information is housed that is

25  not in someone's email inbox, shared files, other types of

142

1   electronic -- relocation of electronic information.  We don't

2   know where Cross Country -- we don't know what Cross Country

3   Group has in terms of these electronic repositories, for one.

4   And two, we don't know what was searched.  So we need a list

5   of everything that the company has in terms of where

6   electronic documents are located.  And then two, we need the

7   defendants to tell us in which of these repositories was a

8   search conducted.  And then thirdly, Cross Country Group

9   didn't participate with plaintiffs in a discussion about the

10  ESI custodians.  Other than these individuals, we don't know

11  Cross Country's view on who may or may not have discoverable

12  documents and electronically stored information.  And it's the

13  defendants who -- or it's Cross Country Group and their

14  counsel who knows, who has this information and it's not our

15  burden to figure it out and tell them.  They  need to tell us.

16  They're the ones closer to the information.  So we need to

17  know the individuals that they believe that could potentially

18  have discoverable information.

19          So for one example my counsel, Mr. Wittels, raises

20  is Howard Wolk's brother Jeff Wolk is on some Cross Country

21  documents even though Jeff Wolk is not a Cross Country --

22  defendant Cross Country.  Jeff Wolk is not an officer or

23  director of defendant Cross Country but he signed documents as

24  a vice president of Cross Country.

25          MR. WITTELS:  Home Services.

1           MR. McINTURFF:  Home Services, the defendant.  And

2   he's not listed -- you know, we didn't subpoena him but he's

3   certainly a custodian, a likely custodian for groups ESI

4   collection and production because he's on documents that Cross

5   Country Home Services has produced where he's signing as the

6   vice president of the company.  So we need a list from

7   defendants of the individuals that may have discoverable

8   information.  And we need to have a discussion with them about

9   who the appropriate custodians are.

10          THE COURT:  Who would have information pertaining to

11  discussions about check solicitations from CG Group?

12          MR. McINTURFF:  Correct.

13          THE COURT:  Meaning people beyond the list of --

14          MR. McINTURFF:  The individuals --

15          THE COURT:  -- Individuals that were listed on the

16  subpoena.

17          MR. McINTURFF:  Correct.

18          THE COURT:  I mean I think you're going to have to

19  sort some of this stuff out.  I can't resolve the issues

20  unless you talk through some of this stuff in terms of who do

21  you think might have information and obviously, you know, to

22  the extent you know of other people at the company that might

23  have this information, you'll have to talk about who that

24  might be and whether their information needs to be searched as

25  well.

1          MR. McINTURFF:  Your Honor, we requested that and

2   Cross Country Group said they would not discuss it.  So we're

3   requesting that Your Honor order Cross Country Group to

4   disclose who it believes has discoverable information, one.

5   Two, to disclose all of the potential sources of

6   electronically stored information.  Three, to tell us which

7   ones they searched.  They didn't consult us in terms of

8   electronically stored information.  They were supposed to

9   disclose to us what they had and then we were supposed to have

10  a conversation.  So they refused to have the conversation.  So

11  we're requesting that Your Honor order they disclose what they

12  were supposed to disclose at the outset.

13         THE COURT:  I mean I think you need to have these

14  conversations and figure this stuff out.

15         MR. McINTURFF:  Just to be clear, Your Honor,

16  plaintiffs cannot meaningfully participate in the conversation

17  unless we're provided certain disclosures, and they haven't

18  provided the disclosures.  So we can't have a conversation

19  about who in addition to the four individuals that we

20  subpoenaed is a potential ESI custodian until Cross Country

21  takes a look, Cross Country Group takes a look at who may have

22  ESI, and then they talk to us about it.  They're the ones that

23  have the -- that are closer to the information.

24         MR. ALEXANDER:  Your Honor, they're using the term

25  disclosures as in Rule 26.  That's for a party.  That doesn't

145

1  apply to a third party subpoena, entity or individual.

2          MR. McINTURFF:  We disagree.  We've done this.  We

3  did the exact same thing with Merkl.  We've done this in other

4  cases.  It's not -- there isn't a hard line separation between

5  a party and a non-party.  This is about ESI.  It's about the

6  best way to move ESI forward.  There's abundant case law in

7  this circuit and others about this process.  That's all we're

8  trying to do.

9          THE COURT:  Look, I agree with you that there are

10 certain burdens that can be imposed on a party with respect to

11 ESI that are probably more onerous than with respect to a non-

12 party, but I think the discussions at least need to take place

13 even with the non-party so that intelligent decisions can be

14 made about what needs to be searched and what needs to be

15 asked for.

16         Now, if the parties can't agree about the scope of

17 the production, then that's something properly brought to me

18 to resolve.  But I can't really do that if the parties can't

19 even agree on what is potentially there and what needs to be

20 searched  So I think you need to have these conversation,

21 figure out who the potential custodians might be.  See if you

22 can agree on them and see if you can agree on the scope of

23 what needs to be searched.  And if you can't, then we can at

24 least have an intelligent discussion about it.  But you know,

25 at this point all I'm left with is a subpoena that asks for

1   specific information and they're saying we've produced it all

2   and you're saying no you haven't.  I can't really do much with

3   that.  I don't know whether they've produced everything that

4   you want or not, and I'm not going to go through 10,000

5   documents to figure it out.  So you're going to have to sit

6   down and have these conversations and see if you can sort it

7   out.

8           MR. McINTURFF:  Your Honor, we're happy to have the

9   conversations.  We would like firm deadlines for when Cross

10  Country will produce the information that we need to have

11  these conversations.  That includes a hit report, it includes

12  the list of potential document custodians, it includes the

13  list of potential non-custodial data sources, as well as the

14  non-custodial data sources that were searched, as well as the

15  number of documents that Cross Country deemed were duplicates

16  and withheld those on the basis of their determination.  And

17  again, we need a firm deadline because if we don't get one, we

18  won't get an answer.

19          MR. FIOCCOLA:  Your Honor, can I just make a

20  suggestion?

21          THE COURT:  Yes.

22          MR. FIOCCOLA:  Why don't we explain what we actually

23  did and what the sources were that were looked at, and then

24  have a conversation about what you think was sufficient.  He

25  complained about the third party.  Even with a party you're

1  not entitled to every single potential document that might be

2  relevant to your case from every single custodian from every

3  single data source.  That, when you're at a non-party level,

4  is even less.  So let's have a discussion about what we did

5  first and we can provide that by whatever the date Your Honor

6  tells us to, and then have a conversation with them within ten

7  days of that to discuss what additional information they may

8  need or what they think is sufficient based on what we

9  provided and have a fulsome discussion about that.  And that I

10  think accounts for the fact that this is a non-party, they're

11  not entitled to every scrap of paper that a non-party might

12  have that might be relevant in trying to get at it in the most

13  efficient cost effective way for everyone involved especially

14  in light of the fact that discovery is set to close on August

15  31st.  Your Honor might remember they wanted a shorter deadline

16  for that, and so let's be proportional to what would be the

17  amount of time that we have left and what they're asking us to

18  do on this, I think this is the tenth motion to compel you're

19  hearing today.

20       THE COURT:  Okay.  So give me a date by which you

21  can have those discussions.

22       MR. McINTURFF:  Again, Your Honor, we are here

23  because we reached out to Cross Country and said we need to

24  have discussions.  We were told we will not discuss anything

25  with you.

148

1        THE COURT:  Okay.  Well now I'm telling them they

2   have to discuss it with you.

3        MR. McINTURFF:  And so --

4        THE COURT:  And I'm telling you give me a date by

5   which you have to have these discussions.

6        MR. McINTURFF:  Before we have the discussions, we

7   need information from them.  We can't -- we need the

8   information, we need --

9        THE COURT:  The discussion is where you get the

10  information.

11       MR. McINTURFF:  Not necessarily.  Like for example,

12  we need their view on who they believe has discoverable

13  information.  We haven't obtained that.  So we need them to

14  tell us.  We need an email with a lost of people that they

15  believe have discoverable information.

16       THE COURT:  Okay.  And then so what you're talking

17  about is maybe having a two part discussion.

18       MR. McINTURFF:  Fair enough.

19       THE COURT:  At which point maybe you can tell them

20  who you think might have relevant information.  They can tell

21  you who they think may have relevant information.  You can see

22  if you can agree on which ones need to be searched.

23       MR. McINTURFF:  But it starts with them.  They're

24  the company.

25       THE COURT:  It doesn't necessarily have to start

149

1    with them.  It could start with you too.

2              MR. McINTURFF:  Respectfully, Your Honor, we're --

3              THE COURT:  Or you can exchange information at the

4    same time.  Look, it might take them a little while to figure

5    out who they think might have relevant information.  Right?

6    So they come into the discussion.  It doesn't have to be in

7    person.  You can do it by phone.  There are such things as

8    phones and emails.

9              MR. FIOCCOLA:  Your Honor, why don't we just set

10   June 8th as the deadline for having that discussion and as part

11   of that we will discuss with them what was done and how it was

12   done.  And if they have additional information that they want,

13   they'll ask us on that call and we'll get back to them and

14   have that dialogue, but we'll have that conversation.

15             MS. PALIKOVIC:  Your Honor, we're concerned this

16   will run out the clock.  We're trying to depose Mr. Wolk at

17   least in July.  If there's documents that should be produced,

18   we need to have those before.

19             THE COURT:  Look, I don't know why you need a lot of

20   time to have this conversation.  If it requires multiple

21   conversations, I mean --

22             MR. McINTURFF:  Your Honor, respectfully, the

23   procedure that we are proposing is that Your Honor order the

24   defendants to make certain disclosures.  Once they make those

25   disclosures, the discussions can happen rapidly.  But if wait

1   for the discussions before they make the disclosures, it will

2   permit defendants to continue to hide the ball which they've

3   done.  They've refused to talk to us.  So we need them to make

4   the disclosures that we're requesting and then we'll have the

5   conversation.  It's more about the exchange of information

6   than the negotiation.  You can't have negotiation if we don't

7   have the exchange of information.

8            MR. FIOCCOLA:  Well, I think the point though that

9   I'm trying to make, Judge, is how we've already produced

10  information to them.  And what I heard them say is we don't

11  know how you did this.  And so why don't we start with an

12  explanation for what was done and how it was done and have

13  that conversation with them and then from there have a

14  discussion about what else they think they need to be done and

15  we can talk to them about that.  So I keep asking him you've

16  already done this, so we want to know what you did.  We also

17  want to know what else you think maybe what you should do

18  based on what we're looking for.  And then I think if we're

19  going to do this we should discuss what we did first and then

20  have a discussion about what else they think might need to be

21  done.  And if there's a dispute, then maybe that's ripe.  But

22  there's nothing ripe here yet.  Let's have a discussion about

23  what was done first and whether that was sufficient or there's

24  additional information that they want.  And if we cannot

25  agree, then unfortunately we will be back here but maybe

1  through some discussion we can get that issue resolved.  So I

2  think it has to start with an explanation of what it is that

3  we've done that they've said they don't understand that.  So

4  let's start with that because they might hear that and say

5  okay, that makes sense.  But we're not even there yet, so

6  let's have that discussion.

7        MR. McINTURFF:  Respectfully, you weren't on any of

8  the calls.  Second, you should be able to tell us right now

9  what was done.  You shouldn't have to wait three weeks to tell

10 us what was done.  And if you wanted to propose something like

11 that, the time to propose it was when we issued the subpoena,

12 not after objecting to the subpoena and then responding to our

13 request for a meet and confer with we're not talking to you.

14 It's been months.

15       MR. FIOCCOLA:  I'm trying to move the process along.

16       MR. McINTURFF:  No, you're trying to slow the

17 process down.

18       MR. FIOCCOLA:  No, I'm not.  And I'm suggesting

19 having a call before June 8, not on June 8.  If you want to

20 set a date now, we're happy to set it now.

21       MR. McINTURFF:  Respectfully, Your Honor, if you

22 order the disclosures that we've requested, this will go a lot

23 more quickly and smoothly and it leaves a lot less room for

24 gamesmanship.  We want four things.  We want the hit report,

25 we want their view on who the custodians potentially could be,

152

1   all of the locations of ESI.  We want what locations, non-

2   custodial locations that were searched, and we want the

3   request that Your Honor issued with the number of duplicate

4   documents.  Your Honor could order that.  Give them those five

5   things.  Give them a reasonable timetable for production, say

6   a week or two, and then we can take it from there.  And again,

7   the context is this isn't the first time.  This is now the

8   third iteration of this request, and what they're proposing,

9   sanctions and gamesmanships that they've been playing.

10           THE COURT:  Okay.  You're going to find out how many

11  of the documents were duplicates and turn over the hit report

12  as well.  I mean I think by next week you can have a

13  discussion about what was already done.  And then I assume at

14  that point both sides should be prepared to discuss who else

15  might potentially have information in terms of other

16  custodians.  Okay?  I don't see why that needs to be done in a

17  piecemeal fashion.  You can have that discussion together.

18  And if you do it by the end of next week, then you'll have

19  time for any followup.

20           MR. McINTURFF:  So just to be clear, when is the

21  deadline for Cross Country Group to disclose the documents

22  that were withheld as duplicates?

23           THE COURT:  How long to give that number?

24           MR. ALEXANDER:  Well, certainly next week.  I mean

25  today's Thursday.  I'm not sure that I'm going to get it

153

1   tomorrow but it'll be before the end of next week.

2          THE COURT:  How about the 25th.  It's a week.

3          MR. ALEXANDER:  Certainly, Your Honor.

4          THE COURT:  And then the hit report?

5          MR. ALEXANDER:  We'll try to do the same thing.

6          THE COURT:  Okay.  And then the list of potential

7   custodians?

8          MR. FIOCCOLA:  I think the judge said that that was

9   going to be the conversation.

10         THE COURT:  Okay.  I think you can both have that

11  conversation at the same time.  Do it by the end of next week.

12  You know, you tell them who you think might be a custodian and

13  they'll tell you who they think might be a custodian as well

14  and you can hash it out.

15         MR. McINTURFF:  Your Honor, that's not the normal

16  way this is done.  And the reason the way this is done -- the

17  way it is done is normally the defendants or the subpoenaed

18  party's counsel goes and talks to their client and asks those

19  questions.  I can't talk to their clients and ask them who

20  potentially had these conversations.

21         THE COURT:  Okay.  That's why their list will

22  probably be longer than yours.  I mean look, they have to tell

23  you by next Friday or whenever, the end of next week --

24         MR. McINTURFF:  Okay.  Is that the --

25         THE COURT:  -- when you have the conversation.

1          MR. McINTURFF:  Is that the same for the --

2          THE COURT:  I just don't understand why you have to

3    get that information and then have another conversation.  You

4    can tell them your information at the same time, who else you

5    think might be a custodian.

6          MR. McINTURFF:  Fair enough, fair enough.  The

7    problem -- where gamesmanship occurs in this process is the

8    party with the greater information says I don't know anybody,

9    I don't think I have any custodians.  And then I come forward

10   and I say have five people, and they say why don't you pick

11   two of the five?  That's what happens.

12         THE COURT:  They're going to tell you who they think

13   might be custodians.  You're going to tell them who you think

14   might be custodians.  And if you can't agree on which

15   custodians' information needs to be searched, then you'll come

16   back to make.

17         MR. McINTURFF:  And then at the end of next week

18   they will disclose potential ESI non-custodial data sources?

19         THE COURT:  I don't even know --

20         MR. FIOCCOLA:  I think what we said we would do is

21   tell you what we've done and then part of the discussion, if

22   you think there's additional sources, then that's something

23   that we could talk about.  I think you have to understand what

24   was done in the first place and then we can have as part of

25   the discussions if we think there's additional custodians, and

155

1    we do, we'll have that discussion.

2           MR. McINTURFF:  Again, the reason why it normally

3    does not work like this is every day in ESI cases is because I

4    don't know where they keep files.  The requesting party has no

5    idea whether they have messaging apps, whether they use Skype,

6    whether they have shared drives.  These are all things that

7    counsel can ask their client and disclose.  That's how we did

8    it in the main case and that's how it should be done here.

9    They should disclose it.  They should say where do we keep

10   electronic information?  I have no idea.  I don't know how

11   their company operates.  For me to come into a conversation

12   and say I think you should search your shared drive, I don't

13   even know if they have a shared drive.  That's why the other

14   party has to disclose first.  It's a one-sided conversation

15   otherwise because -- I'm not saying they're going to do this

16   but I've had it happen in cases before where the other party

17   says well where do you think I should look?

18          MR. FIOCCOLA:  Well that's -

19          THE COURT:  Well look, as part of the discussion of

20   what they've already done, you just tell them what there is

21   and what you've done.

22          MR. McINTURFF:  By the end of next week?

23          THE COURT:  Yes.  And based on past experience I

24   would suggest starting really early.

25          MR. McINTURFF:  Okay.  I think that brings us to the

156

 1   remaining issues on the letter.  So the remaining issue is

 2   issues start on Page 2.  It's number four.

 3            MR. TRABON:  Counsel, I might be able to resolve

 4   this issue.

 5            MR. McINTURFF:  Okay.  Go ahead.

 6            MR. TRABON:  So within the past week we've

 7   identified some hard copy documents responsive to this request

 8   and are currently reviewing those for responsiveness and

 9   privileged materials and can produce them before June 9th.

10            MR. WITTELS:  Judge, we've been here now a long time

11   today.  We've asked for board meetings.  For years this was

12   originally asked for.  And now they're finding documents four

13   years into this litigation when they've been trying to cut us

14   off.  I was told at the beginning of this litigation by

15   defense counsel sitting next to me you don't need any

16   documents, we all know what happened.  That's what he told me.

17   And that proved absolutely false because now we've gotten the

18   smoking guns.  Now they're giving us the board meetings?  We

19   had people at depositions telling us we never discussed it.

20   They produced the document recently showing that they very

21   well discussed the problems with cancellations from people

22   disputing enrollment.  Now they're telling us they're finding

23   documents?  I look forward to seeing them and I want to know

24   why we're getting these things now.  I mean what sort of

25   production have they done?  That's why we want to know what's

1   going on here.  Things have been withheld.  It's quite clear.

2          MR. TRABON:  If I may, Your Honor, plaintiffs noted

3   the absence of certain board meeting material in the ESI and

4   we recognized that absence during the 2009 and 2013 time

5   period and our client performed supplemental searches for any

6   hard copies of this material.  Not that they had not before.

7   And they were able to locate certain files that are

8   potentially responsive to this.

9          MR. ALEXANDER:  More likely documents.

10          MR. TRABON:  Documents.

11          MR. ALEXANDER:  They're not electronic.

12          MR. TRABON:  They're not electronic.

13          MR. McINTURFF:  Your Honor, the entire --

14          MR. ALEXANDER:  One of the reasons --

15          THE COURT:  So they weren't part of the ESI

16   production for whatever reason, so you went back and found

17   hard copies of the stuff.

18          MR. McINTURFF:  The entire time period of the

19   litigation of the check solicitations is 2009 to 2013.  There

20   was, with the exception of two or three virtually non-

21   responsive documents relating to Cross Country's board of

22   advisor meetings, in the ESI there were no documents.  They

23   had documents on both ends.  They had documents -- just by way

24   of background, Cross Country is a privately held company.

25   They don't have a board of directors, they have a board of

158

1    advisors.  They produced documents, meeting notes, meeting

2    presentations,  these documents called advance review and pre-

3    reads of -- these are all documents that the company employees

4    were preparing to make presentations to the board of advisors.

5    They produced these documents on both ends of the relevant

6    period of the litigation.  So pre-2009 and post 2013.  We

7    recently, because we've been looking and looking and looking

8    for board documents, did an exhaustive review of everything

9    that's been produced, found nothing, and we notified the

10   defendants.  And now they are just finding documents for the

11   board of -- I mean this is like the board of directors of the

12   company.  They still haven't produced any meeting minutes, any

13   resolutions if those were even made.  And they're finding them

14   now?

15           MR. ALEXANDER:  Your Honor --

16           MR. McINTURFF:  This is entirely improper, Your

17   Honor.

18           MR. WITTELS:  It's more than improper.  It's hiding

19   the ball.  I mean to say that you just found documents from

20   the key period from 2009 to '13 and your client didn't turn

21   over hard copies and you didn't ask them for the hard copies

22   because they should have been turned over.

23           MR. McINTURFF:  And where are they in the emails?

24           MR. WITTELS:  Before we got ESI, Judge, they turned

25   over a lot of hard copies in this case.  They obviously did

1   not get them from the client, and the client withheld them.  I

2   want to know why these were withheld and not produced.  They

3   knew -- they had the lawyer Necheles come down here and sit in

4   this courtroom repeatedly.  He knew what was going on.  He was

5   the lawyer for Cross Country Group and Agero.  And they didn't

6   produce these documents that we've been asking for?

7          MR. McINTURFF:  And again, the hard copy documents

8   aside, these documents are not in the ESI.  There's no --

9   they're missing.  They've got them on both ends but they're

10  missing in the middle.  Do you have an explanation as to why

11  in the ESI, why they're not in the ESI?

12         MR. ALEXANDER:  I don't have an explanation as to

13  why they're not in the ESI.  That's why we went to look for

14  [inaudible] --

15         MR. WITTELS:  Because they are obviously ESI

16  documents.

17         MR. ALEXANDER:  Excuse me --

18         MR. WITTELS:  This company didn't operate by hard

19  copies.

20         MR. McINTURFF:  Did you search the corpus of

21  documents?  So they had the entire -- they have all of the

22  emails.  They only gave us the emails that were hit on by the

23  search terms and then they were produced after their review.

24  Did you search your entire corpus of documents for these

25  documents like the board of advisor meeting presentation or

1   the advanced review for the board of advisors or the pre-

2   reads?  Did you search any of those?

3            MR. TRABON:  Again, Your Honor, we've located these

4   documents and are agreeing to produce them before June 9th.

5            MR. McINTURFF:  Okay.  Again, were those documents

6   searched for in the larger ESI corpus?

7            MR. ALEXANDER:  When you say were they searched for

8   in the larger ESI corpus, we have not been able to find them

9   in the larger ESI corpus.  So I guess the answer to your

10  question --

11           MR. McINTURFF:  Are you searching?  Like are you

12  using search terms?  Are you searching for them?  What are you

13  doing?  Pointing and shooting?  I mean they're all missing.

14           MR. TRABON:  Discovery in discovery.

15           MR. ALEXANDER:  Yeah.

16           MR. McINTURFF:  Yeah, that's right.  It is discovery

17  in discovery because --

18           MR. ALEXANDER:  And so the complaint is that --

19           MR. McINTURFF:  -- you've got five years of relevant

20  documents that are just not there.

21           MR. ALEXANDER:  We can't find them in the ESI, so we

22  found them by an alternative means and now they're bitching

23  because we found them by an alternative means.

24           MR. McINTURFF:  No, because --

25           MR. WITTELS:  We asked for them --

1      MR. McINTURFF:  -- you found them in hard copy and

2  you've got all the company's emails and you produced

3  conveniently from -- you're missing the entire period.

4  There's nothing prior to 2009 and there's nothing post 2013.

5      MR. WITTELS:  This company didn't operate by hard

6  copies from 2009 to 2013.  That's proven by the fact that they

7  gave us ESI on either end.  They withheld documents for five

8  years related to the board.

9      MR. McINTURFF:  We want all presentations, meeting

10  minutes, everything related to the board.  We think we're

11  entitled to it.  I mean it's --

12      MR. ALEXANDER:  Whether they have anything to do

13  with check marketing at all?

14      MR. McINTURFF:  Because you've apparently excluded

15  them on a wholesale basis for the entire period of the

16  litigation.

17      MR. ALEXANDER:  No, no.  The question here is

18  whether we're going to get into production of documents that

19  are completely irrelevant to any conceivable issue in this

20  case.

21      MR. McINTURFF:  Well, Your Honor, I mean I think

22  frankly there's no way to trust defendants to make that

23  determination.

24      MR. ALEXANDER:  And this is a strange thing because

25  we come forward after going back and looking at alternate

162

1  sources and come forward and are producing the documents and

2  now we're getting condemned for finding the documents that

3  they've been asking for.

4         MR. McINTURFF:  Your Honor, they didn't come

5  forward.  We figured this out and we notified them.

6         MR. ALEXANDER:  Yes.  Right.

7         MR. McINTURFF:  They were under an obligation to

8  check to make sure that they produced the relevant documents.

9         MR. ALEXANDER:  And you know, the question is if

10  they had nothing to do with check marketing, that may be the

11  reason why they weren't found.

12         MR. McINTURFF:  But it's everything during an entire

13  period.

14         MR. WITTELS:  Five years.

15         MR. ALEXANDER:  Everything?  You haven't got a

16  single document?

17         MR. McINTURFF:  We've got like two documents, and

18  none of the same documents that you have on either end.  Like

19  they're preparing these meeting notes --

20         MR. ALEXANDER:  Well, are we talking about the same

21  thing?  You have no documents at all from 2009 to --

22         MR. McINTURFF:  We have like two or three related to

23  the board.

24         MR. ALEXANDER:  I'm talking about no documents.

25  You're talking about related to the board which is a board of

163

1   advisors and not a board of directors.  They don't have

2   resolutions.  And so let's get off that point.  But you're

3   saying you have no documents between 2009 and 2013 or you

4   don't find any ESI documents for the board.

5          MR. McINTURFF:  Let me tell you what I've got.  I've

6   got documents called board of advisor meeting notes, board of

7   advisor meeting presentations, advanced readings, pre-reads

8   for BOA, board of advisor meetings, and pre-meeting materials.

9   These are all sort of types of documents.  I've got them on

10  pre-2009 and post 2013 and nothing in the middle.

11         MR. ALEXANDER:  And there may not be anything

12  dealing with --

13         MR. McINTURFF:  When they were doing check

14  solicitations, sending millions of check solicitations.  This

15  was their most profitable marketing --

16         MR. ALEXANDER:  The question is whether --

17         MR. WITTELS:  And they have nothing.

18         MR. McINTURFF:  And they have nothing.

19         MR. WITTELS:  And now they do have something.

20         MR. McINTURFF:  And they went and found some.

21         MR. ALEXANDER:  We don't know whether they have

22  anything to do with check marketing.

23         MS. PALIKOVIC:  You'll produce them.

24         MR. McINTURFF:  But you're going to produce them.  I

25  thought you just said you were going to produce them.

164

1          MR. TRABON:  We're reviewing them for responsiveness

2     and --

3          MR. ALEXANDER:  Yeah, we're reviewing them now.

4          MR. TRABON:  -- [inaudible] materials.

5          THE COURT:  I don't remember what the original

6     request was.  Was the original request for all board documents

7     or only board related documents that discussed check

8     marketing?

9          MR. McINTURFF:  The original request was documents

10    related to the check solicitation campaign, so --

11         THE COURT:  Okay.  But if they don't have to do with

12    check marketing then they didn't have to produce them, right?

13         MR. McINTURFF:  Yeah, that's fair.  That's fair.

14         THE COURT:  Okay.  So let's first find out what's

15    there.  And if there are stuff -- if there's stuff there that

16    relates to check marketing, (A), they're going to produce it,

17    and then (B), we're going to make them explain why they didn't

18    produce it earlier.  But let's -- you're getting ahead of

19    yourselves.  Let's deal with the first question first which is

20    is there stuff here that should have been produced that

21    wasn't?  We haven't gotten to that point yet.  Let's see

22    what's there first.

23         MR. ALEXANDER:  Thank you, Your Honor.  That's

24    correct.

25         THE COURT:  Although I have to say it does seem a

1   little suspicious to me that during the relevant period

2   there's nothing and there's stuff that was prior and after.

3   But let's wait and let me see what the records are before --

4           MR. McINTURFF:  If we can have that firm date for

5   when those documents are going to be produced?

6           MR. TRABON:  June 9th.

7           THE COURT:  June 9th.

8           MR. McINTURFF:  The last issue, Your Honor, is this

9   relates to two document requests relating to documents and

10  communications concerning Ocwen's decision to stop collecting

11  for the plan premiums and then Cross Country's response and

12  what ultimately was Ocwen's decision to continue collecting

13  for the plan premiums.  We tabled this in advance of the

14  preliminary trial.  As we say in the letter, Your Honor

15  recognized that it was relevant but because it wasn't related

16  to the preliminary fraud trial we tabled it but now it's time

17  for those documents to be produced and defendants have not

18  produced them.  We need a firm date.

19          THE COURT:  Okay.

20          MR. ALEXANDER:  If I might, Your Honor, the actual

21  communication between the parties have been produced.  The

22  internal communications have not.

23          THE COURT:  When are they going to be produced?

24          MR. ALEXANDER:  I have to go back and check.  I

25  think they may have been privileged.

166

1          MR. McINTURFF:  They should be on your privilege

2   log.

3          MR. ALEXANDER:  Right.

4          MR. McINTURFF:  So we'd like a date when Cross

5   Country can advise as to when they're going to produce non-

6   privileged documents and when they're going to identify which

7   documents are being withheld on the privilege log on the basis

8   that were related to this decision to continue billing.

9          THE COURT:  So when can you do that by?

10          MR. ALEXANDER:  Can we have till the 16th of June,

11   Your Honor?

12          MR. WITTELS:  How about the 9th, Judge?  The same day

13   as the other thing.

14          THE COURT:  This is just for --

15          MR. WITTELS:  They're pushing us into the July 4th

16   week.

17          THE COURT:  This is the -- I mean this stuff has

18   been outstanding for a while so I think you should be able to

19   do it by June 9th particularly if it's mostly privileged, then

20   you just have to add it to the privilege log.

21          MR. McINTURFF:  No, Your Honor, that should have

22   always been on the privilege log.

23          MR. ALEXANDER:  It may already be on the privilege

24   log.  I just have to check.

25          THE COURT:  Oh, it may already be on the privilege

167

1   log.

2           MR. ALEXANDER:  This was raised yesterday, Your

3   Honor.  I haven't had a chance to look back at it at this

4   particular point.

5           THE COURT:  Okay.  Well look, I think June 9th should

6   be enough time.  This is not a new issue.  It might have been

7   just re-raised --

8           MR. ALEXANDER:  Right, right.

9           THE COURT:  -- for the first time yesterday but --

10          MR. ALEXANDER:  Re-raised.  Correct.

11          THE COURT:  -- we've talked about this before.

12          MR. ALEXANDER:  Correct.

13          THE COURT:  All right.  Is that it?  Are we done?

14          MR. ALEXANDER:  I have two things, Your Honor, if it

15  please the Court.  First, I apologize to the Court for any

16  inappropriate language I may have used earlier in the heat of

17  the moment.  And I hope my apology is accepted.  It's given

18  sincerely.

19          THE COURT:  I'm not going to sanction you today but

20  let's try to avoid such language in the future, shall we?

21          MR. ALEXANDER:  We shall, Your Honor.

22          The second thing is I'd like a point of

23  clarification about something we talked about last time.

24  Actually, the context was depositions that still needed to be

25  done.  And if Your Honor will recall, there was a back and

168

1    forth about whether Judge Levy's ruling early in the discovery

2    process about taking depositions of the plaintiffs who were

3    not identified as class representatives would be allowed.  And

4    there was a colloquy about whether it would be staged or

5    whether they would be held for the class cert.  And I have

6    after some back and forth, and I quote the Court, "I don't

7    want to belabor this point but let's -- I don't think there's

8    any reason to tier the class certification discovery versus

9    merits.  Let's just pick a deadline for completion of all

10   discovery."  Is that -- I say that merely because I raised

11   earlier that we wanted to take the depositions of the

12   plaintiffs or not class representatives.  And the plaintiffs'

13   attorneys informed me that they are not interested in having

14   those depositions taken.  Their recollection was that Your

15   Honor had ruled that, consistent with Judge Levy, that there'd

16   be no depositions of the plaintiffs.  And it's our position

17   that they should be.  They are plaintiffs in the case and so

18   long as they're plaintiffs in the case and heading toward the

19   trial that we should be allowed to take their deposition.  And

20   we'd just like to have that clarified.

21             THE COURT:  And there's a question about that?

22             MR. McINTURFF:  We don't believe there's a question.

23   Bruce, can I borrow that transcript a second?

24             MR. ALEXANDER:  As long as you --

25             MR. McINTURFF:  I will ignore when you said --

169

1          MR. ALEXANDER:  I'm trying to think --

2          THE COURT:  I'm sure there's no bad comments about

3    you written in the margin there.

4          MR. ALEXANDER:  Yeah.

5          MR. McINTURFF:  Maybe the judge --

6          MR. WITTELS:  Those are the attorney-client --

7          THE COURT:  As you've heard, he has no problem just

8    saying it on the record.

9          MR. McINTURFF:  Because our understanding was that -

10   -

11         MR. ALEXANDER:  If you can confine it to Page 16 to

12   21.

13         MR. McINTURFF:  19 is where I'm looking.  Yeah.

14         MR. ALEXANDER:  19.  Okay.  Fine.  It's 19 to 21 is

15   where most of the discussion takes place.

16         MR. McINTURFF:  I appreciate it.  I'm sorry I didn't

17   bring it.

18         THE COURT:  Okay.

19         MR. ALEXANDER:  I have some notes in the other

20   section.

21         MS. PALIKOVIC:  On Page 19, and this was our

22   understanding, Your Honor, he said, "I don't think you should

23   depose those plaintiffs until the cert motion is decided

24   because I think at that point you'll have a better idea of

25   whether or not it's really necessary."

170

1          MR. ALEXANDER:  Right.  The discussion continues

2    onto Page 21.  Why don't you please go ahead?

3          MR. McINTURFF:  Well, we don't think that your

4    reading of Page 21 is accurate.  We think that what he's

5    saying in 21 --

6          MR. ALEXANDER:  I just quoted it.

7          THE COURT:  Why don't you give me the transcript?

8    Because there's been so many conferences and motions in this

9    case, I can't even remember what I said.

10          MR. WITTELS:  What are you asking for now?

11          MR. McINTURFF:  He wants to depose all the named

12    plaintiffs now --

13          MR. WITTELS:  Well, Judge --

14          MR. McINTURFF:  -- who are not class

15    representatives.

16          MR. WITTELS:  -- he just moved to dismiss the entire

17    class action on the pleadings and now they want to depose

18    plaintiffs?

19          MR. McINTURFF:  Your Honor ruled.  The order of

20    everything in this case seems to be all over the place.  I

21    mean --

22          MR. ALEXANDER:  If they don't want to have any more

23    depositions I guess maybe we'll trade them off.

24          THE COURT:  We've got a deadline for the completion

25    of discovery in three months but there's a pending motion to

171

 1   dismiss.  There's a class motion that hasn't been decided.  I

 2   mean --

 3         MR. WITTELS:  Well, I would suggest to you, Your

 4   Honor, part of it, if not all of it, is given their failure to

 5   show up for a trial.  We would have been done with that issue.

 6   We lost two and a half years basically on that one.

 7         THE COURT:  Be that as it may, I think the problem

 8   is we're now in the posture of -- I mean plaintiffs are really

 9   pushing to move forward with this case and finish it and moved

10   to the next stage and go to trial which is something that I'm

11   certainly inclined to go along with.  But that necessitates

12   certain sacrifices, and one of those sacrifices might be you

13   may have to go forward and do these depositions now because we

14   can't wait until after the class motion is certified.

15         MR. McINTURFF:  They want 18 depositions of people

16   all over the country who are not class representatives at the

17   expense --

18         MR. ALEXANDER:  No.  No, we're only talking about

19   four more.

20         MR. WITTELS:  Judge, Judge Garaufis told us

21   originally, and this is why you ended up ruling that way, this

22   is why Judge Levy ended up ruling this way, you don't need to

23   have everyone deposed in order to decide class cert.  If they

24   need an extra four depositions which are going to take them

25   all of the two hours that they ask the same questions over and

172

1  over again, are boilerplate questions, and have gotten the

2  same answers in basically 25 depositions before that we've

3  done, they can do that in two days before the trial. We'll

4  have plenty of time. There's no need now to do this. And

5  Your Honor properly ruled let's wait. We have a class cert

6  motion we're going to try to get on. We're going to go to

7  Judge Garaufis now because defendants have -- talk about

8  trying to delay us, we've got a fully briefed class motion and

9  now they're moving to dismiss on the pleading. It's

10  ridiculous. I'm talking about procedure. They're delaying,

11  causing unnecessary harassment to the Court. The Court has a

12  class motion. Why does it have to decide a motion to dismiss

13  on the pleadings? I've never heard of such a thing. Talk

14  about wasting money and wasting the Court's time and our time.

15  We already wasted time in seven months of trial preparation.

16  Ten in limine motions they made all the way up to the point of

17  the trial. And now we're supposed to brief a dismissal motion

18  that --

19         MR. McINTURFF: It's a motion to strike class

20  allegations.

21         MR. WITTELS: Strike class allegations when the

22  judge said supplement your previous motion. They didn't

23  supplement their motion. They made a new motion.

24         MR. McINTURFF: Just to be clear, Your Honor,

25  they've moved to preclude the allegations of the class action

1  from the complaint when there is a pending motion for

2  classification.

3            MR. WITTELS:  Never heard of such a thing.

4            MR. McINTURFF:  First of all, that motion, a motion

5  to strike is disfavored in all the circuits, and yet they've

6  moved to strike class pleadings when -- and the reason it's

7  disfavored is courts always say well will decide it at class

8  cert.  There is now a motion for class certification pending.

9            MR. WITTELS:  Pending for seven months, fully

10 briefed.  And they're saying we haven't alleged -- I mean what

11 are they trying to argue?  Argue it three times, four times?

12 How many times do they want to argue class cert?  I mean the

13 judge can decide the class cert motion.  Got it pending.

14           MR. FIOCCOLA:  Back to the issue.  If I may just

15 [inaudible] whether we depose these four or postpone it to a

16 later date, Judge, it's just like --

17           THE COURT:  Look, I'm happy to postpone it but this

18 is the problem.  You keep pushing --

19           MR. FIOCCOLA:  [Inaudible] --

20           THE COURT:  -- you keep pushing for a quick trial --

21           MR. McINTURFF:  Yeah, but they're not going to be in

22 the trial.  If we get certified, those four people aren't

23 going to be in the trial.

24           MR. WITTELS:  We won't need them as class reps.

25 Will they come forward?  If we put them on, Judge, if we call

1  those four plaintiffs, we will produce them so they can depose

2  them.  Okay?

3          MR. FIOCCOLA:  We can call them as witnesses.

4          MR. WITTELS:  Yes.  I just told you you'll have your

5  opportunity to depose them.  There's no point in doing it now

6  when we have to focus in on getting the documents you've been

7  holding back for two and a half years, three years.

8          MR. FIOCCOLA:  It's just like the issue where we

9  wouldn't table the issue about the audited financials because

10  there's no point in doing that until these other motions are

11  decided.  Why is there a point in doing it now?  Why not just

12  move forward?

13          MR. McINTURFF:  Completely different.

14          MR. WITTELS:  You've already deposed -- it's not

15  like you don't know the story.  You've already deposed 23

16  people.

17          MR. FIOCCOLA:  But part of our --

18          MR. WITTELS:  And you deposed -- Judge, the reason

19  they got an additional seven or eight depositions was because

20  they needed it for the trial.  These were the people who were

21  subject to arbitration.  Judge Levy didn't order those seven

22  or eight people to be deposed.  He said you wait.  Let's have

23  the class cert decided.  Now they need everyone?  They don't

24  need everyone?  They know the story.  You take a deposition

25  when you really don't know something.  We don't know

1  something, we're taking Wolk, we're taking Incandella [Ph.],

2  the man they just disclosed yesterday was the guy who was

3  making the decisions with Wolk on continuing check

4  solicitations in 2006.  That's discoverable.  But taking four

5  depositions just to harass us on top of a harassing class

6  motion to dismiss class claims, come on.  Be realistic here.

7          THE COURT:  This can wait.

8          MR. ALEXANDER:  Your Honor --

9          MR. WITTELS:  It can wait.  It's not necessary.

10  Judge Garaufis didn't say it was necessary.  Once we get class

11  certified, we'll see if we need to call these four people.

12          MR. ALEXANDER:  Your Honor --

13          MR. WITTELS:  He asked them to withdraw that

14  frivolous motion to dismiss class claim.  That's what we want

15  them to do because [inaudible] to Judge Garaufis, see if he's

16  going to allow it.

17          MR. ALEXANDER:  I'm not sure that any of that has

18  anything to do with the question before Your Honor at the

19  moment.

20          MR. WITTELS:  You have --

21          MR. ALEXANDER:  I think it's a question on Pages 19

22  to 21, just to help the Court if that could be of some help.

23          MR. WITTELS:  Judge, we're going to have expert

24  discovery after the close of discovery.  There will be still

25  discovery going on.  They may produce some new expert out of

1  the blue.  Who knows what they're going to do?  The point is

2  we'll give them the depositions.  There's no point in doing

3  them now.  They spent two and a half hours.  We'll have people

4  traveling all over the country to do this?  It's a waste of

5  time and money.  They want to pay -- we'll have to pay for it.

6  They've already caused this unnecessary expense.

7          MR. ALEXANDER:  Your Honor, they decided --

8          MR. WITTELS:  We have to do seven depositions all

9  around the country because they said they were subject to

10  arbitration.  They're not subject to arbitration.  It was a

11  frivolous motion from day one and they knew it, and they

12  didn't want to go to trial on it because they knew they were

13  going to lose.  These are the facts.  Not alternate facts, the

14  facts.

15          MR. ALEXANDER:  And the fact is that these people

16  are plaintiffs in this case.

17          MR. WITTELS:  You can depose them at an appropriate

18  time.  Not now.  The judge ruled it wasn't appropriate.

19          MR. McINTURFF:  Judge Levy ruled it wasn't

20  appropriate.  Judge Tiscione ruled it wasn't appropriate.

21          MR. ALEXANDER:  No, I don't think so.  I think Judge

22  Tiscione is about to get to the page where he'll find the

23  previous --

24          MR. WITTELS:  Do you really need him, Bruce?  What

25  do you need him for?  What do you need him for?  You're going

1   to supplement your motion to dismiss class claim?

2           MR. ALEXANDER:  I need him because I want him.

3           MR. WITTELS:  You want him.  Okay.  Well, you got a

4   lot of lawyers on that side coming up with lots of good ideas

5   to harass us.  That's fine.

6           MR. ALEXANDER:  Well, if you don't want to be

7   harassed then don't have them as plaintiffs.

8           MR. WITTELS:  You don't want legitimate discovery.

9           MR. ALEXANDER:  If someone's going to be a

10  plaintiff, that's per the rule.

11                  [Pause in proceedings.]

12          THE COURT:  Here's what I'm going to do.  I think --

13  like I said, I'm not extending the deadline.  So we're still

14  closing discovery in August.  If the class motion isn't

15  decided by then, you're going to have to do these depositions

16  by close of discovery.  So I'm not going to order them to be

17  done right this instant, but they are going to be done before

18  the end of August.

19          MR. ALEXANDER:  That's all I wanted to clarify, Your

20  Honor.  Thank you very much.

21          THE COURT:  I mean you can --

22          MR. WITTELS:  Judge, I don't see why they're

23  necessary to do these people if they don't come in as

24  witnesses.  I said if they don't come as witnesses, they're

25  not necessary.  Judge Garaufis said if you --

178

1          THE COURT:  But until --

2          MR. WITTELS:  Why do you need to depose all the

3    plaintiffs?  And we said they don't.  He said well good,

4    you're not deposing all of them.  Judge Levy said pick the

5    people who are your representative plaintiffs.  We picked

6    what, 17?  You only need two or three to have representative

7    class actions.  This is just pure harassment.  He's

8    articulated no reason.  They --

9          MR. McINTURFF:  He just said he wants them because

10   he wants them.

11         MR. ALEXANDER:  He wants them not because he has any

12   evidentiary need for them, other than to just divert us to

13   finishing the discovery.  They can get them, Judge, if we call

14   these people.  Let's get our class cert motion decided.  I

15   mean they don't need them, we don't -- it's just a harassment

16   technique.  You're allowing them to harass us for no reason.

17   It's to divert -- we've already obligated.  We said we would

18   produce them if the case goes to trial.  You will have them

19   eons before then once we have a class motion decided.  Once we

20   have your frivolous motion to dismiss decided, we will have

21   these decided.  We will then produce them.  There's nothing

22   wrong, Judge.  We're going to have ongoing discovery.  We're

23   going to have expert discovery after the close of this.  These

24   are day long -- you know, we have to travel all over or bring

25   the people in.  It's very expensive.  They ask the same

1   boilerplate questions, they get the same answers.

2           THE COURT:  How many?  You said you wanted four

3   additional ones?  Who are these four plaintiffs?

4           MR. ALEXANDER:  Well, there's the named plaintiff.

5   His wife may be necessary as a third party.  And we have four

6   named -- the class rep.  I'm sorry.  And then we have four

7   others who are named plaintiffs.

8           MR. McINTURFF:  This is totally unnecessary, Your

9   Honor.

10          MR. WITTELS:  Totally unnecessary.

11          MR. McINTURFF:  We have class representatives that

12  have been deposed.  We have a pending class motion.  Once the

13  motion is decided, if those individuals become part of the

14  case, we'll make time to depose them and they'll be deposed.

15          MR. ALEXANDER:  The same thing could be said about

16  the financials.

17          MR. WITTELS:  Judge, it's just like the arbitration

18  motion.

19          MR. ALEXANDER:  No, it's like the financials.  It's

20  more like the financials.

21          MR. WITTELS:  They asked for eight.  They got I

22  think it was five additional people they wanted to depose

23  because they were going to trial.  We produced them.  That was

24  worked out.  That was not an issue.  The same thing will occur

25  here.  If we go to trial and they don't settle this case

180

 1    before then, we will produce them just like we did in the

 2    arbitration trial.  It wasn't an issue.  But to do it now when

 3    we're engaged in trying to ferret out why they haven't

 4    produced discovery, finishing ESI, taking four depositions of

 5    defendants, it's just too much.  We've got summer vacation.

 6    There's no need for it now other than to put us under

 7    unnecessary pressure.

 8            MR. McINTURFF:  Respectfully, Your Honor has put

 9    plaintiffs to a pretty stringent test to explain why the

10    things we want are relevant and proportional.  And you know,

11    you cut us down on several issues.  We haven't heard

12    defendants articulate a reason of why these people now --

13    they're already proposed class representatives for the classes

14    that encompass these people, why they need them now.  They

15    can't explain it.

16            MR. FIOCCOLA:  One of the arguments wasn't why it

17    should happen now before class certification because that

18    motion may be fully briefed but he filed a fourth amended

19    complaint which he did not have to do.  Judge Garaufis gave

20    him the option not to do it.  And then said if you do do it,

21    I'm going to give them an opportunity to make new arguments in

22    a --

23            MR. McINTURFF:  No.

24            MR. WITTELS:  That's not what he said.

25            MR. McINTURFF:  No, no, no.

181

1          MR. WITTELS:  That's not what he said.

2          MR. FIOCCOLA:  Hold on.  You spoke a lot.  Now let

3    me finish.  Let me finish.  So that's what happened.

4          Now, that brief is not actually pending.  He said

5    he's deciding the motion to dismiss first and will likely give

6    us an opportunity to look at class cert again possibly through

7    shorter briefing.  Now, if we are deposing those four

8    individuals, there might be additional new issues, not

9    cumulative.  We're back to the same arguments you were making

10   before that we can make now.  There might be new issues that

11   would be relevant to that class motion and it could be

12   conflicts within the class, it could be differences between

13   these individuals and the other class reps that all go to the

14   Rule 23 factors.  So in fact, getting the deposition of the

15   plaintiffs in this case is highly relevant and we should do it

16   before the class certification motion is decided.  We should

17   do it before the close of fact discovery.

18         MR. McINTURFF:  Respectfully, Your Honor, counsel is

19   new to this case so I think he might be getting some of his

20   facts mixed up.  The named plaintiffs they want to depose are

21   not class representatives.  They are not --

22         MR. WITTELS:  One of them.

23         MR. McINTURFF:  Oh, one of them is.  Oh, the new

24   one.  Well, that's the new one.  The new one is fine.  Yeah.

25   I mean --

1          MR. FIOCCOLA:  But my point applies to both because

2    if you have --

3          MR. McINTURFF:  No --

4          MR. FIOCCOLA:  Hold on.  Let me finish.  If you have

5    representatives who you're saying represent everybody else,

6    it's not like we have absent class members where you don't

7    know who they are.  You actually -- the way you set up your

8    case, you have absent class members who are otherwise absent

9    named plaintiffs.  So now you actually get to test what the

10   absent class members are who are not reps, and what the reps

11   actually say is there's a conflict within the class.

12         MR. WITTELS:  No, no.

13         MR. McINTURFF:  No --

14         MR. WITTELS:  Hold on one second.

15         MR. McINTURFF:  Judge Levy --

16         MR. FIOCCOLA:  Hold on.  Let me finish.  You said --

17         MR. WITTELS:  You're not understanding --

18         MR. FIOCCOLA:  Hold on.  Let me finish.  You said

19   articulate for us why this would be probative and relevant.

20   That's exactly one of the reasons why it would be probative

21   and relevant.

22         MR. McINTURFF:  I'm glad that you making the

23   argument now.  Judge Levy dismissed that argument three years

24   ago when he ordered that only the people to be put up as class

25   representatives are to be deposed.  So your argument is a few

183

1   years too late.

2          MR. ALEXANDER:  No, he didn't say that we would

3   never depose these --

4          THE COURT:  I think the problem is when Judge Levy

5   made that decision the assumption is that the class

6   certification motion would be decided well before the trial

7   and so I don't think it was a decision that they could never

8   depose those plaintiffs.  It was a question of whether they

9   should depose them prior to class certification.  Because I

10  agree with you that depending on the decision on the class

11  motion those depositions may be irrelevant.  They might not

12  need them.

13         MR. McINTURFF:  Likely to be irrelevant.  And so we

14  should continue the status quo.

15         THE COURT:  Look, I told you from the beginning I'd

16  be happy to put them off but you know, there is a tension here

17  about wanting to put some of this stuff off as far as possible

18  and wanting to move as quickly as possible to get to trial,

19  and you can't have both.

20         MR. McINTURFF:  We're not asking for both.

21         MR. ALEXANDER:  You are.

22         MR. McINTURFF:  This is a reasonable request.

23         MR. ALEXANDER:  You want financials now.

24         MR. WITTELS:  We only want to put off things that

25  are not needed.  Okay?

184

1          MR. ALEXANDER:  Right.  Financials.  You don't need
2    those now.
3          MR. WITTELS:  Well no, I went to -- look, Judge,
4    they got at least in terms of fairness --
5          THE COURT:  Let me say --
6          MR. WITTELS:  -- they deposed five additional
7    plaintiffs that --
8          THE COURT:  -- you've got one plaintiff that they
9    want to depose that's clearly a class rep.  Yes?
10         MR. WITTELS:  Yes, Indiana.
11         THE COURT:  All right.  That one, clearly you can do
12   that one.  So move forward with that one.  The other ones,
13   like I said, I'm inclined to give you the ability to depose
14   those people before the end of fact discovery which is a
15   little bit off.  Before we do those depositions, let me talk
16   to Judge Garaufis and see if I can get a sense as to when he
17   thinks the class certification motion might be coming down
18   because --
19         MR. ALEXANDER:  If it helps, Your Honor --
20         MR. WITTELS:  There's a --
21         MR. ALEXANDER:  -- we can do it in July or August.
22   We don't need to it right away.
23         MR. WITTELS:  There's a problem, Judge.
24         THE COURT:  What.
25         MR. WITTELS:  (A), Judge Garaufis' order, when we

1    stipulated with defendants or they stipulated that they were

2    withdrawing their motion to compel arbitration, as part of

3    that the idea was they wouldn't raise that issue again.  Then

4    we came in and we asked the judge, Judge Garaufis, can you set

5    the trial date and we told him that we wanted to just amend

6    really one plaintiff.  That's all we did in the complaint.  We

7    put in a new plaintiff, we put in maybe a summary at the

8    beginning of some of the more information we had for the

9    trial.  We didn't change any of the facts or theories.  We

10   added a fraud count, nationwide fraud count.  The judge said

11   in his order you have the right, plaintiffs, to amend if you

12   want to.  I'm going to give them leave to supplement their

13   prior motion to dismiss, supplement their motion.  It didn't

14   supplement the motion to dismiss.  Supplement meant they only

15   moved to dismiss the [inaudible].  Now they came up with a

16   whole new theory which is dismiss the --

17              MR. McINTURFF:  Strike.

18              MR. WITTELS:  Strike, to strike the class action

19   allegations which those motions are always made at the

20   beginning.  I've never seen one, and I looked at all the cases

21   in New York.  I've never seen one that's made when the class

22   motion has already been fully briefed.  Never seen it.  So

23   they spent 18 pages of their 30-page memo talking about

24   striking class claims. So what we're looking at now is why are

25   we bothering to finish those class reps when they don't think

186

1   we should have a class action, they don't think we should have

2   any claims for the state action, they don't think we're

3   entitled to go forward period.  So I'm asking you to just

4   defer slightly --

5           THE COURT:  And I am.  And I said that that's what I

6   was going to do.  I'm inclined -- I agree with you.  The

7   problem I'm facing is we set these discovery deadlines to be

8   relatively short so that we can move this case along and so

9   there's only a limited window for us to push things off for.

10          MR. WITTELS:  Right.

11          THE COURT:  So what I said was let's go forward with

12  the deposition of the one class representative, hold off on

13  the depositions of the other non-class representatives right

14  now.  My inclination though is to let them do that before the

15  end of fact discovery.  But before I make any final ruling on

16  that, let me talk to Judge Garaufis.  I'll try to get a sense

17  as to what his timing is on those motions.  And then we can

18  discuss the issue a little bit further.  Because if the

19  motions are going to come down relatively soon, then I can

20  hold off on that until the motions come down.

21          MR. WITTELS:  Okay.  I didn't articulate it.  In his

22  briefing, in his schedule, the scheduling order on the motion

23  to dismiss he gave them till the 15th, this week, when they

24  filed a motion to dismiss.  He gave us a month, June 15th.  He

25  gave them till July --

1          MR. McINTURFF:  Two weeks.

2          MR. ALEXANDER:  June 29th.

3          MR. WITTELS:  June 29th?  June 29th to submit the

4     motion to dismiss.  He said in the last line of that order I

5     will then -- in the course of this I will first decide the

6     motion to dismiss, then I will decide class certification.  We

7     think the -- we don't think we should be briefing a motion to

8     dismiss class allegation.  We think that we should now -- the

9     judge should decide the class motion at the same time.  That's

10    the way they want it.  I mean there's no point in having a

11    motion to dismiss class claim, to strike class claims when

12    there's a fully briefed class motion.  If you speak to Judge

13    Garaufis, and we're going to write him a letter asking him --

14    first I've asked the defendants today withdraw that part of

15    the motion and let's submit the class motion.  That's what's

16    ripe.  Why do we have to submit anything else?  Why do we have

17    to argue the pleadings?  It doesn't make sense.

18         MR. FIOCCOLA:  Well, there's a new complaint that

19    they filed.  It's their fourth iteration of these allegations.

20    And unlike other cases where there's a motion to dismiss with

21    a motion to strike class allegations which occurs at the

22    beginning of the case without discovery, we have the opposite.

23    Right?  We're at the end of discovery.  They have a lot of

24    discovery already.  What they're getting is additional, right,

25    that we're piling on for their putative damages that they

1   said.  And if the argument is that, and this is perfectly

2   appropriate and there's a lot of cases that grant these

3   motions at the motion to dismiss stage, saying look, you have

4   four opportunities to get this right, and you had the benefit

5   of discovery and you still didn't get it right, maybe I can

6   narrow case now at the motion to dismiss stage because the

7   current briefing for class certification doesn't exactly line

8   up with the complaint anymore.  That's going to need to be

9   revisited.

10          MR. McINTURFF:  Actually it does.

11          MR. FIOCCOLA:  It may not need to be rewritten, but

12   it will need to be narrowed and streamlined to account for two

13   things.  (A), the fact that there's a new complaint, and (B),

14   what those claims look like after the judge decides the motion

15   to dismiss and the motion to strike class allegations.

16          MR. WITTELS:  That's not what they're asking, Judge.

17   They didn't open in their motion with let's dismiss certain

18   state claims.  They opened with a broad blunder bust dismissal

19   of the class allegations out of the box.  There is nothing --

20   as they said in Candid, and I heard it recently as well,

21   there's nothing new under the sun.  Candid, Ecclesiastes, I

22   heard someone say that as well.  There's nothing new in the

23   complaint that they didn't know before.

24          MR. McINTURFF:  [Inaudible] Ecclesiastes.

25          MR. WITTELS:  Well, that's where it came from.  But

189

1  anyway, the point is there is really nothing new.  We added a

2  plaintiff and we gave a little more meat on the description of

3  what we've learned.  I mean we --

4         THE COURT:  Look, I don't really -- let's table this

5  discussion for now.  I think I've already said go forward on

6  the one plaintiff.  I'm sure we're going to be back here

7  discussing some other issue in the near future.  So let me

8  talk to Judge Garaufis first and try to get a sense from him

9  about the timing of this motion before I make any final

10  decisions about the other class, non --

11         MR. WITTELS:  If I might, Judge, mention our

12  position that there shouldn't be briefing on the plaintiffs

13  when there's a class motion fully briefed.

14         MR. ALEXANDER:  Your Honor, I don't think it's

15  appropriate for you to be arguing their case.  I don't think

16  you're going to.  But really this is beside the point.

17         THE COURT:  I'm not.  I'm only going to talk about

18  the timing.  I'm not -- if you want to make an argument to

19  Judge Garaufis, feel free to do so.  I'm not going to do that.

20         MR. McINTURFF:  We have a number of issues that

21  we're going to be working on as well as some motions that are

22  going to be filed next week.  We'd like to, if Your Honor has

23  availability, to get another date for another conference maybe

24  sometime --

25                  [Pause in proceedings.]

190

1          MR. ALEXANDER:  I hope they're not talking about
2    this Saturday.
3          MS. COHEN:  I think they're in June.
4          THE COURT:  Maybe if I schedule it on Saturday you
5    guys will keep these things shorter.  The 20th is my wife's
6    birthday so I'd really, really prefer not to do it on that
7    day.
8                    [Pause in proceedings.]
9          MR. McINTURFF:  Can we come down on the 16th, Judge?
10         THE COURT:  We can do the 16th.
11         MS. COHEN:  Sorry, that's not --
12         MR. FIOCCOLA:  That's not going to work.  The
13   following week is better.
14                   [Pause in proceedings.]
15         MR. McINTURFF:  There's no time you guys can do on
16   the 16th at all?
17         MR. FIOCCOLA:  The 14th, 15th, and 16th, no.
18         THE COURT:  What about the 13th?  Can you do the 13th?
19
20         MR. ALEXANDER:  I'd have to check, Your Honor.
21   Neither one of us can do the 12th or the --
22         THE COURT:  What about the 13th?
23         MR. ALEXANDER:  -- 13th.  No.
24         THE COURT:  I think this is yours.
25         MR. ALEXANDER:  It is, Your Honor.

191

1          MR. McINTURFF:  How about the 9th?  Can you do the 9th

2  or the 8th?

3          THE COURT:  Well, considering that's the deadline

4  for a bunch of stuff, maybe we should do it a little bit after

5  that only so that --

6          MR. WITTELS:  It's hard getting dates.

7          THE COURT:  I know.

8          MR. WITTELS:  And we can't do the next --

9          MR. McINTURFF:  And we've got motions that we're

10  going to be filing.

11          MR. WITTELS:  How about the 9th?

12          MR. ALEXANDER:  Again, I can't commit.  I'd have to

13  check with somebody else.

14          THE COURT:  13 lawyers.

15          MR. WITTELS:  13 lawyers.  We can't get one date in

16  two weeks.

17          MR. ALEXANDER:  I've got problems the end of the

18  week and the beginning of the week.

19          THE COURT:  Well, someone else can come from your

20  law firm.

21          MR. WITTELS:  You've got Jason and --

22          MR. ALEXANDER:  I just have to check.  That's all I

23  said is I just have to check.  I don't have his schedule.

24          MR. WITTELS:  Judge, could you tentatively put down

25  the 13th?

192

1          THE COURT:  Let me look at my schedule.

2          MR. WITTELS:  The 14th?

3          MR. ALEXANDER:  The 14th.

4          MR. WITTELS:  June 13th or 14th.

5          THE COURT:  The 13th is not going to work.  I have a

6  pretty heavy calendar that day.

7          MS. COHEN:  Is that the week of the 25th?

8          MR. ALEXANDER:  Yeah, 26th, 27.  Going once.

9          MR. FIOCCOLA:  That works for me.

10          MR. WITTELS:  No, no.  We don't want to [inaudible]

11  the whole month of June.

12          MR. McINTURFF:  Yeah.  No, we can't --

13          MR. ALEXANDER:  Is it because you have a conflict or

14  you don't want the wait?

15          MR. WITTELS:  I'm away.

16          MR. McINTURFF:  Both.

17          MR. WITTELS:  But that's -- yeah, we don't want to

18  wait.

19          MR. McINTURFF:  Both.

20          MR. WITTELS:  We're going to have other motions,

21  Judge, we're filing in the next week.  You couldn't do the

22  14th, right, Judge?

23          THE COURT:  I can do the 14th.  I just couldn't do

24  the 13th.

25          MR. WITTELS:  We can do the 14th.

193

1        MR. FIOCCOLA:  I have a status conference in Chicago

2   but co-counsel may be available.

3        MS. COHEN:  I'm available.

4        MR. WITTELS:  Yeah, there are two firms representing

5   one defendant.  One would think we could get a little leeway

6   here.

7        MR. ALEXANDER:  Is it the 14th?

8        MS. COHEN:  The 14th is fine.  That's fine with the

9   Court?

10       THE COURT:  I guess this is going to be another

11  multi-motion conference?

12       MR. McINTURFF:  Yes, Your Honor.

13       THE COURT:  All right.  Unfortunately I have

14  something in the morning so 2 o'clock is the earliest I can

15  do.

16       MR. WITTELS:  [Inaudible], Your Honor.

17       THE COURT:  Yes.

18       MS. PALIKOVIC:  Your Honor, we have for the upcoming

19  motion, one upcoming motion we'll be filing is likely going to

20  need to be over the three-page page limit.  Is it okay to

21  submit that or do you want us to follow a certain procedure

22  going forward for when we -- it's not against both sets of

23  defendants, so that's not the reasoning this time.  It just is

24  a voluminous long motion.

25       THE COURT:  What does it have to do with?

194

1          MS. PALIKOVIC:  Deficiencies in Cross Country's

2    redaction log.

3          MR. FIOCCOLA:  Your Honor, I don't know if we even

4    know about this issue and why don't we have a discussion about

5    it, see if we can reach an impasse before we start briefing

6    the issue?

7          MR. WITTELS:  Well, we're asking now for an

8    additional page limit.  I mean --

9          MR. FIOCCOLA:  No, but I'm saying I'm not even sure

10   if there's a -- you can correct me if I'm wrong.

11         MR. ALEXANDER:  I'm not aware of what the motion is

12   about, Your Honor, at this point.

13         MR. WITTELS:  Well, Judge, we --

14         THE COURT:  Have you had a discussion --

15         MR. WITTELS:  -- usually just say to defendants do

16   you object to our having additional pages.  We don't tell them

17   all the details of what the motion is about.  So the question

18   is --

19         MR. ALEXANDER:  I thought we were supposed to

20   confer.

21         MR. FIOCCOLA:  Meet and confer and reach an impasse

22   before we bring a motion.  That's what I'm saying.  I don't

23   even know what the dispute --

24         MS. PALIKOVIC:  If we reach agreement, then we

25   obviously won't be filing a motion.  I just wanted to get

195

1    clarification from the judge for the process that he would

2    prefer us to follow for a long motion, longer than three

3    pages.

4              MR. FIOCCOLA:  Yeah, I know.  But what I'm saying

5    though is you're saying oh Judge, we want to bring motions

6    before you.  You can ask for more pages.  That's fine.  What

7    I'm saying though is at least communicate to us what the

8    issues are because we're not aware of any dispute other than

9    all the ones --

10             MS. PALIKOVIC:  Have we ever not communicated our

11   issues?

12             MR. FIOCCOLA:  Well, I'm asking --

13             MS. PALIKOVIC:  We will communicate our issues.

14             MR. FIOCCOLA:  -- because [inaudible] motions.  We

15   don't know what the disputes are.

16             MR. McINTURFF:  We've just gotten a little

17   accustomed to how --

18             MS. COHEN:  How many pages do you want on your

19   brief?

20             MR. McINTURFF:  -- our meet and confers have gone.

21             MS. COHEN:  How many pages do you want on your

22   brief?

23             MS. PALIKOVIC:  We don't know yet.  We were seeking

24   clarity on how to --

25             MS. COHEN:  But what's a maximum?

196

1          MS. PALIKOVIC:  We don't know.  It's in the single

2  digits.

3          THE COURT:  It's in the same what?

4          MS. PALIKOVIC:  Single digits.

5          THE COURT:  All right.

6          MR. McINTURFF:  And unlike previous motions where

7  it's been five or six issues, this is one large issue but it's

8  just --

9          THE COURT:  One large issue that requires how many

10  pages to discuss?

11          MS. PALIKOVIC:  I mean it's one large issue and then

12  it concerns redaction and privilege calls.  But it's hard to

13  address it other than specific --

14          MR. McINTURFF:  And it doesn't fall under the

15  category of motions [inaudible] our view is.

16          THE COURT:  Okay.  Fine.  You can have your

17  additional pages.

18          MS. PALIKOVIC:  Thank you, Your Honor.

19          THE COURT:  And before you ask, defendants can have

20  additional pages too if you need them.  Try not to kill so

21  many trees if you can avoid it.  There's a very important

22  quality to brevity.  All right.  I'll see you on June 14th.

23          ALL:  Thank you, Your Honor.

24  (Proceedings concluded at 5:28 p.m.)

25                      * * * * * *

197

1     I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5   _____

6                                    Shari Riemer, CET-805

7   Dated:  May 24, 2017

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25