

# WITTELS LAW
New York & New Jersey

**J. Burkett McInturff**  
**Associate**  
jbm@wittelslaw.com

18 Half Mile Road  
Armonk, New York 10504  
T: (910) 476-7253   F: (914) 273-2563

July 12, 2017

**Via ECF**
Honorable Steven L. Tiscione
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**Re:**  <u>No. 13 Civ. 04427-NGG-ST:</u> *Delgado et al v. Ocwen Loan Servicing, LLC et al.*

Dear Judge Tiscione:

As Interim Class Counsel, we write on behalf of Plaintiffs and the Class to outline the current discovery disputes which require the Court's assistance at Friday's status conference.

The disputes are as follows:

1. **Plaintiffs' Letter Motion to Compel Cross Country Home Services, Inc. and Sandra Finn to Revise their Privilege Log and Produce Certain Documents (ECF No. 329)**

Plaintiffs seek to compel the Cross Country Defendants to (i) produce a revised privilege log and produce certain documents Cross Country incorrectly claims are privileged, or, in the alternative, (ii) provide those documents to the Court for *in camera* review. Plaintiffs believe Cross Country has an impermissibly broad view of privilege and as a result is improperly withholding hundreds of responsive documents. Defendants' withholding is compounded by numerous deficiencies in Cross Country's privilege log, which make it impossible for Plaintiffs or the Court assess the propriety of Cross Country's privilege claims.

Plaintiffs also understand that Cross Country is improperly withholding the non-privileged portions of the documents listed on its privilege log, and are asking the Court to order Cross Country to produce all non-privileged portions of any withheld documents.[1]

---

[1] *See Expert Choice, Inc. v. Gartner, Inc.,* No. 03 Civ. 2234 (CFD) (TPS), 2007 WL 951662 (D. Conn. March 27, 2007) ("In asserting a claim of privilege, counsel must take care not to withhold unprivileged information. It is not proper to withhold an entire document from discovery on grounds that a portion of it may be privileged. Where a document purportedly contains some privileged information, the unprivileged portions of the document must be produced during discovery. The proper procedure in such instances is to redact the allegedly privileged communication, and produce the redacted document."); *see also Makhoul v. Watt*, No. 11 Civ. 05108 (PKC) (VMS), 2014 WL 977682, at *13 (E.D.N.Y. March 12, 2014) ("Insofar as the last email on the chain discussed a simple scheduling detail, that scheduling detail

*Footnote continued on next page.*

2. **Plaintiffs' Letter Motion to Compel Cross Country Home Services, Inc. and Sandra Finn to Revise their Redaction Log and Produce Certain Documents (ECF No. 331)**

This motion seeks to compel the Cross Country Defendants to (i) produce unredacted versions of 12 documents on Cross Country's redaction log or, in the alternative, (ii) provide those documents to the Court for *in camera* review. As with its privilege log, Cross Country uses privilege assertions to shield discoverable evidence and further conceals its suspect privilege claims with inadequate redaction log entries.

3. **Defendants Should Log Redacted and Withheld Documents that Were Created After this Lawsuit Was Filed in August 2013**

Section VI of the ESI Protocol, which was entered by Judge Levy in March 2015, relieves the parties from their obligation to log purportedly privileged documents created after Plaintiffs filed this case in August 2013. ECF No. 65-1 at 8; s*ee also* March 13, 2015, Order Approving ESI Protocol. However, when the parties agreed to this provision, the available evidence suggested that Defendants had ceased all aspects of their check solicitation scheme upon this lawsuit's filing. It was not until more than a year later in May 2016 that Defendants revealed that the billing component of their scheme did not stop. Indeed, it continues to this day.

Due in large part to Defendants' continued billing, each Defendant produced documents and ESI that were created years after this lawsuit was filed, including thousands of 2014 and 2015 emails. In fact, when Cross Country produced its initial February 4, 2016 privilege log, this Defendant logged hundreds of categories of documents created after August 2013. Nevertheless, Cross Country later relied on ESI protocol Section VI to strike these post-lawsuit documents from its April 19, 2016 revised privilege log.

Remarkably, it was Judge Levy's order requiring Cross Country to correct certain serious privilege errors that Cross Country exploited to cut large swaths of documents from its log. By way of background, in the spring of 2016 Plaintiffs objected to Cross Country's practice of withholding virtually every email the company's in-house lawyer was copied on. On April 1, 2016 Judge Levy ordered Cross Country's in-house counsel John Walsh to certify that "where privilege has been claimed, neither he nor any other member of the legal team was performing a business function, and that no privilege was asserted merely because a member of the legal team

---

is not privileged, and [the producing party] must produce a redacted version of this document for that reason as well."); *Starr Indem. & Liability Co. v. American Claims Management, Inc.,* No. 13 Civ. 742 (DLC), 2014 WL 1378127, at *2 (S.D.N.Y. Apr. 8, 2014) (non-privileged portions of documents not protected from discovery); *Anderson v. Sotheby's Inc. Severance Plan,* No. 04 Civ. 8180 (SAS) (DFE), 2004 WL 5402553, at *9 (S.D.N.Y. Oct. 18, 2004) (ordering the production of non-privileged portions of privileged documents); *105 Street Associates, LLC v. Greenwich Ins. Co.*, No. 05 Civ. 9938 (VM) (DF), 2006 WL 3230292, at *6 (S.D.N.Y. Nov. 7, 2006) (same).

was copied on a document." April 1, 2016, Minute Entry. Following Judge Levy's ruling, Cross Country de-designated and produced 2,608 pages of documents. Country also, however, served a revised privilege log that eliminated more than 300 categories of withheld documents (i.e. Cross Country's new log contained 80 entries instead of the prior 389 categories).

Ocwen has similarly exploited the ESI protocol's privilege provision. While Ocwen's privilege/redaction log contains dozens of post-suit entries, Plaintiffs recently advised Ocwen that several of the redacted documents in its productions are not logged. Like Cross Country, Ocwen took the position that post-suit documents need not be logged. Obviously, by not logging the redacted documents Ocwen hinders Plaintiffs' ability to efficiently review and assess the propriety of Ocwen's redactions.

ESI protocol Section X allows any party to request that the Court revise the ESI protocol. Accordingly, because Defendants have redacted and withheld hundreds of discoverable documents—documents that were in large part created as a result of Defendants' decision to continue the billing component of their scheme—Plaintiffs request that Defendants be ordered to log any post-suit documents that have been redacted or withheld.

### 4. Cross Country's Failure to Supply Discovery Ordered During the October 14, February 15, and May 18 Conferences Before Your Honor

In advance of the October 14, 2016 conference Cross Country represented that it had produced all notes, memos, emails or documents regarding Cross Country's board meetings. ECF No 153 at 9.[2] During the October 14 conference Defendants similarly maintained that these documents had been produced and, as a result, the Court ordered that Cross Country identify all Bates numbers that it was relying on in making its claim. Oct. 14 Tr. 79. During a November 16 meet-and-confer Cross Country advised Plaintiffs that they were gathering this information. Having still not received the requested Bates numbers by the end of January 2017 (ECF No. 214 at 4) Plaintiffs renewed their request at the February 15 conference, which resulted in Your Honor again ordering Cross Country to supply the requested information. Feb. 15 Tr. 72. On March 29, 2017, more than five months after the Court's initial October 14 order, Plaintiffs received a partial production of board-related documents that referenced only documents prior to 2009 and post July 2013 (the check solicitations at issue in this litigation were sent between April 2009 and June 2013).

After a diligent search of Cross Country's production Plaintiffs identified only a handful of responsive documents that fall within the omitted time frame and raised this issue with Your Honor at the May 18, 2017 conference. Based on Plaintiffs' review we concluded that dozens (if not hundreds) of relevant board documents were being withheld from production.

---

[2] This request was made during the June 14, 2016 deposition of Cross Country's Senior Vice President of Sales and Business Development Alfred Venditti. Venditti Tr. 260.

More than 11 months after these documents were first requested on June 14, 2016, Cross Country's counsel reveled during the May 18 conference that "within the past week we've identified some hard copy documents responsive to this request and are currently reviewing those for responsiveness and privileged materials before June 9th." May 18 Tr. 156.[3]

When Plaintiffs began probing as to why Cross Country is locating hard copy documents at this late stage of the case, and why those same documents were not in Cross Country's ESI production, the Court ordered Cross Country to (a) determine if there were board-related and other documents related to check marketing that had been withheld, and (b) "explain why they didn't produce [the documents] earlier." May 18 Tr. 164.

We now know that the answer to (a) is that Cross Country was withholding several highly damaging documents showing knowledge of Defendants' scam at the company's highest levels. Further, *all* of these documents exist in electronic format such that they should have been in Cross Country's ESI production. Cross Country's recent production includes the following damning documents:

A. July 31, 2006 – Board of Advisors Advance Readings state: "We were severely handicapped in not being able to use highly promotional packages due to clients becoming ever more conservative; the loss of the 'check' package, in particular, impacted our response rates significantly" and notes "the response barrier that has plagued us since the elimination of the check package last year." CCHS_394193.

B. February 26, 2007 – Cross Country presentation to the Board of Advisors notes: "Check package though infrequently allowed by clients, remains a potent package from a response rate perspective." Under "2007 Marketing Tactics – Revenue" Cross Country told its Board that it would "[u]se check packages whenever possible." CCHS_394189.

C. August 22, 2011 – Cross Country presentation to the Board of Advisors shows Cross Country was "currently re-evaluating the check package cancel curve" and candidly informs top brass that "price point is not an issue with check packages." CCHS_394529.

D. April 26, 2013 – Cross Country presentation to the Board of Advisors shows the Board paying close attention to renewal rates and increasing cancellations, as well as Cross Country's retention efforts and cancellation code tracking. CCHS_393465. Presentation also notes higher profits "resulting from the lower claim frequency primarily due to new channel client composition (e.g. more Ocwen check customers)." *Id*.

---

[3] Any documents Cross Country is asserting privilege over need to be logged.

E. August 1, 2013 – Cross Country presentation to the Board of Advisors notes the importance of check packages to Cross Country's bottom line, explaining that "the significant change from budget is in Direct Mail (Check) as Ocwen has acquired loans from GMAC, which now allows check packages to a client's customer base that previously disallowed it's [*sic*] use, that five-year operating profit projections are "favorable to budget primarily due to our Direct Mail (Check) results" and showing check solicitation accounting for 49.2% of Cross Country's actual 2013 Operating Profits (as compared with 20.1% for telemarketing and 3.6% non-check). The Revenue summary also notes that the increased variance (i.e. difference between projected and actual revenue, i.e. shortfall) results in part from "increased product awareness." CCHS_393651.

The Cross Country Defendants have also not "explain[ed] why they didn't produce [the documents] earlier." May 18 Tr. 164.

### 5. Cross Country's Continued Lack of Transparency Regarding Its Unilateral Imposition of a Predictive Coding Protocol

At the outset of discovery Judge Levy rejected Cross Country's attempt to exclude Plaintiffs from their ESI production process and ordered the parties to agree on a search methodology prior to Cross Country conducting an ESI search. Feb. 5 Tr. 23-24, 31-32; *see also id*. at 40 ("THE COURT: [B]eforehand they will tell you what the search, their methodology will be, what their sources of data, what the data range will be, the search terms, et cetera."). Yet it wasn't until more than two years later during the June 14, 2017 conference with Your Honor that Cross Country revealed that in violation of Judge Levy's order (and the ESI protocol) it unilaterally and secretively imposed predictive coding on the documents recalled by the parties' heavily negotiated search terms. In response to these revelations the Court agreed that Plaintiffs needed information regarding Cross Country's predictive coding, stating that "[y]ou need to know the information before you can decide how you want to respond and what motion you want to make." June 14 Tr. 61. The Court further ruled as follows:

> I'm going to make this very simple. You're going to tell them when you used predictive coding and on what. You don't have to do it now on the record but you are going to do it and if you don't do it I'm going to order you to do it later and we're just going to be here again.

*Id*. at 63-64.

During the parties' June 26 meet and confer Cross Country made certain disclosures to Plaintiffs but curiously persisted in refusing to put many of those disclosures in writing. Cross Country also refused to discuss certain topics altogether. Below are two lists: (A) a list of the outstanding items Cross Country committed to providing Plaintiffs, and (B) a list of the outstanding information Plaintiffs seek regarding Cross Country's predictive coding process:

A. <u>Outstanding Disclosures Cross Country Agreed to but Has Yet to Provide:</u>

    i) The bates ranges of the documents produced after imposition of predictive coding.[4]

    ii) A final hit report showing the total number of documents recalled by the parties' negotiated search terms.

    iii) All relevancy/responsiveness "restrictions" Cross Country applied in removing documents from the predictive coding ranking process.

B. <u>Information Cross Country Has Not or Will Not Voluntarily Provide:</u>

    i) When the decision to use predictive coding was made.

    ii) Who made the decision to do predictive coding.

    iii) The date(s) the predictive coding was done.

    iv) Information about the software Cross Country used for predictive coding.[5]

    v) The steps (a/k/a the "workflow") that Cross Country used for its predictive coding.[6]

    vi) A list of responsiveness categories into which the documents were categorized.

    vii) The documents used as the "seed set" for training the computer program.[7]

---

[4] Cross Country advised Plaintiffs that more than 107,000 of the approximately 116,000 total produced documents (or more than 92%) were produced as a result of predictive coding. Cross Country also represented that the total universe of Cross Country's collected documents was approximately 3.3 million, out of which the negotiated search terms recalled approximately 450,000 documents.

[5] Some "predictive coding" software uses entirely unsatisfactory algorithms. While Cross Country disclosed the name of the software it used, Plaintiffs need to know (a) the version number of the program, and (b) how the machine learning in Cross Country's computer program works.

[6] Plaintiffs need to know exactly (a) how Cross Country trained the computer program, (b) how many documents were included in each training and assessment phase (c) how and which documents were selected, and (d) how each document was coded.

[7] In addition to producing non-privileged seed documents, Plaintiffs need to know (a) whether responsive

*Footnote continued on next page.*

> viii) The privilege "restrictions" Cross Country applied in removing documents from the predictive coding ranking process.[8]
>
> ix) The workflow's output.[9]
>
> x) The ultimate ranking of the seed documents.[10]
>
> xi) The ultimate ranking of selected hot documents provided by Plaintiffs.
>
> xii) Whether a ranking level or confidence level was used as a stopping point and, if so, why that level was selected.[11]
>
> xiii) All quality control steps Cross Country took.[12]

---

privileged documents were used as seed documents, and (b) whether Defendants included litigation documents such as the complaint or requests for production or any non-document summaries or outlines.

[8] Cross Country maintains that these "restrictions" are privileged. Plaintiffs disagree. Knowing the restrictions will help Plaintiffs and the Court determine whether Cross County's view of privileged largely overrode the computer program's responsiveness determinations. Further, Plaintiffs understand that documents pulled out of the data set because of privilege restrictions were not put on a privilege log.

[9] For example, Plaintiffs need to know (a) whether each document was assigned a ranking, (b) if so, the distribution of documents across the ranking, and (c) the number of documents at a 99% likely responsive, 98% likely responsive, etcetera. This information provides an understanding of the results of the training process, how "rich" in responsive documents the collection is likely to be, and the relative balance between precision and recall. This information also provides transparency into how deep Cross Country should have looked into the collection's rank order, and will assist Plaintiffs and the Court in determining how many documents were left unreviewed or left behind and for what reason.

[10] An understanding of how the seed documents were ultimately ranked provides useful insight into how well the system is trained and will aid in assessing whether the ranking suffers from "GIGO" or "garbage-in-garbage-out." Errors in scope and coding are highly magnified during training and assessment and will affect the ranking of important documents.

[11] Plaintiffs also need to know (a) how many documents at each ranking were reviewed, (b) how many were not reviewed, (c) of the documents reviewed, Cross Country should produce all non-privileged documents and disclose for each document whether it was marked responsive or not responsive, and (d) Cross Country should identify the number of documents reviewed in each ranking that were marked privileged. These statistics provide transparency into whether the reviewers for privilege were largely overriding the results of the predictive coding or taking a narrower perspective on the scope of discovery.

[12] Cross Country disclosed that it did certain sampling of documents marked as likely non-responsive. Cross Country should (a) produce all sampled documents and disclose which responsive documents were

*Footnote continued on next page.*

---

    xiv)     Whether a "control set" of documents was used.

    xv)     How Cross Country handled non-text or numerical documents.[13]

    xvi)     How Cross Country accounted for review and production of email messages and attachment sets once a file, email, or attachment was found to be responsive or not responsive or responsive and privileged.[14]

    xvii)     How Cross Country accounted for documents the predictive coding software was unable to categorize for any reason.

    xviii)     Cross Country disclosed that it used predictive coding on multiple ESI productions. For each of these productions Plaintiffs need Cross Country to explain (i) all training and quality control steps taken and (ii) how and whether those steps were repeated in subsequent productions.

**6. Defendants' Failure to Timely Produce Call Recording Samples**

During the June 14 conference Defendants committed to producing the call samples for certain categories of customers on a rolling basis. Defendants have still not produced calls for either of the three sampled categories. Plaintiffs request that a firm production date be provided.

**7. Cross Country's Failure to Log Purportedly Privileged Documents Related to Ocwen's Attempt to Stop the Billing Component of Defendants' Scheme**

Plaintiffs had previously issued discovery concerning Ocwen's attempt to stop collecting Cross Country plan premiums, and Ocwen's later reversal of that decision. ECF No. 214 at 2 During the parties' May 18 conference Cross Country's former counsel Mr. Alexander represented that all documents related to this issue had been produced, that he would confirm that any documents withheld on privilege grounds were on Cross Country's privilege logs and, if not, that they would be added. May 18 Tr. 167. This has not been done.

---

found in the "test the rest" sampling and (b) explain why they were not predictively ranked higher. Plaintiffs also want to know (c) whether Cross Country performed targeted searches related to responsive "test the rest" documents and (d) whether Cross Country found additional responsive documents.

[13] These documents are not easily subjected to the algorithms which rely on groupings and similarities of words in text from document to document.

[14] Most training and assessment procedures are based on individual files, messages, and attachments as stand-alone documents.

### 8. Cross Country Group's Continued Failure to Make Required ESI Disclosures

During the June 14 conference, the Court directed Cross Country Group ("Group") to respond to Plaintiffs' May 22 ESI letter as well as a June 5 ESI-related email. Group's responses were vague, boilerplate, and insufficient. As set forth below, Plaintiffs require the Court's assistance on the following items:

A. Even though it was subpoenaed in late 2016, Group secretly restricted the date range of its production to December 31, 2013. When Plaintiffs brought this matter to the Court's attention Your Honor noted "[t]he subpoena requests certain documents. Unless the answer is we don't have them or we're objecting to them for some reason you should be producing them up to the date of the subpoena if they are responsive." June 14 Tr. 72. Contrary to the Court's clear guidance, on June 23, 2017 Group announced that it was withholding all post-2013 documents because in Group's view those documents are "likely privileged and not relevant to the claims in this case."

B. Group maintains that it is "searching all electronic file locations for responsive documents." Plaintiffs have now requested on three separate occasions that Group provide a list of its ESI sources. Plaintiffs also requested that Group identify which sources it is collecting and which sources it is leaving behind. Group has not responded.

C. Group's four ESI custodians have offered to review their cell phones for responsive text messages. Plaintiffs need an update on this review.

D. Produced documents demonstrate that at least two of Group's four custodians conduct business via personal email accounts. Group agreed to discuss with the four custodians whether they used any additional personal email addresses in conducting Group's affairs. On June 23, Group advised that "[w]e are in the process of determining information responsive to this request, and hope to provide a response by the end of next week." No response has been provided.

E. On June 23, Group committed to providing Plaintiffs with an employee list with names and titles. The list has not been provided.

F. Group has offered to collect and search the email accounts for Sid and Jeffrey Wolk. Plaintiffs need Group to confirm that these accounts have been collected.

G. Despite Group's size, its email server only contains emails dating back to 2011. Plaintiffs have requested that Group explain why pre-2011 emails are missing and Group responded on June 23 that it is "following up on this." During the parties'

   June 26 meet and confer Group's counsel agreed to identify and disclose Group's pre-2011 backup practices.  Plaintiffs have yet to hear the results of counsel's inquiry.[15]

               Respectfully submitted,

               /s/ J. Burkett McInturff___
               J. Burkett McInturff

cc: All counsel of record (via ECF)

---

[15] Plaintiffs also request that Group be ordered to make the same predictive coding disclosures requested in Section 5 above.