UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


```
----------------------------X
                            :
MARGARITA DELGADO, et al.,  :
                            :    13-CV-4427 (NGG)(ST)
            Plaintiff,      :
                            :    August 29, 2017
                            :
            V.              :    Brooklyn, New York
                            :
OCWEN LOAN SERVICING, LLC,  :
et al.,                     :
            Defendant.      :
----------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE STEVEN TISCIONE
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          STEVEN WITTELS, ESQ.
                            J. BURKETT McINTURFF, ESQ.


For the Defendant:          DAVID FIOCCOLA, ESQ.
                            CAMERON TEPFER, ESQ.
                            MATTHEW PREVIN, ESQ.
                            TIMOTHY OFAK, ESQ.
                            JASON McELROY, ESQ.  .


Court Transcriber:          ARIA SERVICES, INC.
                            c/o Elizabeth Barron
                            102 Sparrow Ridge Road
                            Carmel, NY 10512
                            (845) 260-1377



Proceedings recorded by electronic sound recording,
transcript produced by transcription service

1                THE CLERK:  Civil cause for motion hearing,

2   13-CV-4427, Delgado, et al. v. Ocwen Loan Servicing,

3   LLC, et al.

4                Counsel, please state your appearances for

5   the record.

6                MR. WITTELS:  Steven Wittels for plaintiffs

7   and the class.  Good afternoon, your Honor.

8                THE COURT:  Good afternoon.

9                MR. McINTURFF:  Burkett McInturff for

10  plaintiffs and the class.

11               MR. FIOCCOLA:  Good afternoon, your Honor.

12  David Fioccola of Morrison & Forester on behalf

13  defendant Cross Country.

14               MR. TEPFER:  Cameron Tepfer on behalf of

15  Cross Country.  Good afternoon.

16               MR. OFAK:  Timothy Ofak of Weiner Brodsky

17  Kider for Cross Country Home Services, Incorporated and

18  Sandra Finn.

19               MR. McELROY:  Jason McElroy, Weiner Brodsky

20  Kider, on behalf of Cross Country defendants.

21               MR. PREVIN:  Matthew Previn at Buckley

22  Sandler on behalf of Ocwen Loan Servicing.

23               THE CLERK:  The Honorable Steven Tiscione

24  presiding.

25               THE COURT:  Good afternoon, everyone.  Bear

1    with me a little bit.  We just moved into this new

2    courtroom and chambers today so things are a little bit

3    of a mess.

4              MR. PREVIN:  Congratulations.

5              THE COURT:  As an initial matter, I got the

6    materials that defendants were ordered to produce in

7    camera.  I have not had a chance to go through all of

8    them yet.  I got one courtesy copy of the binder.  Does

9    that have both sets of documents in it or just one set?

10             MR. OFAK:  The courtesy copy of the binder

11   should have documents with highlighting over the

12   redacted portions.

13             THE COURT:  Yep.

14             MR. OFAK:  Sort of to make it easier, what

15   we did is just kind of (ui) the submission.

16             THE COURT:  As I said I haven't had a chance

17   to look through all those materials yet, so that aspect

18   of (ui) table that discussions until I have a chance to

19   review all the materials.

20             The more pressing issues -- I still have no

21   sense in talking with Judge Garaufis as to when there's

22   going to be a decision on the motion to dismiss.  I

23   wish I could give you better guidance on that but as of

24   now, I know just as much as you do.  There's still the

25   issue of the certification motion.  Unfortunately,

```
 1   things are kind of in limbo a little bit for those
 2   reasons and there's not much I or you can do about it
 3   at this point.  We'll just have to make do with what we
 4   have.
 5            So let's talk about some of the issues that
 6   the parties have raised more recently.  I don't
 7   particular care where you want to start.
 8            MR. McINTURFF:  Well, your Honor, we believe
 9   we laid out all the issues in our letter, and I think
10   that it encompasses -- will give us an opportunity to
11   discuss the issues that the defendants raise.  Our
12   letter is document 349 filed yesterday.  Your Honor has
13   already dealt with the first item in our letter, which
14   is the redactions motions, and then the second item is
15   plaintiffs' motion for a protective order postponing
16   the deposition of individual plaintiffs who have not
17   been brought forward as class representatives.  I think
18   my colleague, Mr. Wittels, wanted to address the Court.
19            THE COURT:  Technically speaking, we're
20   obviously going to have to change that deadline since
21   you're not going to get (ui) rest of discovery in the
22   next three days.  But what you're asking for is
23   essentially a hold-off until two months before the end
24   of discovery.  I think we're kind of at that point,
25   aren't we?
```

```
 1              MR. WITTELS:  I don't think so, Judge.

 2              THE COURT:  No?  Okay.

 3              MR. WITTELS:  A) We'll get to it but we're

 4    going to -- we have other issues about group and their

 5    production.  We have issues about documents that may

 6    have not -- in our number three item that weren't

 7    logged in terms of privilege properly, in our judgment,

 8    and post-lawsuit.  Therefore, those documents might end

 9    up bringing forth documents we want to question people

10    about.  So we are not opposed to producing these

11    plaintiffs at the appropriate time.

12              Just as a back story, we are producing

13    Tuesday one of the class representatives who had been

14    substituted in, Justin Mignusky (ph), so we are willing

15    and able to produce the plaintiffs.  He is coming into

16    New York to make it easy for everybody but the other

17    plaintiffs that I want to depose are not class

18    representatives.  One is a husband of one of the class

19    representatives and your Honor should know that none of

20    -- there was never any effort by the defendants to

21    depose these people before they responded to the class

22    motion.  There is no sort of motion saying we need

23    these depositions so that we can oppose --

24              THE COURT:  Okay.

25              MR WITTELS:  We are hearing that now.  So
```

```
1    what we are just saying is we will produce them but

2    what is the point now, before we have the class motion

3    and the motion to dismiss decided.  It's just not

4    necessary.

5              THE COURT:  Can't the same argument be made

6    with respect to 90% of the outstanding discovery?  I

7    mean what is the purpose of going there if we just --

8    why don't we just wait and see how these motions come

9    out?  I mean, look, there are different ways you can

10   approach discovery.  We could have tabled a lot of this

11   stuff until after the class certification motion was

12   decided but nobody really wanted to do that.

13             MR. WITTELS:  Because we did anticipate, you

14   know, at some point -- obviously, we were going to have

15   the trial, didn't happen.  We want to be in a position,

16   once the judge rules, to move forward.  It's either

17   going to be a class trial or it won't.

18             THE COURT:  Okay.

19             MR. WITTELS:  At some point.

20             THE COURT:  But if it's not going to be a

21   class trial, aren't these named plaintiffs?  They might

22   not be class representatives but they are named

23   plaintiffs, right?

24             MR. WITTELS:  Right.

25             THE COURT:  So they have individual claims
```

```
 1   against the defendants.

 2               MR. WITTELS:  Yes, true.  It's just that a

 3   lot --

 4               THE COURT:  So they would have to need to be

 5   deposed.  I mean, look, you're right.  If certification

 6   is granted, then maybe they don't need to be deposed.

 7   But if certification is not granted, then obviously

 8   they need to be deposed since they are the individual

 9   plaintiffs for the remaining claims and, I don't know,

10   the defendants may want to depose them anyway.  I don't

11   know what the purpose for that would be but if they

12   choose to expend their resources deposing these people

13   now, instead of waiting to see whether or not it is

14   necessary, isn't that really their wasted time and

15   effort?

16               MR. WITTELS:  Well, it is not only their

17   resources because we have a lot of -- in doing five

18   plaintiffs -- with five plaintiffs all over the place,

19   it's either we bring them in and pay for them, which

20   has gone on -- if they want to pay to fly them in and

21   put them up in New York, I mean, that it is a different

22   story.  They did say they would travel all over the

23   place but apparently, you know, it took a lot of effort

24   to produce, 23 is it, I think.

25               MR. McINTURFF:  I stopped counting at 18.
```

1          MR. WITTELS:  23 plaintiffs, I think it was,

2    that we have said in our motion.  That is a big deal.

3    As your Honor said, if we do get certified, they

4    probably won't be deposed.  I mean, it is unlikely that

5    we are going to call everybody.  If we call someone,

6    certainly we will produce them before hand.  We are not

7    going to put up -- you know, you call twenty witnesses

8    saying the same thing, you put the jury to bed.

9          THE COURT:  I assume at this point you don't

10   know who you are going to call.

11         MR. WITTELS:  Right, we don't know.  But I

12   mean, it is likely it will be the people we put up as

13   the class representatives, likely, I mean, if we get

14   certified.  So, I mean, we are just asking that it be

15   held in advance.  It is not something that really is

16   necessary now, and Judge Levy and even Judge Garaufis

17   had said -- when we were talking about who would be

18   deposed, he said why -- he asked the defendants, why do

19   you have to depose everyone?  You don't, you know, -- I

20   can decide class certification on a few plaintiffs.  We

21   ended up with 23.  Judge Levy said, pick the ones you

22   are going to put forward.  We picked some from each

23   state and that's what we produced.

24          It is not like they are going to learn

25   something radically new here.  The story is very

1  similar, if not identical, for all people, you know,

2  all the plaintiffs.  I mean, I was at every one of

3  these plaintiffs' depositions and it is sort of like

4  that new show Ground Hog Day really.  I mean, it's the

5  same schpiel (ph).  I discovered this charge, I called

6  and I was outraged.  I mean, it's the same thing.  So,

7  I'm just -- if your Honor thinks 60 days is not enough

8  time -- I think it is.  We can extend it to 90.  I

9  mean, we will have to have an extension of the

10  discovery and it just seems that it's not necessary to

11  do now.

12          MR. OFAK:  Your Honor, I have a few points

13  whenever you're ready.  First, these aren't absent

14  class members.  They chose to be involved in this case,

15  they chose to be named plaintiffs, and we have been

16  trying to depose them since the beginning of the case.

17  At this point, discovery has to end at some point in

18  the near future and we need adequate time to schedule

19  their depositions, and their depositions may lead to

20  some additional discovery.

21          In addition to that, your Honor, they have

22  unique information and we are not just trying to depose

23  them just because we want to.  There is information

24  that they may have that is very necessary for us to

25  defend our clients.  And if I may, I would like to

```
 1    approach with two documents.

 2                    THE COURT:  Okay.

 3                    MR. OFAK:  The first document, which is only

 4    two pages, it is a letter and a check.  This was

 5    actually produced by the plaintiffs and it is addressed

 6    to Kevin Chowning (ph).  Now his wife, who is a named

 7    class representative, during her testimony, deposition

 8    testimony, she stated that her husband, Kevin, actually

 9    called and spoke with Cross Country Home Services and

10    he also signed the check which is on the second page of

11    the document.

12                    The first page, which is the letter,

13    indicates that he was in fact the person who likely

14    called Cross Country Home Services.  So we should be

15    entitled to ask him questions about his conversations

16    with Cross Country, his understanding of what he was

17    signing at the time he signed the check, and other

18    related information.

19                    The second example we have relates to

20    plaintiff Melanie Bordwick (ph).  This is what is being

21    commonly referred to as a fulfillment kit.  Now many of

22    the plaintiffs in the case that we've deposed have been

23    refusing to admit that they received it.  But again,

24    this is a document that was produced by the plaintiffs,

25    which is a copy of the fulfillment kit.  It indicates
```

1  that she received this document, and we should be

2  entitled to depose her and explore these different

3  areas of information. So we feel the time is ripe now

4  to actually depose there people so that we can finish

5  our discovery.

6          MR. WITTELS: Your Honor, I haven't heard

7  anything other than Ground Hog Day story here. I mean,

8  this is a document that, this first one, that they

9  always send to every plaintiff who contests, who

10 disputes enrollment. There is nothing new under the

11 sun here with this document. There is nothing that

12 they have to ask him that they haven't asked her. It's

13 just, really just sort of a make way if you will, just

14 busy work. I mean, they didn't need his deposition

15 before they opposed class certification and they don't

16 need it now. I mean, there is no reason for it.

17          And this other document is the so-called --

18 they call it a fulfillment kit. It is the glossy

19 brochure that everyone throws out. If one person kept

20 it, so what? It doesn't matter. It doesn't even say

21 what it is. We contest the whole issue of this

22 document as being informative. The whole nub of the

23 lawsuit is whether this glossy -- one part of it is

24 whether this glossy brochure that they are relying on

25 somehow informs people that they were involved in some

1   plan.  If you can look at it -- we've studied this but

2   there is nothing that even connects it to the check.

3   So their own people say it's something -- their own

4   head of marketing testified it was something they would

5   throw out.

6           But there is no reason to the do the

7   depositions now.  That's the point.  They have deposed

8   23 people.  They have records of phone calls from

9   people, these people.  They have logs of all the back

10  and forth in their own written documents.  There is

11  nothing new that they need to know from the depositions

12  and certainly nothing has come out  We'll do the

13  deposition on Tuesday but, again, it's going to be

14  another Ground Hog Day.

15          MR. OFAK:  Your Honor, at this point, the

16  plaintiffs aren't contesting that there were not

17  allowed to take the depositions, they're just

18  challenging the timing.  And at this point, why wait?

19  The end of discovery is coming and there is new

20  information.  These documents show that there is new

21  information regarding these individuals.  They are

22  named plaintiffs in this case.  They chose to be named

23  plaintiffs.  They did not have to be part of this

24  lawsuit.

25          MR. WITTELS:  Judge, you said yourself at

```
 1   the beginning they may not be deposed if class
 2   certification is granted.  There's probably no need for
 3   that.  We're not contesting whether they chose to be
 4   part of the lawsuit or not.  They didn't choose to be
 5   ripped off by the defendants either.  The real question
 6   is, is there a need now?  We don't know what the cutoff
 7   is going to be.  Your Honor hasn't discussed that, if
 8   there even should be a cutoff now until we come back
 9   for the next hearing and see where we are because we're
10   going to making a motion for sanctions involving what
11   we thought was really improper, fraudulent conduct and
12   not giving us -- not doing their discovery properly
13   with the predictive coding.  There are going to be
14   disputes that are ongoing, certainly until -- we have
15   no idea when we're going to get a ruling from the judge
16   on the main issues, the motion to dismiss or class.
17            MR. OFAK:  Your Honor, if I may make two
18   points.  There's a different standard perhaps for class
19   members and these are not absent class members.
20   They're not even generally people who decided to opt
21   in.  Named plaintiff is a different category
22   altogether.  Second, to the extent that Judge Garaufis
23   allows for additional class briefing, this information
24   may also be helpful in that respect.
25            MR. WITTELS:  If the judge orders it -- we
```

```
 1   have no idea whether he's going to have an issue.
 2   We've submitted the motion, it's fully briefed.  Both
 3   sides briefed it extensively.
 4             THE COURT:  Was there any decision on that,
 5   because I got the sense from the last conference that
 6   there was a difference of opinion as to what Judge
 7   Garaufis was going to let you do with respect to the
 8   class certification motion.  Was that ever resolved?
 9             MR. OFAK:  Your Honor, my guess is that
10   there's probably still a difference of opinion.  Our
11   position is that because the plaintiffs filed a fourth
12   amended complaint, we will likely be allowed to
13   supplement our briefing, if not file new briefing.
14             MR. WITTELS:  You have to remember what
15   happened, Judge, on the last motion.  When we had the
16   conference in front of Judge Garaufis, he said,
17   plaintiffs, you have a choice:  You can stand on your
18   third amended complaint or you can amend.  Really, the
19   only amendment we were contemplating at that time was
20   the substitution of the Indiana plaintiff.
21             THE COURT:  Okay.
22             MR. WITTELS:  When we substituted the
23   plaintiff, we also added a common law fraud claim
24   nationwide or multi-state.  The response or motion to
25   dismiss that we got was addressed to --
```

```
 1              MR. OFAK:  80% striking the class pleadings.
 2              MR. WITTELS:  -- striking the class
 3    pleadings.  The judge said supplement and we wrote to
 4    him and we had an argument about it.  We said, this is
 5    not a supplement, this is a new motion to dismiss based
 6    on your not having pled the class properly.  We said,
 7    Judge, we've already briefed the class motion.  This is
 8    duplicative, the case law doesn't allow it.  He right
 9    away understood the argument and said, I'm disregarding
10    everything you said about class, I'll take whatever
11    else you said that's new.  So if he lets the defendants
12    supplement, if that was any telling, it's not going to
13    be new, expansive briefing.  It's going to be something
14    new.
15              I don't know what could possibly be new from
16    -- there's only one witness who is the husband of a
17    class plaintiff.  Maybe that, if they needed to depose
18    that person.  They didn't need him beforehand.  Lea
19    Chowning, I was at her deposition in D.C.  They asked
20    her everything, she answered everything.  There was a
21    motion that she couldn't answer, so I don't know what
22    they're going to get out of him.  But if they need him
23    somehow and they want to supplement their class
24    opposition for one plaintiff, okay.  The others are not
25    class plaintiffs so they wouldn't be supplementing
```

1    anything.  I'm just saying it doesn't make sense to put

2    us to the burden to producing all these people.

3    There's prep involved, there's expense involved.  We

4    already had 23 of them.

5              MR. OFAK:  Your Honor, if I may just correct

6    a mistake I think Mr. Wittels has made regarding the

7    procedural posture here.  We did -- about this time two

8    years ago, in 2015, we were having a similar fight over

9    whether or not we were able to depose any of the named

10   plaintiffs.  We sought schedules from plaintiffs'

11   counsel in order to start our depositions of the named

12   plaintiffs in June of 2015.

13             At that point, the end of August, 2015 was

14   the original discovery deadline.  We had multiple

15   conversations between counsel and multiple

16   conversations with Judge Levy, including we took that

17   decision to Judge Garaufis to discuss with  him about

18   the depositions that Judge Levy allowed us to take.  So

19   I think that stating that we've never sought to take

20   these depositions is just a mis-statement about the

21   procedural posture.

22             THE COURT:  Part of this is going to depend

23   on how long we need for the rest of discovery.  You're

24   taking the deposition of one of the plaintiffs, the

25   recently substituted class representative?

```
1              MR. OFAK:  That's correct, your Honor.  It's
2   currently scheduled for I believe September 5th.
3              MR. WITTELS:  A week from today.
4              THE COURT:  I think they should be permitted
5   to take the deposition fo the husband as well, since
6   he's at least closely related to their class
7   representative.  With respect to the other plaintiffs,
8   let me table that for now and I'll come back to it when
9   we decide what we're going to do with rest of the
10  discovery schedule.
11             MR. OFAK:  Your Honor, if I could just ask
12  one question.  The two documents I handed up to you are
13  two different named plaintiffs.  The first one is for
14  the husband, Kevin Chowning.  The second document I
15  handed up, which his the fulfillment kit that they
16  produced, that is for Melony Bordwick.
17             THE COURT:  Okay.
18             MR. OFAK:  The plaintiffs, like I said
19  before -- they're stating that they refuse to admit
20  that they received this document.  Here, for this
21  particular plaintiff, they actually produced it in
22  discovery.
23             THE COURT:  Okay.
24             MR. OFAK:  So we'd also like --
25             THE COURT:  So that particular plaintiff
```

```
 1   received it.

 2            MR. OFAK:  Yes.

 3            THE COURT:  Okay.

 4            MR. OFAK:  We believe we should be allowed

 5   to depose her as well.

 6            THE COURT:  To say that she received the

 7   kit?

 8            MR. OFAK:  To understand what else -- does

 9   she remember receiving it, what did she do with it?

10   Does she remember receiving the other documents related

11   to it, why she didn't throw it away?

12            MR. WITTELS:  Judge, I think your ruling is

13   a fair compromise.  While we don't think that the

14   husband should be deposed at that point, at least it's

15   a compromise.  There's no reason to start doing

16   individual discovery here without the class motion

17   decided.  The questions that counsel is raising, they

18   ask of every plaintiff.  It's nothing new.

19            THE COURT:  I guess it's new to the extent

20   that none of the others plaintiffs actually admitting

21   to receiving it.

22            MR. WITTELS:  When he says refused to admit,

23   that's not exactly how the depositions occur.  Their

24   own head of marketing says most people throw it out as

25   junk mail, and that's in the many documents.  It's
```

1  considered to be junk.  If someone saved some junk, it

2  doesn't mean anything in terms of whether they were on

3  notice of what it was.

4  THE COURT:  Okay.

5  MR. WITTELS:  The point is I don't see what

6  she adds at this point.  We've got motions to dismiss

7  pending, we've got class certification pending.  That's

8  really where we have to get to.  Plus, there's going to

9  be more discovery.  I think maybe if we could get to

10  the next issue, we can come back if you want to change

11  your mind, but I think you ruled on it.  Why don't we

12  get to the other motions now?

13  THE COURT:  We'll do that.  Let's talk about

14  the rest of the discovery first and we can circle back

15  to this.

16  MR. McINTURFF:  The next item on our agenda

17  is the plaintiffs' motion to compel defendants to

18  revise their privilege and redaction logs to include

19  post-lawsuit documents.  We've submitted letters and

20  laid out our arguments but just briefly --

21  THE COURT:  Let me ask you this:  You're

22  looking for a privilege log for the stuff that they've

23  withheld.

24  MR. McINTURFF:  Correct, and we --

25  THE COURT:  I guess there's been document

```
1    requests and there's been discovery and post-lawsuit
2    have been turned over.
3              MR. McINTURFF:  Correct, your Honor.
4              THE COURT:  So all you're looking for is
5    basically for them to log the stuff that they haven't
6    turned over because it's privileged.
7              MR. McINTURFF:  Correct.  In order to reduce
8    the burden, we've offered that the defendants that
9    don't have to log any communications directly with
10   outside counsel.  We asked Ocwen to give us an estimate
11   of how many documents that was.  We were told
12   approximately 900.  We asked Cross Country.  Cross
13   Country wouldn't tell us how many documents that was,
14   but we don't think it's going to be terribly burdensome
15   because Cross Country previously logged those documents
16   on an inadequate and deficient privilege log that they
17   initially served.
18             When Judge Levy ordered them to redo their
19   log, the second time around, they took them all off.
20   So we think they've already logged them.  I don't know.
21   Counsel is not telling us whether or not they have any
22   additional documents that they're not logging.
23   Basically, we're looking for -- if there's a document
24   that was in their production that they're withholding,
25   we want them to meet their burden to show that it's
```

```
 1   been properly withheld or redacted.

 2            THE COURT:  There's a reason why those

 3   privilege logs usually don't include post-lawsuit

 4   documents.

 5            MR. WITTELS:  If I may.

 6            MR. McINTURFF:  Go ahead.

 7            MR. WITTELS:  I think the case that the

 8   defendants cite in opposition is telling because if you

 9   look at page -- on page 2 of one of their cases, they

10   cite a case from Magistrate Judge Brown where the judge

11   says that normally, you only log documents that are

12   before a litigation is commenced.  He says, "This is

13   due to the fact that in many situations, it can be

14   assumed that all documents created after charges have

15   been brought or a lawsuit has been filed... were

16   created because of that pending litigation."

17            We have a very different circumstance here

18   because we're not in one of those many situations.  We

19   have -- I don't want to say unique situation but we

20   have an anomaly because here, what happened was, the

21   defendants had continued the wrongful -- what we allege

22   is a fraudulent practice.  The billing --

23            THE COURT:  The continued billing.  You

24   haven't continued the fraudulent conduct, which was the

25   mailing.
```

```
 1              MR. WITTELS:  No.  Judge, with all due

 2   respect, when we filed the initial complaint, we

 3   alleged a two-part fraud, which was that there was not

 4   only a fraud in sending the check solicitation, which

 5   had all the indicia of fraud for all the reasons we've

 6   talked about, but that the billing component was also

 7   part of that in masking it, which was sending bills

 8   that were not from Cross Country but from Ocwen, which

 9   kept having ever-changing language.  And even if it was

10   the same, it was ambiguous, not noticeable.  It wasn't

11   called to their attention.  It came out of the blue,

12   weeks after they supposedly had signed the check, many

13   weeks after, so there was no way to connect it.  So the

14   billing fraud we thought would have ended when we

15   started the lawsuit.

16              In fact, you know that Ocwen was sent a

17   letter -- sent a letter to Cross Country saying, we

18   want to stop billing.  They thought that the fraud was

19   over.  But when they were told, you've got to pay 69

20   million dollars to end your involvement as our partner

21   here, they backed off and obviously made a business

22   decision, maybe because of the indemnity we've been

23   talking about, and said, we'll keep billing.  So there

24   really is a two-part fraud here.  It's not just, they

25   sent a check, end of story.  They stopped that part but
```

```
 1   multi-millions of dollars, twenty million bucks has
 2   been collected since we sued them in 2013, so the jury
 3   is going to hear all about that.  Why do they keep
 4   doing it?  We've got documents about that and now they
 5   don't want to log documents.  We're not looking for
 6   attorney/client privileged documents, we're looking for
 7   the other documents that were related to the ongoing
 8   fraud.
 9               MR. McINTURFF:  If I might add, your Honor,
10   defendants' production goes well into 2015.  The quote
11   that my colleague referenced in defendants' letter
12   about presumably, documents created after the
13   litigation are all going to be privilege -- we've seen
14   many, many documents created after the litigation and
15   they're not privileged at all.  They have to do with
16   droves of customers calling and complaining and call
17   center employees sicking out because they're getting
18   abused by customers, the reaction of executives --
19               THE COURT:  All that stuff is information
20   that they've turned over to you and wouldn't be
21   privileged, so it wouldn't be on the log anyway.
22               MR. McINTURFF:  Correct, but the presumption
23   that everything is privileged after the lawsuit, we've
24   rebutted that because we know that there's plenty of
25   documents they've turned over that aren't privileged.
```

1   On top of that, the burden isn't very great.  Cross

2   Country has already done it, to the extent that they

3   didn't withhold documents initially, and then that

4   would raise an issue as to why they told Judge Levy

5   they logged post-lawsuit documents but then didn't log

6   others, and Ocwen says it's only 900 documents, so it's

7   not that burdensome.

8           THE COURT:  Why do you need this stuff?

9           MR. McINTURFF:  Because we believe

10  defendants' assertions of privilege are, in many, many

11  instances unfounded, and we think that they are not

12  going to be able to support their privileged calls.  We

13  have no ability to test their privileged calls.

14  They've already turned over some non-privileged, like

15  for example the twelve documents that were sent to

16  chambers in camera, they turned over two with fewer

17  redactions.  Those privileged calls were -- the word

18  questionable is very, very light, to say the least, in

19  terms of what they redacted and their basis of

20  redacting them.  So we have real grounds here to

21  suspect that they're withholding documents on the basis

22  of privilege and we want them to meet their burden to

23  show that these documents have been properly withheld.

24          MR. WITTELS:  Just to briefly follow up on

25  that, Judge.  They've given you -- originally, they

1  were giving you twelve documents to look at where there

2  had been redactions.  Fully I would say 15% of them,

3  because that's roughly the two that they ended up

4  turning over, had no basis to be withheld in the first

5  place.  If their privilege log is anything similar to

6  that, then you're looking at at least 15% of the

7  documents should have never been withheld.

8          I don't know what your Honor is going to

9  find when you look at the rest of their redacted

10 documents but Mr. McInturff brought these documents

11 down here that they ended up turning over, and those

12 were only turned over because we forced the issue.

13 They weren't going to give us those redacted documents.

14 They picked out -- if the word "legal" is in there.

15 Maybe legal should look at it or consider it.  They

16 willy-nilly were over-inclusive in how they redacted a

17 document.  So we are suspicious and suspect about how

18 they're going about it.  We do think they should --

19 they have an obligation to log those documents, since

20 the fraud continued after the lawsuit started.  They

21 should have a proper log.

22          MR. McINTURFF:  If I could just add, I think

23 it's probably the fourth or fifth time we've been here

24 on a privilege issue.  Initially, two years ago, Judge

25 Levy ordered Cross Country's in-house counsel to

1   certify that all the emails that were being withheld as

2   privileged, where he was supposedly acting as counsel,

3   he had to certify that he was acting as counsel not in

4   a business capacity.

5           As a result of that requirement, Cross

6   Country turned over 2,000 pages of additional

7   documents.  I looked at it with my paper rings the

8   other day in my officer for my printer -- that's how

9   many pages they turned over.  We think that we've more

10  than carried our burden to show that the privilege

11  assertions have been improper.  And without a privilege

12  log, we have no way to test it.  We're simply relying

13  on counsel's say-so.

14          MR. PREVIN:  Your Honor, may I be heard?

15          THE COURT:  Sure.

16          MR. PREVIN:  First of all, the burden would

17  be considerable.  Speaking for Ocwen, it would be

18  several weeks for us to (ui).  This log we are

19  estimating will take -- will contain approximately

20  three times the number of entries as (ui).  That is a

21  significant burden.

22          THE COURT:  Including if you eliminate all

23  of the --

24          MR. PREVIN:  That is a (ui).  I actually

25  don't have the numbers in front of me.  It was less

1  than 20% (ui).

2          THE COURT:  What about if you exclude in-

3  house counsel and just make the same certification?

4          MR. PREVIN:  I have not -- I don't have

5  (ui).  I assume we can -- relying on metadata, that may

6  be possible.  I assume (ui).  Our view is that this is

7  a marginal (ui).  The stated reasons for these

8  documents -- plaintiffs know -- yes, there are going to

9  be ongoing complaints.  Those have been produced.  The

10  primary reason I think sort of goes to why are we still

11  billing -- they've asked lots of witnesses from all the

12  defendants and every one has said it was a decision

13  made on advice of counsel.  So you're not going to get

14  any more information from the documents on that.

15          This is in our letter.  This was negotiated

16  several years ago.  The defendants relied on this

17  provision in good faith.  Ocwen (ui) pushed very hard

18  for a discovery cutoff -- as of the complaint filing,

19  we had not had this provision because of this very (ui)

20  or we would have negotiated custodian search terms in

21  an effort to weed out documents.  Obviously, we're not

22  there but we relied on this and plaintiffs have known

23  about this issue for a year and a half and they're

24  raising it now.  Our view is that the discovery period

25  should end within thirty days or something like that I

1   know that your Honor is tabling that issue for now but

2   we are at the tail end of discovery. So to impose

3   retroactively an entirely different standard for ESI

4   production and logging documents that would carry a

5   significant burden on defendants is unfair.

6           MR. McINTURFF: If I may respond, your

7   Honor. Defendants still have not articulated what

8   their burden would be. This case involves at least 100

9   million dollars at stake at this point, so we believe

10   that the proportionality analysis -- defendants need to

11   show that it truly would be overly-burdensome. We

12   don't think it will be because Cross Country has

13   already logged them, unless there are documents they're

14   withholding that they didn't log initially.

15           For Ocwen, counsel hasn't even said -- it's

16   900 documents. This is not a tremendous undertaking.

17   Counsel says it's three times what they've done before

18   so they logged 300 documents before. It's not a big

19   deal, it's not that expensive. And in light of the

20   highly suspect privileged calls, we believe it's

21   completely justified.

22           In terms of the timing, the timing relates

23   to the revelations of the discovery misconduct that

24   have occurred over the past few months. We now have

25   substantial reason to suspect that because defendants

1    did predictive coding without telling us, among other

2    things, to suspect that there was other misconduct, and

3    we need to make sure that the defendants are acting

4    properly in terms of the documents they're withholding.

5            Again, it's their burden and these documents

6    are in their production.  It's not like they're not in

7    their production.  They know what the documents are,

8    they've pulled them out.  They've got plenty of

9    lawyers.  It's not going to be too cumbersome to do it

10   and we think that your Honor should order them to put

11   these documents on a privilege log.

12           MR. PREVIN:  Your Honor, any accusation of

13   discovery misconduct is (ui).  Ocwen didn't even use

14   predictive coding so that's an issue that (ui) some of

15   the other defendants.  That's really beside the point.

16   It is a significant burden.  It would cost tens of

17   thousands of dollars to do, potentially more than that.

18           THE COURT:  Let me just stop you there.  Let

19   me ask the plaintiffs this:  Have any of the alleged

20   discovery abuses that you've articulated been with

21   respect to Ocwen?  Because the vast majority of stuff

22   that I recall with regard to privilege problems and

23   other things have all been directed towards Cross

24   Country.

25           MR. McINTURFF:  To date, it has been to

1  Cross Country.  In order to be most sufficient, we're

2  seeking your Honor's guidance on issues such as

3  privilege and redaction logs so that we can then

4  address those issues with Ocwen once we have sort of an

5  idea of where we can predict where your Honor would

6  rule.

7           THE COURT:  I think if you're looking at it

8  from that standpoint, you have a better argument with

9  respect to Cross Country than you do with respect to

10  Ocwen.  I haven't seen anything from Ocwen's end that

11  would justify changing the ESI protocols at this point.

12           MR. McINTURFF:  I take your Honor's point.

13  We still don't think it's that burdensome.  In light of

14  the fact that the defendants have continued to collect

15  monies from the challenged conduct and we know that

16  there are documents that are -- that have been produced

17  that are responsive and are relevant.  We think that

18  they should be required to meet their burden.

19           MR. WITTELS:  Judge, they're looking at a

20  period from 2013 until now, where Ocwen has been

21  involved -- knowing they wanted to get out of the

22  scheme completely, they didn't and they've continued to

23  bill.  There's been interchange between the two

24  companies.  We have some of those documents.  We know

25  that they've been interacting with each other about

```
 1   complaints because a lot of people call up.  First they
 2   go to Ocwen, they end up at Cross Country.  Cross
 3   Country then tells Ocwen, give them a refund, so
 4   there's a lot back and forth.
 5            But the point is there's a whole block of
 6   time where we've gotten documents and Ocwen is now
 7   saying, we're not going to tell you what's
 8   attorney/client privilege, we're not going to tell you
 9   what's work product.  We don't really want the work
10   product and we don't want the attorney/client.  We want
11   to know if they properly characterized those documents.
12   Until we see the log, we can't even challenge it.
13            THE COURT:  Okay, but you haven't given me
14   any reason to believe that Ocwen has it.  The fact that
15   one of the other defendants -- I'm not even saying I
16   agree with you but the fact that one of the other
17   defendants has improperly asserted privilege doesn't
18   mean that it should be imputed to Ocwen.
19            MR. WITTELS:  Judge, what we're saying is,
20   in the first instance, you're sort of putting the
21   burden on us to say we need to show --
22            THE COURT:  Because you negotiated this ESI
23   protocol two and a half years ago.
24            MR. WITTELS:  Not understanding that they
25   had continued -- that the fraud had continued in the
```

1  way it had.  A lot has evolved.  It's taken a lot of

2  discovery and a lot of digging to get underneath it.

3  Before we even got documents, it was years, before they

4  produced.

5          MR. McINTURFF:  We didn't know that they had

6  continued billing until May of 2016.

7          MR. WITTELS:  We didn't realize that because

8  the first answer had a small amount of money they

9  collected.  So you're asking us to sort of tell you

10 what they did wrong in terms of -- you're saying, you

11 haven't shown us that Ocwen improperly withheld

12 documents.  We don't know what they did because we

13 haven't got the log to see if they're asserting

14 privilege properly.

15         THE COURT:  You got their log with respect

16 to everything else.

17         MR. PREVIN:  Your Honor, plaintiffs just

18 admitted that they were aware of this issue fifteen

19 months ago.  To raise now, at the close of discovery --

20 they already know the critical fact.  I'm not sure what

21 they're looking for.  They know billing has continued.

22 The reasons behind that are going to be protected by

23 attorney/client privilege -- the lawsuit was filed.

24         MR. OFAK:  They've also had the opportunity

25 to ask multiple Ocwen and Cross Country

```
1   deponents/witnesses about this practice.  The fact of

2   this matter is not a surprise, nor is it new to them.

3              THE COURT:  You're conflating the issues.

4   I'm not saying that this information post-lawsuit isn't

5   relevant and that there's not some non-privileged

6   material there.  What I'm asking you is -- the question

7   I asked was why you needed the privilege log, and you

8   said you needed the privilege log for that post-lawsuit

9   stuff because you have demonstrated instances where the

10  defendants have improperly asserted privilege.

11             Assuming I agree with you, that still only

12  applies to Cross Country, not to Ocwen.  So it's not

13  that I'm shifting the burden to you but I'm trying to

14  explain why the privilege log, at least with respect to

15  Ocwen, is something -- I'm not saying that you're not

16  entitled to get non-privileged documents during that

17  time period.  It sounds like you already have.  But

18  there's been no indication that Ocwen hasn't been

19  producing what they should be producing to you with

20  respect to that time period.  So I'm just not sure why

21  we should revise the ESI protocol and make them go back

22  and redo the privilege log with respect to these post-

23  litigation documents, when there's been no suggestion

24  that they've done anything improper with respect to the

25  privilege so far.
```

```
1              MR. WITTELS:  Ocwen's cousnel for some
2    reason was assigned the task of responding to this
3    motion for Ocwen and for Cross Country.
4              THE COURT:  Okay, well --
5              MR. WITTELS:  If we accept your Honor's
6    ruling at this point -- you seem to be saying you
7    haven't shown Ocwen.  At least Cross Country, we have
8    shown a problem, so they should log their documents and
9    supplement them with any documents they have not --
10             THE COURT:  It sounds like they already did
11   log their documents.
12             MR. McINTURFF:  They did in the past and
13   then they took them off.
14             MR. WITTELS:  That was how many years ago?
15             MR. McINTURFF:  It was in February of 2014
16   or '15.
17             MR. WITTELS:  They should reserve it and
18   supplement with any other documents that they haven't
19   included.
20             MR. OFAK:  Your Honor, if I may just for a
21   moment.  I want to start out with the fact that
22   plaintiffs' attempt to recreate the record of what has
23   occurred here -- they try to make Cross Country out to
24   be some sort of serial discovery violator when that's
25   simply not the case.  For a variety of reasons we'll
```

1   get into when we discuss the extension of the discovery

2   period and discuss what the actual obligations and what

3   actually happened with the predictive coding are, those

4   are simply accusations that quite frankly, in our

5   opinion, are baseless at this point, that plaintiffs

6   have refused to actually deal with us in good faith on.

7              Secondarily, with regard to the privilege

8   log, Judge Levy never ordered us to redo our privilege

9   log.  What we agreed to do was to redo our privilege

10  log in a certain manner.  We had a dispute over the

11  form of our privilege log, which you'll recall because

12  plaintiffs' counsel brought it up again at our last

13  hearing.  That was about whether or not we could group

14  by category on the privilege log.  The first privilege

15  log, we readily stated at the first hearing -- we said

16  they raised a couple of items that we think are valid

17  issues for us to address.  We went back and we

18  addressed them.  We did that voluntarily and we

19  reproduced the privilege log.

20             At that point, too, we also identified that

21  we had initially logged post-complaint privileged

22  documents on that original log, which was from January,

23  2016 is when that log was provided.  So we identified

24  that and we identified two plaintiffs, both at that

25  hearing on the record and subsequently, that what we

1    were planning on doing was, because we had agreed under

2    the ESI protocol to not log post-complaint privileged

3    documents, in order to make the process easier, to

4    streamline it and make it faster for us to get a

5    revised privilege log to them.  We were just going to

6    take off privileged documents that had been logged

7    post-complaint.  We got not complaint from anyone at

8    that point.  In fact, we hadn't heard about it again

9    until this idea or this issue raised its head recently.

10            Again, these issues are not new.

11   Plaintiffs' counsel knew about it and they agreed to it

12   with us in the ESI protocol.  We agree with everything

13   that Ocwen's counsel stated for the reasons why we

14   shouldn't have to log post-complaint privileged

15   documents.  However, the amount of documents that we

16   have is far larger.  I only have the metadata to go by

17   right now.  Presumably, they still have the version of

18   the privilege log that we originally produced.  We had

19   no agreement where they had to destroy it.  If they

20   have any issues with any of the documents on their

21   post-complaint, they certainly can talk to us about it.

22            But there are roughly 3,500 documents,

23   that's responsive and non-responsive, because the way

24   that we group them, anything that was responsive gets

25   all family members pulled in, whether it's responsive

1   or not.  So for purposes of our discussion of the

2   number of documents, that 3,500 number is responsive

3   and non-responsive.  The number of actual responsive

4   documents is only about 2,000.  Of that 2,000, what we

5   can tell from the metadata -- we would have to go back

6   and review to actually comply with their restrictions,

7   which are to outside counsel or even to inside counsel,

8   about 2,200 of those documents with families.  So that

9   includes non-responsive family members and even non-

10  privileged family members that we would have no

11  obligation to provide in the first place fit into

12  either sent to outside counsel or inside counsel.

13          So depending on what the number is here,

14  that's still a pretty large amount of documents to go

15  through for a purpose that I have still yet to discern

16  because plaintiffs' counsel have the actual documents,

17  for instance about the continuation of billing.  The

18  reason they know about that is because both Ocwen and

19  Cross Country produced documents about it.  We have had

20  meet and confers on specific subjects where they

21  thought there might be additional documents.  We've

22  gone back and we've found a few additional documents

23  through an additional review, but nothing out of the

24  ordinary in the standard discovery operations.

25          So at this point, they claim to have

1    identified a very large number of discovery

2    "violations."  We disagree completely with that but

3    they're also taking the wrong numbers.  So Mr. Wittels

4    stated that of the twelve redacted documents that they

5    challenged, we produced two, and he then produced a

6    percentage based off that.

7              But in reality, what you need to look at is

8    the total number of redacted documents that we provided

9    on a redacted privilege log, which is hundreds, only

10   twelve of which they challenged, two of which we looked

11   at and we said, okay, we agree that that particular

12   line -- while we don't think it's a privilege call, we

13   go back and we look at it and we say, we understand why

14   the privilege determination was made at the time.  At

15   this point, we agree to produce it.  You actually have

16   those documents as well.  You have all twelve.

17   Regardless of whether we decided to produce them or

18   not, we included them, including the redactions.  That

19   way, you can see our good faith.

20             THE COURT:  Which ones did you produce?  Is

21   it listed on there?

22             MR. OFAK:  It's listed in the documents,

23   yes.

24             THE COURT:  Okay.

25             MR. OFAK:  In terms of the greater privilege

 1   log, we've had meet and confers, we've had discussions,

 2   we've talked about this.  I think the redacted log is a

 3   perfect example of this.  At the last hearing, you'll

 4   recall we had a long discussion about -- we weren't

 5   quite sure what documents they were actually

 6   challenging on the privilege log.  It appeared to

 7   simply be a broadside attack on the entire privilege

 8   log.

 9        At that hearing, we finally realized what

10   the specific documents they were challenging were.  Had

11   we just simply had that discussion beforehand, I think

12   we could have streamlined the dispute much better, but

13   I think that happens a lot and that actually has

14   happened in a few other items they put on their agenda

15   this week, issues that they've addressed with the Court

16   that they hadn't even come back to us on yet.  I think

17   that this is consistent with the pattern of issues that

18   we address on a regular basis in this Court.  Most of

19   this stuff is better suited to simply deal with out of

20   court, but we don't think that we have done anything

21   wrong or that any discovery violations have been shown

22   that warrant them going into the thousands of documents

23   we would have to take a look at and log post-complaint.

24        MR. McINTURFF:  If I can just briefly

25   respond, your Honor.

```
 1              THE COURT:  Both sides kind of talk about
 2   the general reasons why you have privilege logs that
 3   can cut off at the filing of a lawsuit.  There's at
 4   least an arguable basis here for why that might not be
 5   the most workable solution to this case, given that
 6   there are -- I don't know exactly what the number is
 7   but there's at least some discovery that's been
 8   produced in the post-litigation time period.  So I'm
 9   not sure that you can look at it and say, well, we're
10   not going to require a privilege log for that time
11   period because the presumption is that everything that
12   was created after that time period would be privileged.
13   I don't know that you can say that in this particular
14   case.
15              Neither side has really kind of pointed to
16   any cases and I haven't done the research myself, so I
17   don't know if there are any, but are there any cases
18   that talk about situations like this, where you have a
19   fairly relevant portion of documents that's being
20   produced post-litigation and how that affects the
21   presumption that materials created post-litigation
22   would be privileged?
23              MR. McINTURFF:  I can say, your Honor, I
24   haven't seen a case but there's an additional fact in
25   this case that I think takes it out of any potential
```

1  case law research, which is the defendants -- in Cross

2  Country's case, they've already logged the documents.

3  They logged the documents and counsel wasn't accurate

4  in his description of what they said at the hearing

5  before Judge Levy.  They didn't say, we're going to

6  take these documents off but they took them off their

7  privilege log, so they've got them logged.

8           The only thing that we're asking is that

9  they put them back on the log but they do so in a

10  manner that conforms with your Honor's ruling at the

11  last conference regarding how privileged documents

12  needed to be logged.  If you remember, at the last

13  conference, we had this issue with emails, where they

14  were just logging the sender and the recipient and the

15  last email.  If we just look back at their privilege

16  log, assuming that they logged all of the documents at

17  the time, if we just look back at that initial

18  privilege log, we have the same issues.

19           So really what we're asking is just for them

20  to re-log the old documents that they've logged and do

21  so in a manner that complies with your Honor's last

22  order, which was if you have a string email, you have

23  to make it apparent so that we can see.  That should be

24  -- there shouldn't be hardly any burden there.

25           MR. OFAK:  I have a few responses to that.

```
 1    First of all, I think this really goes back to the idea
 2    that this is an agreement that we made at the beginning
 3    of this case.  The agreements that the parties make
 4    among counsel have to mean something.  So far, they
 5    haven't meant anything in this case because we've blown
 6    through our case management plan.  We've blown through
 7    all of the things that we agreed in the case management
 8    plan and now we're about to blow through the ESI
 9    protocol on privilege logging.  So at some point,
10    agreements between counsel and things that we've put in
11    front of the Court and had agreed to and consented by
12    the Court have to mean something at some point in this
13    case.
14              With regard to whether or not there's any
15    authority out there on point, we think the authority we
16    put out there is relatively on point.  It may not be
17    specific to the exact fact pattern, but we think that
18    that general basis is what leads people to agree or
19    make such agreements about not logging post-complaint
20    privileged documents in the first place.  Secondly, I
21    think that the timing of this particular issue again
22    identifies some of the lack of importance of this
23    issue.  I did in fact state at that hearing in front of
24    Judge Levy that we were taking off the documents from
25    post-complaint.  We talked about that.  I don't have
```

1   the transcript in front of me but I can point you to it

2   if you'd like.

3          Secondarily, it's something that they've

4   known about for, at the very least, fifteen months.

5   Why have they brought it up now, when discovery is

6   supposed to be ending at the end of August.  I think

7   that ultimately, we have a lot of sort of ministerial

8   issues, minuscule, ministerial issues that they're

9   taking issue with in the document production that we

10  simply -- we are attempting to address and we're not

11  really getting any traction on.

12         But the fact of the matter is that they

13  stated, I believe it was in March, at the two hearings

14  in front of both your Honor and in front of Judge

15  Garaufis, that they had all the documents they needed

16  in order to go to trial and set a trial date.  But now,

17  we're sitting here today and they're stating something

18  different.  I just don't understand at this point why

19  we have to go back and re-log these documents and re-

20  log them in a manner that -- it's my recollection that

21  there wasn't an order but there was an agreement that

22  we would provide documents in the form that we actually

23  just produced to them last week, that is documents that

24  didn't have an attorney on the to or from.  We agreed

25  to provide a line-by-line production of that and we did

1   that.

2         MR. WITTELS:   Judge, if they logged them

3   once, they obviously thought they had to log them.

4   They pulled it off for no good reason.   We're not going

5   to sit here and talk about nearly five years of

6   litigation, what stands and what doesn't.   As your

7   Honor knows, in any case, issues change constantly,

8   orders change constantly, depending upon what happens.

9   So this argument about, well, orders have to mean

10  something -- orders are informed by what happens in the

11  case.   When we get to the facts of why we're making

12  this sanctions motion, it's because there is a real

13  question about what's going on here.

14         We had an ESI -- we negotiated search terms.

15  We spent weeks, months negotiating them.   We had to

16  bring down our ESI experts to negotiate.   Then we find

17  out through our own digging, literally on the eve --

18  two months ago -- that they did predictive coding

19  without telling us.   Every case you look at says that

20  predictive coding is supposed to be open and

21  transparent.   They didn't tell us.   We discovered in

22  open court that they had done predictive coding on

23  documents that had been found through the search terms.

24  They still haven't -- even now, we spent the last few

25  months trying to figure out what their predictive

1    coding was about and they won't tell us.

2         So we're here in a very unusual but unhappy

3    situation where we are challenging a lot of what the

4    defendants do in their discovery because we can't trust

5    what's being done.  That's why we're going to make a

6    sanctions motion, because we've got case law to back it

7    up, that they didn't act properly.  So we're asking for

8    logs of what's privileged and they're objecting when

9    they already logged the documents.  I don't understand

10   why they wouldn't log them now.  Post-litigation

11   documents are obviously relevant.  Therefore, the

12   documents they're withholding should be logged.

13        THE COURT:  You've got the documents they

14   previously logged.  Is there any reason why you can't

15   use that to -- assuming that there's maybe some

16   additions to that, but is there any reason why you

17   can't use that prior log to at least decide whether or

18   not they've properly asserted privilege for those

19   documents, the same way that you did with the more

20   recent ones?

21        MR. McINTURFF:  If I can correct -- counsel

22   confused the privilege log and the redaction log

23   issues.  The redaction log -- your Honor ruled that

24   because we can look at the documents and we can see the

25   documents, that that didn't need to be adjusted.  The

```
 1   issues we raised with the privilege log resulted in
 2   defendants producing a revised privilege log that dealt
 3   with the email chain issue.  The old privilege log,
 4   assuming that it contains all of the documents they're
 5   withholding, is going to suffer from that infirmity, as
 6   well as the other issues we raised in connection with
 7   the privilege log motion.
 8            We think if they've already logged them,
 9   they can at least produce to us a log that conforms
10   with the most recent iteration of the privilege log,
11   one, so it all looks the same and is standard, and two,
12   that we don't have the same problem -- because we'll
13   just be back here in front of your Honor requesting
14   that your Honor enforce the Court's order regarding the
15   prior log because, as is the case with all of our meet
16   and confers with Cross Country, when we ask them if
17   they do something to correct their privilege log,
18   they're going to get told no.
19            We would ask that prospectively, since
20   they've already logged them, that they be ordered to
21   conform with your Honor's -- the rulings in the prior
22   conference -- to conform their privilege logs with
23   their rulings in the prior conference and to notify us
24   if there are any documents that they're withholding
25   that weren't on the prior log.
```

```
 1              MR. PREVIN:  Your Honor, just for clarity of
 2     the record, they sometimes loosely use the term
 3     "defendants."  All of that relates to Cross Country.
 4              THE COURT:  Okay.
 5              MR. OFAK:  Your Honor, the only thing I have
 6     to add is, at this point, I think our position is
 7     clear.  We will comply with whatever you order.
 8              THE COURT:  Do you know if there are
 9     additional documents that were withheld that were not
10     on the previous log?
11              MR. OFAK:  I think it's unlikely because the
12     additional productions that were made after were for
13     the time period previous to the complaint.
14              THE COURT:  Okay.  So all of the post-
15     complaint documents should have been produced in that
16     first batch.
17              MR. OFAK:  Correct.
18              THE COURT:  Remind me again, the issue
19     between the old privilege log and the new privilege log
20     is that it's not always clear whether it's the
21     attorneys that are getting emails or are on the email
22     chain?
23              MR. McINTURFF:  Correct, the senders and
24     recipients.
25              THE COURT:  Or whether it's one of those --
```

1   it references an attorney and that's why it was being

2   logged as privileged, that kind of thing?

3          MR. McINTURFF:  Correct.  If you want, we

4   can go back to the transcript of the last hearing.

5   Perhaps, in order so that we don't lost any precision,

6   your Honor could just order that the log be conformed

7   to the Court's orders from the last hearing, because I

8   don't want to mis-state exactly what went on because it

9   was a number of -- there were a number of things that

10  went on.

11         MR. OFAK:  I do think that, for clarity's

12  sake, we should be clear about what's going on.  It's

13  my recollection of what we did that we agreed to log

14  individually all privilege lines and their groupings

15  that did not contain an attorney in the "to" or "from"

16  on the privilege log.  That is what we did.  If

17  plaintiffs' counsel are stating that we need to do that

18  for every single line, that's just attacking our

19  categorical privilege log again, which I think your

20  Honor was fine with last time and Judge Levy was

21  clearly fine with the first time it was attacked.

22         MR. McINTURFF:  I think counsel is correct.

23  That's my recollection.  I just didn't want to mis-

24  speak.

25         THE COURT:  Here's what I'm going to order

```
1    you to do at this point.  Check to see if there's any

2    new documents that were not previously logged in the

3    last privilege log.  If the answer is no, then you're

4    going to have to explain to me why that earlier

5    privilege log is not sufficient for you to make

6    whatever privilege challenges you want to make.  It

7    might be, I don't know.  If you get the verification

8    from them that there's no additional document that

9    they've withheld, you might be able to use the log that

10   was previously produced to decide whether or not they

11   properly withheld anything.  But if not, you're going

12   to have to explain to me why not so I can specifically

13   tailor it to what you need.

14              MR. McINTURFF:  Okay.

15              THE COURT:  But I'm not going to order that

16   with respect to Ocwen.  The only reason I'm doing it

17   with respect to Cross Country is because they've

18   already essentially produced it.

19              MR. OFAK:  We'd request until September 15th

20   to produce that, your Honor.

21              THE COURT:  You don't have to produce

22   anything.

23              MR. OFAK:  To produce the answer is what I

24   mean.

25              THE COURT:  Okay.
```

```
 1              MR. OFAK:  Because we're going to have to do
 2   some work with --
 3              THE COURT:  That's fine.
 4              MR. OFAK:  -- our vendor.  We may be able to
 5   get it earlier.
 6              THE COURT:  Okay.
 7              MR. OFAK:  With the Labor Holiday, though, I
 8   don't --
 9              THE COURT:  That's fine.
10              MR. McINTURFF:  Okay, your Honor, the next
11   issue is regarding plaintiffs' forthcoming sanctions
12   motion.  My colleague, Mr. Wittels, is going to address
13   this but just briefly, there have been a number of
14   letters submitted.  We think that in light of Cross
15   Country's failure to make key disclosures regarding its
16   imposition of a predictive coding protocol, really at
17   this point, both as a matter of timing and just in
18   order to properly lay out the issues, we intend to
19   submit a motion.  We think that that sort of venue is
20   the best place to address the outstanding issues
21   because we've obviously reached an impasse in terms of
22   what defendants are willing to disclose about what they
23   did.  My colleague, Mr. Wittels, is --
24              MR. WITTELS:  Judge, I don't know really
25   that it's right.  I mean, we've gone back and forth on
```

1  it in discussions with you.  Your Honor said, although

2  I was in another land when you said it, at the last

3  hearing --

4          THE COURT:  You were on the phone, I

5  believe.

6          MR. WITTELS:  I was listening until the end.

7  Then it got very late and I don't want to confess what

8  happened to my sleep at that point, but it was getting

9  very late.  I remember that.  Your Honor came out and

10 said, there are real concerns here about the

11 transparency with respect to the predictive coding and

12 what we've done.  There's no point really in debating

13 it here.  We've decided that, based on our inability to

14 ferret out what went on with their predictive coding,

15 we're left with no choice but to make the motion.

16          We don't think we have to have -- the

17 defendants take the position, you haven't shown us that

18 what we did was wrong.  The fact that they did, in our

19 view, is wrong, okay?

20          THE COURT:  Okay?

21          MR. WITTELS:  Out of the box.  The fact that

22 they did it without telling us, the fact that it wasn't

23 negotiated at the beginning and that they weren't

24 transparent and said, we want to do predictive coding

25 -- that was also something that should have been told

```
1   to us.  You can't do, in our judgment, predictive
2   coding on top of the ESI without having that part of
3   your protocols, on top of the word search.
4           So there's a very strong case -- I think we
5   may have alluded to it -- where, similar to our case,
6   the court said, you didn't do it properly.  You can't
7   come back after you do a word search negotiation that,
8   again, I tell you took months and much time and expense
9   with the ESI experts, and then try to do predictive
10  coding.  Ocwen has conceded that they never did it.
11  They knew it wasn't proper.  Judge Levy called for
12  transparency.  So here we are on the eve of -- two days
13  away from what was going to be the cutoff, hearing that
14  they had found 400,000 documents, apparently -- I'm
15  roughing it out -- and on top of that, 400,000.  They
16  culled it down through predictive coding to about
17  100,000 documents.
18          We're not going to start discovery again,
19  which is what they want us to do.  Tell us what we did
20  wrong.  We don't want to go down that route.  There has
21  to be a sanction for what they did because out of those
22  400,000 to 100,000, there's got to be thousands of
23  documents that are pertinent to this lawsuit that they
24  have not produced.  We won't know that and we don't
25  want to go down that route so we're going to ask for
```

```
 1   stiff sanctions against them for doing this.  I've
 2   never been in a case where they did that.
 3            My last round of predictive coding -- one of
 4   the judges who sort of was the -- I guess the guru,
 5   Judge Peck here in the Southern District, about
 6   predictive coding.  We fought not to have predictive
 7   coding at all in that case.  That engendered a decision
 8   that has now been cited many times over, as to why
 9   predictive coding is okay to use.  But it's only okay
10   if you're transparent and you do it from the beginning.
11   There was a debate from day one, not about them doing
12   it after they had already negotiated a word search
13   protocol.  So we're going to hash it out with you,
14   Judge, and with defendants, and you're going to decide
15   if it's sanctionable, what they did, because this is
16   really an important issue.
17            THE COURT:  Okay.
18            MR. TEPFER:  Your Honor, if we could just --
19            THE COURT:  Do you want to set a briefing
20   schedule for that motion?
21            MR. WITTELS:  We're going to need --
22            MR. TEPFER:  Could we just address one issue
23   before we do that?
24            THE COURT:  Okay, go ahead.
25            MR. TEPFER:  One of the issues -- I think
```

1  what they're failing to recognize is that they haven't

2  been prejudiced by this.  Let's put some context around

3  what actually happened here and co-counsel will correct

4  me if I mis-state anything.  There were negotiated

5  search terms which were applied to reduce a universe of

6  three million documents to half a million documents.

7  That's what they understood has happened and that's

8  what has happened.  That universe of documents, that

9  500,000, then had predictive coding run, and the

10  production is out of that half a million documents.

11       We've said to the plaintiffs, look, give us

12  what you would run through the algorithm and we'll run

13  it, at substantial cost to us, or identify for us what

14  you think the deficiencies are, because what we're

15  talking about is how you get to a production set from

16  that half million documents.  Whether it's predictive

17  coding or manual review, we're only talking about

18  producing from that half million documents because we

19  got to that half million documents using the search

20  terms they agreed to.

21       So we've offered to run a seed set of their

22  choosing and would tell them what's different in their

23  seed set than the one that we used, and we would

24  produce responsive, non-privileged documents from

25  running that algorithm.  They've refused to do that.

1  We've also said to them, tell us what the deficiencies

2  are -- identify for us, in other words, the prejudice

3  so we can work with you in an attempt to cure it, even

4  though we don't think that there's any prejudice here,

5  and they've refused to do that.

6           All they want to do is file the sanctions

7  motion without even identifying what the prejudice is.

8  The sanctions motion isn't just going to be, hey, they

9  did something we don't like.  Therefore, we should get

10  stuff sanctions against hem.  It's they did something

11  that has resulted in incurable prejudice.  We're trying

12  to say to them, what is the prejudice?  Give us an

13  opportunity to cure it with you, and if you cannot cure

14  it, that's when we get into sanctions territory.  We're

15  not even there.  They haven't even responded to our

16  offer to try to compromise this.

17           In a letter we submitted to your Honor last

18  night, which outlines all of the meet and confers,

19  where we left off is, they're refusing to provide to us

20  any information as to how they were prejudiced.  They

21  haven't responded to our offer to say, hey, we'll run

22  the seed set for you and give you that.  They just want

23  to file the sanctions motion for whatever purpose they

24  want to, which we think is pure gamesmanship.  So we

25  can set a briefing schedule to do it but they should

```
 1   meet and confer before we get to a briefing schedule,

 2   and identify the information outlined in our letter as

 3   of yesterday which they've refused to respond to,

 4   Judge.

 5           MR. FIOCCOLA:  If I may just follow up

 6   quickly, the information they claim that we're not

 7   providing to them, what they left out is that we're

 8   asserting work product privilege over that information.

 9   So it's not -- we're not just simply saying, you don't

10   get this.  We're saying, this is work product.  This is

11   fundamental work product and our determination and our

12   process of how we determine what is responsive and not

13   responsive in complying with our obligations under the

14   discovery rules.  I think that our letter stated pretty

15   clearly why we think there is no discovery misconduct

16   here, but if you have any questions about that, I'm

17   happy to answer them.

18           MR. WITTELS:  Judge, MoFo was not involved

19   in this process until they came on board right before

20   the trial.  So they, as far as we know, were not

21   involved with the decision to do predictive coding.  It

22   was made way back when, after they had ascertained that

23   there were -- I thought it was 400,000 but 400,000 to

24   500,000 documents.  I understand counsel is

25   representing his client but what we're really
```

 1   challenging is what went on beforehand.

 2          When discovery is closed or was going to be

 3   closed two or three months ago, we thought it was an

 4   end, and we discovered that there was a fundamental

 5   flaw in how the production occurred.  We're now faced

 6   with a very bad choice, which is to now start

 7   negotiating a predictive coding model, which is what

 8   they're asking us to do, which may result in reviewing

 9   tens of thousands of documents more or hundreds of

10   thousands.  Who knows what they have to produce if they

11   went down that route, or saying no, you just did it

12   wrong, you were not allowed to do it.  We have this

13   case and we'll argue it.

14          The Progressive case out of the District of

15   Nevada was the only one we could find right on point,

16   where the court said -- I'll just quote this part

17   because it's germane:  "Had the parties worked with

18   their e-discovery consultants and agreed at the outset

19   of this case to a predictive coding-based ESI protocol,

20   the court would not hesitate to approve a transparent,

21   mutually agreed upon ESI protocol.  However, this is

22   not what happened.  Progressive agreed to search the

23   universe of documents identified in the stipulated ESI

24   protocol using search terms."

25          The court said no, you cant do -- in that

1   case, the defendant, after doing the search, came to

2   the judge and said, we want to predictive coding to

3   what we have now found through the initial search.  The

4   judge said no, now you're going to produce all those

5   documents.  That's how it ended.  I'm not going to get

6   into the nitty-gritty of the case because we'll argue

7   it when the time is here.  But they at least in that

8   case went to the judge and said, we want to change what

9   we did.  We want to change what we negotiated, which

10  was a word search through ESI.

11          But here, we didn't even find out about it

12  until we ferreted it out, and they didn't even tell us

13  voluntarily.  It was hidden.  We're just not going to

14  play that game, which is, tell us what we did wrong,

15  blame us for not negotiating properly with them, when

16  they won't tell us -- now they're claiming work product

17  on the seed set, when that's something you fight about

18  at the beginning, as to whether you're entitled to the

19  seed set -- we think we are -- whether you feed the

20  documents in without doing would searches.  That's how

21  you do the predictive coding from the beginning.  You

22  use the computer and the algorithms to do it.  They

23  want to start the discovery process again and we're not

24  going down that road.  It's a massive burden to us, so

25  we have no choice but to make this motion, basically.

```
1              MR. TEPFER:  Judge, what does that order
2   look -- assuming everything he said was true, at the
3   end of the day, there has to be some prejudice that has
4   to result in something to be cured.  That's the basis
5   for the sanctions.  They won't even tell us what's
6   wrong with the end result.  They're focused on the
7   process and not the end result that they actually have
8   to use in litigation.  That's the point.
9              Our point is that our system was over-
10  inclusive.  The results were better -- they produced
11  more documents than otherwise would have been produced
12  through a manual review.  This is a well-accepted
13  methodology for producing documents.  Without them
14  telling us what the deficiency is that they're claiming
15  is the basis for any prejudice, their can be no
16  sanctions motion.  That's not the analytical framework
17  for a sanctions motion.
18              MR. FIOCCOLA:  Just to add to this, the case
19  that Mr. Wittels has cited, the Progressive case out of
20  the District of Nevada, does not stand for the
21  proposition that you must consult with opposing counsel
22  or that you must seek permission from the Court.  In
23  fact, the ESI protocol in that case -- they negotiated
24  -- there were two options.  They applied search terms
25  and then the two options to produce to the FDIC from
```

```
 1   Progressive were produce everything or do a linear
 2   review.
 3            That was literally written into the ESI
 4   protocol.  So what the judge was doing in Progressive
 5   was upholding the agreement the parties had made at the
 6   beginning of the case.  We don't have such an agreement
 7   in this case.  We don't have an ESI protocol that says
 8   anything about how the documents are to be reviewed
 9   once the search terms are agreed upon.
10            And just to push back on some of the other
11   misconceptions about TAR (ph) that have been stated
12   today, if your Honor would like, we have Adam Cohen
13   here in the Court.  Adam is one of the country's
14   foremost experts on TAR.  In fact, he literally wrote
15   the book on electronic discovery.  If your Honor would
16   like to hear from Adam about generally how predictive
17   coding works or TAR works and the processes and the
18   general trends, we're happy to do that.  I know Adam is
19   prepared to discuss it with you or answer any questions
20   if you would like.
21            MR. McINTURFF:  Your Honor, first of all, we
22   object because this is premature.  We'd like -- we're
23   going to file our motion.  We think the motion will lay
24   out the proper framework.  Defendants have obviously
25   sandbagged us with this expert that they never
```

```
1   mentioned that they were going to bring.  But we don't

2   think it's appropriate at this juncture to basically

3   argue the motion.  We'd like to brief it and put it

4   into proper context.

5           Obviously, we strongly disagree with almost

6   everything the defendants are saying but this isn't the

7   appropriate forum for us to disagree about their

8   assertions that we haven't been prejudiced or for us to

9   disagree that what they call TAR, predictive coding, is

10  always necessarily better than an attorney review,

11  especially since an attorney has ethical obligations

12  and isn't -- can't just be trained by a crooked

13  attorney to spit out whatever you tell it to do.

14          We asked for the defendants to give us their

15  seed set documents, the non-privileged ones.  We asked

16  for them to give us the documents that they coded and

17  how they coded.  They won't tell us any of that.  The

18  case law is really clear that that type of transparency

19  is what's necessary.  We want the opportunity to argue

20  this in an orderly fashion.  Obviously, defendants --

21  this is just a last-gasp effort for them.  They don't

22  want us to file our motion.  They're doing everything

23  they can to prevent us from filing the motion.  We want

24  to file our motion.  We believe that it will be

25  successful.
```

```
 1            We think that it's proper to brief the

 2  numerous misrepresentations defendants' counsel made to

 3  the Court, to us as plaintiffs' counsel, in papers.  So

 4  we think that we need to set it all up first before we

 5  argue the motion and then we can bring our expert,

 6  which we likely will have back to discuss with their

 7  expert.  Hopefully, next time, they will tell us

 8  they're going to bring somebody before they bring him

 9  down.

10            MR. FIOCCOLA:  Your Honor, I would just

11  suggest that if you haven't read our submission last

12  night on the issue, do that before you decide this

13  issue so you can see -- we outlined the full context of

14  our discussions to date.  There's I think four exhibits

15  to that, which are the communications back and forth.

16  I think your Honor should take a look at that first

17  before deciding this issue and whether this issue is

18  ripe or whether the parties should continue to meet and

19  confer to try to resolve this, in light of the fact

20  that there has been no showing of prejudice.

21            MR. WITTELS:  Judge, we're entitled to file

22  the motion, again with respect to your Honor of course

23  reading whatever you want to read and whatever

24  defendants want to suggest.  We're preparing the

25  motion.  We're going to file it.
```

```
1            THE COURT:  Look, I've reviewed the

2  materials that you did send.  Ultimately, it's

3  plaintiffs' burden to show that sanctions are warranted

4  and what those sanctions should be.  I'm not going to

5  preclude them from filing the motion.  If you don't

6  think they're going to be able to make out the

7  prejudice prong, then put it in your response.

8            MR. FIOCCOLA:  I'm not arguing that they

9  don't have a right to file the motion.  What typically

10 happens is you have to meet and confer to try to

11 resolve that.  What I'm saying is, I don't think

12 they've in good faith been meeting and conferring

13 because we said to them, you haven't offered --

14           THE COURT:  You've offered a way to remedy

15 what you believe --

16           MR. FIOCCOLA:  We offered a remedy in light

17 of the fact that they haven't provided to us any

18 deficiencies to be remedied.  That's the problem.

19 They're saying, we want to file this motion but we're

20 not going to tell you how we were actually harmed by

21 it, which would trigger our obligation to meet and

22 confer to try to resolve it.  They won't even do that

23 so we don't have the opportunity to try to resolve what

24 that prejudice is because they haven't identified it

25 for us.  They just say, we're not going to tell you,
```

1   we're just going to move for sanctions.

2          THE COURT:  It sounds to me like their

3   argument is, the prejudice was that you used it in the

4   first place.

5          MR. FIOCCOLA:  But that's --

6          THE COURT:  You may disagree that that's

7   prejudice but --

8          MR. FIOCCOLA:  But, Judge, you have to look

9   at what the end -- back to my first statement.  You

10  have to look at what the end result is of this system.

11  We went from three million documents to half a million

12  as a result of search terms, by agreement.

13         THE COURT:  Okay.

14         MR. FIOCCOLA:  So we are only talking about

15  how do you get from that half million documents to the

16  production set, okay?  We used technology-assisted

17  review to get from that half million to the set.  What

18  they're saying is no, you should have reviewed

19  everything manually and then produced.

20         THE COURT:  Okay.

21         MR. FIOCCOLA:  So what you need to look at

22  is, what's the delta between what the individual review

23  would have been versus what the system had looked at

24  and identify for us what you think is missing.  Are

25  there -- for example, let's say there's an email chain

1   and you don't find -- and it's asking Joe Smith a

2   question, and we can't find the response for Joe Smith.

3   Either Joe Smith didn't respond via email because he

4   called or they had an in-person meeting, or for some

5   reason that email didn't get picked up.

6          So you'd say, this seems to be a deficiency

7   because I have a string of emails that have these open

8   issues and nobody has responded.  So you would say,

9   that looks like it's deficient, can you go back and

10  look?  Then you can pull those and pull those families

11  and take a look at them.  That's how you would do that

12  to resolve whatever you think is missing from that

13  production.

14         So when we say you look at the end result,

15  what was actually produced, what is deficient about

16  that, that has resulted in the prejudice?  They haven't

17  identified that for us.  You need that because you need

18  to understand, what is the difference between what

19  plaintiffs think was done and what was actually done

20  that has harmed their position.  It can't just be, you

21  didn't tell us you were doing that, because at the end

22  of the day, it may be that there was no difference,

23  that we produced more documents than we otherwise would

24  have produced.

25         But without them identifying for us specific

```
 1    instances of deficiencies, what are we really talking
 2    about?  What is the harm that they alleged suffered
 3    that justified sanctions?  That's what we're talking
 4    about.  It's negotiating in good faith.  When you have
 5    a sanctions motion, usually, you have to meet and
 6    confer and identify what the problem is.  When it
 7    cannot be cured, that's when you get to sanctions, but
 8    we're not there yet.  They just want to jump to -- they
 9    can file their sanctions motion but you have to follow
10    the process to even get to that point.
11            It's not right because they're going to
12    include information in their motion that they're not
13    telling us in the meet and confer because they're
14    refusing to tell us.  How is that good-faith
15    negotiation on meet and confer?  That's not.  You have
16    to identify the prejudice that you're claiming.
17    They're going to filed a sanctions motion without
18    having yet identified for us what the prejudice
19    actually is in the end result of the process that
20    they're complaining about.  That's the issue.
21            MR. McINTURFF:  Your Honor, respectfully,
22    just to give some background, search terms were
23    negotiated with the idea that they would be reviewed by
24    an attorney who is an officer of the Court.  The case
25    law is clear that you don't do predictive coding on top
```

1    of search terms, so that's the first major, major

2    problem.  Because they didn't disclose that they were

3    going to do predictive coding, they argued and

4    represented to us over and over and over again that we

5    needed to cut this search term down because it was

6    going to be too expensive for us to review and we

7    needed to narrow this search term because it was going

8    to produce too many documents that would be too

9    expensive to review.

10              Then they went to Judge Levy and they said,

11   Judge Levy, you have to narrow the search terms that

12   they want to use because it's going to cost us too much

13   in attorney time to review it, all the while

14   duplicitously knowing that they were going to do

15   predictive coding.  They then did predictive coding

16   without including us in any aspect of the process.

17   We're going to show that had we been included in the

18   process, it would have been very different.  It would

19   have been much more transparent.  As a result of the

20   misrepresentations to plaintiffs' counsel and the Court

21   and their opaque process that they're still refusing to

22   show us the fundamental documents that they used in

23   educating this machine to produce documents.

24              They're claiming they're privileged.  In

25   ever other case -- I'll read from the Progressive case.

1   "In the handful of cases that have approved technology-

2   assisted review of ESI, the courts have required the

3   producing party to provide the requesting party with

4   full disclosure about the technology used, the process

5   and the methodology, including the documents used to

6   train the computer."

7           They're giving us half disclosures, very

8   vague disclosures.  They've changed their story a few

9   times.  They aren't giving us enough visibility into

10  the process.  They're not giving us enough visibility

11  into the methodology.  They won't produce any of the

12  documents that they used to train the system.  They're

13  essentially arguing, you need to tell us which

14  documents of the three million that we then narrowed

15  down with fraudulently induced search terms that we

16  didn't produce in order to sustain your burden.

17          We disagree.  We're ready to make the

18  motion.  We've had enough meet and confers.  They're

19  claiming privilege on everything that's important and

20  we think that once we make the motion and they respond

21  and your Honor has a chance to review the papers, then

22  we can have an orderly conversation.  They just don't

23  want us to make the motion because they've cooked up

24  this idea that you've got to show exactly what

25  documents we're withholding when they didn't produce

1  them.  We don't know.  We don't know what we don't

2  know.

3          We know what we do know, which is they

4  didn't tell us they were doing predictive coding, they

5  didn't include us in the process.  Now that we've

6  inquired about the process, they won't give us any real

7  transparency, so we believe that the time is now -- the

8  meet and confer process is played out.  They just want

9  to drag this on for months and months and months.

10  We're ready to make our motion.

11          MR. FIOCCOLA:  In fact, we do not want to

12  drag this on for months and months and months, which is

13  why we're trying to cut it off at the pass, your Honor.

14  But having said that, I think that plaintiffs are

15  taking one line from a case that is literally factually

16  distinct from our case and extrapolating a lot of stuff

17  that is not true about the case law that is underlying

18  that.  I can sit here and I can explain that to you but

19  like I said, we have Adam Cohen, who literally wrote

20  the book.  He can stand up and just discuss some of the

21  basics in five minutes.

22          Plaintiffs' counsel say that we're

23  sandbagging them but plaintiffs' counsel in fact have

24  brought their ESI expert to hearings without telling us

25  previously.

1              MR. McINTURFF:  That's inaccurate.  That's

2    not true.

3              MR. FIOCCOLA:  It's not inaccurate.

4              MR. McINTURFF:  It's not true.  It's a lie.

5    It's not true.  You're misrepresenting to the Court.

6              MR. FIOCCOLA:  That is not inaccurate.  At

7    the end of the day, if you don't want to hear from him,

8    that's great, your Honor.  You'll hear from him in our

9    opposition.  But I just think that it's good and

10   possibly could save some of the Court's and the

11   parties' resources here.

12             THE COURT:  Look, he's here.  I'm happy to

13   hear from him.  I'm not making any decision today so if

14   he wants to say what he wants to say -- you're going to

15   file your motion and if you want to have your own

16   expert submit an affidavit, that's fine, too.

17             MR. McINTURFF:  Judge --

18             THE COURT:  They're going to be allowed to

19   make the motion so if you still want to have your

20   expert explain whatever you want to explain, that's

21   fine.

22             MR. FIOCCOLA:  I think five minutes will be

23   beneficial and instructive.

24             THE COURT:  That's fine.  I'm happy to hear

25   from you.

```
1              MR. MCINTURFF:  Over objection, Judge.

2              THE COURT:  Understood.

3              MR. COHEN:  How could I not say something

4    after that?  I think counsel has sort of alluded to

5    what I would say, leaving aside all the lawyer

6    arguments and just sticking with sort of the research

7    and the science aspect of this.  The use of predictive

8    coding has been -- the reason it has been approved by

9    the courts and the reason that there are so many cases

10   where plaintiffs have demanded that defendants use

11   predictive coding is because it is so well-established

12   by the research that it is more accurate than other

13   ways of finding information.

14              What we are looking at is this theory that,

15   if an attorney reviewed it, then you're going to get a

16   better production, but that's precisely the opposite of

17   what all of the tests that have been done by government

18   groups, by technical groups over years and years have

19   found.  So that would be the position.

20              THE COURT:  Do your clients know that and do

21   they still continue to agree to pay $600 an hour for

22   some first-year associate to review documents?  It's

23   just a question.

24              MR. COHEN:  The trend is towards use of the

25   technology.  Of course, it's not even as new as it was
```

```
 1   back in the days of DeSilva six years ago or something.
 2   In fact, it motivated -- I know this because I was
 3   involved in some of the rule-making process for the
 4   amendments to the federal rules and Federal Rule of
 5   Evidence 502.  Those changes were motivated by the
 6   desire that litigants use this technology more because
 7   it is so effective.
 8              MR. FIOCCOLA:  Thank you, Adam.
 9              THE COURT:  Thanks.  I'm not deciding
10   anything at this point.  There's nothing to decide.  If
11   you want to file your motion, you can file your motion.
12   To the extent that there are things that you've offered
13   to do that they don't want you to do that would have
14   revealed whether or not there's any prejudice, I guess
15   we'll deal with it.  I'm not going to force them to do
16   something that they don't want that's an extra burden
17   on you.  If failing to do that means that they can't
18   establish prejudice, then you'll put that in your
19   motion and it's their loss, I guess.
20              MR. McINTURFF:  On that front, we'd at least
21   like to have this motion covered by the standard
22   federal motion rules instead of the five days and three
23   pages because this issue is going to take more than
24   that.
25              THE COURT:  That's fine.  That's why I
```

 1   suggested a briefing schedule as opposed to just the

 2   normal file your motion whenever you file it.

 3           MR. McINTURFF:  We'll work out a briefing

 4   schedule with counsel.

 5           THE COURT:  Okay.

 6           MR. FIOCCOLA:  Thank you.

 7           MR. McINTURFF:  This next issue is the call

 8   recording samples that were initially ordered during

 9   the June 14th conference.  We've had some rolling

10   productions but it's taking way too long and we need

11   the Court to set a firm production deadline.  There are

12   a number of outstanding calls still owed, so that's

13   issue number one.  And two, despite many attempts to

14   get an understanding from Cross Country regarding 77

15   customers in its initial production who -- the company

16   had records that they contacted the company but they

17   didn't produce any calls for them.  We'd like Cross

18   Country to give us an explanation.  We haven't been

19   able to get an explanation through the meet and confer

20   process so we'd like one here.  And, again, a firm date

21   for production of the remaining call recordings.

22           MR. WITTELS:  Just so your Honor is clear on

23   what the volume is, there were three categories of

24   calls that they were to produce.  The first, we finally

25   got the rest on Friday, which was a hundred calls for

```
1   people who terminated being billed within the last
2   year.  The other two groups were supposed to be fifty
3   calls, the first one being nonpayment was the code and
4   then BVNLA, billing vehicle no longer available.  That
5   was the other code so they called it group three.  On
6   group two, the nonpayment, they produced eleven total
7   out of the fifty.  On the other, they only produced for
8   six for BVNLA.  So that's what's still lacking, almost
9   190 or 87 calls still owed.
10              MR. McINTURFF:  Just so your Honor
11  understands where we are in the process, last week,
12  they produced their latest production and so it's now
13  plaintiffs' turn to provide Cross Country with
14  additional account numbers and we can do that promptly.
15  The issue has been that it's taken so many months to
16  turn these around.  We'd request that the Court enter a
17  deadline.  Let's wrap this up in the next few weeks
18  because it's taken now more than two months.
19              THE COURT:  Is the one where they have to
20  check the numbers and not all of them are still there?
21              MR. McINTURFF:  Correct.
22              MR. OFAK:  Yes, your Honor, if I may.  When
23  you originally ordered us to do this, we explained in
24  detail that this is a very onerous process, incredibly
25  burdensome.  We have been complying with your order.
```

```
 1    Your original said that the plaintiffs would choose two

 2    hundred documents for each category or two hundred

 3    contract numbers for each category.  For each contract

 4    number, we would look to see whether there were any

 5    calls for those contract numbers.  And to the extent

 6    that we found them, we would produce them.  We did that

 7    for the first round of two hundred for each category.

 8              Plaintiffs provided us with a second round

 9    of numbers.  It's unclear whether we were actually

10    required to look for those additional contract numbers

11    but we agreed to do it in good faith.  But at this

12    point, we've looked through over 1,100 customer

13    contract numbers.  The calls are what they are.  We're

14    going through and we're making sure we didn't miss

15    anything in the archives.  We should have that done in

16    the next two to four weeks.  At that point, we believe

17    that we've satisfied the Court's order.

18              MR. McINTURFF:  No, you need to finish and

19    produce.

20              THE COURT:  I thought I had ordered a

21    hundred of the more recent ones because they were on a

22    more easily accessible format and fifty for each of the

23    other ones.

24              MR. OFAK:  Your Honor, I believe your order

25    stated that it was a hundred for the first, fifty for
```

1   each, but we would get to that fifty by reviewing two

2   hundred contract numbers that were randomly selected by

3   the plaintiffs.

4           MR. McINTURFF:  Your Honor, we're not here

5   on a motion for relief from your prior order.

6   Essentially, that's what counsel is making here.  They

7   need to comply with your order.  They have taken months

8   to do it.  They complained -- they use burden as an

9   argument to object to our discovery requests.  Your

10  Honor overruled their argument and they need to comply

11  with the order.  We're not here to renegotiate what

12  your Honor's prior order was.

13          MR. OFAK:  Your Honor, I'm not trying to

14  renegotiate the order.  Like I said, it was a bit

15  unclear from the order based upon what we were required

16  to do.  Our understanding was that it was (ui) two

17  hundred contract numbers for each category, and then

18  after we did that, produce the calls for the first

19  fifty contracts.  As we stated, a lot of these

20  contracts aren't going to have any calls associated

21  with them.

22          So what we found was that we went through

23  the six hundred contract numbers and there weren't,

24  with respect to categories two and three, fifty

25  contract numbers with calls.  In good faith, we also

1   looked through an additional six hundred documents.  At

2   this point, we're up to 1,100 customer contracts that

3   we've been looking for calls and it's incredibly

4   burdensome.

5           MR. FIOCCOLA:  We should point out that

6   group one, we've been able to identify a hundred at

7   this point.  Those are the more recent ones that you

8   were just discussing, your Honor.

9           MR. WITTELS:  So we'll produce another

10  randomly generated set of numbers for group two and

11  three, Judge.  And when they get to fifty, they've met

12  their obligation.  It's that simple.

13          MR. FIOCCOLA:  I think it really comes down

14  to how many iterations do we have to do because we're

15  finding -- out of the two hundred, we're finding three,

16  four, five contracts that actually have extant call

17  recordings.

18          THE COURT:  And there's no way to figure out

19  ahead of time?

20          MR. OFAK:  No, your Honor, it's a manual

21  process.  We have to go to the contract numbers.  We

22  have to look at whether, with respect to that contract

23  number, there was a call, and then we have to go and

24  try to find those calls.  It's a very arduous process.

25  As I said, we've gone through over 1,100 documents.  It

```
 1    has taken a lot of time but we've been diligently
 2    working on it.  There are multiple people at the
 3    company working with us to try and gather this
 4    information.
 5              MR. FIOCCOLA:  We also have -- I think the
 6    part of this equation that's being left out is that
 7    when the call recordings were originally requested
 8    about a year and a half ago at this point, we
 9    identified that it was going to be a very arduous
10    process to go through and identify them.  What we said
11    instead, which will in our view get you to the same
12    place, is that we have a database of notes from the
13    people who take notes when the calls apply.
14              We produced those for each of those as well
15    and for those that we have, we're producing those as
16    well.  I think those are a suitable alternative at this
17    point, given the amount of effort that has been
18    expended for very low turnout on the call recording.  I
19    think this is exactly what the proportionality section
20    of Rule 26 gets out.
21              THE COURT:  Why were there so few calls?
22              MR. OFAK:  Your Honor, not every contract
23    number has calls associated with it.  People may just
24    not call.  So the plaintiffs are randomly selecting
25    calls --
```

```
 1              THE COURT:  So they're just randomly

 2    putative plaintiffs.

 3              MR. OFAK:  Yes.

 4              THE COURT:  And you're going in and seeing

 5    whether or not there were any calls.  And there's no

 6    way to identify the reverse.  In other words, can you

 7    look in your thing and see who made calls and then just

 8    randomly pick fifty of them?

 9              MR. OFAK:  Your Honor, plaintiffs are

10    seeking calls associated with specific codes.  I

11    believe this was discussed at greater length at prior

12    conferences.  They're seeking calls that are associated

13    with specific cancel reasons, so I don't know how that

14    would be done in the reverse.

15              THE COURT:  I don't know.  I'm just trying

16    to figure out if there's an easier way to do it.  The

17    ultimately goal is they want a sampling of fifty calls

18    from those two categories.

19              MR. OFAK:  Fifty from each.

20              THE COURT:  Fifty from each of those two

21    categories.  I understand that the way you're doing it

22    this way, where they identify a random number and you

23    have to go through and see whether there are any calls

24    and then get them -- that seems fairly onerous.  Is

25    there a simpler way of getting fifty calls?
```

1          MR. OFAK:  Your Honor, plaintiffs have

2    represented that they are trying to use some sort of

3    statistical sampling.  That's not anything that we can

4    do on our end.

5          MR. WITTELS:  It has to be random, Judge, in

6    terms of how the numbers are generated, rather than

7    just going through and picking calls.  It might infect

8    the statistical process.  We'll keep going but that's

9    how --

10          MR. McINTURFF:  As your Honor has pointed

11    out --

12          MR. WITTELS:  Look, it took a long time for

13    them to give us the first fifty users.

14          THE COURT:  If they have to look through two

15    hundred to get one or two, that's why it's taking so

16    long.  It's not as simple as -- if they could pull

17    fifty and give you fifty, then I think we'd be -- it

18    would be a different story.

19          MR. OFAK:  Right.

20          MR. PREVIN:  Your Honor, if I may.  On

21    behalf of Ocwen, it's sort of a staged process.  Once

22    Cross Country identifies the calls, the accounts where

23    they have calls, plaintiffs want Ocwen then to produce

24    any calls it has related to Cross Country from those

25    same customers.  We're in the process of doing that.

1    Obviously, we can't do it concurrently because we don't

2    know -- there's no way for us to match up the Cross

3    Country account number with the Ocwen loan number

4    without -- we have to wait for Cross Country to produce

5    its -- the ones who have their calls and then after

6    that, we do ours.  So we're several weeks behind in the

7    schedule.

8             But what we found from -- now it's been

9    about six weeks after Cross Country produced its first

10   batch of sixty-something I think it was.  We're in the

11   process of collecting those calls.  We're finding --

12   this isn't particularly surprising.  We have a couple

13   of thousand calls just from those sixty customers.  I'm

14   not in a position to say how many of them relate to

15   Cross Country because we're going through them, but my

16   expectation is that it will be a tiny fraction because

17   people are calling about the mortgage, they're not

18   calling about --

19            It's an average of over thirty calls per

20   account.  Extrapolating sort of down the line -- it's

21   very time consuming both to collect the calls and then

22   to review them.  We're talking about a burden that will

23   require Ocwen to review thousands of call recordings

24   for -- without even knowing whether any of them relate

25   to Cross Country.

1    MR. WITTELS: Judge, this is the key to the

2 case in many ways because had Cross Country and Ocwen

3 paid attention to the calls in the first place, maybe

4 they would have stopped a long time ago. We've asked

5 all the people at Cross Country if they listed to phone

6 calls and it was amazing to hear that not one person

7 said they ever listened to any phone calls from anyone

8 complaining. The person in the retention department,

9 the head of the retention department said he didn't

10 even listen to calls, which we know is not true from

11 other people in the department, but it was amazing.

12    I feel somewhat sympathy for the lawyers but

13 I feel no sympathy for the client because they brought

14 this on themselves. That's why this lawsuit is here.

15 They didn't want to listen to the calls so now people

16 are listening to them, and we're going to show them to

17 the jury so the jury can use them.

18    MR. McINTURFF: If I could just add, your

19 Honor, this is falling on the heels of -- we got calls

20 for a sample group of customers who had used the plans,

21 supposed happy users. If your Honor remembers, 77% of

22 those people called up and expressed that they didn't

23 know what was going on. This is very key discovery.

24 As your Honor has ruled in the past, this is a problem

25 of defendants' own making. We've already -- we're

1   already narrowing it down by doing sampling.  We're not

2   requesting all the calls.

3          THE COURT:  Look, I'm not going to change

4   the number of calls but I think under the

5   circumstances, you're just going to have to give them

6   more time.  I'm to going to impose a strict deadline

7   when it's obviously an onerous process.  Frankly, they

8   don't know how long it's going to take because they

9   don't know how many random numbers you're going to have

10  to generate before they get the requisite fifty.

11         MR. WITTELS:  Fair enough.

12         THE COURT:  All I can ask is for them to

13  continue to diligently do what they've been ordered to

14  do.  But I'm not going to tie their hands to a

15  particularly time period, given the uncertainty of what

16  they actually have to do to get it.

17         MR. WITTELS:  Okay, your Honor, thank you.

18         MR. McINTURFF:  If we can have an

19  explanation -- I'll give some background.  In Cross

20  Country's initial production of this set of calls, they

21  said that they had gone through six hundred accounts

22  and that they were producing call recordings for 66

23  accounts and there was no record of telephonic contact

24  for 457 of the accounts.  So when you do all the math,

25  that means there was a record of telephonic contact for

1    77 customers but they didn't produce the calls.  We

2    asked them to explain this in the meet and confer and

3    we still haven't gotten an explanation.  So we need an

4    explanation as to why they have a record for 77

5    customers having called but they don't have the call or

6    they didn't produce the call.

7           MR. FIOCCOLA:  The answer to this is rather

8    simple and I thought we had provided this to them.  I

9    feel like I've been on a phone call where we provided

10   this to them but perhaps not.  It's not there.  Where

11   we identify calls and we identify that we still possess

12   the record of the call, we have produced them.

13          THE COURT:  Okay.  So when you say that

14   there's a record that there was a call but you no

15   longer have it, are those call logs that you were

16   talking about?

17          MR. FIOCCOLA:  Correct.  So we can identify

18   from a call log that a call was received or made but we

19   don't have a record of a recording of the call.  We

20   just don't have a record of the actual audio of the

21   call.  Where we have them, we produced them.  Where we

22   don't have them, we can't produce them because we don't

23   have them.

24          MR. OFAK:  I'll just add one additional

25   point to that, your Honor.  Again, some of these calls

 1   are going back a number of years so it's a manual

 2   process to go (ui) in the archives and trying to locate

 3   them diligently and reasonably.  Some may not have been

 4   saved and recorded.

 5           MR. FIOCCOLA:  It was my understanding the

 6   question to us was, why don't we have them?  In a

 7   perfect world, for anyone who watches Game of Thrones,

 8   perhaps I could go in the warewood (ph) tree and go

 9   check out what happened.  Unfortunately, we don't have

10   that ability.  We just don't have them.

11           THE COURT:  I don't know that anyone has

12   ever compared Game of Thrones to a perfect world before

13   but --

14           MR. FIOCCOLA:  Fair enough.

15           THE COURT:  I take your point.  Anything

16   else?

17           MR. McINTURFF:  Yes, your Honor.  We have a

18   dispute regarding the contact performer employees.  We

19   issued document requests for employees who are no

20   longer employed at both Cross Country and Ocwen.

21   Through the meet and confer process, we negotiated

22   certain productions.  We got a production from Ocwen

23   with the contact information that they had.  Cross

24   Country, on the other hand, is objecting to producing

25   contact information for former employees who were hired

1  after the lawsuit was filed.

2          They are agreeing to give us information --

3  contact information for former employees who were hired

4  prior to the lawsuit but they're saying that it's not

5  relevant or discoverable, this contact information for

6  employees hired after the lawsuit.  It's not

7  burdensome.  We're just asking for phone numbers and

8  email addresses and we think that their objections are

9  groundless and that it's --

10          THE COURT:  I think we've established that

11  filing of the lawsuit is not the relevant -- not the

12  touch point for relevance in this case, so why is that

13  -- not to say that there's not a whole bunch of

14  employees for the company that would be irrelevant but

15  why does it matter whether they were with the company

16  after the lawsuit was filed or not?  Why is that the --

17          MR. OFAK:  Your Honor, we just don't think

18  they would have any relevant information.

19          THE COURT:  You might be right on an

20  employee by employee basis but I'm not sure that that

21  in and of itself is a reason not to do it.  I guess,

22  for example, if you have customer service people who

23  were receiving phone calls during the period post-

24  lawsuit, at least under plaintiffs' theory, that person

25  might have relevant information.

```
 1              I know you disagree about whether or not
 2   that's relevant but under their theory, that person
 3   would conceivably have relevant information if they
 4   were fielding complaints from customers who were still
 5   being billed even though it's post-lawsuit.  It's just
 6   an example.  I would think that there's probably a
 7   large category of people that might not be relevant but
 8   there might be some that are, and I'm not sure that
 9   post-lawsuit or pre-lawsuit really is the defining
10   feature.
11              MR. McINTURFF:  Just to add, your Honor, we
12   only asked for a narrow -- we didn't ask for all their
13   former employees.  We asked for a narrow subset of
14   employees who were -- I don't want to get too much into
15   work product but largely people in customer service.
16              THE COURT:  Okay.
17              MR. McINTURFF:  Not exclusively but --
18              MR. WITTELS:  And we have -- yeah.  I just
19   don't know why they're not producing them.  We've
20   already deposed one witness who we had ready for trial,
21   Steve Wilkins, and he was after the lawsuit started.
22              THE COURT:  I don't see any reason not to
23   produce it.  I'm not saying they're going to
24   necessarily be able to use any of these people but I
25   think at least for discovery purposes, they can contact
```

1    them and see if there's any relevant information there.

2

3              MR. OFAK:  That's fine, your Honor, we'll

4    produce it.

5              THE COURT:  Okay.

6              MR. FIOCCOLA:  If we can have a deadline for

7    production.

8              MR. OFAK:  Labor Day is coming.  The

9    following Friday after Labor Day?

10             MR. FIOCCOLA:  That's good.

11             THE COURT:  The 15th?

12             MR. OFAK:  Yes.

13             THE COURT:  Okay.

14             MR. TEPFER:  So, your Honor, using that same

15   logic, does that mean we get to depose the other

16   plaintiffs, if we could revisit that issue now.

17             MR. WITTELS:  We're not done.  We can come

18   back but there's a few more things.

19             MR. McINTURFF:  The next item on our list

20   is, we continue to be blocked with our request for

21   information related to Cross Country group's ESI.  We

22   really think that your Honor already cleared this up.

23   We issued a subpoena to group in late 2016.  Group

24   secretly restricted the date range of its production to

25   December 31, 2013.  Your Honor ruled -- we have the

 1   quote from the record.  Strangely, defendants are --

 2   they say that the transcript is not a ruling from your

 3   Honor and that the minute entry doesn't reflect any

 4   ruling, so they're refusing to update their production.

 5   We thought it was clear but I guess defendants don't

 6   believe it's clear, so we need more clarity.

 7              MR. FIOCCOLA:  Your Honor, I'll just say

 8   first of all, on this particular issue, I do think that

 9   the transcript -- that was a statement, it was not an

10   order that your Honor made based upon our reading of

11   it.  I wasn't at the hearing.  I read the transcript, I

12   read the minute entry.  I spoke to who was at the

13   hearing and no one believed that that was an order that

14   your Honor made.

15              We stand on our time frame that was -- they

16   claim that it was surreptitiously done but we provided

17   them the metadata, we provided them everything.  It was

18   clear what --

19              THE COURT:  I don't understand why you

20   limited it to that time period.

21              MR. FIOCCOLA:  We went from -- I can't

22   remember the start date, until the end of 2013 because

23   that was the time frame that we had seen any action on

24   this from anyone at Cross Country group, within the

25   Cross Country Home Services frame.  After that time,

```
1   everything that we've seen is only privileged

2   documentation.  If your Honor is going to order us to

3   produce it, you're going to order us to produce it.

4   Wee don't think it's relevant.  We stand on our

5   objections but we'll do what your Honor says on this at

6   this point.  The remaining points, B through --

7           THE COURT:  If it's privilege, obviously,

8   you don't have to turn it over but --

9           MR. FIOCCOLA:  Of course, but it's sort of a

10  proportionality and a burden issue to begin with.

11  First of all, let's start off with the concept of what

12  the Cross Country group production is.  The Cross

13  Country production -- plaintiffs came here a few months

14  ago and stated that there were vast problems with it

15  because we only produced 340 documents.  That basically

16  completely avoided the fact that Cross Country group

17  does not solely do work for Cross Country Home Services

18  but in fact does work for over twenty other companies

19  that are all owned by the same family.

20          The primary -- most of these documents -- we

21  have reviewed a ton of them and I'll walk through

22  exactly what we did in just a minute.  Most of these

23  documents have nothing to do with Cross Country Home

24  Services.  In fact, out of the documents that came back

25  from the search terms, only about 6,000 of them
```

1   actually have Cross Country Home Services or some

2   variation of that or variation of the domain name even

3   within those documents.  On top of that -- we reviewed

4   every single one of those, by the way, in response to

5   plaintiffs' concerns about the purported deficiencies

6   in our production.

7          Additionally, we reviewed another 6,000

8   documents that we added some documents that plaintiffs

9   identified.  They wanted us to go back and look for

10  certain documents.  We found some documents that had

11  Jpeg images in them so they wouldn't have been caught

12  by search terms, either.  There were four or five of

13  those and we plugged those back in and we reran the

14  algorithm and about 6,000 additional documents came

15  back as responsive versus non-responsive from the

16  previous run.  We reviewed every single one of those

17  documents.  We reviewed every single document that came

18  back that had CCHS or some form of that that hadn't

19  previously been produced.  If it had been reviewed but

20  not produced previously, we reviewed it again.  That

21  resulted in a little under 12,000 documents.  Sixty of

22  those documents were responsive.  Fifteen of those were

23  privileged.  All of those privileged documents came

24  after the institution of this lawsuit.  All but I think

25  one came after the institution of this lawsuit and all

 1  were about this lawsuit.  So our focus here isn't just

 2  some willy-nilly cutoff.

 3           Additionally, they take issue with -- they

 4  say that we haven't --

 5           THE COURT:  So you reviewed documents up to

 6  the date of the subpoena, or you only reviewed

 7  documents through December --

 8           MR. FIOCCOLA:  No, we only reviewed

 9  documents through December 13 for this particular

10  issue.

11           MR. McINTURFF:  If I can also add, your

12  Honor, a little bit more context.  We issued the

13  subpoena -- we negotiated search terms.  We agreed that

14  the parties would use two sets of previously negotiated

15  search terms.  Mr. McElroy's counsel, Mr. Alexander,

16  confirmed on the record in front of your Honor that

17  they were going to be using both sets of search terms.

18  Then they produced three hundred documents.  That's

19  when we found out that what they actually did was used

20  one set, not two sets of search terms, that they

21  produced as of December 31, 2013, not as of the date of

22  the subpoena.  They then used predictive coding, which

23  they hadn't disclosed to us previously.  Also, one of

24  the two sets of search terms returned 60,000-some

25  documents.

1          Counsel made this representation that they

2   reviewed documents and so many of them didn't even have

3   the words Cross Country Home Services in it.  That's

4   completely irrelevant, that's a total red herring.

5   They're talking about check solicitations.  The search

6   terms are designed to recall documents  about check

7   solicitations.  People don't we're Cross Country Home

8   Services in their emails necessarily when they're

9   talking about this.

10          So 60,000 were recalled by one set of the

11  search terms when they were supposed to use two.  They

12  did predictive coding.  Then after they did predictive

13  coding, which is unprecedented, without disclosing it,

14  then also unprecedented -- after they did the

15  predictive coding, they reviewed documents and then

16  only produced three hundred documents.  So that's the

17  real context.  This stuff about, we reviewed so many

18  documents, first of all, it's premature, it's going to

19  be the subject of our sanctions motion.  And secondly,

20  we're just dealing with the -- this is the first issue.

21  It's just the date.  The date should be the date of the

22  subpoena.  It shouldn't be December, 2013.

23          MR. FIOCCOLA:  I disagree with the

24  characterized of what search terms we agreed to.  I

25  have an email where I stated specifically, we're using

1   the last agreed-upon search terms.  If that was

2   ambiguous, I didn't think it was.  If it was ambiguous,

3   I didn't get a question about it.  I apparently wasn't

4   at this hearing that Bruce stated we were using both

5   agreed-upon search terms but my suspicion is that he

6   said that after we had already done it and that he

7   misunderstood based upon a conversation with me.

8          I have to look at that transcript.  I don't

9   know.  I've asked them before which search terms they

10  thought we didn't use and they haven't identified any

11  of this transcript information to me.  They simply said

12  that they thought we meant every search term that we

13  had previously agreed to, which I said, that's not what

14  we said.

15         MR. McINTURFF:  Why would agree to a

16  narrower list of search terms if we had --

17         MR. FIOCCOLA:  You agreed to narrower search

18  terms before.

19         MR. McINTURFF:  We would never have done

20  that.  It's just completely inaccurate.  They misled us

21  through the entire process.

22         MR. FIOCCOLA:  I think the accusations of

23  misleading, deceptive character, I think crooked was

24  used earlier, are really not necessary here.  I think

25  that we can have a dispute on professional terms.

```
1    Having said that, I think that we were fairly clear
2    about what we were doing.  They obviously don't.  At
3    the end of the day, if your Honor wants us to produce
4    up to the date of the subpoena, we'll go back and do it
5    as ordered.  But I thought we made it clear the time
6    frame we were using and the objections.  We made
7    relevance objections just like we did to everything
8    else for these purposes that we have argued about time
9    and again on various issues.  This is a third party,
10   this is not an actual defendant.  At the end of the
11   day, I don't think we need to spend an hour arguing
12   this.
13         THE COURT:  I think -- I still don't really
14   see any good limit the response to that time period.
15   Obviously, if it's privileged documents, you don't have
16   to turn them over.  Otherwise, I think -- I don't think
17   you can categorically say everything past that date is
18   irrelevant when you admitted you haven't reviewed it.
19   Review it for relevance, and if it's not relevant, then
20   don't produce it.  I don't think you can come in here
21   and say, we predict that it's going to be irrelevant
22   but we haven't reviewed it.
23         MR. FIOCCOLA:  Okay.
24         MR. McINTURFF:  The next issue, your Honor,
25   is --
```

```
1              THE COURT:  Maybe in a different case, you

2    could make that prediction.  But in this case, there's

3    obviously some relevant information that's occurred

4    post-lawsuit, so I don't think you can just presume

5    that anything that's post-lawsuit is not relevant.

6              MR. FIOCCOLA:  Thank you.

7              MR. McINTURFF:  The next issue is, we're

8    trying to have the ESI search conversation with groups

9    and we're trying to get an idea of where their

10   potential locations of electronically stored

11   information are.  So we keep asking them, tell us all

12   of the places where you have ESI and we keep getting

13   this response, which is, we're searching all locations

14   for responsive documents.  That is not the question

15   that we keep asking.

16             We want to know what they have and what

17   they're searching and what they're not search, so that

18   we can understand whether or not what they're not

19   searching is proper.  We've asked this five different

20   times.  This is now the sixth time that we are asking

21   Cross Country group to tell us specifically everywhere

22   it has ESI and to tell us what it is searching and what

23   it is not searching.  Frankly, I don't understand why

24   they can't tell us that and why it's taken six times.

25             MR. FIOCCOLA:  Your Honor, frankly, I don't
```

1  understand what more they want from us other than what

2  we've told them.  We had conversations with them a few

3  times where I identified that the company, Cross

4  Country Group, maintains one shared server which is

5  used by company employees.  There aren't that many

6  company employees.  So we identified that we would

7  review the shared server.  I identified this to them on

8  the phone.  I have an August 1st email I sent to them

9  which they reference in here, where I also stated that.

10         We also stated that the individuals have

11  personal computers and we stated we would be searching

12  personal computers for relevant information.  We also

13  stated that the individuals have cell phones which

14  would be searching for relevant information as well.

15  The last update, I told them that so far, we have not

16  identified any responsive information in any of those

17  sources, that we would supplement and identify to them

18  if and when we did.  I haven't heard back from them

19  from that August 1st email, except for this letter that

20  we received yesterday for today.  So I asked them

21  previously --

22         THE COURT:  Let me ask you, though, what

23  does that mean exactly, you haven't found anything yet?

24  Does that mean you've done the search or that you've

25  started the search but you haven't finished it yet?

```
1              MR. FIOCCOLA:  We have not completed the

2    search, as far as I'm aware.  We are searching the

3    shared file folder.  I know that.  There's in-house

4    counsel.  I'm working with him closely to search the

5    relevant locations.  The last time I checked with them,

6    which was prior to the August 1st email, they had not

7    completed the task but they had begun the task.  I

8    asked them --

9              THE COURT:  Here's what I want you to do:

10   Get in touch with them, find out what the status is.

11   Are they still doing the search, roughly how far are

12   they into the search?  Have they done 50%, 70%, just so

13   that plaintiff has some idea where you are.

14             MR. McINTURFF:  If I can add, your Honor,

15   counsel -- I assume you just forgot to mention that

16   you're searching their email accounts.

17             MR. FIOCCOLA:  We've already searched their

18   email accounts.  That's what the production primarily

19   was and that's what our conversations were originally.

20   So yes, the email accounts have been pulled for

21   specific custodians.

22             MR. McINTURFF:  Okay.

23             MR. FIOCCOLA:  Originally, it was four

24   custodians.  We've agreed to two additional custodians

25   at this point.
```

```
1              THE COURT:  Okay.

2              MR. McINTURFF:  So if we can have, your

3  Honor, because we haven't gotten written response from

4  the defendants stating all of the sources of their ESI

5  and what they're including and what they're leaving

6  out.  We'd like them to give us that in writing.

7              MR. FIOCCOLA:  I don't know what else I can

8  do other than what I put in the August 1st email, which

9  is -- do they want the name of the shared file folder,

10 do they want the serial numbers of the competitors that

11 people are searching?  I just don't know what

12 additional information other than the custodians who

13 have personal -- not personal computers but work

14 computers that have separate, non-network storage and

15 then network storage.  Those are the types of storage

16 that the company has and that's what we've reviewed.

17 We've also said that we're reviewing their cell phones

18 for text messages or any other types of data.  I don't

19 understand what additional I can provide to them other

20 than getting down to the nitty-gritty of the serial

21 numbers of the server box or something.

22             MR. McINTURFF:  We're not asking for that.

23 We're just asking for it to be written in one place in

24 case it turns out that there's some other ESI that they

25 -- we want them to go on record about --
```

1          THE COURT:  I think he just did.

2          MR. FIOCCOLA:  And it's in the August 1st

3     email that I sent to them.

4          THE COURT:  You can get a transcript to

5     this.  I think he's laid out pretty clearly what the

6     databases are.

7          MR. McINTURFF:  Fair enough.

8          MR. FIOCCOLA:  To that point, just to

9     clarify, to be clear, the company does not maintain a

10    database of information.

11         THE COURT:  Okay, the server --

12         MR. FIOCCOLA:  Because that was one of the

13    additional questions, too.  The server is just a

14    standard network server.

15         THE COURT:  It's a network server and then

16    each of the custodians has their own personal computer

17    that has a non-network drive that's also being

18    searched.  That's correct?

19         MR. FIOCCOLA:  Correct.

20         THE COURT:  Okay.  And their own person or

21    business cell phones.

22         MR. FIOCCOLA:  Yes.

23         THE COURT:  Okay.

24         MR. McINTURFF:  The next issue is -- counsel

25    alluded to this.  Group's ESI custodians have offered

1 to review their cell phones for responsive text

2 messages. We just need an update on when this review

3 will be complete.

4 　　　　　MR. FIOCCOLA: Again, I'm happy to provide

5 an update. Just to be clear, what I stated in my email

6 was that nothing had been identified to date and if we

7 do identify anything, we will let them know. I will

8 make double sure that --

9 　　　　　THE COURT: I don't know what that means.

10 Does that mean you've done the search and you didn't

11 find anything or does that mean you started the search

12 but you haven't finished it yet?

13 　　　　　MR. FIOCCOLA: As of July and as of the

14 point that I sent this email, we had begun the search.

15 　　　　　THE COURT: Okay.

16 　　　　　MR. FIOCCOLA: At that point --

17 　　　　　THE COURT: You haven't found anything yet.

18 　　　　　MR. FIOCCOLA: -- we hadn't found anything

19 yet.

20 　　　　　THE COURT: Okay.

21 　　　　　MR. FIOCCOLA: To this point, it is still my

22 understanding that nothing has been found because I

23 have not been told otherwise.

24 　　　　　THE COURT: Okay.

25 　　　　　MR. FIOCCOLA: That's sort of the --

```
 1              THE COURT:  Double-check with your client
 2    and find out what --
 3              MR. FIOCCOLA:  Without getting too much into
 4    it, that's just the plan that we had.
 5              THE COURT:  -- where you are in the process.
 6    Is it 50% done and they still haven't found anything?
 7              MR. FIOCCOLA:  I will provide an update.
 8              THE COURT:  Where are you?
 9              MR. FIOCCOLA:  Yes.
10              THE COURT:  What's next?
11              MR. McINTURFF:  The next issue -- just to be
12    clear, for C, now that the number of ESI custodians is
13    six, we'd ask that the two additional custodians also
14    has their cell phones reviewed for text messages.
15              MR. FIOCCOLA:  It is my understanding that
16    that is occurring or has occurred.  I will double-check
17    on that as well.
18              MR. McINTURFF:  This is background but in
19    the document production, in Cross Country Home Services
20    defendant's document production, there are emails from
21    some of Group's custodians where they're sending emails
22    to certain of the Cross Country custodians and they're
23    using their personal email accounts.  We requested
24    first whether there were any additional email address
25    that Group's custodians were using.  We got a response
```

1  saying that we're looking into it and we'll provide you

2  that information.

3         Then we got this cryptic response of, we

4  haven't identified any emails used for CC group

5  business other than those identified in their

6  production. So they're telling us that the only emails

7  are the ones that we show them. We think that in

8  reality, it's evident that these people are using their

9  personal email in conducting Group's affairs. And in

10 light of their inability to give a clear response to

11 our request that they tell us whether or not they're

12 using any other email addresses -- because we obviously

13 know they're using at least two. We think that it's

14 time now for the Court to order them to search the

15 personal email accounts of all four custodians, or I

16 guess it's six now.

17        THE COURT: Because two of them have used

18 personal emails?

19        MR. McINTURFF: Because two of them have

20 used it and we have proof it, and they won't even give

21 us a straight answer about whether these two have used

22 additional email accounts. They're basically saying

23 the only two emails are the ones that you showed us.

24        THE COURT: Are they saying the only two

25 emails or the only two email accounts?

 1              MR. FIOCCOLA:  Only two email accounts.

 2              THE COURT:  That's what I thought.

 3              MR. McINTURFF:  Okay.

 4              MR. FIOCCOLA:  Yes.

 5              MR. McINTURFF:  Then we have a

 6    misunderstanding.  I misread that.  If it's just the

 7    email accounts --

 8              MR. FIOCCOLA:  That's what I thought the

 9    question was about.

10              MR. McINTURFF:  If it's just the email

11    accounts, then those email accounts need to be

12    searched.  They're conducting business from personal

13    email.

14              MR. FIOCCOLA:  I think that there are two or

15    three documents that have been produced that have these

16    emails in them.  I think the same reason that your

17    Honor issued a protective order against taking the

18    depositions of these individuals apply for going into

19    their personal emails.  The review, which had the

20    custodial email accounts, produced very few emails to

21    begin with that related to Cross Country Homes Services

22    or the check program.  I just don't think there's a

23    basis to go into these individuals' personal emails.

24    It hasn't been shown based upon one or two emails that

25    were used, personal email.

```
 1            THE COURT:  I don't know what those one or

 2   two emails were.  Were they important documents?

 3            MR. McINTURFF:  I don't have them in front

 4   of me, your Honor.  They are related to the case and

 5   obviously caught our attention.

 6            MR. FIOCCOLA:  I also think this isn't

 7   really -- this is an issue that shouldn't be decided

 8   informally.  If this is going to be decided, I think a

 9   formal motion to compel should be filed and we should

10   be given opportunity to brief the issue and

11   specifically address why they believe the personal

12   emails are to be used or should be searched.  Again,

13   these are nonparties.  Effectively, they're contract

14   employees.  They do a board of advisors a few times a

15   year for --

16            THE COURT:  This is also the reason why

17   usually, companies instruct their employees not to use

18   personal emails for company business.  If they used the

19   emails they were supposed to, you wouldn't have this

20   problem.  I'm not saying it's your fault but --

21            MR. WITTELS:  We might have a different

22   president.

23            THE COURT:  Don't get me started on Twitter.

24   Without knowing what the context of those emails are

25   that's in the private accounts, I'm not really in a
```

1    position to rule on that at this point.  See if you can

2    -- now that you understand what it is, it's those two

3    email accounts that have been used, see if you can sort

4    that out amongst the parties and decide if there's some

5    parameters that you can set.  If not, then you're going

6    to need to set it out a little bit more for me before I

7    determine whether or not to search personal email

8    accounts for nonparties.

9              MR. McINTURFF:  Okay.  The next issue I

10   think we've gone over.  We just need an update of when

11   these two additional custodians' accounts are going to

12   be collected and produced.  This also raises an issue

13   regarding whether or not they're going to use

14   predictive coding again.  We would ask that for these

15   email accounts, at least these two where they haven't

16   used predictive coding yet, they just produce the

17   documents that are recalled by all of the search terms,

18   which is what was agreed to, and that they produce

19   responsive documents, that they not be allowed to use

20   predictive coding again.

21             MR. FIOCCOLA:  First of all, we never agreed

22   to produce all documents which hit on search terms.  We

23   would have fought much more about the expansive set of

24   search terms if that had been the actual agreement, but

25   that was never agreed to.

1        MR. McINTURFF:  Just to be clear, I mean

2   responsive, in accordance with the ESI protocol.

3        MR. FIOCCOLA:  With respect to these, I

4   thought that I had informed you that we already

5   collected them.  We're in the process of reviewing

6   them.  We did the other review first, which we produced

7   a document production of 45 responsive documents along

8   with non-responsive family members I think two weeks

9   ago.  I was on vacation.  I can't remember the exact

10  date that it went out.  We worked on that for a while.

11  We got through that.  Then we stuck the Sid and Jeffrey

12  Wall documents on the back end of that and we're in the

13  process of reviewing that.

14        There are about 12,000 total documents that

15  hit on the search terms.  We have, according to my

16  review team -- I asked this morning for an update.  We

17  have finished about 4,000 of those documents.  We have

18  had a lot of vacation time taken by our review team in

19  the month of August, which I think is sort of natural.

20  At this point, of the approximately 4,000 documents

21  reviewed, we have not identified a single responsive

22  document.

23        MR. McINTURFF:  Have you done predictive

24  coding on the --

25        MR. FIOCCOLA:  No, we are reviewing them

```
 1   linearly.  With only 12,000 documents, there's not

 2   really cost savings.

 3          MR. McINTURFF:  And you applied both sets of

 4   the parties' search terms?

 5          MR. FIOCCOLA:  I applied the same search

 6   terms that I used before.

 7          MR. McINTURFF:  Okay.

 8          MR. FIOCCOLA:  If you want me to use the

 9   other search terms, that's fine, let's talk about it.

10          MR. McINTURFF:  Okay, we can discuss that.

11          THE COURT:  Okay, next issue?  Why do I feel

12   like this is part meet and confer?

13          MR. FIOCCOLA:  These items have not been

14   brought up with me since my August 1st email.  We could

15   have taken care of a lot of this just through a simple

16   back-and-forth email.

17          MR. McINTURFF:  We're almost done.  This

18   last one is, we need an explanation, which we've

19   requested a number of times, on why Group doesn't have

20   emails prior to 2011.  In June, we were told that Cross

21   Country is following up on it in early June.  Then in

22   late June, Cross Country agreed to identify and

23   disclose Cross Country Group's pre-2011 backup

24   practices, and they still haven't responded to us.

25          MR. FIOCCOLA:  First of all, we have
```

1  produced documents prior to 2011. It's a little bit of

2  a background. The company -- plaintiffs' counsel know

3  this. The company did not start archiving until 2011.

4  That's why we go back to the archive. It started

5  archiving in 2011. So at that point, anything that

6  existed when the first archive was made is what exists.

7          THE COURT: Okay.

8          MR. FIOCCOLA: We've had this discussion a

9  few times. Go back and provide pre-2011 backup

10 practices. It's my understanding that the company did

11 not start archiving until 2011, so I'm not sure that

12 there was a backup practice. I've asked about this

13 quite a few times and we've had this conversation quite

14 a few times. If what they want us to say is that the

15 company didn't archive prior to 2011, I can say that

16 right now. They didn't archive prior to 2011. I don't

17 know what else can be said about this.

18          THE COURT: So in other words, if it still

19 existed at the time that they started archiving, it

20 would be there.

21          MR. FIOCCOLA: That's correct.

22          THE COURT: But if it wasn't there at that

23 point, they wouldn't have preserved it.

24          MR. FIOCCOLA: That is correct.

25          THE COURT: That's why the pre-2011 stuff is

1    hit or miss, essentially.

2            MR. FIOCCOLA:  That is correct.

3            MR. WITTELS:  Judge, I think that's really

4    the end of today in terms of disputes.  Rather than set

5    any kind of deadline now, I'd like to suggest --

6    obviously, this is subject to hearing from defendants

7    -- that we work out the briefing schedule on our

8    motion.  There may or may not be other related motions.

9    There are obviously some followup points here, and we

10   come back on that date. Because it's hard to get dates

11   when we call, maybe we can pick a date now and

12   hopefully work towards that date.

13           Then your Honor maybe can -- I don't think

14   now is the time to talk about the discovery cutoff

15   date, given that we don't have the motions decided.

16   We're going to have more motions and defendants are

17   still producing discovery, and they want discovery from

18   plaintiffs.  Why don't we revisit the issue of the

19   plaintiffs' depositions.  We'll come back in six weeks.

20   We should have the motion briefed by then and we can

21   hash out due dates then.  Maybe Judge Garaufis will

22   have ruled on one of the motions by then or at least

23   the first motion.

24           MR. TEPFER:  Judge, I think we do need at

25   least -- if you recall, back I think it was April, I

```
 1    was advocating for a longer discovery period, the end

 2    of September.

 3              THE COURT:  Yes, I remember.

 4              MR. TEPFER:  And plaintiffs' counsel was

 5    arguing for a shorter one, the end of July.  Some of

 6    these issues, at least the call recordings and that

 7    kind of stuff, had already surfaced, and I thought I

 8    had argued very vehemently for a longer period.  I

 9    don't have an objection to a longer period now but it

10    shouldn't be open-ended.  We should have a date and if

11    we need to revisit that date as we get closer to that

12    date, we can do that.  But I don't think we would agree

13    to an open-ended discovery period.  I think that's

14    inconsistent with how we've been proceeding in this

15    case.

16              But if you wanted to do the end of October

17    or the end of November, three months, and allow us to

18    take the plaintiffs' depositions within that time

19    frame, I think we'd be amenable to that.  I think the

20    sanctions motion will be briefed before the end of that

21    period.  If we need to revisit that deadline based on

22    any lingering issues, we can do that.  But I think we

23    need to have a firm end and if we need to extend that

24    as needed, we can do that.  But I think part of that

25    also means that we get to take the plaintiffs'
```

1    depositions during that period.

2               MR. WITTELS:  Can I talk to counsel, please?

3               THE COURT:  Yes.

4               (Off the record discussion.)

5               MR. TEPFER:  Your Honor, just to add one

6    other point that co-counsel reminded me, that would be

7    the end of discovery and then expert discovery might

8    extend.

9               THE COURT:  Yes.  It will be conclusion of

10   fact discovery.

11              MR. WITTELS:  Judge, I think our suggestion

12   from the plaintiffs' side is more workable, to give us

13   a date in mid-October or towards the end of October for

14   this next motion.  We come in, we see where we are in

15   terms of setting dates.  There's no point in setting a

16   cutoff when it's obviously going to be -- we're never

17   going to finish it by -- it's unlikely that it's going

18   to be the end of the year, maybe.  It depends how

19   quickly the judge rules and we get the discovery that

20   we need.  We have other depositions we have to take,

21   Howard Walk (ph).  We need to get Incandella (ph).

22              THE COURT:  I thought Walk was supposed to

23   be deposed months ago.

24              MR. McINTURFF:  We held off on Walk because

25   Walk was when we found out that Cross Country Group had

1  used predictive coding and that's why we didn't have

2  any documents from Walk.  So we deferred Walk, we have

3  deferred Walk pending the resolution of the predictive

4  coding issue because how the predictive coding issue is

5  resolved by your Honor is going to affect what we do

6  afterwards and whether there's more or less discovery.

7  So that issue is sort of in limbo at the moment.

8         MR. WITTELS:  The motion we made earlier

9  about the board of advisors -- your Honor quashed the

10  subpoenas subject to our renewing it depending upon

11  what shows up A) in the discovery and B) perhaps in the

12  deposition of Walk.  We have to do Walk, Incandella,

13  Tammy Throng (ph).  I would suggest that we come back

14  -- discovery will be ongoing.  We come back for that

15  motion and we'll be in a better position to see where

16  we're at.  If we can get a date say after the 18th of

17  October?

18         MR. McINTURFF:  It depends on how long

19  they're going to need to respond.

20         MR. WITTELS:  I think if you set it for

21  towards the end of October, they will have had time to

22  brief this and we'll be back and now where we are by

23  then.

24         MR. PREVIN:  Your Honor, Ocwen really does

25  think a discovery cutoff is appropriate.  If at the

1  resolution --

2          THE COURT:  Here's what I'm going to do.

3  I'm setting a discovery deadline of December 29th.  I

4  think that's more than enough time to brief whatever

5  you need to brief and deal with some of these issues.

6  If as a result of ruling on any of these motions, we

7  need to extend that deadline, then I'm happy to extend

8  the deadline if that's necessary.  I don't want to keep

9  it open-ended.  I think that just invites years and

10  years of endless litigation.  So let's try to keep to

11  the schedule and to the extent that we need to revise

12  it, I'm happy to do that.  I think everyone should have

13  a target date in mind to try to aim for at least.

14          MR. TEPFER:  Judge, that sounds good to us.

15  Just so we're clear, we'll be able to depose -- we'll

16  be able to take the depositions of those remaining

17  plaintiffs during that period.

18          THE COURT:  Yeah, before December 29th.

19          MR. TEPFER:  Great, thank you, Judge.

20          MR. WITTELS:  Judge, with the caveat that,

21  as your Honor said at the beginning, if for some reason

22  we get rulings on the other motions and it becomes

23  apparent they're not necessary, then they wouldn't be

24  deposed, correct.  We'll produce them -- assuming that

25  the cutoff and nothing else has changed, we will

1    produce them before the end of the (ui).

2            MR. FIOCCOLA:  Your Honor, I think there

3    might be a little confusion here.  We would like to

4    depose them within the next -- by late September, by

5    mid-October and get something schedule because we have

6    to work on the schedule to find when these plaintiffs

7    will be available.  We have to determine where they

8    would like to be deposed.  There also might be followup

9    discovery on our part based on what we learn from the

10   depositions.  So plaintiffs just want to wait until the

11   end, which is going to be really problematic about

12   scheduling, and we  don't want to have to come back --

13           THE COURT:  You wanted them to be produced

14   two months before the end of discovery, right?  Two

15   months before the end of discovery as of now would be

16   basically the end of October.

17           MR. WITTELS:  Judge, September and October

18   are -- we're going to be doing a lot with these

19   motions.

20           THE COURT:  Do them in November.

21           MR. WITTELS:  Can we do them before the end

22   of November?  You'll get them before the end of

23   November.

24           MR. PREVIN:  Judge, there are five --

25           MR. FIOCCOLA:  There are only five

1    individuals, your Honor.

2              MR. PREVIN:  If there are only five

3    individuals, we'd prefer not to wait until Thanksgiving

4    and running into the holidays at the end of the year to

5    depose these individuals when we can do it now

6              MR. WITTEL:  It's not running into the

7    holidays.  Your Honor made the point that if the class

8    motion is granted, we won't know them.  I know they

9    think they're going to discover some smoking gun from

10   the plaintiffs.  It hasn't happened yet.  Again, to

11   keep beating the Ground Hog Day, they know the story.

12   They've got the phone calls.  If they don't have the

13   phone calls, they have the logs, they have the

14   documents.  They're not learning anything new.

15             THE COURT:  The same thing could be said for

16   you getting more phone calls.  You've heard the story a

17   million times.  You know what the phone calls are going

18   to say.  There's a reason why you want those, there's a

19   reason why they want to depose your plaintiffs.  They

20   may get the exact same story and it will be a waste of

21   their time but they're entitled to do it.

22             MR. WITTELS:  Judge, if we could do it --

23             THE COURT:  I don't think we should be

24   fighting about a one-month difference between whether

25   you do it in October or you do it in November.

```
 1              MR. McINTURFF:  We have a lot of things on

 2   the calendar already in September and October so

 3   we're --

 4              THE COURT:  Work it out with defendants as

 5   to when --

 6              MR. WITTELS:  If we could have until

 7   November 17th, we'll get them done by then.

 8              MR. PREVIN:  We'll have them done before

 9   November 17th?

10              MR. WITTELS:  Yeah, you'll get the people by

11   November 17th.

12              MR. PREVIN:  You mean the dates will be

13   before November 17th.

14              MR. WITTELS:  Yes.

15              MR. PREVIN:  We'll notice the depositions

16   and works out the dates.  If we run into an issue,

17   Judge, we'll let you know.

18              THE COURT:  Okay.  If you can't figure out

19   the dates, let me know.

20              MR. FIOCCOLA:  We'll work out dates.

21   They're technically already noticed.

22              MR. WITTELS:  Judge, do you have a date for

23   us to come back?

24              THE COURT:  Yes.

25              MR. WITTELS:  In October?  Subject to the
```

1  defendants and your Honor, maybe the 19th of October.

2  Does that work for you guys?

3            THE COURT:  I'm sorry, what date were you

4  looking for?

5            MR. WITTELS:  The 19th.

6            THE COURT:  Let me take a quick look.  That

7  week is not good for me because I'm on criminal duty,

8  so it would have to be the week after.

9            MR. PREVIN:  The 26th, your Honor?

10            THE COURT:  The 26th is a good day for me.

11            MR. PREVIN:  Judge, maybe we should work out

12  a briefing schedule to make sure that --

13            THE COURT:  How is the 27th?

14            MR. FIOCCOLA:  I was going to ask if the 27th

15  was better.  Friday would be better for me.

16            MR. WITTELS:  Let me just check.

17            THE COURT:  Take your time.

18            MR. WITTELS:  Judge, we'd like to keep the

19  2th that you suggested and then have another date

20  because I don't know if we're going to make the motion

21  by then and it is hard to get dates.  We'll have other

22  discovery issues by then, if not other motions.  Then

23  we're probably going to have to have -- defendants will

24  need a fair amount of time to respond to the sanctions

25  motion.

```
1              THE COURT:  All right.

2              MR. WITTELS:  We'd suggest two weeks later,

3    so maybe the 10th, the 27th and the 10th.

4              THE COURT:  What time do you want to do on

5    the 27th?

6              MR. WITTELS:  That's a Friday.  I'm thinking

7    maybe late morning.

8              MR. OFAK:  Your Honor, this time works well

9    for us because we're traveling from D.C., the 2:00 p.m.

10   time period.

11             MR. WITTELS:  Can you do any earlier?

12             MR. OFAK:  We could do earlier, 1:00.  If we

13   get the 11:00, we could probably make it, but when we

14   get earlier than that --

15             THE COURT:  1:00?  Does that work?

16             MR. OFAK:  That's fine.

17             MR. WITTELS:  So October 27th at 1:00 and

18   then what about the 10th?

19             MR. FIOCCOLA:  November 10th?

20             MR. WITTELS:  Yes.

21             MR. FIOCCOLA:  And that's the hearing on the

22   motion?

23             MR. WITTELS:  Hopefully.

24             MR. FIOCCOLA:  That's Veterans Day.

25             MR. PREVIN:  I can't do the 10th.  If this is
```

```
1    just a hearing on the sanctions motion, then my

2    involvement isn't necessary.

3              THE COURT:  It doesn't matter.  The

4    courthouse is closed that day.

5              MR. WITTELS:  What about the 13th, November

6    13th?

7              THE COURT:  The only problem with the 13th is

8    it's a jury return day.  At this point, I don't have

9    anything but it's very likely I could get assigned a

10   jury selection for that day.

11             MR. WITTELS:  The 14th?

12             THE COURT:  I could do the 14th.

13             MR. WITTELS:  1:00?

14             THE COURT:  Actually, I can't do 1:00 that

15   day.  Can you do 2:00?

16             MR. WITTELS:  Sure.

17             MR. TEPFER:  Working backwards from that,

18   when do you want to file your motion?

19             MR. McINTURFF:  We're going to figure it

20   out.  We'll let you know in the next few days.

21             MR. TEPFER:  We're going to request thirty

22   days to respond, which is standard for a sanctions

23   motion.  So just factor that in and then I assume you

24   want to reply in time for the Court to review

25   everything before the 14th.
```

1          MR. PREVIN:  Is the 14th specifically a

2    hearing on the sanctions motion?

3          THE COURT:  It is.  So if you can't get the

4    briefing done in time for that, I'll just have to move

5    that hearing.

6          MR. PREVIN:  I just want to know whether I

7    need to -- someone on behalf of Ocwen will attend but

8    it may not be me if that's the only --

9          THE COURT:  Okay.

10          MR. PREVIN:  Thank you.

11          THE COURT:  At this point anyway, that's

12    what it's for.  Something tells me that will be the

13    only thing we will have time to discuss that day.

14          MR. FIOCCOLA:  If we don't have anything

15    else, your Honor, I've got to relieve my nanny and I

16    have a three-and-a-half-hour commute home.

17          THE COURT:  I thought my two-hour commute

18    home was bad.

19          MR. TEPFER:  Are we waiting for a date from

20    you when you're going to file your motion?

21          MR. McINTURFF:  No, we'll get to you.

22          MR. TEPFER:  As long as we have our thirty

23    days, I think that's fine, from whenever you're going

24    to file it.

25          THE COURT:  Is there anything else that the

```
1   parties wish to discuss while we're here?  You've got

2   seven minutes for us to make 5:00.  I'm just joking

3   with you.  I can't remember the last time we actually

4   finished before 5:00.

5              MR. FIOCCOLA:  I was going to say this is

6   early for us.

7              MR. WITTELS:  We can have ex parte

8   settlement talks.

9              THE COURT:  I'm always up for ex parte

10  settlement talks but not at 5:00.

11             MR. WITTELS:  Thank you, Judge.

12             THE COURT:  Talk to everyone soon.

13                   *  *  *  *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18     I certify that the foregoing is a correct

19 transcript from the electronic sound recording of the

20 proceedings in the above-entitled matter.

21

22

23

24

25 ELIZABETH BARRON                    September 1, 2017