UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

MARGARITA DELGADO, WILLIAM
SHEPPARD, GERALDINE MAHOOD, KEVIN
CHOWNING, LYA CHOWNING, PAUL
EMMERT, CAROLYN TOTH, BRIAN
RAFACZ, JENNIFER HENDRICKS, CYNTHIA
BENIWAL, KIMBERLY KAYES, JUSTIN
WISNEWSKI, LAURIE CHEAMITRU, DALE
ZIMMER, MICHAEL BENHAMU, MEGHAN
FOX, DAN WILKINSON, KENT COLLIER,
THERESA MCCULLOUGH, BEN ELLIOTT,
JASON ABT, CAMI PELOZA, and TERRY
OLIVER,

Individually and on Behalf of All Others Similarly
Situated,

                    Plaintiffs,

       -against-

OCWEN LOAN SERVICING, LLC, CROSS
COUNTRY HOME SERVICES, INC., SANDRA
FINN, and "JOHN DOES 1-10,"

                   Defendants.
-----------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**13-CV-4427 (NGG) (ST)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiffs bring this putative class action[1] against Defendants Ocwen Loan Servicing,

LLC ("Ocwen"), Cross Country Home Services, Inc. ("Cross Country"), Cross Country's

President Sandra Finn ("Finn"), and John Does 1-10 (collectively, "Defendants"). (4th Am.

Compl. ("FAC") (Dkt. 293).) Plaintiffs claim that Defendants engaged in a deceptive check

---

[1] Plaintiffs' Motion for Class Certification is pending before the court. (See Mot. for Class Cert. (Dkt. 152).)

solicitation scheme that led Plaintiffs and other consumers unknowingly to enroll in, and pay monthly fees for, Cross Country's warranty plans.

Before the court is Defendants' motion for partial dismissal of the claims asserted in Plaintiffs' Fourth Amended Complaint (the "Motion"). (Defs. Mot. to Dismiss and Strike Class Allegations ("Mot.") (Dkt. 324).) For the reasons stated below, the Motion is GRANTED IN PART and DENIED IN PART.

## I.     BACKGROUND

While the court has previously detailed Plaintiffs' essential allegations as they appeared in prior iterations of the Complaint (see Sept. 23, 2014, Mem. & Order (Dkt. 42)), it reviews the allegations as presented in the challenged pleading. Unless otherwise indicated, the following factual allegations are drawn from the Fourth Amended Complaint (the "Complaint"). (FAC.)

### A.     The Parties

Defendant Ocwen is "the largest servicer of subprime mortgage loans in the country" and "the nation's largest non-bank mortgage servicer." (FAC ¶ 55.) In that role, Ocwen "collect[s] mortgage payments and handle[s] escrow accounts, delinquencies, loan modifications, and foreclosures" on behalf of the mortgage holders (id.), and services more than 600,000 residential home loans (id. ¶ 44). The plaintiffs in this case are customers of Ocwen who reside in New York, California, Alabama, Arizona, Colorado, Georgia, Indiana, Maryland, Michigan, New Jersey, New Mexico, Ohio, Pennsylvania, Tennessee, Texas, Virginia, and Washington. (Id. ¶¶ 18-43.)

Defendant Cross Country "market[s] and sell[s] appliance warranty plans, homeowner repair/referral plans, and related maintenance plans," and purports to be one of the largest providers of such plans in the United States. (Id. ¶ 58.) At all relevant times, Finn was the

2

president of Cross Country. (Id. ¶ 46.) Cross Country operates subsidiaries and affiliates under different names in various states. (Id. ¶¶ 48, 50.) Cross Country operates through these subsidiaries and affiliates to enroll customers in plans and policies provided by Cross Country. (Id. ¶ 47.) Plaintiffs allege that these subsidiaries and affiliate companies are controlled and directed by Cross Country and Finn.[2] (Id. ¶ 49.)

### B. The Alleged Scheme

Plaintiffs allege that Cross Country markets its plans and policies in part through lists of customers obtained from mortgage servicing companies, including Ocwen. (Id. ¶¶ 59-60.) Cross Country approaches these companies about providing their customers with Cross Country's plans as "add-on products" for the mortgage-related services those customers are already receiving. (Id. ¶ 59.) At an unspecified point prior to the events described in the Complaint, Cross Country and Ocwen entered into such an agreement, and Ocwen provided Cross Country with a list of its customers. (Id. ¶ 60.)

The gravamen of the Complaint is that Cross Country uses misleading and fraudulent mailings to Ocwen customers in order to trick them into enrolling in Cross Country-provided plans. According to Plaintiffs, Cross Country sends Ocwen customers mailings that are addressed to the individual customer, display the Ocwen logo, and list Ocwen as a return addressee on the outside of the envelope. (Id. ¶¶ 62, 68.) The outside of the envelope is also prominently marked with a label that says "CHECK ENCLOSED." (Id. ¶¶ 62, 66.) The envelope does not state that it contains any "solicitation" or "marketing material." (Id. ¶ 65.)

---

[2] The Complaint also names ten "John Doe" Defendants, identified only as "currently unknown participants, actors, and/or co-conspirators in Defendants' check solicitation scheme and enterprise, who will be identified and added as Defendants if discovery warrants it." (Id. ¶ 54.)

Contained within the envelopes are checks for a small amount (examples provided in the Complaint show amounts of $2.50 and $3.50). (Id. ¶ 69.) The fronts of the checks state in small print that they are from "CCHS" and provide an address similar to that of Ocwen. (Id. ¶ 70.) The checks themselves are valid and may be deposited. (Id. ¶ 71.) However, the checks state in small print that "[b]y cashing or depositing this check, you are purchasing the annual Systems MD Gold Home Warranty" or a similarly named plan. (Id. ¶¶ 69, 71.) The backs of the checks contain signature lines for the recipient, which read simply "[s]ignature of payee required for processing." (Id. ¶ 76.) Above these lines, the checks contain a statement, again in small print, one iteration of which reads:

> By cashing or depositing this check, I understand that I am purchasing an annual Systems MD Gold Home Warranty Plan and understand that $44.95 per month will automatically be charged to my Ocwen Loan Servicing mortgage payment unless I cancel my Plan by calling toll free 1.800.474.4047 within 30 days from the date this check is cashed or deposited. I understand that this is an annually renewable plan and the monthly cost of $44.95 will continue to be collected along with my monthly mortgage payment until I cancel the plan.

(Id. ¶ 78.)

Also contained within the envelopes is a "solicitation pitch" that "promote[s] the savings and benefits customers [would] supposedly receive by cashing the checks." (Id. ¶ 80.) Plaintiffs allege that these solicitations do not "disclose the hidden cost of accepting the checks, or the way to avoid the hidden costs," and instead "proclaim[] that the checks' purpose is to 'pay you' and create 'savings' for customers." (Id.) In some cases, these solicitations are attached to the checks along a perforated line and direct the recipient by name to "Sign and Deposit the Enclosed Check." (Id. ¶ 81.) In other cases, the solicitations contain language encouraging the recipient to "cash or deposit your check to get $2.50 instantly and activate the benefits of" the Cross Country plan. (Id. ¶ 84.) Plaintiffs contend that these solicitations are "presented upside

4

down, have confusing and barely legible tiny footnotes which contain or refer to various disclaimers and limitations, and are designed to be overlooked." (Id. ¶ 85.) Moreover, in some cases, the "terms, conditions, and limitations" referenced in the solicitations are not contained in the same mailing, but were promised in separate "service agreements" or "membership materials" that never in fact arrived. (Id. ¶ 86.)

Plaintiffs allege that the nature of these mailings is such that a reasonable customer would assume that both the mailing and the check were sent by Ocwen and that they mislead Ocwen's customers "into believing that they are receiving some kind of refund or rebate from their mortgage company." (Id. ¶ 70.) Instead, by signing and depositing the checks, Ocwen's customers are enrolled into a Cross Country plan that causes them to incur a recurring monthly fee. (Id. ¶ 78.)

In those cases in which check recipients cash or deposit the checks and are thereby enrolled in a Cross Country-provided plan, Plaintiffs allege that the charges were intentionally obscured to prevent detection by the "customer." (Id. ¶ 88.) Specifically, Plaintiffs contend that subsequent mortgage billing statements by Ocwen—who collects the payments for Cross Country (id. ¶ 89)—arrive after the 30-day cancellation window and omit any mention that Ocwen splits receipts with Cross Country, that customers might be charged more than the amount listed on the initial check, or that the charges are attributable to Cross Country (id. ¶¶ 88 (i), (ii), (iv), 91). Ocwen also allegedly "mask[s] the new charge under vague names," including the payments as line items on mortgage and escrow statements labeled as, inter alia, "optional insurance," "Systems MD Gold," "Membership," "Referral Assistant," and "Optional Products." (Id. ¶¶ 90-91.)

The Complaint alleges that Defendants were aware that Ocwen customers enrolled in Cross Country memberships did not use those plans and, in many cases, complained about being enrolled. (Id. ¶ 95.) In support of this claim, Plaintiffs provide excerpts from consumer protection websites in which Ocwen customers described being billed by Cross Country for unwanted plans. (Id. ¶ 96.)

According to Plaintiffs, Defendants have mailed "hundreds of thousands, if not millions, of solicitation checks in Ocwen's name." (Id. ¶ 79.) As a result of these mailings, the Complaint alleges that more than 55,000 homeowners were "victimized by the scheme" and that they made payments totaling more than $35 million. (Id. ¶ 1.)

In addition to their factual allegations about Defendants' practices in general, the Complaint details how, between 2011 and 2014, the named Plaintiffs entered into Cross Country plans and made payments through their Ocwen-provided mortgage billing and escrow statements. (Id. ¶¶ 98-237.) Each of these allegations follows a similar pattern: Plaintiffs received a mailing in an envelope marked "Ocwen," deposited the enclosed check, and, several months later, realized they had been paying for a Cross Country plan of which they were previously unaware. (Id. ¶¶ 98-110.) In some instances, the Complaint also details particular Plaintiffs' efforts to extricate themselves from those plans. (See, e.g., id. ¶¶ 107-110.)

## C.   Class Allegations

Based on the claims described above, Plaintiffs bring class actions for both a nationwide class and classes corresponding to each of the named Plaintiffs' states of residence.[3] (Id. ¶¶ 239-241.) Plaintiffs allege that the conduct of which they complain was part of a "uniform

---

[3] Those states, noted supra in Section I.A., are New York, California, Alabama, Arizona, Colorado, Georgia, Indiana, Maryland, Michigan, New Jersey, New Mexico, Ohio, Pennsylvania, Tennessee, Texas, Virginia, and Washington.

and standardized" course of conduct by Defendants that "did not meaningfully differentiate among individual Class members." (Id. ¶ 238.)

With respect to the putative nationwide class, Plaintiffs define the class as consisting of all Ocwen customers who (1) enrolled in a Cross Country plan through a check solicitation during the statutory period; (2) paid a plan premium; and (3) never placed a claim under the plan. (Id. ¶ 240.) Plaintiffs define the putative state classes in much the same way, adding in the additional limitation that the class extends only to Ocwen customers in each of the states represented in this action.[4] (Id. ¶ 241.)

Plaintiffs argue that "[q]uestions of law and fact are common to the Class and predominate over any questions affecting only individual class members," specifically pointing to the following questions:

      a. Whether Defendants participated in and pursued the common Check Solicitation Scheme;

      b. Whether Defendants' scheme is likely to mislead Ocwen's customers;

      c. Whether Defendants used the mails and/or wires through interstate commerce in a Racketeering Enterprise to accomplish their Check Solicitation Scheme;

      d. Whether Defendants' conduct constitutes unfair, unlawful and/or fraudulent practices prohibited by the laws of New York and California;

      e. Whether Defendant Ocwen breached its fiduciary duty to Plaintiffs and the Class;

      f. Whether Defendants were unjustly enriched as a result of their conduct;

---

[4] Both sets of classes exclude Defendants' officers and directors, as well as the immediate family members, legal representatives, and heirs, successors, and assigns of Defendants' officers and directors and any entities in which the officers and directors have or previously had a controlling interest. (Id. ¶ 242.) It also excludes federal, state, and local entities, judicial officers presiding over the action, and the immediate families and judicial staff of such judicial officers. (Id.)

g. Whether, and to what extent, Defendants are liable to Plaintiffs and the Class for damages; and

h. Whether, and to what extent, equitable relief should be imposed on Defendants to prevent such conduct in the future.

(Id. ¶ 247.)

### D. **Procedural History**

Plaintiffs filed their initial complaint in this court on August 6, 2013. (Compl. (Dkt. 1).) The operative complaint is the Fourth Amended Complaint, filed on April 14, 2017. (FAC.) From the foregoing allegations, Plaintiffs bring putative class claims against all Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, based on predicate acts of mail and wire fraud, 18 U.S.C. §§ 1341 and 1343, and RICO conspiracy in violation of 18 U.S.C. § 1962. (Id. ¶¶ 251-81.) Plaintiffs also bring the following state-law-based claims against all Defendants:

- Unjust enrichment under the laws of New York, Alabama, Arizona, Colorado, Georgia, Indiana, Maryland, Michigan, Ohio, Pennsylvania, Tennessee, Texas, Virginia, and Washington.[5] (Id. ¶¶ 282-91.)

- Breach of fiduciary duty under the laws of Alabama, Arizona, California, Georgia, Indiana, Michigan, New Jersey, New Mexico, Ohio, Virginia, and Washington. (Id. ¶¶ 292-300.)

- Violation of New York General Business Law § 349. (Id. ¶¶ 301-09.)

- Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq. (Id. ¶¶ 310-20.)

- Violation of the Alabama Deceptive Trade Practices Act, Ala. Code §§ 8-19-1 et seq. (Id. ¶¶ 321-31.)

- Violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. Ann. §§ 44-1521 et seq. (Id. ¶¶ 332-41.)

---

[5] Plaintiffs also bring an unjust enrichment claim on behalf of the putative nationwide class under New York law or, alternatively, the laws of the states to which Defendants sent checks. (Id. ¶ 283.)

- Violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. §§ 6-1-101 <u>et seq</u>. (<u>Id.</u> ¶¶ 342-51.)

- Violation of the Georgia Fair Business Practices Act, Ga. Code Ann. §§ 101-1-390 <u>et seq</u>. (<u>Id.</u> ¶¶ 352-60.)

- Violation of the Georgia Uniform Deceptive Trade Practices Act, Ga. Code Ann. §§ 10-1-370 <u>et seq</u>. (<u>Id.</u> ¶¶ 361-67.)

- Violation of the Indiana Deceptive Consumer Sales Act, Ind. Code Ann. §§ 24-5-0.5 <u>et seq</u>. (<u>Id.</u> ¶¶ 379-89.)

- Violation of the Maryland Consumer Protection Act, Md. Code Com. Law §§ 13-101 <u>et seq</u>. (<u>Id.</u> ¶¶ 390-97.)

- Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. §§ 445.901 <u>et seq</u>. (<u>Id.</u> ¶¶ 398-407.)

- Violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1 <u>et seq</u>. (<u>Id.</u> ¶¶ 408-18.)

- Violation of the New Jersey Truth-In Consumer Contract, Warranty, and Notice Act, N.J. Stat. Ann. §§ 56:12-14 <u>et seq</u>. (<u>Id.</u> ¶¶ 418-21.)

- Violation of the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1 <u>et seq</u>. (<u>Id.</u> ¶¶ 422-29.)

- Violation of the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. §§ 1345.01 <u>et seq</u>. (<u>Id.</u> ¶¶ 430-38.)

- Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. and Cons. Stat. Ann. §§ 201-1 <u>et seq</u>. (<u>Id.</u> ¶¶ 439-47.)

- Violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-104 <u>et seq</u>. (<u>Id.</u> ¶¶ 448-57.)

- Violation of the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. §§ 17.41 <u>et seq</u>. (<u>Id.</u> ¶¶ 458-70.)

- Violation of the Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-196 <u>et seq</u>. (<u>Id.</u> ¶¶ 471-80.)

- Violation of the Washington Consumer Protection Act, Wash. Rev. Code Ann. §§ 19.86 <u>et seq</u>. (<u>Id.</u> ¶¶ 481-89.)

With respect to the state-law-based claims, Plaintiffs bring those actions on their own behalf and on behalf of each member of the putative state classes within the relevant states (i.e. the states under whose laws each of those claims is brought). (Id. ¶¶ 284, 294, 302, 311, 322, 333, 343, 353, 366, 380, 391, 399, 409, 419, 423, 431, 440, 449, 459, 472, 482.) Finally, Plaintiffs bring claims for common law fraud on their own behalf and on behalf of the putative nationwide class, or, in the alternative, on behalf of the individual putative state class.[6] (Id. ¶¶ 490-96.)

On August 31, 2015, Defendants filed a motion to dismiss the Third Amended Complaint (Mot. to Dismiss 3d Am. Compl (Dkt. 92)), and Cross Country and Sandra Finn filed a motion to compel arbitration (Mot. to Compel Arbitration (Dkt. 94)). The court denied both motions without prejudice on September 2, 2016. (Sept. 2, 2016, Mem. & Order (Dkt. 136).) With respect to the motion to dismiss, the court concluded that the motion was "premature" in light of the dispute over arbitration and the then-pending "mini-trial" on the issue of contract formation. (Id. at 28-29.) On March 20, 2017, Defendants Cross Country and Sandra Finn withdrew their motion to compel arbitration, mooting the need for hearings on the issue of contract formation. (Mar. 20, 2017, Stipulation (Dkt. 264).) Following this withdrawal, the court granted Plaintiffs leave to file a fourth amended complaint and granted Defendants leave to renew their motion to dismiss. (March 31, 2017, Order (Dkt. 289).)

## II.   DISCUSSION

Before the court is Defendants' motion for partial dismissal of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[7] (Mot.) The Motion contains several subparts. First,

---

[6] As to the putative nationwide class, Plaintiffs bring the common law fraud claim under the laws of each state to which Defendants sent a check solicitation. (Id. ¶ 491.) In the alternative, with respect to the putative individual state classes, Plaintiffs bring common law fraud claims under the law of each individual state represented by a named plaintiff. (Id.)

[7] The Motion also seeks to strike class allegations in the Complaint. (Mot. at 6-18.) As noted above, however, the court only granted Defendants leave to move to dismiss the Complaint, and stated explicitly that it would only

Defendants argue that the claims brought under six of the state consumer protection statutes listed in Section I.D., supra, are deficient under the terms of those statutes. (Id. at 18-22.) Second, the Motion contends that Plaintiffs' unjust enrichment and breach of fiduciary duty claims fail under the laws of fourteen and ten of the states cited in the Complaint, respectively. (Id. at 22-28.)

The court considers these arguments separately. For the following reasons, the court grants the motion to dismiss claims brought under the Alabama, Tennessee, and Georgia consumer protection statutes, and denies the motion with respect to the remaining consumer protection statutes as well as the common law claims for unjust enrichment and breach of fiduciary duty.

A.      **Legal Standard**

The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of a plaintiff's claims for relief. Patane v. Clark, 508 F.3d 106, 112-13 (2d Cir. 2007). A complaint will survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

---

address the pending motion for class certification after it decided the motion to dismiss. (March 31, 2017, Order.) Following service of the Motion, Plaintiffs wrote to draw the court's attention to the expanded motion and requested that the court deny the motion to strike without prejudice, considering those arguments only after ruling on the motion to dismiss. (Pls. May 26, 2017, Ltr. (Dkt. 304).) The court held a hearing on the issue, at which time it informed the Defendants that the court would address class certification issues after ruling on the motion to dismiss. (Tr. of June 6, 2017, Hr'g (Dkt. 318) 11:13-22.) Accordingly, the court does not consider the portions of the Motion that discuss only class certification issues at this stage.

In reviewing a complaint on a motion to dismiss for failure to state a claim, the court must accept as true all allegations of fact in the complaint and draw all reasonable inferences in favor of the plaintiff. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). "In determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005). "[W]hatever documents may properly be considered in connection with the Rule 12(b)(6) motion, the bottom-line principle is that once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Roth v. Jennings, 489 F.3d 499, 510 (2d Cir. 2007) (internal quotation marks and citation omitted).

## B.  Challenges to Consumer Protection Statute-Based Claims

Defendants argue that several of the state consumer protection statute-based claims are inadequately pled based on their inclusion of class claims, the absence of certain required allegations, and the timeliness of the claims. The court addresses these challenges in turn.

### i.  *Permissibility of Pursuing Class Claims*

Defendants first contend that the Alabama, Georgia, and Tennessee consumer protection statutes explicitly prohibit class actions to enforce their terms. (Defs. Mem. in Supp. of Mot. ("Defs. Mem.") (Dkt. 325) at 18-19.) Each of those statutes contains language which proscribes the use of class actions to enforce the substantive rights created therein. Ala. Code Ann. § 8-19-10(f) ("A . . . person bringing an action under [the Deceptive Trade Practices Act] may not bring an action on behalf of a class."); Ga. Code Ann. § 10-9-399 ("Any person who suffers injury or

damages . . . as a result of consumer acts or practices in violation of this part[8] . . . may bring an

action individually, but not in a representative capacity . . . ."); Tenn. Code Ann. § 47-18-

109(a)(1) ("Any person who suffers an ascertainable loss of money or property . . . as a result of

the use or employment by another person of an unfair or deceptive act . . . may bring an action

individually to recover actual damages."). Plaintiffs do not contest the meaning of these

statutory provisions, but instead argue that they are procedural limitations which are preempted

by Federal Rule of Civil Procedure 23 based on the United States Supreme Court's decision in

Shady Grove Orthopedic Associates, P.A., v. Allstate Insurance Company, 559 U.S. 393 (2010).

(Pls. Opp'n to Mot. ("Pls. Opp'n") (Dkt. 326) at 7-11.)

### 1.     The *Shady Grove* Opinions

Plaintiffs' argument requires the court to briefly review the decision in Shady Grove. In

that case, the Court reviewed a lower court's dismissal of a putative class action based on

Section 901(b) of the New York Civil Practice Law and Rules ("CPLR Section 901"), which

prohibits suits from proceeding as class actions if they seek to recover a "penalty" or statutory

minimum damages. 559 U.S. at 397. Assessing which of the two rules applied to the case

before it required the court to address two questions: first, whether CPLR Section 901 and Rule

23, which governs class actions in federal courts, addressed the same question; and if so, whether

Rule 23 was within the statutory rulemaking power of the courts under the Rules Enabling Act,

28 U.S.C. § 2072. Id. at 399. A majority of the Court found that this class action bar conflicted

with Federal Rule of Civil Procedure 23, concluding that Rule 23 creates a "categorical rule" as

---

[8] By its terms, the cited limitation on class actions applies only to actions brought under the Fair Business Practices Act and does not extend to Plaintiffs' claim under Georgia's Uniform Deceptive Trade Practices Act.

to when plaintiffs may maintain a class action, and so found that CLPR Section 901 "cannot apply in a diversity suit unless Rule 23 is _ultra vires_." _Id._

While the Court held that Rule 23 was validly enacted and so preempted CPLR Section 901 in the putative class action challenged in that case, no majority coalesced around a justification for that outcome. Writing for three other justices, Justice Scalia concluded that Rule 23's regulation of which actions can and cannot proceed through a class vehicle is purely procedural in nature and so does not impermissibly "abridge, enlarge, or modify any substantive right" created by state law. _Id._ at 407 (plurality opinion) (quoting the Rules Enabling Act, 28 U.S.C. § 2072(b)). On that basis, the plurality concluded that Rule 23 _always_ preempts conflicting state laws such as CPLR Section 901 regardless of "the substantive nature of [the conflicting state] law, or its substantive purpose," _id._ at 409, arguing that the validity of any Federal Rule of Civil Procedure depends "entirely upon whether [the challenged Federal Rule] regulates procedure," _id._ at 410.

Justice Ginsburg, writing for the four dissenting members of the Court, argued that the majority fundamentally erred in finding that there was any conflict at all between CPLR Section 901 and Rule 23. In stark contrast to the plurality's singular focus on content of the challenged federal rule, the dissenters looked to the nature of the state rule to be displaced, examining the history and function of CPLR Section 901 and concluding that it was adopted for the non-procedural purpose of limiting remedies. _Id._ at 445-451 (Ginsburg, J., dissenting). Reasoning that Rule 23 "governs purely procedural aspects of class litigation," the dissenters contended that the rule thus presented no conflict with CPLR Section 901's purpose of "control[ling] the size of a monetary award a class plaintiff may pursue." _Id._ at 446-47.

Justice Stevens provided the deciding vote. Writing only for himself and concurring with the judgment, he agreed with the plurality that Rule 23 and CPLR Section 901 stood in conflict and concluded that the federal rule preempted the state's class action bar. Id. at 416-436 (Stevens, J., concurring in part and concurring in the judgment). With respect to the second of these conclusions, however, Justice Stevens eschewed the plurality's categorical approach of treating every federal rule that "really regulates procedure" as sufficient to preempt a conflicting state rule. Id. at 424-28. Instead, he adopted an approach similar to that urged by the dissenters, focusing on whether the state law had a substantive purpose and acknowledging the possibility that state rules that are otherwise procedural "may in some instances become so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy," and concluding that such rules should not be preempted by a conflicting federal rule. Id. at 420. Under this view, Justice Stevens concluded that the determination of whether a state rule is supplanted by a federal rule depends not on "whether the state law at issue takes the form of what is traditionally described as substantive or procedural" but rather on "whether the state law actually is part of a State's framework of substantive rights or remedies." Id. at 419 (emphasis in original). While Justice Stevens concluded that CPLR Section 901 did not present such a case, emphasizing in particular the application of that law to any action brought in New York under any federal or state law, he cautioned that even genuinely procedural Federal Rules of Civil Procedure would need to give way when they conflict with "seemingly procedural [state] rules that are intimately bound up in the scope of a substantive right or remedy." Id. at 433.

### 2. Post-*Shady Grove* Decisions

The opinions in Shady Grove present a particularly intractable precedential question, as it is very difficult to determine whether the Court reached a majority on any subset of its analysis.

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." United States v. Alcan Aluminum Corp., 315 F.3d 179, 189 (2d Cir. 2003) (quoting Marks v. United States, 430 U.S. 188, 193 (1977). Interpreting this standard, the Second Circuit has cautioned that

> [t]his rule only works in instances where one opinion can meaningfully be regarded as 'narrower' than another—only when one opinion is a logical subset of other, broader opinions . . . that is to say, only when that narrow opinion is the common denominator representing the position approved by at least five justices. When it is not possible to discover a single standard that legitimately constitutes the narrowest ground for a decision on that issue, there is then no law of the land because no one standard commands the support of a majority of the Supreme Court.

Alcan Aluminum, 315 F.3d at 189 (internal quotation marks and citations omitted).

The Second Circuit has not clarified whether Justice Stevens' opinion in Shady Grove constitutes a "common denominator" and so the holding of the case. See Greene v. Gerber Prods. Co., — F. Supp. 3d —, Nos. 16-CV-1153 (MKB), 17-CV-93 (MKB), 2017 WL 3327583, at *13 (E.D.N.Y. August 2, 2017) (citing Retained Realty, Inc. v. McCabe, 376 F. App'x 52, 55 (2d Cir. 2010)). However, "the majority of district and circuit courts [] have found Justice Stevens' concurring opinion controlling." Green, 2017 WL 3327583, at *13 (collecting cases). Of note, a number of courts have treated Justice Stevens' opinion as binding precedent based on the five justice majority formed by the apparent agreement between Justice Stevens and the four dissenters, reasoning that both opinions require courts to assess "the validity of [a challenged] Federal Rule[] of Civil Procedure [based], in part, on the rights afforded by the state rule that the Federal Rule displaces."[9] In re Wellbutrin XL Antitrust Litig., 756 F. Supp. 2d 670, 675 (E.D.

---

[9] While some courts have seemingly concluded that Justice Stevens' opinion controls simply because he cast the deciding vote on grounds that were less expansive than the those put forth by the plurality, at least one court in this

Pa. 2010); see also, e.g., In re Digital Music Antitrust Litig., 812 F. Supp. 2d 390, 415

(S.D.N.Y. 2011); cf. also Shady Grove, 559 U.S. at 442 n.2 (Ginsburg, J., dissenting) ("[A]

majority of this Court, it bears emphasis, agrees that Federal Rules should be read with

moderation in diversity suits to accommodate important state concerns."). Following from this

conclusion, a number of opinions in this circuit and elsewhere have distinguished between "pan-

statutory" class-action bars such as CPLR Section 901(b) and limitations built into particular

state statutes, concluding that bars in the latter category "provide[] a procedure that is 'so bound

up with the state-created right or remedy that it defines the scope of that substantive right or

remedy'" and so displaces Rule 23. In re Digital Music Antitrust Litig., 812 F. Supp. 2d at 416

(quoting Shady Grove, 559 U.S. at 420 (Stevens, J.); see also Greene, 2017 WL 3327583, at *14;

Leonard v. Abbott Labs., Inc., No. 10-CV-4676 (ADS) (WDW), 2012 WL 764199, at *13

(E.D.N.Y. Mar. 5, 2012); Bearden v. Honeywell Int'l, Inc., No. 3:09-1035, 2010 WL 3239285,

at *10 (M.D. Tenn. Aug. 16, 2010) (Tennessee Consumer Protection Act limitation on class

actions is not preempted by Rule 23); Fejzulai v. Sam's West, Inc., 205 F. Supp. 3d 723, 728-29

(D.S.C. 2016) (same as to South Carolina Unfair Trade Practices Act).

Rather than wading into this dispute, Plaintiffs urge the court to adopt the approach taken

by the Eleventh Circuit in Lisk v. Lumber One Wood Preserving, LLC, 792 F.3d 1331 (11th

Cir. 2015), which found that Rule 23 preempts the class action bar in the Alabama Deceptive

Trade Practices Act under either the plurality or concurrence approach. The panel concluded

---

circuit has questioned whether that concurrence is really a "logical subset of" the plurality opinion. See In Re
Aggrenox Antitrust Litig., No. 3:14-MD-2516 (SRU), 2016 WL 4204478, at *5 (D. Conn. Aug. 9, 2016) ("[The
concurrence] is not logically narrower [than the plurality opinion] because it is not a logical subset of the opinion of
the other Justices in the majority. Those Justices do not implicitly approve of its rationale for sometimes allowing
state procedural rules to control—on the contrary, they explicitly reject that rationale—and it therefore does not
represent the common denominator of the Court's reasoning.") The court agrees with this skepticism, but ultimately
concludes that it is Justice Stevens' agreement with the dissenters in Shady Grove that gives his opinion precedential
force in interpreting the federal rules.

that "[t]here is no relevant, meaningful distinction between [CPLR Section 901] . . . and [the] statutorily created claim for deceptive practices of the kind at issue here" and so held that Rule 23 preempted the class action bar. Id. at 1335. The panel specifically rejected the suggestion that inclusion of the class action limitation in the statute to be enforced—as opposed to the "pan-statutory" bar in CPLR Section 901—affected the analysis, concluding that "the question of whether a federal rule abridges, enlarges, or modifies a substantive right turns on matters of substance—not on the placement of a statute within a state code." Id. at 1336. The decision in Lisk has not been widely followed outside of the Eleventh Circuit, however, with most courts outside of that circuit implicitly or explicitly disagreeing with its interpretation of Shady Grove and its determination that there was no "meaningful distinction" between CPLR Section 901 and the Alabama class action bar. See Fejzulai, 205 F. Supp. 3d at 728-29; Helpling v. Rheem Mfg. Co., No. 15-CV-2257, 2016 WL 1222264, at *13-14 (N.D. Ga. Mar. 26, 2016); Chapman v. Priceline Grp., Inc., No. 15-CV-1519, 2017 WL 4366716, at *7 (D. Conn. Sept. 30, 2017). But see Suchanek v. Sturm Foods, Inc., 311 F.R.D. 239, 263-64 (S.D. Ill. 2015).

### 3.    Application

In light of the foregoing discussion, the court concludes that it is compelled to follow Justice Stevens' concurrence in Shady Grove and apply the class action bar incorporated in the Alabama, Georgia, and Tennessee consumer protection laws over Rule 23 on that basis. The court concludes that the overlap between Justice Stevens' concurrence and the dissent—both of which "concluded that the validity of the Federal Rules of Civil Procedure turns, in part, on the rights afforded by the state rule that the Federal Rule displaces," In re Wellbutrin XL, 756 F. Supp. 2d at 675—renders Justice Stevens' concurrence controlling. Accordingly, the court must assess the whether the state rule being displaced is "intimately bound up in the scope of [the]

substantive right or remedy" designed by the state legislature. <u>Shady Grove</u>, 559 U.S. at 410 (Stevens, J.). As with the majority of courts that have examined that question, the court concludes the specific inclusion of the class action bar within the Alabama, Tennessee, and Georgia consumer protection statutes under which Plaintiffs' claims are brought differentiates them from the "pan-statutory" bar in <u>Shady Grove</u> and demonstrates that they incorporate a substantive policy choice. In this regard, the court respectfully breaks with the Eleventh Circuit's analysis in <u>Lisk</u>, as it concludes that the specific inclusion of a class action bar in the Alabama (and Tennessee and Georgia) consumer protection laws evinces a desire by the state legislature to limit not only the form of the action but also the remedies available, placing those bars squarely within Justice Stevens' concurrence.

Accordingly, Plaintiffs' class claims under Alabama's Deceptive Trade Practices Law, Georgia's Fair Business Practices Act, and Tennessee's Consumer Protection Act are dismissed without prejudice.[10]

### ii. *Justifiable Reliance*

Defendants next contend that Plaintiffs' actions under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL")[11] must be dismissed because they "fail to plausibly allege that Plaintiffs reasonably or justifiably rely upon the alleged deceptive representation," a requirement of both state's statutes. (Defs. Mem. at 19-20.) Defendants maintain that, because the checks that form the basis of Plaintiffs' claims and the enclosed marketing materials "explain what the check is and what the consumer is signing up for if they

---

[10] If they choose to do so, Plaintiffs may amend their complaint to include only claims brought on behalf of the Alabama, Georgia, and Tennessee plaintiffs in their individual capacities.

[11] Defendants also challenge claims brought under the Georgia Fair Business Practices Act on the same basis. Because the court has already concluded that those claims must be dismissed in Section II.B.i.3, <u>supra</u>, it does not consider them further here.

cash it," no claim of justifiable reliance can be established as a matter of law. (Id. at 20.)

Plaintiffs do not contest the requirement to plead justifiable reliance, instead arguing both that

their allegations meets the required pleading standard and that the question of whether reliance

was justifiable is a jury question in almost all cases. (Pls. Opp'n at 11-13.)

Under Pennsylvania law, parties bringing claims under the state's consumer protection

law are required to set forth "sufficient factual allegations showing that '[they] justifiably relied

on the defendant's wrongful conduct or representation.'" Hall v. Equifax Info. Servs. LLC, 204

F. Supp. 3d 807, 812 (E.D. Pa. 2016) (quoting Yocca v. Pittsburgh Steelers Sports, Inc. 854

A.2d 425, 438 (Pa. 2004)); see also Hunt v. U.S. Tobacco Co., 538 F.3d 217, 221, 223-24 (3d

Cir. 2008). Under this standard, a consumer protection claim is not actionable if the plaintiff

"knows [the claimed deception or misrepresentation] to be false or if its falsity is obvious." See,

e.g., Toy v. Metro Life Ins. Co., 928 A.2d 186, 208 (Pa. 2007). At the same time, however, "the

recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in

order to justifiably rely." Id. at 207 ("[A] party who engages in intentional fraud should be made

to answer to the party he defrauded, even if the latter was less than diligent in protecting himself

in the conduct of his affairs."). The fact that a defendant's alleged misrepresentation is directly

contradicted by a later-in-time written contract between the parties is not dispositive of the

inquiry under this standard, and courts have held that the question of whether a misrepresentation

is "obvious" under such circumstances is "a question of fact for the fact-finder to decide."

Boehm v. Riversource Life Ins. Co., 117 A.3d 308, 326 (Pa. Super. Ct. 2015).

Assessing the Complaint based on this standard, the court concludes that Plaintiffs

provide ample allegation of justifiable reliance. Pennsylvania courts have explicitly held that a

contracting party's reliance on pre-contract statements by the counterparty/defendant may be

justifiable even where the written contract contradicts those representations. See, e.g., Toy, 928 A.2d at 208 ("[W]e conclude that [the plaintiff] was under no duty to read the Policy and the fact that she did not do so does not preclude her from establishing justifiable reliance.") In the court's view, the allegations presented here provide even greater reason to overlook Plaintiffs' admitted failure to review the terms of the purported contract: Plaintiffs contend that they never intended to contract with Cross Country, were unaware that they were entering into a contract at all, and only did so because they relied on the implicit representation that the document they signed was a check from Ocwen. (E.g. FAC ¶¶ 62-64.) Crediting those allegations, the court sees no basis for concluding that Plaintiffs' failure to review the contractual terms on the check or enclosed material was per se unjustifiable and concludes that the allegations are more than sufficient to survive at this stage.

Accordingly, Defendants' motion to dismiss the Pennsylvania UTPCPL-based claims for failure to allege justifiable reliance is denied.

### iii.    Statute of Limitations

Defendants next challenge Plaintiffs' claims brought under the Arizona and Indiana[12] consumer protection statutes as untimely under the applicable statutes of limitations. (Defs. Mem. at 20-22.) The court examines Defendants' specific arguments with respect to those statutes separately.

### 1.    The Arizona Claims

Defendants contend that the Arizona Consumer Fraud Act ("CFA") claims are untimely because, under Arizona law, the statutory period within which the claims run started on the date

---

[12] Defendant also challenges Plaintiffs' claims brought under the Alabama Deceptive Trade Practices Act and the Tennessee Consumer Protection Act on the same basis. Because the court already concluded those claims must be dismissed (Section II.B.i.3, supra), it does not address the timeliness of those claims.

that Plaintiffs received an account statement containing the allegedly fraudulent charges. (Id. at 20.) Claims brought under the CFA must be initiated "within one year after the cause of action accrues." Alaface v. Nat'l Inv. Co., 892 P.2d 1375, 1380 (Ariz. 1994). A consumer fraud cause of action accrues "when the defrauded party discovers or with reasonable diligence could have discovered the fraud." Id. (quoting Mister Donut of Am., Inc. v. Harris, 723 P.2d 670, 672 (1986)); accord Cervantes v. Countrywide Home Loans, Inc., 656 F.3d 1034, 1045 (9th Cir. 2011). "When discovery occurs and a cause of action accrues are usually and necessarily questions of fact for the jury." Doe v. Roe, 955 P.2d 951, 961 (Ariz. 1998) (en banc). However, where the alleged fraud is "apparent" from the face of documents or statements, the statutory period begins to run from the time the plaintiff receives those documents and the court may assess the statutory period accordingly. See Phillips v. Mortg. Elec. Registration Sys., Inc., No. CV-10-2459-PHX-DGC, 2011 WL 587097, at *2 (D. Ariz. Feb. 8, 2011).

The court concludes that the allegations in the Complaint give rise to an inference that the Arizona Plaintiffs could not have discovered the alleged fraud in the exercise of reasonable diligence from the face of billing statements provided by Defendants. As alleged in the Complaint, one of the integral components of the alleged scheme was the practice of obfuscating the source and nature of payments to Cross Country on Plaintiffs' mortgage and escrow statements by, inter alia, hiding the charges within Ocwen-provided statements as a line item and using intentionally vague or inconspicuous descriptions of those charges. (FAC ¶¶ 88-94; see also id. ¶¶ 129-131 (as to Arizona Plaintiff Paul Emmert); 134-136 (as to Arizona Plaintiff Carolyn Toth); 139-141 (as to Arizona Plaintiff Brian Rafacz).) These allegations are sufficient to support a plausible inference that the Arizona Plaintiffs' delay in discovering the alleged fraud

from the billing statements was reasonable and so that the actions, initiated within a year of Plaintiffs' actual discovery of the charges,[13] was timely.

Accordingly, Defendants' motion to dismiss is denied as to the Arizona CFA claims.

### 2. The Indiana Claims

Defendants separately move to dismiss as untimely claims under Indiana's Deceptive Consumer Sales Act ("IDCSA") raised by Justin Wisnewski, the sole Indiana-based plaintiff listed in the Complaint. (Defs. Mem. at 21-22.)

Defendants first argue that Wisnewski's claims are untimely because they were filed outside of the applicable statute of limitations. Claims under the IDCSA must be brought within two years of "the occurrence of the deceptive act." Ind. Code Ann. § 25-5-0.5-5(b).[14] However, under Indiana law, "the commencement of a class lawsuit tolls the applicable statute of limitations during the period between the filing of the action and the trial court's ruling on the question of class action certification." Ling v. Webb, 834 N.E.2d 1137, 1142 (Ind. Ct. App. 2005). In the present case, this class action tolling rule renders Wisnewski's claims timely: class action claims under the IDCSA in the present action were first brought in November 2014. (2d Am. Compl. (Dkt. 53) ¶¶ 160-64), roughly 17 months after the earliest point at which Wisnewski's claims could have accrued (FAC ¶ 162 (stating that Wisnewski received a

---

[13] The Arizona Plaintiffs initiated their claims against Defendants on November 20, 2014, less than one year from each of those plaintiff's separate discovery of the payments during 2014. (See 2d Am. Compl. (Dkt. 53) ¶¶ 126, 130, 131, 135, 136, 140.)

[14] This period may be tolled where the defendants engaged in "concealment or fraud of such character as to prevent inquiry, [] elude investigation, or to mislead the plaintiff." Elward v. Electrolux Home Prods., Inc., — F. Supp. 3d —, No. 15-C-9882, 2017 WL 3704842, at *9 (N.D. Ill. Aug. 28, 2017) (internal quotation marks and citations omitted). With respect to Wisnewski, there is no dispute that he brought his claim more than two years after receiving the initial solicitation in June 2013 and his discovery of the charges in July 2014. (FAC ¶¶ 162, 165.)

solicitation "[i]n or around June 2013).) Tolling Wisnewski's time to file from November 2014, the court thus concludes that Wisnewski's IDCSA claims are timely.[15]

Defendants next point to the IDCSA's notice provision, with which they claim Wisnewski failed to comply. (Defs. Mem. at 22 n.15; Defs. Reply in Supp. of Mot. ("Defs. Reply") (Dkt. 327) at 7-8.) The IDCSA requires that a prospective plaintiff who does not claim to have been harmed by an "incurable deceptive act" must

> give[] notice in writing to the [defendant] within the sooner of (i) six
> [] months after the initial discovery of the deceptive act, [or] (ii) one
> [] year following such consumer transaction . . . which notice shall
> state fully the nature of the alleged deceptive act and the actual
> damages suffered therefrom . . . .

Ind. Code Ann. § 24-5-0.5-5(a). This notice can only be provided by the aggrieved consumer bringing the action, and constructive notice given through another individual or action is insufficient to satisfy the notice provision. See, e.g., Jasper v. Abbott Labs., Inc., 834 F. Supp. 2d 766, 773 (N.D. Ill. 2011).

Notice need not be provided, however, where the consumer complains that they suffered from an "incurable deceptive act." Ind. Code Ann. § 24-5-0.5-5(a) ("No action may be brought . . . unless (1) the deceptive act is incurable or (2) the consumer bringing the action shall have given notice in writing to the supplier . . . ." (emphasis added)); cf. also McCormick Piano & Organ Co., Inc. v. Geiger, 412 N.E.2d 842, 849 (Ind. Ct. App. 1980) ("[I]f the consumer fails to comply with the notice procedures[,] then his suit can only be for an 'incurable deceptive act.'"). An "incurable deceptive act" is defined as "a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." Ind. Code Ann. § 24-5-0.5-2(8).

---

[15] This conclusion stands even if the period between the original Indiana plaintiffs' withdrawal from the action in November 2016 (Stipulation of Dismissal (Dkt. 165)) and the filing of Wisnewski's claims in April 2017 is excluded from the tolling period, as the resulting, non-tolled period would total approximately 22 months.

In order to bring a claim for an incurable deceptive act, the plaintiff must allege the circumstances of the fraud with specificity, see McKinney v. State, 693 N.E.2d 65, 71 (Ind. 1998), and must also allege that the defendant acted with the intent to defraud or mislead, see Perry v. Gulf Stream Coach, Inc., 814 N.E.2d 634, 647 (Ind. Ct. App. 2004).

Here, the court concludes that Wisnewski was not required to provide notice under the IDCSA, as the allegations in the Complaint, taken as a whole, are more than sufficient to support a finding that Defendants engaged in an "incurable deceptive act." The Complaint is replete with detailed allegations regarding Defendants' scheme, the form of the solicitation checks, and the means by which Defendants disguised the charges incurred by plan recipients (see generally FAC ¶¶ 60-97), including specific allegations that Defendants acted with the purpose of deceiving and misleading mailing recipients (see, e.g., id. ¶¶ 2, 65, 273). Moreover, the Complaint provides specific allegations as to the timing of Wisnewski's receipt of the allegedly fraudulent mailing, the form of the solicitation and subsequent charges on his mortgage statements, and his reliance on the fraudulent representation. (Id. ¶¶ 162-66.) Taken together, these allegations provide ample reason to conclude that Wisnewski was the victim of an "incurable deceptive act" committed by Defendants and so is not bound by the IDCSA's notice provisions. See Jones v. Bridgepoint Educ., Inc., No. 16-CV-338, 2017 WL 2438461, at *4 (N.D. Ind. June 5, 2017) ("A plaintiff asserting a claim for an incurable deceptive act under the IDCSA must present facts to show what the fraudulent or deceptive act was, when and how it was committed, and how plaintiff relied on said deceptive act to [their] detriment.").

Accordingly, Defendants' motion to dismiss the IDCSA claims brought by Wisnewski is denied.

C.    **Challenges to Unjust Enrichment and Breach of Fiduciary Duty Claims**

Separate from their challenges to Plaintiffs' statutory claims, Defendants also challenge

several of Plaintiffs' claims for unjust enrichment and breach of a fiduciary duty by Ocwen.  The

court examines these challenges separately and, for the reasons that follow, concludes that the

Motion must be denied as to both sets of claims.

i.    *Unjust Enrichment*

1.    Viability of Unjust Enrichment Claims Under Texas and Virginia
Law

Defendants first argue that neither Texas nor Virginia recognizes a cause of action for

unjust enrichment and so Plaintiffs' unjust enrichment claims under those state laws must be

dismissed.  (Defs. Mem. at 22.)  The court reviews the laws of those states separately.

(a)    *Unjust Enrichment in Texas*

Where a federal court rules on matters of state law, it is bound to apply the law as

"declared by its Legislature in a statute or by its highest court in a decision."  Erie R.R. Co. v.

Tompkins, 304 U.S. 64, 78 (1938).  Where no such statement is available, however, the court

"consider[s] the language of the state intermediate appellate courts to be helpful indicators of

how the state's highest court would rule . . . . [and] will look to their decisions unless convinced

by other persuasive data that the highest court of the state would decide otherwise."  Licci ex rel.

Licci v. Lebanese Canadian Bank, SAL, 739 F.3d 45, 48 (2d Cir. 2013) (internal quotation marks

and citations omitted).

The issue of whether Texas courts treat unjust enrichment as a cause of action has not

been addressed directly by the Texas Supreme Court, nor do the decisions of that state's

appellate courts clearly indicate a single result.  In a limited number of decisions, the Texas

Supreme Court has referred to causes of action for unjust enrichment without specifically stating

26

whether unjust enrichment is itself a "cause of action" or merely a "theory of recovery," as

Defendants contend here. See, e.g., HECI Exploration Co. v. Neel, 982 S.W.2d 881, 891-92

(Tex. 1998) (affirming grant of summary judgment in favor of defendant on unjust enrichment);

Fortune Prod. Co. v. Conoco, Inc., 52 S.W.3d 671, 683-84 (Tex. 2000) (affirming in part

damages award based on unjust enrichment claim); Heldenfels Bros., Inc. v. City of Corpus

Christi, 832 S.W.2d 39, 41 (Tex. 1992) ("A party may recover under the unjust enrichment

theory when one person has obtained a benefit from another by fraud, duress, or the taking of an

undue advantage.") Texas's intermediate appellate courts have split on the significance of these

decisions and the proper treatment of unjust enrichment claims. Compare, e.g., Davis v.

OneWest Bank N.A., No. 2-14-264-CV, 2015 WL 1623541, at *1 (Tex. Ct. App. Apr 9, 2015)

("Unjust enrichment, itself, is not an independent cause of action but rather characterizes the

result of a failure to make restitution of benefits either wrongfully or passively received under

circumstances that give rise to an implied or quasi-contractual obligation to pay." (internal

quotation marks and citation omitted)), with Pepi Corp. v. Galliford, 254 S.W.3d 457, 460 (Tex.

Ct. App. 2007) ("Unjust enrichment is an independent cause of action.") However, one federal

court considering the issue recently concluded that

> [w]hether unjust enrichment is characterized as a cause of action or
> a theory of recovery, the elements are clear. Unjust enrichment is
> an implied-contract basis for requiring restitution when it would be
> unjust to retain benefits received. Unjust enrichment allows
> recovery when one person has obtained a benefit from another by
> fraud, duress, or the taking of an undue advantage.

Perales v. Bank of Am., N.A., No. H-14-1791, 2014 WL 3907793, at *3 (S.D. Tex. Aug. 11,

2014) (internal quotation marks and citations omitted) (collecting cases); see also Newington v.

Forrester, No. 08-CV-0864, 2008 WL 4908200, at *4 (N.D. Tex. Nov. 13, 2008) ("Given that the

[Texas] Supreme Court has stated that unjust enrichment is a cause of action, and that Texas

courts seem willing to award recovery based on unjust enrichment, even if it is nothing more than a theory, the court concludes that [plaintiff's] claim for unjust enrichment should proceed.")

The court concludes Plaintiffs' cause of action for unjust enrichment under Texas law can proceed. While it is admittedly a close call, the court concludes that the implicit recognition of unjust enrichment by various decisions of the Texas Supreme Court demonstrates that court's willingness to accept such causes of action. Moreover, the court agrees with those federal courts in Texas cited above in their conclusion that, regardless of whether unjust enrichment is styled as a cause of action or simply as a theory of recovery based on implied contract, Texas law clearly permits recovery on that basis. Accordingly, Defendants' motion to dismiss the claims of unjust enrichment under Texas law is denied.

*(b)     Unjust Enrichment in Virginia*

Unlike their counterparts in Texas, courts in Virginia leave little doubt that unjust enrichment may be maintained as an independent cause of action. In one 2008 decision, for instance, the state's highest court set forth the elements of a cause of action for unjust enrichment:

> To state a cause of action for unjust enrichment, [the plaintiff] had to allege that: (1) he conferred a benefit on [the defendant]; (2) [the defendant] knew of the benefit and should reasonably have expected to repay [the plaintiff]; and (3) [the defendant] accepted or retained the benefit without paying for its value.

Schmidt v. Household Fin. Corp., II, 661 S.E.2d 834, 838 (Va. 2008). Defendant cites only two trial court decisions, both of which predate the opinion referenced above. Steele v. Batalo, 62 Va. Cir. 102, 108 (Va. Cir. Ct. 2003); Lodal v. Verizon Va., Inc., 74 Va. Cir. 110 (Va. Cir. Ct. 2007). In light of the clear statement by the state's highest court, however, these contrary

decisions are of no consequence to the court, and Defendants' motion to dismiss the Virginia-law-based unjust enrichment claims on that basis is denied.

## 2. Adequacy of Alternate Remedies

Defendants next make the related arguments that Plaintiffs' unjust enrichment claims fail because, first, they have adequate legal remedies at law and so are barred from bringing their claims under the law of Alabama, Arizona, Colorado, Georgia, Indiana, Maryland, Michigan, New Mexico, Pennsylvania, Tennessee, Virginia, and Washington, and second, the presence of a valid contract bars Plaintiffs from bringing those claims under the laws of all of those states except Alabama and with the addition of Ohio. (Defs. Mem. at 22-24.) In response, Plaintiff argues both that they are permitted by Federal Rule of Civil Procedure 8 to plead alternative theories of recovery (Pls. Opp'n at 21-22), and in any event Plaintiffs dispute the presence of any valid contract (id. at 17-19).

The court agrees that, at the pleading stage, it would be premature to dismiss the unjust enrichment claims based on Plaintiffs' alternate claims for legal remedies. Rule 8 sets forth a liberal pleading standard, pursuant to which "[a] party may set out [two] or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones." Fed. R. Civ. P. 8(d)(2). "Rule 8(d) ameliorates the uncertainty inherent in all litigation at the pleading stage by permitting plaintiffs to allege claims in the alternative, even if the legal theories underlying those claims are technically inconsistent or contradictory." St. John's Univ., N.Y., v. Bolton, 757 F. Supp. 2d 144, 184 (E.D.N.Y. 2010) (Garaufis, J.) (holding that both breach of contract and unjust enrichment claims could survive motion to dismiss).

Defendants are correct that, in some instances, courts in the cited states have dismissed claims because of the presence of a valid contract or some other form of adequate legal remedy.

See, e.g., Univalor Tr., SA v. Columbia Petroleum, LLC, 315 F.R.D. 374, 382 (S.D. Al. 2016) ("[T]he existence of an express contract extinguishes an unjust enrichment claim altogether because unjust enrichment is an equitable remedy which issues only where there is no adequate remedy at law."); CR3 of Ind., LLC, v. Specialty Surfaces Int'l, Inc., No. 07-CV-991, 2008 WL 3914092, at *9 n.4 (S.D. Ind. Aug. 19, 2008) (same). In the court's view, however, these cases fail to account for the liberal pleading standard of the Federal Rules of Civil Procedure described above, which expressly contemplates pleading in the alternative regardless of inconsistency. See Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). Courts applying the law of each of the cited states have reached the same conclusion in assessing alternative unjust enrichment pleadings on motions to dismiss.[16] Moreover, the court notes that some courts that disallowed alternative pleading of unjust enrichment have done so explicitly on the basis that the plaintiffs before them admitted the presence of a valid contract covering the same subject matter targeted by their unjust enrichment claims. See, e.g., Duke Energy Ind., Inc. v. Comcast of Indianapolis, LLC, No. 14-CV-2041, 2015 WL 5554016, at *3-4 (S.D. Ind. July 17, 2015) ("In short, the parties agree that an express

___

[16] See, e.g., Sirmon v. Wyndham Vacation Resorts, Inc., No. 10-CV-2717-LSC, 2012 WL 4341819, at *5-6 (N.D. Ala. Sept. 18, 2012); Menocal v. GEO Grp., Inc., 113 F. Supp. 3d 1125, 1133 (D. Colo. 2015); WESI, LLC v. Compass Envtl., Inc., 509 F. Supp. 2d 1353, 1362-63 (N.D. Ga. 2007); Stanley v. Cent. Garden & Pet Corp., 891 F. Supp. 2d 757, 766 (D. Md. 2012); Glaske v. Indep. Bank Corp, No. 323167, 2016 WL 298986, at *10 (Mich. Ct. App. Jan. 21, 2016) (unpublished opinion); Fultz & Son, Inc. v. Browning-Ferris Indus. of Ohio, Inc., No. 17-CV-53, 2017 WL 40129224, at *2 (N.D. Ohio Sept. 12, 2017); Kane v. Platinum Healthcare, LLC, No. 10 4390, 2011 WL 248494, at *5-6 (E.D. Pa. Jan. 25, 2011); United Tel. Se., LLC v. Bristol Tenn. Essential Servs., No. 14-CV-242, 2015 WL 13186245, at *3 (E.D. Tenn. Aug. 5, 2015); Kelly v. Ammado Internet Servs., Ltd., No. 12-CV-291, 2012 WL 4829341, at *5 (E.D. Va. Oct. 12, 2012); cf. Alliance Labs, LLC v. Stratus Pharm., Inc., No. 12-CV-927, 2013 WL 273309, at *5 (D. Ariz. 2013) (allowing alternative pleading of trademark infringement and unjust enrichment); F. McConnell & Sons, Inc. v. Target Data Sys., Inc., 84 F. Supp. 2d 961, 979 (N.D. Ind. 1999) (acknowledging permissibility of alternate pleading of unjust enrichment and breach of contract but dismissing unjust enrichment claim because it was "insufficient to place [the defendant] (or the Court) on notice as to whether [the plaintiff] seeks to advance a quantum meruit remedy for breach of contract, an unjust enrichment claim for relief, or both"); Auge v. Stryker Corp., Civ. No. 14-1089 KG/SMV, 2016 WL 3567047, at *8 (D.N.M. May 5, 2016) (permitting pleading of both unjust enrichment and claims under the New Mexico Unfair Practice Act); Accretive Tech. Grp. Inc. v. Adobe Sys., Inc., No. C15-309RSM, 2015 WL 4920079, at *11 (W.D. Wash. Aug. 17, 2015) (permitting alternative pleading of unjust enrichment where the claim was "not merely a re-pleading of the breach of contract claim under a different name" (internal quotation marks omitted)).

and enforceable contract exists and that this contract governs [the subject matter at issue in the unjust enrichment claims], and Plaintiff is accordingly not permitted to also plead equitable theories of relief."); Selman v. CitiMortgage, Inc., No. 12-441-WS-B, 2013 WL 838193, at *13 & n.19 (S.D. Ala. Mar. 5, 2013) (same); cf. also Elliot Indus. Ltd. P'Ship v. BP Am. Prod. Co., 407 F.3d 1091, 1116-17 (10th Cir. 2005) (affirming grant of summary judgment on unjust enrichment where plaintiff did not dispute validity of contract but only whether it covered the precise question at issue in the equitable claim). The court views these cases as readily distinguishable from the present controversy, in which the essence of the Complaint is that Plaintiffs and other putative class members were fraudulently induced to enter into a contract and so that the resulting agreements with Defendants were invalid.

Finally, Defendants argue that, regardless of whether unjust enrichment may be alleged in the alternative, Plaintiffs' claims fail to meet the pleading standard for those claims because they fail to assert that they lack an adequate alternate remedy at law. (Defs. Reply at 10.) Among the cited states, only Arizona incorporates an explicit requirement that unjust enrichment pleadings must allege the lack of an adequate legal remedy. See, e.g., OptoLum, Inc. v. Cree, Inc., 244 F. Supp. 3d 1005, 1013 (D. Ariz. 2017) (stating that, under Arizona law, plaintiffs bringing unjust enrichment claim must allege, inter alia, "an absence of a remedy provided by law"). As other courts have noted, however, "Arizona courts define the adequate remedy at law element as asking "whether there is a contract which governs the relationship between the parties." In re Auto. Parts Antitrust Litig., 29 F. Supp. 3d 982, 1016 (E.D. Mich. 2014) (citing Trustmark Ins. Co. v. Bank One, Ariz., NA, 48 P.3d 485, 491 n.5 (Ariz. Ct. App. 2002)). Where, as here, Plaintiffs' allegations are clearly read to indicate that no valid contractual relationship existed due to Defendants' fraud, the requirements of Arizona law are met, and the court will not dismiss

the claim for the lack of a formulaic recitation of that element. Cf. Auto. Parts Antitrust Litig., 29 F. Supp. 3d at 1016 (concluding that the absence of a contractual relationship in the complaint satisfied the pleading requirements); Isofoton, S.A. v. Giremberk, No. CV-04-0798-PHX-ROS, 2006 WL 1516026, at *4-5 (D. Ariz. 2006) (concluding that unjust enrichment claim could proceed where "the Court has not yet decided whether a binding contract is in effect").

### 3. Benefit of the Bargain

Defendants' final argument is that Plaintiffs cannot maintain a claim for unjust enrichment under the law of Arizona, Colorado, Maryland, or Tennessee because, in failing to deny that they received coverage under the warranty, they effectively admit that they received the "benefit of the bargain" under the policies. (Defs. Mem. at 24.) In support of this argument, Defendants cite cases from each of those states for the proposition that, where a defendant "performed [its] obligation pursuant to agreement with [the plaintiff]," no action for unjust enrichment may be maintained. USLife Title Co. of Ariz. v. Gutkin, 732 P.2d 579, 585 (Ariz. Ct. App. 1986); see also Van Zanen v. Qwest Wireless, LLC, 522 F.3d 1127, 1129-33 (10th Cir. 2008) (holding that a party to a contract that was subsequently invalidated could not recover through unjust enrichment where they received performance); Cannon v. Wells Fargo Bank, N.A., No. PWG-13-1324, 2014 WL 672687, at *13-14 (D. Md. Feb. 20, 2014); Charles Griggs Bldg. Materials, Inc. v. Wong, No. 6628, 1989 WL 35470, at *2 (Tenn. Ct. App. Apr. 14, 1989). Those cases speak to the readily distinguishable situation in which the defendants provided a benefit pursuant to a valid and voluntary agreement. See USLife, 732 P.2d at 585 (stating that the benefit was conferred "pursuant to agreement"); Van Zanen, 522 F.3d at 1128-29 (noting that the parties entered into an agreement voluntarily); Cannon, 2014 WL 35470, at *11, *14 (holding that the insurance policies that formed the basis for the unjust enrichment claim were

expressly contemplated by contract); Charles Griggs, 1989 WL 35470, at *1 (noting that the defendants had already paid a third-party under an express agreement with that party). Crediting the allegations of the Complaint, Plaintiffs never voluntarily entered into the contracts with Defendant and were unaware of either the contract or the coverage of the policies provided thereunder. In the court's view, it would be inimical to the purposes of unjust enrichment to dismiss Plaintiffs' unjust enrichment claims on the basis that they received the benefit of a bargain that they never sought and of which they were unaware.

*     *     *     *

For the foregoing reasons, Defendants' motion to dismiss Plaintiffs' claims for unjust enrichment is denied.

### ii.  *Breach of Fiduciary Duty*

Defendants' final contention is that Plaintiffs' claims for breach of fiduciary duty by Ocwen under the laws of Alabama, Arizona, Georgia, Indiana, Michigan, New Jersey, New Mexico, Ohio, Virginia, and Washington[17] fail because, as a matter of law, no fiduciary relationship exists between a mortgagor and loan servicers in those states. (Defs. Mem. at 25-28.) Under the law of each of the cited states, mortgagees (and mortgage servicers) typically do not owe the borrower a general fiduciary duty.[18] Plaintiffs do not contest this

---

[17] Plaintiffs also assert a breach of fiduciary claim under California law. (FAC ¶ 294.) Defendants previously moved to dismiss that claim, and the court denied that motion. (Sept. 23, 2014, Mem. & Order (Dkt. 42) at 48.)

[18] See, e.g., Shedd v. Wells Fargo Home Mortg., Inc., No. 14-275-CB-M, 2015 WL 6479537, at *5-6 (S.D. Ala. Oct. 26, 2015) (Alabama); Margaritis v. BAC Home Loans Servicing LP, No. CV 11-1741-PHX-SRB, 2012 WL 12885712, at *6 (D. Ariz. Mar. 9, 2012) (Arizona); Phillips v. Ocwen Loan Servicing, LLC, 12-CV-3861-WSD, 2013 WL 4854760, at *7 (N.D. Ga. Sept. 11, 2013) (Georgia); Baehl v. Bank of Am., N.A., No. 12-CV-29-RLY-WGH, 2013 WL 1319635, at *9-10 (S.D. Ind. Mar. 29, 2013) (Indiana); Cover v. HSBC Mortg. Servs., Inc., 701 F.3d 1104, 1108 (6th Cir. 2012) (per curiam) (Michigan); Galayda v. Wachovia Mortg., FSB, No. 10-1065, 2010 WL 5392743, at *16-17 (D.N.J. Dec. 22, 2010) (New Jersey); Sinclair v. Donovan, Nos. 11-CV-10, 11-CV-79, 2011 WL 5326093, at *9-10 (S.D. Ohio Nov. 4, 2011) (Ohio); Grenadier v. BWW Law Grp., No. 14cv827, 2015 WL 417839, at *8-9 (E.D. Va. Jan. 30, 2015) (Virginia); Westcott v. Wells Fargo Bank, N.A., 862 F. Supp. 2d 1111, 1119 (W.D. Wash. 2012) (Washington); cf. Zamora v. Wells Fargo Home Mortg., a Div. of Wells Fargo Bank, N.A., No. CV 12-48 RB/LFG, 2012 WL 12895364, at *12 (D.N.M. Sept. 18, 2012) (concluding, in the context of a

general proposition. Instead, Plaintiffs argue that Ocwen stands in a fiduciary relationship to Plaintiffs because it serves as Plaintiffs' escrow agent and contend that Ocwen violated its fiduciary duties by misleading Plaintiffs for its own benefit. (Pls. Opp'n at 25-28.) Plaintiffs separately contend that Ocwen's relationship with Plaintiffs went beyond that of a normal mortgage servicer and so supports a finding of a fiduciary relationship. The court addresses these arguments separately.

### 1.    Fiduciary Duties of Escrow Agents

The laws of eight of the relevant states—all aside from Alabama and Georgia—clearly recognize that the acceptance of escrow funds imposes on the holder of the funds a limited fiduciary duty with respect to the management and disposition of escrowed funds.[19] While the specifics of escrow agents' fiduciary duties vary between those states, it is axiomatic that escrow depositaries are "required to perform their responsibilities [under the escrow agreement] with scrupulous honesty, reasonable skill, and ordinary diligence." 28 Am. Jur. 2d Escrow § 23. Engaging in self-dealing and misleading the principal with respect to the funds held in escrow

---

negligence action, that home loan servicer did not owe a common law duty of care, including a fiduciary duty, to mortgagor borrower under New Mexico law).

[19] Maxfield v. Martin, 173 P.3d 476, 478 (Ariz. Ct. App. 2007) (noting that escrow agent has fiduciary duty to discharge responsibilities with "scrupulous honesty, skill, and diligence" (internal citations omitted)); Meridian Title Corp. v. Pilgrim Fin., LLC, 947 N.E.2d 987, 992 (Ind. Ct. App. 2011) (holding that escrow depositary has fiduciary duty towards each of the parties); Smith v. First Nat'l Bank & Trust Co. of Sturgis, 440 N.W.2d 915, 918 (Mich. Ct. App. 1989) ("[A]n escrow agent may be held liable in tort for the negligent performance of its duties as escrow agent or breach of its fiduciary duties owed to its principal."); Colegrove v. Behrle,164 A.2d 620, 625 (N.J. Super. Ct. App. Div. 1960) ("A fiduciary relationship is created by and inherent in the nature of an escrow agreement"), accord Innes v. Marzano-Lesnevich, 136 A.3d 108, 116 (N.J. 2016); Matter of Arrieta, 733 P.2d 866, 868 (N.M. 1987) ("By acting as an escrow agent, [the depositary] assumed a fiduciary relationship . . . ."); Saad v. Rodriguez, 506 N.E.2d 1230, 1233 (Ohio Ct. App. 1986) ("[T]he escrow is a fiduciary agent for both parties to a purchase agreement."); Int'l Fid. Ins. Co. v. Western Va. Water Auth., Civ. No. 11-CV-441, 2012 WL 2357368, at *4 (W.D. Va. June 20, 2012) ("Because an escrow agreement creates a principal-agent relationship, certain fiduciary duties that normally accompany principal-agent relationships also apply within the context of escrow agreements."); Styrk v. Cornerstone Invs., Inc., 810 P.2d 1366, 1371 (Wash. Ct. App. 1991) ("An escrow agent owes a fiduciary duty to the parties to the escrow to conduct the transaction with scrupulous honesty, skill and diligence, and must comply strictly with the provisions of the escrow agreement." (citing Nat'l Bank of Wash. v. Equity Inv'rs, 506 P.2d 20 (Wash. 1973)).

both constitute violations of the depositary's fiduciary obligations, id., and this is precisely what Plaintiffs accuse Ocwen of doing: the Complaint alleges that Ocwen allowed Cross Country to send Plaintiffs and others checks that appeared to relate to escrow funds managed by Ocwen, intentionally obscured subsequent deductions in mortgage and escrow statements using vague descriptions of the charges, and directly benefitted from the resulting charges in the form of fee-splitting with Cross Country (FAC ¶¶ 295, 297). These allegations relate directly to Ocwen's role as an escrowee for its customers and support a claim based on violation of its duty to administer the escrow accounts honestly.

As noted above, the law of Alabama and Georgia with respect to a mortgagee's fiduciary duties when holding an escrow account for a mortgagor is not as clear as that in the other relevant states. The dispute is not whether an escrow agent in those states is generally subject to fiduciary duties with respect to the escrowed funds, as that proposition is established under the law of both states. See Fisher v. Comer Plantation, Inc., 772 So.2d 455, 468 (Ala. 2000) ("An escrow agent is generally considered to be the agent of both parties to an escrow agreement." (internal quotation marks and citation omitted)); Threatt v. Rogers, 604 S.E.2d 269, 272 (Ga. Ct. App. 2004) (holding that escrow is subject to fiduciary duty where it is established that the depositary, "by mutual consent of both parties, [is] made the agent of both parties and clothed with authority to deliver the property to one party or the other on the happening of some future event."). However, in a pair of decisions, the Eleventh Circuit concluded that a mortgagee's use of an escrow account to make "tax and insurance payments" did not give rise to fiduciary duties under the laws of Georgia or Alabama. Telfair v. First Union Mortg. Corp., 216 F.3d 1333, 1342 (11th Cir. 2000) (examining Georgia law); Faez v. Wells Fargo Bank, N.A., 745 F.3d 1098, 1110-11 (11th Cir. 2014) (same as to Alabama). While those cases at first appear to cut down

Plaintiffs' claims under the law of those states, the court concludes that they do not foreclose the issue. At issue in both cases were escrow payments made after the escrow agent, who was also the mortgagee, obtained insurance on the property to protect its own interest in the property. See Telfair, 216 F.3d at 1336 (security deed authorized defendant to use escrow funds to obtain hazard insurance to protect its collateral); Faez, 745 F.3d at 1109-10 (defendant required plaintiff to obtain flood insurance for an amount equal to the mortgaged property's replacement value). Under those circumstances, the Eleventh Circuit concluded that "the mortgagee does not act as an agent because the mortgagee acts neither for the sole benefit of the mortgagor nor under the mortgagor's control." Telfair, 216 F.3d at 1342; Faez, 745 F.3d at 1111 ("The loan agreement makes it clear that the insurance requirement is for the lender's protection." (internal quotation marks and citation omitted)).

The court views these cases as distinguishable and so insufficient to relieve Ocwen of its fiduciary duties as an escrow agent under the laws of either Alabama or Georgia at this stage. As noted, the defendants in the cases before the Eleventh Circuit were acting both as mortgagee and escrowee, and the challenged payments from the escrow accounts protected the defendant's interest in the mortgages and were contemplated by the mortgage agreement themselves. Limiting the defendants' ability to act in their own interest as mortgagee by making payments from the escrow account would have undermined their otherwise arms-length mortgagor-mortgagee relationship and so been at odds with repeated warnings from courts in both states that no fiduciary relationship arises in a normal mortgage because the parties to a mortgage "are creditor and debtor with clearly opposite interests." Moore v. Bank of Fitzgerald, 483 S.E.2d 135, 139 (Ga. Ct. App. 1997); cf. also K&C Dev. Corp v. AmSouth Bank, N.A., 597 So.2d 671, 675 (Ala. 1992) ("Courts have traditionally viewed the relationship between a bank and its

customer as a creditor-debtor relationship that does not impose a fiduciary duty on the bank."). This is readily distinguished from the current allegations, in which Plaintiffs contend that Ocwen abused its position as escrowee to enter into an entirely new agreement that was not necessary to protect the mortgagee's interests nor even logically related to the mortgage. Separating Ocwen's duties as an escrowee from its duties as a mortgage servicer, the court concludes that Plaintiffs may bring a breach of fiduciary duty claim based under Alabama and Georgia law.

Defendants argue that placing mortgage servicers under a fiduciary duty with respect to the escrow accounts would "swallow the default rule that mortgage servicers owe no fiduciary duty to borrowers." (Defs. Reply at 12.) This argument misunderstands the scope of the duties contemplated here, however. The court does not hold that mortgage servicers are subject to an "omnibus fiduciary duty," as Defendants put it, based on their duties with respect to the escrow funds. Rather, the court holds only that escrow depositaries are subject to a fiduciary duty only with respect to their management and maintenance of funds or other property held in escrow.

## 2. Relationship Between Plaintiffs and Ocwen

Plaintiffs also argue that Ocwen's relationship with Plaintiffs transcended that of a normal mortgagor and mortgagee and so gives rise to a general fiduciary relationship under the laws of Alabama, Arizona, Michigan, Ohio, New Mexico, and Washington.[20] (Pls. Opp'n at 28-30.) Plaintiffs identify cases in each of those jurisdictions indicating the general rule that mortgagees and mortgage servicers owe no fiduciary relationship to mortgagors may be overcome where the relationship between the parties transcends that of a normal borrower and lender. (Id.)

---

[20] In their opposition, Plaintiffs state only that "several of the [newly added] jurisdictions" embrace an expansive definition of fiduciary relations, without identifying any particular states (id. at 28), but they cite cases discussing fiduciary duties of mortgagors under the law of the states listed above.

After examining these cases, however, the court is unconvinced that any exception to the general rule that mortgagees are not fiduciaries of the mortgagors is applicable here. Plaintiffs are correct that courts in each of the cited states have offered some suggestion that a mortgagee's relationship with the borrower may give rise to a fiduciary relationship between mortgagor and mortgagee.[21] The factors that may give rise to such a relationship are extremely ill-defined, however, suggesting only in general terms that actions by the mortgagee that go beyond the role of a "normal lender" could lead to imposition of heightened duties. See, e.g., Lansburg v. Fed. Home Loan Mortg. Corp., No. 11-CV-1529, 2016 WL 5931030, at *6 (D. Ariz. Oct. 12, 2016) (noting that fiduciary relationship may arise if the "loan servicer goes beyond the ordinary role of a lender and actively engages with the borrower and advises the borrower as to what to do, then the loan servicer may have a fiduciary duty to the borrower"). These vague, standardless statements of potential exceptions do little to assist the court in assessing the validity of Plaintiffs' claim. More to the point, however, Plaintiffs fail to connect any allegation in the Complaint to the development of a fiduciary relationship under the laws of any of the relevant states.[22] Left without either a standard to apply or facts to support that standard, the court cannot

---

[21] See Atkins v. GE Capital Mortg. Servs., Inc., 993 F. Supp. 1406, 1419 (M.D. Ala. 1998); Lansburg v. Fed. Home Loan Mortg. Corp., No. 11-CV-1529, 2016 WL 5931030, at *6 (D. Ariz. Oct. 12, 2016); Ponder v. Bank of Am., No. 10-CV-81, 2011 WL 8307207, at *4 (S.D. Ohio Mar 8, 2011) ("Though a financial institution generally does not owe a fiduciary duty to a borrower, a fiduciary relationship can arise out of an informal relationship if both parties understand that a special trust or confidence has been reposed." (internal quotation marks and citation omitted)); cf. Sheldon v. Vilsack, No. 11-CV-10487, 2011 WL 6371289, at *5 (E.D. Mich. Dec. 20, 2011) (noting that the complaint "does not plead adequate facts to demonstrate the extraordinary situation that would create a fiduciary duty to Plaintiff under Michigan law" without stating what facts would be required); R.A. Peck, Inc. v. Liberty Fed. Sav. Bank, 766 P.2d 928, 92 (N.M. Ct. App.) (concluding that lender had "well exceeded a 'normal lender's' role" as it had "thrust itself into the transaction, and plac[ed] itself in a position to reach financial benefits"); Tonseth v. Wamu Equity Plus, No. C11-1359, 2012 WL 37406, at *5 (W.D. Wash. Jan. 9, 2012) ("[A] special relationship must develop between [a lender and a borrower] before a fiduciary duty exists.")

[22] In its own review of the Complaint, the court identifies only one paragraph relating to the basis for finding such a fiduciary duty, which alleges that Ocwen "took on more services and received greater economic benefit than a typical loan servicer does" by "unilaterally provid[ing] its logo, customer lists, and confidential customer information to a third party (Cross Country) solely for the purpose of generating profits for itself and the third party." (FAC ¶ 296.) The court fails to see how these allegations, which point only to interactions between Ocwen

reasonably adopt Plaintiffs' argument that Ocwen's relationship with Plaintiffs justifies departing from the baseline rule and imposing on Ocwen a general fiduciary duty vis-à-vis Plaintiffs.[23]

        \*        \*        \*        \*

Accordingly, Defendants' motion to dismiss Plaintiffs' breach of fiduciary duty claims is denied, and Plaintiffs may proceed with those claims to the extent that they allege breach of Ocwen's duty as an escrow agent.

---

and Cross Country, could support the development of any heightened duty with respect to Plaintiffs, nor do Plaintiffs elaborate on the significance of this allegation to their claim.

[23] To the extent that Plaintiffs argue that the court's previous decision allowing breach of fiduciary duty claims asserted under California law requires the same result with respect to the states cited above (Sept. 23, 2014, Mem. & Order at 47-49), they misread that opinion. Plaintiffs suggest that the court allowed the California claim to go forward because it "failed to give a precise definition of a fiduciary relationship." (Pls. Opp'n at 29.) However, in denying the motion to dismiss those claims, the court cited a six-factor test often relied on by California courts to assess whether a fiduciary relationship exists, and noted that many of those factors appeared to be supported by Plaintiffs' First Amended Complaint. (Sept. 23, 2014, Mem & Order at 49 n.25.) In contrast, Plaintiffs cite no standard for determining whether Ocwen should be treated as a fiduciary under the laws of the states cited here.

## III.    CONCLUSION

For the reasons stated above, Defendants' motion to dismiss (Dkt. 324) is GRANTED IN PART and DENIED IN PART.  Plaintiffs' claims for violations of the Alabama Deceptive Trade Practices Act, the Georgia Fair Business Practices Act, and the Tennessee Consumer Protection Act are DISMISSED WITHOUT PREJUDICE.  Defendants' motion to dismiss Plaintiffs' claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, the Arizona Consumer Fraud Act, the Indiana Deceptive Consumer Sales Act, Plaintiffs' claim for unjust enrichment under the laws of Alabama, Arizona, Colorado, Georgia, Indiana, Maryland, Michigan, New Mexico, Ohio, Pennsylvania, Tennessee, Texas, Virginia, and Washington, and Plaintiff's breach of fiduciary duty claims under the laws of Alabama, Arizona, Georgia, Indiana, Michigan, New Jersey, New Mexico, Ohio, Virginia, and Washington is DENIED.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      November 8, 2017

NICHOLAS G. GARAUFIS
United States District Judge