UNITED STATES DISTRICT COURT
EASTERN DISTRCT OF NEW YORK

| | |
|---|---|
| **MARGARITA DELGADO, et al.,**<br><br>**Individually and on Behalf of All Others Similarly Situated,**<br><br>  Plaintiffs,<br><br>v.<br><br>**OCWEN LOAN SERVICING, LLC, et al.,**<br><br>  Defendants. | Case No. 13 Civ. 04427 (NGG) (ST) |

# DECLARATION OF STEVEN L. WITTELS IN SUPPORT OF UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

I, Steven L. Wittels, declare as follows under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1. My firm, Wittels Law, P.C., is lead Class Counsel for Plaintiffs and the Class. Based on my active participation and supervision in all material aspects of the prosecution and settlement of this consumer fraud class action, I have personal knowledge of the matters set forth herein.

2. I respectfully submit this Declaration in support of Plaintiffs' Unopposed Motion for Final Approval of the Class Action Settlement. Filed separately as ECF No. 423-2 and attached hereto as **Exhibit A** is the parties' proposed Final Order approving the Settlement and dismissing this case with prejudice. Accompanying this Declaration is Plaintiffs' supporting Memorandum of Law that demonstrates why, under governing decisional law, this Court should grant final approval of the Settlement and the other relief requested.

I.      **Introduction to the Proposed Settlement and Relief Sought by This Motion**

3.      This Settlement for which final approval is sought resolves the claims of Plaintiffs Margarita Delgado, William Sheppard, Geraldine Mahood, Kevin Chowning, Lya Chowning, Paul Emmert, Carolyn Toth, Brian Rafacz, Jennifer Hendricks, Cynthia Beniwal, Kimberly Kayes, Justin Wisnewski, Laurie Cheamitru, Dale Zimmer, Michael Benhamu, Meghan Fox, Dan Wilkinson, Kent Collier, Theresa McCullough, Ben Elliott, Jason Abt, Nathan May, Cami Peloza, and Terry Oliver (collectively "Plaintiffs") and the Class against Defendants Ocwen Loan Servicing, LLC ("Ocwen"), Cross Country Home Services, Inc. ("CCHS" or "Cross Country"), and Sandra Finn (collectively, "Defendants").

4.      On February 20, 2019, this Court granted preliminarily approval of the Settlement (ECF No. 417). A true and correct copy of the preliminarily-approved Settlement Agreement is docketed as ECF No. 415-1.

5.      Wittels Law ("Class Counsel") was retained by Lead Named Plaintiffs Margarita Delgado and William Sheppard in 2013 to prosecute their claims against Defendants for 1) their use of "check solicitations" to enroll mortgage customers into Cross Country's plans, and 2) their subsequent billing for Cross Country's plans via a line item on consumers' monthly mortgage statements.

6.      Before bringing the instant action, Plaintiffs' counsel exhaustively investigated Plaintiffs' claims, communicated with Plaintiffs, reviewed their files, obtained samples of Defendants' marketing materials, performed extensive legal and factual research, and developed a comprehensive litigation strategy.

7.      Plaintiffs' Final Approval Motion seeks final approval of the Settlement of this consumer class action—a settlement achieved after extensive investigation, motion practice and

discovery, including Defendants' multiple attempts to dismiss the action, discovery involving extensive data analysis by two experts, review of hundreds of thousands of pages of Defendants' internal documents, preparation for trial involving a dozen *in limine* motions, four mediations which did not result in settlement, and a full-day mediation overseen by David Geronemus, Esq. at JAMS—a highly regarded mediator with considerable experience in mediating consumer class actions—which resulted in the parties' negotiated Settlement Agreement, effective February 6, 2019.

8.  After the mediation with David Geronemus on April 24, 2018, which was followed by many months of intense follow-up negotiations between counsel, the parties reached agreement on the settlement amount and several other key injunctive relief provisions that make available substantial compensation to proposed Class members of up to $25,460,542.66 (as of June 30, 2019) and includes approximately $12,500,000 in programmatic relief.  In the many months following the mediation the parties negotiated the remaining terms of the settlement with Mediator Geronemus's assistance, which are memorialized in the Settlement Agreement, as well as the Class Notices approved by this Court on February 20, 2019 (ECF No. 417).  At all times, the Parties' negotiations have been vigorous, adversarial, and at arms' length.

9.  As described in the Settlement Agreement, each Class member who has submitted a valid claim is entitled to a refund benefit of up to seventy-seven percent (77%) of all premiums paid that have not been previously refunded.

10. In arriving at this favorable result, Class Counsel considered the uncertain outcome and risks of the litigation, including Defendants' ability to pay, as well as the difficulties and delays inherent in this complex, multi-state class action litigation and the likelihood of protracted appeals.  Class Counsel further acknowledge that both certification of the Class and ultimate

success on the merits remain uncertain. Plaintiffs believe that their claims have merit and that the evidence developed to date supports their case. Despite the strengths of their case, Plaintiffs are mindful of Defendants' ongoing challenges to proof, and their renewed defenses to the claims in this matter. Plaintiffs further recognize and acknowledge the further expense and length of time that proceedings necessary to prosecute this matter through trial, post-trial proceedings, and likely appeals would entail. After almost six years of litigation and analysis of discovery and the pertinent case law, as well as multiple mediations and arms' length negotiations, Class Counsel has concluded that the Settlement set forth in the Settlement Agreement is fair, reasonable, and adequate, and that the Settlement confers substantial benefits upon, and is in the best interests of, Plaintiffs and the Class.

11.     Defendants have consistently maintained that their conduct was lawful. Nevertheless, they likewise recognize the risks inherent in litigation, the significant expense associated with defending a class action, the costs of any appeals, and the continued disruption to their operations arising out of this litigation. Defendants also recognize the risk that a trial on class-wide claims might present.

**II.     Plaintiffs' Complaint, Discovery, and the Parties' Settlement Negotiations**

12.     On August 6, 2013 Plaintiffs Margarita Delgado and William Sheppard filed a Class Action Complaint against Defendants in the United States District Court for the Eastern District of New York on behalf of themselves and all others similarly situated, alleging that they (a) were enrolled in Cross Country home warranty plans without their knowledge through Defendants' use of a check solicitation as a marketing method, and (b) continued to be billed for home warranty plans for almost a year without their knowledge, through Defendants' practice of billing for the plans via Ocwen's monthly mortgage statements.

4

13. The Complaint sought monetary relief and treble damages, interest, an order enjoining Defendants' improper practices, and attorneys' fees and costs.

14. Discovery taken in the case demonstrates that when Margarita Delgado and William Sheppard first filed suit in the summer of 2013 Defendants were in the midst of sending out millions more check solicitations, which mailings were immediately halted as a direct result of this lawsuit.

15. Plaintiffs' counsel also engaged in massive and hard-fought discovery during the multi-year pendency of this litigation; indeed, the parties' numerous disputes led to a remarkable 30+ motions and 35+ conferences and hearings before Magistrate Judges Tiscione and Levy. From the start of this litigation, there was little consensus by the parties on any aspect of the case. Disputes over ESI and word searches alone consumed months of the parties' and the Court's time and involved IT experts from both sides. The parties litigated vigorously every step of the way, from disputes over the scope of discovery, to the arbitrability of certain Plaintiffs' claims, to complex questions of privilege, admissibility, and class certification. Both sides served lengthy and multiple rounds of document requests and interrogatories, leading to numerous conferences first among counsel and then with the Court to resolve disputes over the number, propriety, and import of the requested discovery. All told, Defendants made over 75 separate document productions resulting in Plaintiffs' reviewing over 400,000 pages of documents, which consumed vast amounts of attorney time. Plaintiffs and Defendants also exchanged detailed letters identifying alleged discovery deficiencies and met and conferred on countless discovery issues.

16. As part of their investigation and in preparation for their class certification motion and for a trial on the merits, Plaintiffs also engaged the services of two experts—Dr. Alexander

Vekker, University of Pennsylvania Professor of Economics and Statistics, and Dr. Itamar Simonson, Professor of Marketing at the Stanford University Graduate School of Business—who provided their expertise on the statistical assessment of Defendants' data productions and consumer behavior, respectively. Defendants engaged the services of Dr. Larry Chiagouris, Professor of Marketing at Pace University's Lubin School of Business, as a rebuttal expert.

17. Throughout the 5+ years of litigation, the parties also engaged in heavy deposition practice, with Plaintiffs deposing eleven of the central executives and personnel involved in Defendants' check marketing and issuing twelve third-party subpoenas, and Defendants deposing 26 Plaintiffs, plus Plaintiffs' marketing expert Dr. Simonson, and a former CCHS employee who submitted a declaration supporting Plaintiffs' claims.

18. Defendants also attempted two rounds of dismissal motions in this case. After the Court denied in large part Defendants' first dismissal motion in September 2014, CCHS enacted a refund policy for any check customers who never used the plans and called CCHS to complain. (Defendant CCHS later revoked this refund policy). In May 2015 Defendants also attempted to compel many Named Plaintiffs to arbitrate their claims based on arbitration clauses in certain pamphlets allegedly mailed to these consumers after they negotiated Defendants' solicitation checks. After the Court denied Defendants' arbitration motion without prejudice pending a trial on the issue of whether these Plaintiffs' signatures on the checks were obtained through fraud (scheduled for April 2017), the parties engaged in exhaustive trial preparation, exchanging lengthy pre-trial submissions as well as briefing twelve *in limine* motions. However, on the eve of trial CCHS withdrew its arbitration motion and the parties thereafter agreed to forego trial on the motion to compel with Plaintiffs reserving their right to move for sanctions on an issue that had consumed nearly two years of litigation and motion practice. The Court ultimately granted

6

the withdrawal and authorized additional dispositive motion practice. On June 29, 2017, Defendants jointly filed a Motion to Dismiss Plaintiffs' Fourth Amended Complaint and Strike Class Allegations, which the Court later denied in substantial part.

19. Concerning the settlement negotiation process, the parties participated in their first mediation on May 9, 2016, with Rodney Max of the ADR firm Upchurch Watson White & Max. The parties exchanged thousands of documents and other data to assess the claims and defenses and to calculate damages in advance of the mediation. Using the documents provided by Defendants and Plaintiffs' counsels' research and investigation, and in consultation with their experts, Plaintiffs prepared and submitted a comprehensive mediation brief. In support of their position, Defendants also submitted a mediation brief. After failing to reach agreement at the initial mediation, the litigation resumed. The parties later held three additional mediation sessions with Magistrate Judge Tiscione—on October 11, 2016, February 15, 2017, and March 22, 2017—which similarly concluded without an agreement.

20. On March 16, 2018, after multiple submissions and hearings on Plaintiffs' motion for sanctions against CCHS related to ESI matters, Judge Tiscione granted Plaintiffs' motion. Thereafter, on April 24, 2018, with supplemental class certification briefing underway and almost five years after the lawsuit commenced, the parties participated in a fifth mediation, this time before David Geronemus of JAMS. At the conclusion of the mediation the parties reached a memorandum of understanding. Thereafter, the parties continued with forceful and protracted negotiations over the material terms of the settlement, resulting in the Settlement Agreement executed and effective on February 8, 2019. At all times, the negotiations were hard-fought, adversarial, and at arm's length.

**III.     The Notice and Claims Process**

21.     The Claims Administrator selected by the parties disseminated the Class Notice on April 19, 2019, followed by a Reminder Notice on May 17, 2019, pursuant to the Court's Preliminary Approval Order.[1]  In designing the Notice program the parties were careful to adhere to best practices that have proven successful in similar consumer class actions, including sending a simple notice that directed Class members to quickly place a claim online, including via their smartphones.

22.     On April 18, 2019 the Claims Administrator established a settlement website which was easy to access and navigate, highlighted the claim submission process, and was search engine optimized so that Class members could easily search for it if they did not have the web address in front of them (which address was prominently displayed on the postcard).  The parties were also mindful of the problems associated with providing too much information on the website.

23.     Regarding the claims process itself, the website's home page prominently directed Class members to file claims and Class members were not required to provide any proof (such as proof of payment) to claim settlement benefits.

24.     Before the Class Notice was disseminated, the parties also devoted substantial resources to quality assurance which included multiple edits to the website, design enhancement, and simplifying the steps for claim submission.  This quality assurance resulted in a straightforward and intuitive claims process.

25.     Class Counsel also took an array of steps to ensure that the Class was provided

---

[1] The Claims Administrator has informed Class Counsel that as of June 21, 2019, 4,546 notices were returned as undeliverable, and after updating for new addresses, approximately 3,297 were re-mailed.

the best notice practicable, including fielding hundreds of communications—over 1,800 calls and 50 emails—from Class members who had questions about how to submit claims and about the settlement process. Many of these Class members informed Class Counsel that they were glad that legal action had been taken to recover what they felt were fraudulent charges by Defendants, and they expressed strong approval of the Settlement. In addition, although not required by the Settlement Agreement Class Counsel secured Defendants' cooperation to set up a designated hotline to field calls from Class members seeking to cancel their enrollment.

26. The Settlement Administrator has advised that as of the Claim Deadline—June 18, 2019—10,454 claims had been filed, with an extraordinary **23.16%** of Class members electing to share in the available benefits.[2] See accompanying Supplemental Declaration of Heffler Claims Group Administrator Joseph F. Mahan dated July 19, 2019, filed simultaneously with Plaintiffs' final approval motion. Notably, there have also been no objections to the Settlement to date, and no class members have opted out of the Settlement. *Id.* I have over three decades of class action experience and both the very high participation rate and the complete absence of objections and exclusions is an unmistakable sign of the Class's overwhelming support for the Settlement. Indeed, of the dozens of class actions I have been involved in, this settlement stands out as one of the most successful.

27. The Settlement Administrator further informed counsel that as of July 5, 2019, approximately 3,659 Class members had called the Administrator's toll-free number with questions related to the Settlement. *Id.* To date we have not received any reports from the Administrator as to any complaints from Class members about the Settlement terms, proposed service awards, or

---

[2] Additionally, a number of Claims were filed after the claims period expired, and Class members also contacted Class Counsel to see if late Claims could be accepted, and the parties have been negotiating whether certain additional late Claims will be accepted.

9

requested attorneys' fees.

28. My firm also responded to and returned over 1,800 calls from Class members. To date, Class Counsel has not received communications from any Class members expressing reservations with any of the terms of the Settlement. Such a positive reaction is quite rare in my over 30 years of class action experience.

29. Further, many Class members expressed a desire to cancel their enrollment in the Cross Country home warranty program once they were informed (via the Notice) that they were in fact enrolled.

30. The Settlement represents the substantial result of six years of hard-fought litigation. The Settlement made available to Class members (a) refunds of 77% of the premiums collected, approximately $25,460,542.66, and (b) injunctive relief to current CCHS customers who never used a plan, i.e., informing them that they can cancel if they wish (valued at more than $3,000,000). The litigation also resulted in Defendants stopping check solicitation marketing, which Defendants reasonably valued at $9,500,000. The settlement's gross value is $39,898,431.48.

31. Throughout the litigation, my firm and our co-counsel have been proactive in seeking to protect the interests of prospective Class members and, ultimately, the Class.

**IV.     Wittels Law Attorneys Are Experienced in Consumer Class Actions**

32. Wittels Law attorneys enjoy a very favorable reputation in the area of complex and class action litigation.

33. Wittels Law attorneys have successfully litigated complex class actions in federal and state courts all across the country, have been appointed class counsel in dozens of class action

cases, and are highly experienced and knowledgeable in the area of complex and class action litigation.

34. I have more than thirty years of class action experience and was one of the lead attorneys that obtained a record $250 million punitive damages award by a jury in the Southern District against Novartis Pharmaceuticals for gender discrimination in pay, promotion and pregnancy by the Company against its women sales representatives. An overview of my firm's more significant past and present cases can be found in the firm's resume attached hereto as **Exhibit B**.

### V. Attorneys' Fees and Costs

35. Wittels Law has committed significant resources to the intense six-year investigation and litigation of this case, brought viable claims and amended such claims as needed to defeat multiple dismissal motions, and aggressively pursued discovery to establish the evidence necessary to prevail on the merits in the event that this case had not settled.

36. A chart summarizing Wittels Law's billable time performed on behalf of Plaintiffs and the Class in this case is attached hereto as **Exhibit C**. Altogether, Wittels Law devoted over 15,136 hours in the more than six years they spent investigating, prosecuting, and settling this case. In total with our co-counsel, the three law firms that prosecuted this case spent more than 16,034 hours on this matter.

37. The hours reported are reasonable for a case of this complexity and magnitude and were compiled from time records maintained by each attorney participating in the case. Based on my knowledge and experience, the rates charged by Wittels Law attorneys are within the range of rates normally and customarily charged in New York by attorneys with similar qualifications and experience in cases of this kind, and the time spent was reasonable and necessary to achieve the excellent result in this case.

11

38. Before submitting this declaration, I carefully scrutinized Wittels Law's time records and eliminated or reduced several entries based upon my billing judgment. In addition, Class Counsel is not billing for certain time worked on this matter by junior attorneys and is not billing for *any* paralegal or staff time, although over the six year course of this litigation these individuals' efforts were substantial and contributed to the success of this action.

39. The total number of hours spent by Wittels Law's attorneys alone rendering services through the date of this declaration multiplied by their current or last hourly rate equals $10,825,087.

40. The requested attorneys' fees are not based solely on the extensive time and effort thus far expended but are also meant to compensate Class Counsel for time that they will be required to spend administering the Settlement in the future. Class Counsel anticipate spending additional time with respect to continuing communications with the Settlement Administrator in administering the Settlement, and responding to Class members' inquiries, especially after checks are issued. Moreover, the additional injunctive component of the Settlement, which calls for Defendants to send out a negotiated and previously court-approved Notice to Current Enrollees of their right to cancel their plans (to be sent 30 days after the effective date of Final Approval), will likely engender more communications to Class Counsel. In Class Counsel's experience, administering class settlements of this nature requires additional post-Fairness Hearing attorney and staff time.

41. In total with our co-counsel, the aggregate lodestar of the three law firms that prosecuted this matter for Plaintiffs and the Class amounts to $11,384,411. As described more fully in Plaintiffs' accompanying Memorandum of Law, Plaintiffs' counsel are not asking for a multiplier, although as can be seen from the six years of strenuous litigation which eventually

yielded this remarkable result, this is certainly a case that would have warranted a significant multiplier had Plaintiffs' lodestar not exceeded the requested fee. Further, our co-counsel reduced the number of compensable hours through their exercise of billing judgment and their decision to forego payment for hours worked by some junior attorneys and paralegals.

42. In Class Counsel's experience, law firms that represent plaintiffs in contingency consumer fraud matters in this Circuit typically charge their clients at least one third (33.33%) of their gross recoveries, exclusive of litigation expenses, and as set forth in the accompanying Memorandum of Law many courts in this District and elsewhere routinely approve one-third fee awards. Here, Class Counsel together are requesting one-third of *only* the monetary value obtained for Class members (i.e. the $25,460,542.66 in available refunds + the $1,637,888.82 directly refunded to Class members as a result of Plaintiffs' lawsuit), yielding a total fee award of $9,032,810.49.

43. The requested fee does not account for more than $12,500,000 in value of the significant equitable relief Class Counsel obtained in this litigation, or the approximately $300,000 Defendants have agreed to pay in providing notice to the Class. If the value of these additional sums obtained from Class Counsel's prosecution of this lawsuit is factored into the $39,898,431.48 gross settlement benefit fund created by Class Counsel—as is customary in calculating class action contingency fees—the requested fee represents 22.63% of the total recovery. The requested fee is thus below comparable sums awarded in other class actions in this Circuit.

44. The proposed fee and expense award was disclosed in multiple rounds of Class notice. In addition, Class Counsel's requested fee—for the more than 25 lawyers and staff from the three law firms that prosecuted this case for six years without any guarantee of

13

compensation—is 20.66% less than the fair-market value of Plaintiffs' counsels' lodestar. This represents a substantially discounted charge for the services Class Counsel rendered to Class members and consumers at large on a purely contingency basis.

45. Class Counsel undertook to prosecute this action without any assurance of payment for their services, litigating this case in the face of significant risk. Consumer fraud class actions are, by their very nature, complicated and time-consuming, and attorneys representing clients in these types of class actions inevitably must be prepared to make a tremendous investment of time, energy, and resources. Due also to the contingent nature of the customary fee arrangement, attorneys must be prepared to make this investment with the very real possibility of an unsuccessful outcome and no fee of any kind. Indeed, the facts and circumstances of this case presented numerous and substantial hurdles to a successful recovery on behalf of all Class members. Class Counsel stood to gain no compensation in the event the case was unsuccessful.

46. To date, Class Counsel has worked without compensation of any kind, has expended almost $500,000 in out of pocket litigation expenses, and their compensation is wholly contingent upon the result achieved.

47. The majority of Class Counsel's cases are taken on pure contingency, and Class Counsel cover all out-of-pocket costs and expenses incurred. Thus, when Class Counsel spends time on contingency matters, they do so at significant cost and risk for the firm. Class Counsel frequently turns away cases, including hourly litigation matters and other contingency matters, in order to enable its attorneys to work on pending contingency matters, primarily class or collective actions.

48. Payment of Class Counsel's attorneys' fees and expenses will also in no way diminish the recovery of Class members, which is another factor confirming the fairness of the Settlement. If the Court were to deny the requested award for fees and expenses, in whole or in part, none of the requested fees or expenses would be paid to the Class. To date Class Counsel has not received any reports from the Claims Administrator or from the Class members who contacted our firm as to any complaints about the proposed attorneys' fees and expenses.

49. As part of the Settlement, Defendants have also agreed to pay up to $600,000.00 to reimburse Class Counsel for their litigation expenses. My firm spent $493,134.76 in litigation expenses, and together all three law firms had $499,622.26 in expenses, with the bulk going toward experts, IT data hosting, and the high costs associated with the 38 depositions in 9 states throughout the country plus the Capitol: New York, Florida, California, South Carolina, Washington, Oregon, Arizona, Pennsylvania, Georgia, and Washington, D.C. Based on my knowledge and experience, all of these expenses were necessary and reasonable. Wittels Law's expenses are summarized in **Exhibit D**. A table summarizing all Plaintiffs' counsel's cumulative expenses is also included in Exhibit D.

50. Class Counsel is based in Armonk, NY and our practice focuses on complex consumer protection and employment class action litigation. In our work we survey the status of consumer protection and employment class action litigation in the federal courts across the nation.

51. Complex, multi-state consumer protection class actions are not commonly brought in this District, and when they are class counsel is located in the Southern District or elsewhere. At all times this action was defended by out-of-district counsel and for the last three years it was primarily defended and negotiated by Morrison & Foerster LLP. Class Counsel's requested hourly rates are both similar to rates awarded in other complex class actions in this

15

District and have also been repeatedly approved by courts in this District and beyond in similar litigations.

52. Lead Named Plaintiffs Margarita Delgado and William Sheppard chose to retain our law firm to prosecute this matter because of our experience, proximity to Brooklyn, and because of the lack of capable Brooklyn counsel. *See* attached Joint Declaration of Co-Lead Plaintiffs Margarita Delgado and William Sheppard attached hereto as Exhibit G.

53. The Lead Named Plaintiffs' choice to seek legal services outside of this district has stood the test of time. A survey conducted this week by the attorneys at my firm of "Top Rated Class Action & Mass Torts Lawyers in Brooklyn, NY" on the Super Lawyers website demonstrates that ***none*** of the first 358 of 447 featured law firms contains a Brooklyn consumer class action specialist, and that only two of the 447 results display offices in Brooklyn (the Richman Law Group is #359, and the Stoll Glickman law firm is #409). *See* "Top Rated Class Action & Mass Tort Lawyers in Brooklyn, NY," https://attorneys.superlawyers.com/class-action-and-mass-torts/new-york-metro/brooklyn/ (last visited July 18, 2019). Stoll Glickman, however, (https://www.stollglickman.com/) does not specialize in class actions. The Richman Law Group (https://richmanlawgroup.com/) has expertise in consumer class actions, but is incorrectly listed as having a Brooklyn office. Like all other qualified consumer class action firms, Richman Law Group does not have offices in this District. According to the Richman Law Group's website, that firm maintains offices in Manhattan, San Francisco, and Washington D.C.

VI. **Named Plaintiff Service Awards**

54. As part of the Settlement, the parties negotiated service awards for the 31 Named Plaintiffs for their contributions to the litigation (up to a total of $310,000). The requested payments for each of the 31 Named Plaintiffs range from $1,000 to $20,000. The only two

16

individuals who will receive a $20,000 service award are the original Named Plaintiffs Margarita Delgado and William Sheppard, who spearheaded the litigation as the sole Plaintiffs in August 2013. Twenty-two Named Plaintiffs who traveled to New York or other locations around the country and appeared for deposition, providing invaluable support through documentary evidence and testimony in presenting the class claims, will receive $11,000 each. The remaining seven Named Plaintiffs will receive between $1,000 and $6,000 for assisting Class Counsel in providing documents responsive to Defendants' demands as well as responding to interrogatories. A chart detailing the requested service awards is in **Exhibit E**.

55.     These service awards, which courts typically award Plaintiffs who contribute to a litigation's success, are intended to recognize the time and effort devoted by the Plaintiffs in assisting counsel and facilitating a successful result. In our case, Plaintiffs submitted themselves to a lengthy search of their files and ESI and spent many hours each conferring with counsel on their experiences with Defendants. Plaintiffs reviewed and discussed with Counsel the pleadings, discovery demands, discovery responses, and memoranda of law.

56.     The requested service awards are comparable to sums awarded in other class actions in this Circuit and have been disclosed to the Class. Moreover, the service award request was subject to arm's length negotiations between the parties. To date we have not received any reports from the Claims Administrator or from the Class members who contacted our firm as to any complaints about the proposed service awards.

## **EXHIBITS**

57.     Attached as **Exhibit A** is a true and correct copy of the parties' proposed final Order approving the Settlement and dismissing this case with prejudice.

58.     Attached as **Exhibit B** is a true and correct copy of the firm resume of Wittels Law.

59. Attached as **Exhibit C** is a true and correct copy of the chart summarizing Wittels Law's billable time performed on behalf of Plaintiffs and the Class in this case.

60. Attached as **Exhibit D** is a true and correct copy of the chart summarizing Wittels Law's expenses incurred in prosecuting this matter.

61. Attached as **Exhibit E** is a true and correct copy of the chart summarizing the service awards Defendants have agreed to pay.

62. Attached hereto as **Exhibit F** is a true and correct copy of the Declaration of Daniel Hymowitz.

63. Attached hereto as **Exhibit G** is a true and correct copy of the Declaration of Co-Lead Plaintiffs Margarita Delgado and William Sheppard.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: July 19, 2019
       Armonk, New York

                                    Respectfully submitted,

                                    */s/ Steven L. Wittels*
                                    Steven L. Wittels
                                    **WITTELS LAW, P.C.**
                                    18 Half Mile Road
                                    Armonk, New York 10504
                                    Telephone: (914) 319-9945
                                    Facsimile: (914) 273-2563
                                    slw@wittelslaw.com